# Exhibit C

1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF DELAWARE

4    Case No. 03-1153-GMS            ORIGINAL

5    ----------------------------------x

     HONEYWELL INTERNATIONAL, INC. and

6    HONEYWELL INTELLECTUAL PROPERTIES, INC.,

7                 Plaintiffs,

8

9         - against -

10

11   HAMILTON SUNDSTRAND CORPORATION,

12                 Defendant.

     ----------------------------------x

13                 January 26, 2006

                   9:01 a.m.

14

15

16        Videotaped Deposition of MELVIN

17   GARNER, taken by Defendant, pursuant to

18   Notice, held at the offices of Kirkland &

19   Ellis, LLP, 153 East 53rd Street, New

20   York, New York, before Todd DeSimone, a

21   Registered Professional Reporter and

22   Notary Public of the State of New York.

23

24                     .

25

5

GARNER

1

2      Q.        How many depositions have you

3  taken?

4      A.        Probably over a hundred.

5      Q.        When was the last time you took

6  a deposition?

7      A.        Probably a year ago.

8      Q.        As a lawyer, do you have a duty

9  to be an advocate of your client's

10  position?

11      A.        When I'm representing a client

12  as a lawyer, yes.

13      Q.        Is Honeywell your client?

14      A.        Yes, I have been retained by

15  Honeywell as an expert witness in this

16  case.

17      Q.        Are you a patent lawyer?

18      A.        Yes, I am.

19      Q.        Do you consider yourself to be

20  an expert in the patent law?

21      A.        I consider myself an expert and

22  I'm here testifying as an expert in the

23  operations of the Patent Office, the way

24  patent attorneys deal with the Patent

25  Office, and to help the court, to the

6

GARNER

1

2    extent I can, in interpreting the file

3    history of the cases involved in this

4    litigation.

5        Q.        Are you also an expert in

6    patent law?

7                MS. STEVENSON:  Objection.

8    Asked and answered.

9        A.        I'm not here testifying as an

10   expert in patent law.  The judge will

11   determine what the law is.

12       Q.        Am I right that you are also a

13   litigator?

14       A.        Yes, I have litigated.

15       Q.        And you've been lead counsel in

16   approximately 30 litigations?

17       A.        Yes, that's correct.

18       Q.        And in that role you are acting

19   as an advocate on your client's behalf?

20       A.        That's right.

21       Q.        Am I right that you haven't

22   been employed as an electrical engineer in

23   over 30 years?

24       A.        That's probably accurate.

25       Q.        Do you have any -- well, what

7

1                    GARNER

2    was your last full-time employment as an

3    engineer?

4        A.      As an engineer it was with a

5    company called Sequential Information

6    Systems.

7        Q.      When did that end?

8        A.      Just before I went to Bell

9    Labs.  So it probably ended in 1971.

10             THE VIDEOGRAPHER:  Excuse me,

11   Counsel, can we go off the record?  I'm

12   experiencing technical difficulties.

13             MR. LIND:  Okay.

14             THE VIDEOGRAPHER:  The time is

15   9:05 a.m.  We are going off the record.

16             (Recess taken.)

17             THE VIDEOGRAPHER:  The time is

18   9:07 a.m.  We are back on the record.

19   BY MR. LIND:

20       Q.      Sir, you don't have any

21   experience working with control systems

22   for compressors on gas turbine engines,

23   correct?

24       A.      That's correct.

25       Q.      Has any of your work experience

8

GARNER

1

2    involved gas turbine engines?

3        A.        No.

4        Q.        How about has any of your work

5    experience involved compressors?

6        A.        By "work experience," do you

7    mean my work experience as an engineer or

8    as a patent attorney?

9        Q.        Let's start with engineering.

10   Has any of your work experience as an

11   engineer involved work with compressors?

12       A.        No.

13       Q.        Has any of your work experience

14   as an engineer involved work with

15   diffusers?

16       A.        Could you repeat the question?

17       Q.        Has any of your work as an

18   engineer in your life involved working

19   with diffusers?

20       A.        No.

21       Q.        Has any of your work involved

22   work with surge control systems?

23       A.        That is as an engineer?

24       Q.        As an engineer.

25       A.        No.

9

GARNER

1

2      Q.        Has any of your work as a

3  patent attorney involved working with

4  surge control systems?

5      A.        Except for this case, no.

6      Q.        Has any of your work as a

7  patent attorney involved working on

8  diffusers on compressors?

9      A.        I'm not sure about diffusers on

10 compressors.  Potentially I have worked on

11 that as a patent attorney.

12     Q.        What matter?

13     A.        I have a client who makes

14 refrigeration equipment.  I have either

15 prosecuted or supervised the prosecution

16 of a number of patent applications related

17 to their refrigeration technology, which

18 includes compressors and various parts.

19 Whether or not a diffuser was one of those

20 parts, I'm not clear.  I don't recall.

21     Q.        You don't recall any prior work

22 as a patent attorney working with

23 diffusers, correct?

24     A.        That's correct.

25     Q.        Did you ever take any courses

15

```
                        GARNER
 1
 2       A.        That's right.
 3       Q.        Do you understand the things
 4   shown in Figure 4 of the '893 patent to be
 5   the electrical control circuitry that is
 6   part of the dispute or the equivalents
 7   dispute in this remand proceeding?
 8       A.        Again, I haven't prepared nor
 9   is it my responsibility to figure out what
10   the dispute is.  So to that extent I can't
11   answer.  I do know that the diagram on
12   Figure 4 shows the way that the control
13   system -- shows part of the operation of
14   the control system.  It is my
15   understanding that that is part of the
16   dispute.
17       Q.        As to compressors and
18   diffusers, you are not a person of
19   ordinary skill in the art though, correct?
20       A.        That's correct.
21       Q.        Have you ever seen -- your
22   specialty in your resume, you talked about
23   having a specialty in video circuits,
24   cellular telephones, medical products,
25   office products, and computer hardware and
```

17

```
                    GARNER
```

1    Attachment A.

2    Q.      If you turn to page 5 of your

3    resume at Attachment A of Exhibit 48, in

4    the first full paragraph it says

5    "Mr. Garner has also appeared as an expert

6    witness in key trials throughout the

7    United States."

8              What do you mean by "key

9    trials"?

10    A.      They are the same -- the trials

11    that are referred to in the expert report

12    itself.  I believe I can find the

13    paragraph for you.  Paragraph 9.

14    Q.      Why did you consider the trials

15    in paragraph 9 of your expert report to be

16    key trials?

17    A.      They were interesting,

18    especially the U.S. Surgical one is

19    frequently cited for various propositions.

20    Q.      So you associate "key" with

21    interesting?

22    A.      Yes.

23    Q.      Have you ever worked at the

24    United States Patent and Trademark Office?

18

GARNER

1

2      A.        I have not.

3      Q.        Have you ever been a patent

4  examiner?

5      A.        No, I have not.

6      Q.        Therefore, you've never been a

7  chief patent examiner either, right?

8      A.        That's true.

9      Q.        Have you ever been a judge on

10  the Board of Patent Appeals?

11      A.        No, I have not.

12      Q.        Is your compensation -- you are

13  getting paid $625 an hour for your work in

14  testifying here; is that right?

15      A.        Yes, for my work in studying

16  the files as well as for today's work.

17      Q.        If you were to testify at

18  trial, would that rate be the same or do

19  you have a higher rate for testifying at

20  trial?

21      A.        It is the same.

22      Q.        I'm going to show you what I've

23  marked as Exhibit 49.

24                (Hamilton Remand Exhibit 49

25  marked for identification.)

26

1                    GARNER

2    number of years?

3        A.        I'm here to offer my opinion

4    about what I believe reasonable patent

5    attorneys have done and would do under

6    certain circumstances in practicing before

7    the Patent Office.

8        Q.        And that is based on your role

9    as a lawyer practicing before the Patent

10   Office for a number of years, correct?

11               MS. STEVENSON:  Objection,

12   vague.

13       A.        It is based on my experience as

14   a lawyer practicing before the Patent

15   Office, as well as my experience in

16   teaching courses on the subject, also my

17   experience in working with others within

18   my firm and other firms and in bar

19   associations dealing with the same issues.

20       Q.        Do you agree that in your

21   experience in prosecuting patents the file

22   histories or prosecution histories for the

23   two patents in suit are relatively

24   uncomplicated?

25               MS. STEVENSON:  Objection,

27

                    GARNER
1

2   vague.

3       A.      Yes.

4       Q.      And they are some of the

5   shorter file histories I guess that you

6   might have dealt with over the years,

7   correct?

8       A.      I've had shorter, but they are

9   certainly not extensive file histories.

10      Q.      And there were only a few

11  Office actions, maybe only one in the case

12  of one of the patents; is that right?

13      A.      Yes.

14      Q.      Often patents when they go

15  through prosecution can have, you've heard

16  the term tortuous file histories with lots

17  of Office actions and lots of back and

18  forth between the Patent Office and the

19  examiner, correct?

20      A.      That is certainly possible.

21      Q.      Can you name for me all of the

22  cases for which you've ever prepared an

23  expert report?

24      A.      I probably can't do that, but I

25  can give you -- in the three cases that

45

GARNER

1

2    interest to me.  Also -- well, I can't

3    think of any additional things that we

4    talked about during that first call.

5        Q.        When Honeywell hired you, what

6    did you understand your assignment to be

7    in this case?

8        A.        To review the file history and

9    to see whether or not there was any

10   information within the file history and

11   some selected pleadings that I was given

12   which would support an argument for

13   overcoming the presumption on the three

14   bases that you mentioned earlier.

15       Q.        How long did it take you to

16   review the file histories for these two

17   patents?

18       A.        I really don't know because I

19   didn't do them -- you know, I have other

20   work and I didn't like set aside several

21   days and just do this.  So I would read a

22   little bit and put it aside and do

23   something else.  So it was over the course

24   of maybe a week or so.

25       Q.        But just to review the file

62

GARNER

1
2  you, that would have been submitted after
3  your report.
4     A.       No.   He is the technical expert
5  for Hamilton?
6     Q.       That's correct.
7     A.       No, I haven't.
8     Q.       Did you review any depositions
9  in this case in coming to your opinions?
10    A.       Unless they are listed here, I
11 haven't.
12    Q.       Just to confirm, there are no
13 depositions listed in your list of
14 materials reviewed, correct?
15    A.       Yes.
16    Q.       Did you talk to anyone other
17 than Honeywell's lawyers in coming to the
18 opinions that you intend to offer in this
19 case?
20    A.       No.
21    Q.       Did you talk to anyone at
22 Honeywell in forming your opinions in this
23 case other than their outside counsel?
24    A.       No.
25    Q.       And you didn't talk to, for

64

GARNER

1
2     Q.      Have you done any work for
3     Honeywell prior to this case?
4     A.      Yes.
5     Q.      What work had you done for
6     Honeywell?
7     A.      Going back maybe ten years,
8     there was a company called Allied Signal,
9     and I think we prosecuted four or five
10    patent applications for Allied Signal.    I
11    guess towards the end of that prosecution
12    it was acquired by Honeywell.    So for a
13    short period of time Honeywell was the
14    client.
15    Q.      Back to people you talked to.
16            Am I right that you didn't talk
17    to any what you would call persons of
18    ordinary skill in the art of compressors
19    and diffusers in coming to the opinions
20    that you came to in this case, right?
21    A.      That's correct.
22    Q.      Do you know Mr. Goolkasian?
23    A.      No.
24    Q.      He is an expert that Hamilton
25    Sundstrand has submitted a report from; do

75

GARNER

1

2  equivalent having to do with inlet guide

3  vanes.

4    Q.    Is it your position that the

5  Festo estoppel does not apply here because

6  there was no prior art disclosing the use

7  of inlet guide vane positions cited by the

8  examiner?

9          MS. STEVENSON:  Objection.

10  Asked and answered.

11    A.    Or anything equivalent to it.

12  It just wasn't an issue, which is why it

13  is tangential.

14    Q.    When you say it wasn't an

15  issue, you are talking about inlet guide

16  vanes?

17    A.    Inlet guide vanes used to

18  control the equipment.  In the Chimie

19  case, dust and dust-free was an issue.

20  Maybe it wasn't an issue with respect to

21  this particular equivalent, but that

22  feature was certainly an issue.

23    Q.    Is it your position that the

24  Festo estoppel does not apply here because

25  there was no prior art cited by the

76

GARNER

1

2  examiner that disclosed the use of inlet

3  guide vane position in any way in a surge

4  control system?

5     A.       Yes, that it or anything else

6  equivalent to that, and not only as cited

7  by the examiner, as cited by the applicant

8  or as contained in the application itself.

9     Q.       And you limited your review to

10  the file wrapper, the prosecution history

11  for such prior art, correct?

12     A.       I believe that's the proper way

13  to do it, yes.

14     Q.       Is it your opinion that the

15  scope of Honeywell's surrender of subject

16  matter is limited to what was necessary to

17  avoid the prior art that was the basis of

18  the examiner's rejection?

19     A.       If I understand your question

20  right, the answer is no.

21     Q.       What didn't you maybe

22  understand about my question, you think?

23     A.       I thought you were saying that

24  the estoppel was limited to the change in

25  the claim.  And the change in the claim

82

                    GARNER

1

2  presumption, and then you have to do

3  something else to overcome the

4  presumption.

5      Q.      Did you make any assumptions in

6  forming your opinions in this case?

7              MS. STEVENSON:  Objection,

8  vague.

9      A.      Yes.

10     Q.      What assumptions did you make?

11     A.        Wherever in the opinion I say

12 "I have been informed" or "I understand,"

13 I'm assuming that I'm correct as opposed

14 to something based on what I personally

15 know.

16     Q.        And anytime you say "I

17 understand" or "I have been informed," we

18 know that that information or

19 understanding comes from Honeywell's legal

20 team, right?

21     A.        Potentially -- probably most

22 likely comes from Honeywell's legal team.

23 It might also come from an understanding

24 that I have of the law.  But because I'm

25 not here as a patent expert, I can just

83

GARNER

1

2  say that it is my understanding that this

3  is what the law is, and obviously the

4  judge in the case is going to tell

5  everybody what it really is.

6       Q.      Because you are not purporting

7  to be any better than Judge Sleet at

8  testifying or talking about what the law

9  is, correct?

10      A.      I'm conceding myself being

11 significantly less capable than the judge.

12      Q.      What opinions do you have that

13 depend on any of the assumptions that you

14 made?

15      A.      The foreseeability -- I should

16 turn to my report.  The foreseeability

17 reason for overcoming the presumption of

18 relinquishing subject matter is based on

19 the fact that, at least in the context of

20 controlling these units, use of the IGV

21 valve is after-developed technology and so

22 therefore it was not foreseeable.  That's

23 based on my reading of the record.  In

24 real life it may not be true.

25              But I believe that the courts

84

GARNER

1

2    instruct you to look to the file history

3    to make these kind of determinations,

4    because the Federal Circuit's primary

5    issue was to allow the public to be able

6    to know the metes and bounds of the

7    patent, and therefore they wanted you to

8    rely on the file history to be able to

9    tell, as opposed to, say, testimony from

10   the patent attorney or some other

11   extrinsic information.

12       Q.      So your understanding is that

13   the foreseeability analysis under Festo is

14   limited by I think you called it the metes

15   and bounds of what was in the file

16   history, correct?

17       A.      That's my understanding.

18       Q.      And when you said that -- you

19   made an assumption that IGV -- use of IGV

20   position was, quote, "after-developed

21   technology," that was an assumption that

22   you made based on your understanding of

23   the file history, correct?

24       A.      Yes.

25       Q.      And you did not go look outside

85

GARNER

1
2    the file history, correct?

3        A.        That's right.

4        Q.        Are there any other opinions

5    that depended on assumptions that you

6    made?

7        A.        I assumed that the description

8    of the Sundstrand lockout feature was as

9    described in the materials presented to

10   me.  I've got no independent information

11   about it.

12       Q.        You have no understanding of

13   how the APS 3200 so-called lockout feature

14   works based on study of technical

15   documents or discussions with people,

16   etc., right?

17       A.        That's correct.

18       Q.        When you say you relied on how

19   the working of this so-called lockout

20   feature was expressed in some of the

21   documents you looked at, are you talking

22   about Honeywell's expert reports?

23       A.        Actually, the expert reports of

24   both Honeywell and -- I'm sorry, not

25   expert reports -- yes, the older expert

88

GARNER

1

2    Q.        Well, Honeywell could have

3    fought that, right?

4    A.        Unsuccessfully.  It is a matter

5    of discretion.

6    Q.        But there is an appeal process

7    that you can go through in order to

8    challenge a ruling like that by an

9    examiner, correct?

10    A.        It is a petition process.

11    Q.        Instead of appealing the

12    examiner's decision, Honeywell chose to

13    agree and split the method claims and the

14    apparatus claims into two separate

15    patents, correct?

16    A.        Well, the examiner split them

17    and they went along with it.  They didn't

18    petition the examiner's decision.

19    Q.        So I understand how this works,

20    is that a prosecution formality rather

21    than any intent by Honeywell that the

22    method claims and the apparatus claims

23    should be contained in two separate

24    patents?

25              MS. STEVENSON:  Objection.

GARNER

1

2    Lacks foundation.

3         A.        It is a prosecution formality.

4    The fact that they filed them together

5    shows that they would like to have had

6    them together.  The examiner is the one

7    that made them split it into two.

8              It increases the costs to the

9    company to have two separate patents,

10   because now you have to pay maintenance

11   fees on two cases and you have to track

12   two cases and stuff like that.  But

13   because it is a discretionary thing, you

14   can't -- not you can't -- but you almost

15   never win if you challenge it.  So patent

16   attorneys have come to believe that once

17   you've gotten one of these kinds of

18   rejections, because there is no loss of

19   coverage, that you just go along with it.

20        Q.        You go ahead and split them up

21   in order to avoid the headache, so to

22   speak?

23        A.        The likelihood that you won't

24   be successful in contesting it, so you

25   might as well go ahead and do what the

                    GARNER

1
2  lockout feature.

3            In fact, part of my report says

4  that, I believe, you could make a very

5  legitimate argument that the claims that

6  exist would be directly infringed.  I

7  realize that the court has ruled that that

8  is not true, that there is no direct

9  infringement.  But I don't believe that a

10  reasonable attorney at the time wouldn't

11  be fairly comfortable in taking the

12  position that it is.

13     Q.      Is Honeywell represented by

14  reasonable attorneys?

15            MS. STEVENSON:  I object to the

16  form.

17     A.      Yes.

18     Q.      Do you understand, I think as

19  you put it, the court has ruled that there

20  was no literal infringement by Sundstrand

21  of the asserted patent claims?

22     A.      Yes.

23     Q.      And you understand that the

24  jury determined that there was no literal

25  infringement by Sundstrand of the

125

GARNER

1
2    think you called it after-developed
3    technology?
4       A.        After-arising.  Essentially
5    some technology that came into existence
6    after the prosecution.
7       Q.        Is it your opinion that the
8    need to redraft the asserted claims in
9    such a way that they would literally cover
10   the Sundstrand equivalent was not
11   foreseeable to a patent attorney in 1982
12   because a reasonable patent attorney
13   wouldn't have known how the court was
14   going to come out in the Festo cases?
15      A.        No.
16      Q.        You say in paragraph 43 of your
17   report, on page 13, that "reasonable
18   patent attorneys during that period," and
19   I think you are referring to 1982-'83,
20   correct?
21      A.        Yes.
22      Q.        You say "Reasonable patent
23   attorneys in 1982-83 would have presumed
24   that any amendment to the claims to avoid
25   prior art would have resulted in an

126

                            GARNER
1
2    estoppel giving up equivalents in the
3    range between the original scope and the
4    literal language of the amended claim,
5    only to the extent necessary to avoid the
6    prior art in under consideration by the
7    applicant and the examiner."
8              Do you see that?
9    A.        Yes.
10   Q.        That's your opinion, correct?
11   A.        Yes.
12   Q.        Is your opinion on the
13   foreseeability issue based on your belief
14   that reasonable patent attorneys in 1982
15   or '83 would have thought that they were
16   only giving up scope to the extent
17   necessary to avoid the prior art under
18   consideration by the applicant and the
19   examiner?
20   A.        You mean my current opinion?
21   Q.        Correct.
22   A.        No.
23   Q.        Is the basis for your current
24   opinion on foreseeability your belief that
25   back in 1982 or '83 reasonable patent

129

                        GARNER

 1
 2    thought about it.  But more specifically
 3    in this case there was nothing related to
 4    IGV that would have caused you to think
 5    about it.
 6        Q.      Can you tell me any case
 7    opinions that say that the mindset of a
 8    patent attorney back at the time of the
 9    amendment is relevant to the Festo
10    analysis?
11        A.      There is not specific language.
12    But what the court says is that
13    essentially there is a presumption and you
14    are entitled to go back and figure out
15    whether or not it is reasonable -- whether
16    or not the presumption is reasonable under
17    the circumstances.
18              So part of the value that I
19    hope I can bring to the court is that I
20    was prosecuting patents back during that
21    time period.  I would have looked at this
22    file history.  So can I divine what the
23    intent was, was there really an intent to
24    give up claim coverage or was there some
25    other intent.

133

1                       GARNER

2       Q.        Are you relying on Judge

3   Newman's dissent in Festo as part of your

4   opinions in this case?

5       A.        No, I'm not.

6       Q.        Is it your opinion that the

7   equivalent must not have been foreseeable

8   because it was not cited in any of the art

9   in the prosecution history?

10      A.        No, because your question

11  implies foreseeability beyond the

12  prosecution history.  As I said earlier,

13  my analysis has been limited to what's in

14  the prosecution history.  Somewhere I

15  discuss it that based on the prosecution

16  history it was not foreseeable.  Based on

17  the prosecution history there was no IGV.

18  Whether exterior to that it was known in

19  the art, I don't have any way of knowing

20  that.

21      Q.        You have not attempted to

22  determine whether the Sundstrand

23  equivalent was foreseeable to a person of

24  skill in the art at the time of the

25  amendments in light of prior art that was

134

GARNER

1

2    not before the examiner, correct?

3        A.        That's correct.

4        Q.        And do you have any basis in

5    the case law for limiting your analysis of

6    foreseeability to the art that was

7    disclosed in the prosecution history?

8        A.        I'm sorry, read that once more.

9        Q.        Do you have any basis in the

10   case law for limiting your analysis of

11   foreseeability issue to art that was

12   disclosed in the prosecution history?

13       A.        I can't quote it to you.  But I

14   do recall seeing case law decisions

15   essentially saying that -- it could be the

16   InstaForm case.  But, anyway, there are

17   cases that say you are to look to the

18   prosecution history to determine whether

19   or not you can overcome the Festo

20   presumption.  Because, for example,

21   Honeywell could get an affidavit from the

22   attorney prosecuting the case and say I

23   had no intention to do this or it was a

24   mistake or something like that.  So you

25   are more or less forced to rely upon

135

GARNER

1
2  what's in the prosecution history for your

3  excuse.  So that's why I relied only on

4  the prosecution history for my

5  determination.

6      Q.      Specifically to the issue of

7  foreseeability, can you, as you sit here,

8  cite any case that suggests that the

9  analysis on the foreseeability issue

10  should be limited to prior art that was

11  disclosed within the prosecution history?

12      A.      As I sit here, I cannot cite

13  you a case.

14      Q.      You refer again in paragraph 46

15  to there being no indication in the file

16  histories that the Sundstrand equivalent

17  was known in the art, right?

18      A.      Yes.

19      Q.      And then you say "Thus, it

20  represents a 'later-developed technology'

21  that would not have been foreseeable."

22          Do you see that?

23      A.      Yes.

24      Q.      But you agree that whether or

25  not the Sundstrand equivalent was a

GARNER

1

2     "later-developed technology" in real life

3     might depend on what was outside the

4     prosecution history and what was known to

5     people of skill in the art outside the

6     prosecution history, correct?

7          A.        That's correct.

8          Q.        You also say that at the time

9     of the amendment the lockout was not known

10    to the applicant or the examiner.  Do you

11    see that?

12         A.        Yes, as an equivalent of the

13    change, et cetera.

14         Q.        But you don't know whether at

15    the time of the amendment the so-called

16    lockout was known to others of ordinary

17    skill in the art, correct?

18         A.        That's correct.

19         Q.        Are you aware of anything that

20    changed in the relevant technology after

21    1982 that didn't exist before 1982 that

22    enabled Sundstrand to develop the

23    equivalent?

24         A.        The only information I have on

25    that issue is that Sundstrand did develop

153

```
1               GARNER
2   don't think you have the technical basis
3   for this --
4       A.      That's true.
5       Q.      You agree you don't have the
6   technical basis to be making these
7   infringement determinations, correct?
8       A.      Yes.
9       Q.      Nevertheless, I suppose relying
10  on some of the expert reports, you have
11  given an opinion that the Honeywell claims
12  as they issued literally are broad enough
13  to literally cover the Sundstrand
14  equivalent, correct?
15              MS. STEVENSON:  Objection to
16  form.
17      A.      As I understand it and as
18  expressed in the report.
19      Q.      Assuming you were right, if the
20  claims as issued would literally cover the
21  Sundstrand equivalent, then wouldn't also
22  those same claims with some minor
23  amendment also literally cover the
24  Sundstrand equivalent?
25              MS. STEVENSON:  Objection.
```

176

                    GARNER

1

2    were.

3        Q.      Are you familiar with a concept

4    in the patent law called the person of

5    ordinary skill in the art?

6        A.      Yes.

7        Q.      Do you agree that in the patent

8    law context the person of skill in the art

9    is presumed to have a broad universe of

10   knowledge of all of the prior art?

11       A.      Yes.

12       Q.      Do you agree that the knowledge

13   of the person of skill in the art in the

14   patent law context is not presumed to have

15   only the limited specific person's

16   personal knowledge?

17              MS. STEVENSON:  I object to the

18   form.

19       A.      Yes.

20       Q.      Do you agree that the person of

21   skill in the art in the patent law context

22   is not presumed to have only the limited

23   knowledge of the applicant?

24       A.      If you are talking about -- it

25   depends on how you are using a person of

185

```
1                      GARNER
2        Q.        Is it your understanding of the
3   law that where the equivalents or
4   equivalents to the equivalent were not
5   within the prior art, that the amendment
6   is tangential to the equivalent?
7        A.        I wouldn't say equivalents to
8   the equivalents, but things of the same
9   nature.  Again, it is like the Chimie case
10  where there were two different kinds of
11  granules or particles but the issue there
12  was dust, whether they were dust-free or
13  not dust-free.  If you amend your claims
14  to say that it is dust-free to get past
15  one, that is enough like the ones that are
16  the equivalent that the estoppel will
17  hold.
18       Q.        Is it your understanding of the
19  law that where the equivalents or things
20  like it are not within the prior art, the
21  equivalent is tangential to the amendment?
22       A.        Yes.  Well -- yes.
23       Q.        Did you look to see what types
24  of -- well, strike that.
25       A.        And by prior art, I mean prior
```

186

```
                        GARNER
1
2    art in the file history.
3        Q.        Within the file history,
4    correct.
5                  Describe for me an equivalent
6    to the IGV limitation that would have more
7    than a tangential relation to the reason
8    for Honeywell's amendment?
9        A.        Could you read that one back.
10       Q.        Describe for me an equivalent
11   to the IGV limitation that would have more
12   than a tangential relation to the reason
13   for Honeywell's amendment.
14       A.        Well, if there was some prior
15   art that showed an IGV valve, say, in a
16   different context but in a control context
17   and the examiner -- say the examiner just
18   cited it.  He could have just cited it or
19   he could have combined it, say, with the
20   references that he did use and make an
21   obviousness type rejection, saying here it
22   could be broader than there.  The effect
23   of doing that is to put the attorney on
24   notice that IGV valve use is under
25   consideration.  That puts him on notice
```

195

GARNER

1

2  submitted a new set of claims that could

3  have been narrower than the original

4  dependent claims or somewhere in between

5  the original dependent claims and the

6  original independent claims?

7      A.      They could have done that, yes.

8      Q.      Instead, what Honeywell chose

9  to do was accept the examiner's offer to

10  allow the original dependent claims in the

11  way that they were written, correct?

12     A.      That's correct.

13     Q.      Now, let's go on to other

14  reasons, which is your final area of

15  opinion, correct?  And that begins I

16  believe on page 16; is that right?

17     A.      Yes.

18     Q.      In your opinion is the other

19  reason that Honeywell should be able to

20  overcome the presumption of surrender that

21  a reasonable patent attorney would have

22  believed that the asserted claims already

23  literally covered the Sundstrand

24  equivalent?

25     A.      Yes.

196

                        GARNER

1

2      Q.      Is that the only other reason

3  that you have -- that you are opining on

4  as far as why the presumption can be

5  overcome on the other reason factor?

6      A.      I believe it is.

7      Q.      Confirm my understanding of

8  this.  Your position is that at the time

9  of the inlet guide vane amendment a

10  reasonable patent attorney in your view

11  would have known that the asserted claims

12  literally covered the Sundstrand

13  equivalent, correct?

14      A.      That's not exactly it, no.

15      Q.      Your opinion is that at the

16  time of the amendments a reasonable patent

17  attorney would have believed that there

18  was literal coverage already of the

19  Sundstrand product, correct?

20              MS. STEVENSON:  Objection.

21      A.      That's not exactly right.  I

22  could explain it if you would like.

23      Q.      Go ahead.

24      A.      What I'm saying is that if at

25  the time of the amendment the patent

199

GARNER

1

2    have some technical expertise, correct?

3        A.        Either that or have it provided

4    to you.

5        Q.        So when you come up with these

6    allegations of literal infringement under

7    the scope of the original patents, you are

8    basing it on what you've read in the

9    expert reports, correct?

10        A.        Primarily.

11        Q.        What else?

12        A.        I did have a technical question

13    and the details of it I don't recall, and

14    I asked counsel to check it with

15    Honeywell's expert to let me know whether

16    or not it was technically correct.  I was

17    told that it was.

18        Q.        So your technical conclusions

19    are based on the expert reports you read

20    plus some information you got from

21    Mr. Muller through Honeywell's lawyers?

22        A.        Yes.

23        Q.        Let's look at paragraph 56.

24    What do you know about the -- well, this

25    hypothetical reasonable patent attorney

201

GARNER

1

2    reasonable patent attorney that you've

3    created is going to be some patent

4    attorney with some degree in either

5    mechanical engineering, electrical

6    engineering, or civil engineering?

7        A.        It could be physics too.

8        Q.        Do you rely on any case decided

9    by any court in any jurisdiction in this

10   country for this hypothetical reasonable

11   patent attorney that you referred to a

12   dozen times in your report?

13               MS. STEVENSON:   Objection.

14   Asked and answered.

15       A.       No.

16       Q.        Going back to 56 now, paragraph

17   56, you say "The applicant reasonably

18   believed that all uses of IGV in the

19   control of the surge valve were covered."

20               Do you see that?

21       A.       Yes.

22       Q.        Did you actually talk to the

23   applicant to determine or to inquire about

24   your statement there?

25       A.        No.  In fact, it should say