# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR DISTRICT OF DELAWARE

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., and HONEYWELL INTELLECTUAL PROPERTIES INC., <br><br> Plaintiffs, <br><br> v. <br><br> HAMILTON SUNDSTRAND CORP., <br><br> Defendant. | Civil Action No. 03-1153-GMS |

### HAMILTON SUNDSTRAND CORP.'S RESPONSE TO HONEYWELL'S MOTION *IN LIMINE*, IN THE ALTERNATIVE, TO PRECLUDE TESTIMONY OF SUNDSTRAND'S PATENT EXPERT JOHN GOOLKASIAN

Honeywell's motion *in limine* to preclude expert testimony from HSC's patent expert John Goolkasian should be denied. Mr. Goolkasian, a patent attorney and former patent examiner, has offered an opinion in this case relating solely to the patent *practice* of patent prosecutors filing patent applications. Contrary to Honeywell's argument, both in its current motion and in its resistance to HSC's motion to limit the testimony of Honeywell's proposed "experts," Mr. Goolkasian does *not* intend to offer an expert opinion on either the patent *law* or the relevant technology in this case. Since those arguments form the only bases for Honeywell's motion to preclude Mr. Goolkasian's testimony, its motion should be denied.

HSC contends that Honeywell's '626 patent is invalid because, among other reasons, engineers at Hamilton Sundstrand invented and reduced to practice the claimed invention before Honeywell did. 35 U.S.C. § 102(g). More specifically, HSC engineers developed and reduced

to practice an APU capable of controlling acceleration using a starter/generator during engine start-up, as claimed in the '626 patent. (HAM018109-18112, PTX278 on Honeywell's preliminary exhibit list, attached as Ex. 1) HSC demonstrated this invention to Boeing in May 1992, nearly a year before Honeywell filed its '626 patent application. (HAM013998, PTX 276 on Honeywell's preliminary exhibit list, Ex. 2) Following its demonstration in May 1992, HSC continued to refine its invention, and in May 1993 filed a patent application on that invention.

Honeywell intends to argue that HSC's work is not a prior invention under § 102(g) because HSC "abandoned, suppressed or concealed" the invention. In support, Honeywell contends that the less-than-one-year period between HSC's reduction to practice (for the May 1992 demonstration to Boeing) and the first public disclosure of that invention (the May 13, 1993 patent application) is evidence of "abandonment, suppression or concealment." (*See, e.g.,* Stewart Report at 9, Ex. 3)

A flaw in Honeywell's argument is that a less-than-one-year period between reduction to practice and filing of a patent application is normal in patent practice. In support of this point, HSC has offered the expert testimony of John Goolkasian, a patent attorney who counsels clients on patent issues and prosecutes patents. Mr. Goolkasian has 25 years experience working at the Patent and Trademark Office as both a Patent Judge and Patent Examiner. Mr. Goolkasian's opinion in this case relates strictly to patent *practice* in terms of filing patent applications -- not patent law. Mr. Goolkasian has offered an opinion that "[a] busy attorney can take several months to draft a patent application" and that "it is unheard of in [his] experience to consider that an invention which was potentially demonstrated to the public was abandoned, suppressed or concealed when a patent application is filed" within one year of the reduction to practice.

(Goolkasian Report at 6-7, Ex. 4)  Honeywell's motion does not dispute either the relevance of this opinion, or Mr. Goolkasian's qualifications to offer it.

Contrary to Honeywell's misguided assertion, Mr. Goolkasian does not intend to offer an opinion on the patent law.  As set forth in HSC's motion *in limine* to limit the "expert" testimony of Honeywell's proffered experts, no experts in this case should be allowed to give opinions on the law or what the law allows.  (HSC's Motion *In Limine* to Limit Honeywell's Proposed "Expert" Testimony at 1-3)  That applies to Mr. Goolkasian as well as Honeywell's experts.[1] But Mr. Goolkasian does not intend to offer any such opinions.  Mr. Goolkasian's opinion as to patent practice is admissible under Federal Rule of Evidence 702.

In addition, Mr. Goolkasian does not intend to offer an opinion on the specific technology at issue in this case.  Rather, his opinion about the reasonableness of the time between reducing an invention to practice and filing a patent application is not dependent upon the particular technology at issue.

In conclusion, because HSC is not offering Mr. Goolkasian for the improper purpose of opining on: (1) patent law, and (2) the technology at issue, Honeywell's motion should be denied.

| May 10, 2005 | THE BAYARD FIRM |
| --- | --- |
| | */s/ Richard D. Kirk (rk0922)*<br>Richard D. Kirk<br>222 Delaware Avenue, 9th floor<br>P.O. Box 25130<br>Wilmington, DE  19899<br>(302) 655-5000<br>Attorneys for defendant<br>Hamilton Sundstrand Corporation |

---

[1] Should any of Honeywell's experts be permitted to testify regarding the law in this case, HSC's experts would expect to respond to such testimony.

587262v1

OF COUNSEL:
BARTLIT BECK HERMAN PALENCHAR & SCOTT
Mark L. Levine
Chris J. Lind
Brian C. Swanson
54 West Hubbard Street, Suite 300
Chicago, IL 60610
(312) 494-4400

587262v1

# EXHIBIT B

1

```
         IN THE UNITED STATES DISTRICT COURT
         IN AND FOR THE DISTRICT OF DELAWARE

HONEYWELL INTERNATIONAL INC.    :    Civil Action
and HONEYWELL INTELLECTUAL      :
PROPERTIES INC.,                :
                                :
             Plaintiffs,        :
                                :
      v.                        :
                                :
HAMILTON SUNDSTRAND             :
CORPORATION,                    :
                                :
             Defendant.         :    No. 03-1153-GMS

                   - - -

              Wilmington, Delaware
           Wednesday, June 1, 2005
                  10:00 a.m.
                  Conference


BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

APPEARANCES:

         THOMAS C. GRIMM, ESQ.
         Morris, Nichols, Arsht & Tunnell
               -and-
         JONATHAN F. PUTNAM, ESQ.,
         VICKIE REZNIK, ESQ.,
         MICHAEL STRAPP, ESQ., and
         LEE ANN STEVENSON, ESQ.
         Kirkland & Ellis
         (New York, New York)

                   Counsel for Plaintiffs
```

2

```
APPEARANCES CONTINUED:

         RICHARD D. KIRK, ESQ.
         The Bayard Firm
          -and-
         MARK L. LEVINE, ESQ.,
         CHRIS J. LIND, ESQ., and
         BRIAN SWANSON, ESQ.
         Bartlit Beck Herman Palenchar & Scott LLP
         (Chicago, Illinois)


                   Counsel for Defendant

                   - - -
```

THE COURT: Good morning. Please take your seats. This is an office conference. I just don't have an office big enough for all of you.

Let's start with a round of introductions and in some instances re-introductions, beginning with plaintiff.

MR. GRIMM: Good morning, Your Honor. Tom Grimm at Morris Nichols for plaintiff Honeywell. With me, some lawyers who you already know well, Jonathan Putnam from Kirkland & Ellis, Lee Ann Stevenson, who I don't believe — from the prior case. She has not appeared in this case to date. Vickie Reznik, and Michael Strapp.

MR. PUTNAM: Your Honor, with your permission as well, Nay (phonetic) Baker is a summer associate at our law firm who will be sitting in.

THE COURT: Great.

3

MR. PUTNAM: This is David Brofman (phonetic), on cue.

THE COURT: Mr. Kirk.

MR. KIRK: Good morning, Your Honor. Richard Kirk from the Bayard Firm for the defendant Hamilton Sundstrand Corporation. I would like to re-introduce people who were here for the Markman proceeding. These counsel were not counsel for Hamilton Sundstrand in the first trial, but they are well familiar with what happened back then.

THE COURT: Your lead lawyer has gone off to a saner kind of practice, as I understand it? Hasn't he become general counsel?

MR. PUTNAM: He is the general counsel of 3M now.

MR. KIRK: In Minnesota.

I would like to introduce, from the firm of Bartlit Beck Herman Palenchar & Scott, Mark Levine, Chris Lind, and Brian Swanson.

THE COURT: Good morning. Pleasure to have you.

What we are going to do first is work our way through the various motions in limine. Since the plaintiff has the fewer in number, we will start with the plaintiff.

MR. PUTNAM: Does Your Honor have an order in mind?

THE COURT: The one I have on top is your motion

4

to exclude testimony of noninfringing alternatives by Sundstrand's damages expert, Mr. Yerman.

MR. PUTNAM: Thank you, Your Honor.

Ms. Stevenson will handle that.

MS. STEVENSON: Thank you, Your Honor.

Our motion in limine concerns only Mr. Yerman's testimony about the technical issues concerning noninfringing alternatives. To be clear, we are not challenging Mr. Yerman's ability to give expert testimony concerning other damages issues in the case, which we are happy to hear from him on, as he does have a lot of accounting experience and we are happy to hear from him on those issues and cross-examine him accordingly.

What we are challenging is his ability to testify as a technical expert regarding the availability, acceptability and noninfringing nature of certain alternatives that he discusses at length in his report.

Mr. Yerman conceded repeatedly at his deposition that he does not have the basis, experience, or expertise to form such opinions. He admitted that he does not have any experience or expertise with the design or manufacture of APUs. He does not have any expertise regarding how an APU works. He does not have the ability or expertise to determine the acceptability of certain noninfringing alternatives, if they would have been available to

25

1  He has been introduced to offer a limited
2  opinion relating strictly to patent practice, which says
3  that in his 25, 30 years of experience, a company frequently
4  will take as long as one year, with busy patent lawyers,
5  busy prosecuting attorneys --
6        THE COURT: Let me ask, is that really a
7  controversial point between the two parties, as to how long
8  things take in the PTO?
9        MR. SWANSON: I believe it is, Your Honor. I
10 believe it is an argument Honeywell is going to make, that
11 that less-than-one-year period constitutes abandonment,
12 suppression or concealment. If they don't want to make that
13 argument, we may have a different issue, so I would be
14 interested to hear it.
15       THE COURT: I cut you off. Go ahead.
16       MR. SWANSON: So that is the only purpose that
17 Mr. Goolkasian is being offered. This is something that is
18 going to help the jury to understand, because the people
19 sitting in that jury box are not going to be familiar with
20 how patents go from an idea to a piece of paper that the
21 Patent Office issues. And Mr. Goolkasian is experienced in
22 that area. And the time that it could take a patent lawyer
23 to get the patent application filed is going to assist the
24 jury in understanding this issue.
25       So we submit that Mr. Goolkasian's opinion,

26

1  which is very limited -- he is not going to testify on the
2  patent law. He is not going to testify on the technology at
3  issue. He is just going to testify on the practice of
4  typical patent attorneys prosecuting patents and patent
5  applications.
6        THE COURT: Ms. Reznik.
7        MS. REZNIK: There are a couple things to say to
8  that. First, we agree the period of time at issue here
9  because with abandonment, suppression or concealment you are
10 looking at the reasonableness of the delay or how long the
11 delay is, what the reasons behind that delay are. There is
12 case law that suggests that even a couple-of-day lapse
13 between a reduction to practice and filing your patent
14 application or otherwise making your invention public --
15       THE COURT: That is a pretty fact-intensive
16 inquiry, isn't it?
17       MS. REZNIK: I agree, Your Honor. But here they
18 are saying that Mr. Goolkasian doesn't -- he is not going to
19 be opining on the facts in this particular case, his opinion
20 is just very general, and he simply says that in his
21 experience in patent practice, based on his understanding of
22 the patent laws, that this is what would be a reasonable or
23 not a reasonable delay.
24       So we believe that his opinion, while they are
25 calling it limited to patent practice, is actually

27

1  instructing the jury about patent law. It's not just
2  referring to patent practice, because it's based on or
3  rooted in an understanding of the patent laws and what
4  constitutes a routine delay given the on-sale bar law, for
5  example.
6        The second thing to point out is that his
7  opinion -- they mentioned or Mr. Swanson mentioned that his
8  credentials aren't in dispute. Certainly, his credentials
9  as it relates to patent procedures in the PTO aren't in
10 dispute. But to the extent his opinion is actually
11 overreaching and touches on the relevant technology in this
12 case, which we believe it does, then it should definitely be
13 precluded.
14       More specifically, for his opinion to even
15 matter in this case, they need to assume that the
16 demonstration to Boeing in May 1992 was a reduction to
17 practice, and what Sundstrand later patented, the '275
18 patent, was linked to that Boeing demonstration. He can't
19 offer that opinion. He can't offer an opinion that the
20 Boeing demonstration was a reduction to practice and he
21 can't offer an opinion that that demonstration was later
22 embodied in the '275 patent. So for his opinion to even be
23 arguably relevant, he needs to make that connection, and he
24 can't do it.
25       Which leads to the second point of our motion,

28

1  which is that testimony, if it is true that it is not
2  related at all to the relevant technology in this case,
3  which they are saying, then it should be precluded as
4  prejudicial or irrelevant, because what it will do is
5  confuse that jury by making it seem that even though he, Mr.
6  Goolkasian, does not know the relevant technology at all in
7  this case, that there is, in fact, some link between the
8  Boeing demonstration being reduced to practice --
9        THE COURT: See, I may be oversimplifying what
10 really is a very complex point. You will forgive me if I am
11 doing that. This statement is directed to both of you.
12       It seems to me that this gentleman is only being
13 called to testify as to, in his experience, on average, I am
14 just conjuring what I believe his testimony would be, it
15 takes X number of weeks, days, weeks, months, years, to
16 accomplish the thing that is at issue. That is, after the
17 filing to reduction to practice, that period of time,
18 whatever it might be, is reasonable, would not constitute
19 concealment, abandonment, the things that we are talking
20 about.
21       I agree with you, if he is being asked to say
22 much more than that, or if he is being asked to say anything
23 more than that, I think I am going to have some difficulty
24 with that. But if that's all he is being asked to say -- I
25 am trying to make the link that you say I should between the

29

1  patent law and an interpretation of the patent law and what
2  his experience is before the PTO.
3        MS. REZNIK:  Let me see if I can address that
4  directly.
5        If you will look at his report, what he -- you
6  are right that a delay is a very fact-intensive inquiry.  In
7  particular, Mr. Goolkasian can't do that fact-intensive
8  inquiry because he is not familiar with the facts in this
9  case and doesn't purport to know how long Sundstrand's
10  patent lawyers took to file that patent application.  He
11  can't give that opinion and he is not planning to.  That is
12  fine.
13        His understanding of what constitutes a
14  reasonable delay between reducing an invention to practice
15  and filing a patent application is solely based on his
16  understanding of the patent laws.  It's only reasonable in
17  his view because under the on-sale bar rules, whether or not
18  you have offered an invention for sale and it's barring you
19  from later -- whether or not an offer for sale constitutes
20  an invalidity argument, on-sale bar, is necessarily linked
21  to his understanding of what makes that delay between
22  Sundstrand's reduction to practice and filing of the patent
23  application reasonable.
24        So it is linked to the patent laws.  They are
25  calling it patent practice.  But it's necessarily related to

30

1  his understanding of the patent laws.
2        THE COURT:  Well, does Hamilton Sundstrand seek
3  to have him opine that the delay was reasonable or just that
4  this is the average length of delay?
5        MS. REZNIK:  That is a good question.  I am not
6  sure it's clear.  Mr. Goolkasian in his expert report does
7  both things and in his deposition testimony did both things.
8        THE COURT:  Let's find out.
9        MR. SWANSON:  The answer to your question, Your
10  Honor, I think what Mr. Goolkasian will opine about is what
11  is typical patent practice in his experience.  It will be up
12  to the jury to make a determination, at least on
13  cross-examination, whether that constitutes a reasonable
14  delay or unreasonable delay.  He doesn't need to make that
15  legal conclusion.  That's for the jury.  He can simply say,
16  in my experience, this practice is typical.
17        THE COURT:  Ms. Reznik.
18        MS. REZNIK:  I still think the only basis for
19  him to tell the jury that it's reasonable is based on his
20  understanding --
21        THE COURT:  Listen carefully to what your
22  opponent just said.  I think he has correctly stated that he
23  is not going to proffer the view, the opinion, that this
24  amount of delay, whatever it was or is, was reasonable.
25  Just that it was typical of the timeline that occurs between

31

1  a reduction to practice and filing in his experience.
2        MS. REZNIK:  To me it is not clear why that is
3  not the same thing.  To say what an average is is still
4  directly linked to what is understood by patent prosecutors
5  under the patent laws.
6        THE COURT:  Isn't this either it is or it isn't?
7  If it is not typical, it is not.  If it is typical, it is.
8        I would rather think this would be capable of
9  being reduced to a statistical inquiry of some type, without
10  the need for a proffered expert at all.  But does the PTO
11  keep these kinds of statistics?
12        MS. REZNIK:  I am not aware if they do or not,
13  Your Honor.  The focus here is that his opinion, Mr.
14  Goolkasian's opinion, as expressed in his expert report and
15  in his deposition testimony, is this is what is typical,
16  that that typicality is rooted in his understanding, as he
17  says, of the on-sale bar laws.  So it is about patent laws.
18  Even the typical, average amount of time that he is planning
19  to opine on is rooted in the patent laws.  That is
20  ultimately why his testimony should be --
21        THE COURT:  Why isn't it rooted in the patent
22  law, his understanding of enablement, for instance?
23        MR. SWANSON:  I think, for one point, 102(b) is
24  not at issue in this lawsuit.  It might appear that way from
25  the presentation.  It is not an issue.  He is not opining on

32

1  the on-sale bar.  So his opinion is not rooted in the patent
2  law.  It's rooted in his experience prosecuting patents.  Of
3  course, anybody who prosecutes patents is going to have
4  knowledge and background in the patent law.  But that is not
5  the context of the opinion he is offering.
6        THE COURT:  Is it the case that Honeywell has a
7  similar expert, a counter-expert for this proposition?
8        MS. REZNIK:  We do, Your Honor.  We are offering
9  a rebuttal expert.
10        THE COURT:  What number is that?
11        MS. REZNIK:  It is Mr. Stewart.  That is
12  Sundstrand's motion in limine.
13        MR. LEVINE:  It is Docket No. 110.  It's called
14  Motion in Limine to Limit Honeywell's Expert Testimony.  It
15  deals with the legal issues.
16        MR. LIND:  Your Honor, we have got an extra
17  copy.
18        THE COURT:  I have it.  Okay.  It is No. 7 of
19  Hamilton's, I believe.
20        No. 7 deals with Julie Davis.
21        MR. LIND:  It deals with both.
22        MR. KIRK:  A little bit further, Your Honor, at
23  the bottom of Page 2.
24        THE COURT:  David Stewart, okay.
25        Ms. Reznik, the same, he is the

33

1  counter-designee.

2      MS. REZNIK:  Yes, he is.  Part of his opinion

3  is — all of his opinion is in direct rebuttal to Mr.

4  Goolkasian.  Part of that relates to Patent Office and

5  procedures to the extent Mr. Goolkasian has proffered those

6  opinions.  Part of it relates to his understanding of

7  reduction to practice and abandonment, suppression or

8  concealment under Section 102(g), which is one of the

9  defenses Sundstrand is making in this case.  It covers both

10  of those topics.

11      Here, they are claiming that Mr. Goolkasian

12  isn't offering an opinion on reduction to practice or

13  abandonment, suppression or concealment separately.  The one

14  thing I wanted to point out, Your Honor, is we look at, it

15  was submitted with the papers, directly at Mr. Goolkasian's

16  expert report, so I can clarify or crystallize the point I

17  am trying to make here.  Importantly, however, it is unheard

18  of in my experience to consider that an invention which was

19  potentially demonstrated to the public was abandoned,

20  suppressed or concealed when a patent application was filed

21  within the one-year statutory bar date provided by 35 U.S.C.

22  Section 102(b).  That is his opinion.  Regardless of how

23  they want to characterize it, what he considers a typical

24  delay is definitely rooted in an understanding of the

25  one-year statutory bar date provided by 35 U.S.C. Section

34

1  102(b).

2      MR. SWANSON:  I am wondering if you want to get

3  into Mr. Stewart's opinion or not.  The way we divided

4  things up, I am going to have to cede to my senior.

5      THE COURT:  Why don't we try to dispose of these

6  two matters together.

7      MR. LIND:  We are not moving for Mr. Stewart,

8  their patent law expert, to give similar testimony as to

9  typical practice in how you get things filed from the

10  reduction to practice to getting the application.

11      THE COURT:  You are not moving for the exclusion

12  of that.

13      MR. LIND:  We are not moving for the exclusion

14  of that.

15      What we are moving for is something you alluded

16  to earlier, which is the so-called patent law expert.  What

17  Mr. Stewart has said, out of his report, is he is going to

18  testify about the fundamental concepts of patent law, the

19  nature and purpose of patents.  How patents are to be

20  interpreted.  Explaining the legal burdens of proof in

21  patent law cases.  Explaining the requirements of

22  patentability.  Explaining the legal requirements of

23  invalidity under Section 102(g).

24      All of that stuff is going to be in jury

25  instructions, that we are going to argue over to some extent

35

1  that Your Honor will decide that will be read to the jury.

2      Goolkasian is not going to say that.  We don't

3  think Mr. Stewart should say that.  This is where Julie

4  Davis comes in a little bit.  She offers some legal opinions

5  we can turn to.  We don't think she should say it and we

6  don't think any of the experts should get up and tell the

7  jury what the law is or what the legal standards are that

8  are the fundamental issue in this case.  That is a different

9  issue.

10      THE COURT:  Are you handling that one, too?

11      MS. REZNIK:  Yes, I am.

12      I think, first of all, as I pointed out earlier,

13  Mr. Stewart is a rebuttal expert witness.  He was put

14  forward to contradict or in direct rebuttal to the testimony

15  of Mr. Goolkasian.  So to the extent Mr. Goolkasian talks

16  about patent law, we want to be able to make sure we have an

17  expert to rebut that.

18      THE COURT:  Let me try to simplify this.  There

19  is not going to be any patent law expert testimony along the

20  lines suggested by counsel, from either side.  That takes

21  care of the second half.  But the first half, this timeline

22  issue, you have dueling opinions on this.  Is that right?

23  Does Mr. Stewart opine that it's not typical?

24      MS. REZNIK:  Yes.

25      THE COURT:  What Hamilton says is typical is not

36

1  typical?

2      MS. REZNIK:  Yes.  I believe Mr. Stewart's

3  opinion encompasses the idea that whatever was reduced to

4  practice if anything from the Boeing demonstration by

5  Sundstrand in May 1992 was abandoned, suppressed or

6  concealed, based on their actions, based on the documentary

7  evidence in this case.  So he is certainly going to provide

8  that opinion.  And that's rooted in his -- it's not rooted

9  to patent law.  It sounds like they are not arguing that he

10  could make that opinion.  I do believe he would be making

11  that opinion.

12      The problem is, Mr. Goolkasian isn't looking at

13  the documentary evidence in this case, and is looking at the

14  facts and saying, based on my understanding of this

15  reduction to practice made by Sundstrand and the reasons

16  behind the delay between Sundstrand's reduction to practice

17  or alleged reduction to practice and the filing of the

18  patent application, I don't see abandonment, suppression or

19  concealment.

20      His entire opinion is patent-law based, because

21  what he says is, based on typical patent practice, I would

22  never consider this abandonment, suppression or concealment

23  because every patent lawyer knows that you have one year,

24  based on the one-year statutory bar law.  So it is entirely

25  a patent law opinion, unlike Mr. Stewart's opinion.

45

1    MS. REZNIK: Your Honor, there is one other

2  thing. I am not sure if you addressed the issue, the patent

3  practice point. Mr. Goolkasian, they are offering Mr.

4  Goolkasian they are saying for the limited purpose of the

5  patent practice point. My argument is that is opining

6  on the patent law. I want to make sure Your Honor addresses

7  that point as well.

8    THE COURT: The practices of the PTO, you mean?

9    MS. REZNIK: It goes to the reasonable delay

10  point. My point is that that reasonable delay, his

11  description of the typical delay, is rooted in the patent

12  laws, even though they are calling it patent practice.

13    THE COURT: Let me think about that one. I am

14  still not quite sure that I accept the connection that you

15  have made. Let me think a little bit on that one.

16    So there is only one small issue left in that

17  regard. That is whether Mr. Goolkasian's testimony should

18  be precluded because it is in fact improperly rooted in his

19  understanding of the patent law, rather than his experience

20  before the PTO insofar as how long things take.

21    Is that a fair summarization of your contention?

22    MS. REZNIK: Yes, Your Honor.

23    THE COURT: If I have misstated it...

24    MS. REZNIK: That's it.

25    MR. LIND: To some extent, how long things take

46

1  in the Patent Office or leading up to the Patent Office is

2  because people play by the rules. But he is not going to go

3  in and testify as to what all the rules are and why that has

4  all these implications.

5    He is going to testify about what is typical and

6  practical and average, as we all said, about how long it

7  takes to get from A to B. They will say there is a gap in

8  the timeline that wasn't a proper gap, and we are going to

9  say it is a common gap. That's all there is to that.

10    MS. REZNIK: One final point. I think we agreed

11  that Patent Office procedures is out. That is not going to

12  be opined on by any expert. To the extent they are now

13  claiming Mr. Goolkasian is going to be talking about Patent

14  Office procedures and what is typical, that should be out.

15    MR. LIND: This is not Patent Office procedures.

16  This is before it gets to the office. This is patent

17  prosecution, as a prosecuting attorney, prosecuting patent

18  applications, here is the general steps you take and here is

19  how long it takes. That is not Patent Office.

20    MS. REZNIK: I think that is a distinction

21  without a difference, Your Honor.

22    I will leave it to you.

23    THE COURT: I think that covers Honeywell's

24  motions.

25    MR. PUTNAM: It does, Your Honor.

47

1    THE COURT: And at least one of Hamilton

2  Sundstrand's motions.

3    Let's go to No. 1, at least what we have labeled

4  as No. 1.

5    Let me tell you what the title is: Sundstrand's

6  Motion in Limine to Preclude Honeywell from Offering

7  Testimony or Argument that the '275 Patent was Considered by

8  the Patent Office as Prior Art.

9    MR. LEVINE: Your Honor, I am handling that one.

10    This argument is pretty straightforward. The

11  '275 patent itself was not prior art to the '626 patent. It

12  was filed a few months later. And therefore, Honeywell

13  shouldn't be able to say to the jury, see, the examiner

14  considered the '275 patent and issued Claims 1 through 6,

15  the issued claims of the patent, over the '275 patent.

16    That, in itself, I think is very

17  straightforward. I don't think that can be contested.

18    What Honeywell does argue is, well, the '275

19  patent came up during the prosecution of their patent, the

20  '626 patent. And it did. And it came up in connection with

21  an attempt to provoke an interference. But what is

22  important there, and this is what is critical, is the

23  examiner never compared the issued claims of the '626

24  patent, the claims that are at issue in this lawsuit, Claims

25  1 to 6, to anything in the '275 patent.

48

1    The issue in the interference was whether or not

2  Claims -- what were application Claims 17 through 34 in the

3  '626 patent, those are claims that were rejected, and the

4  issue in the interference was whether or not those claims

5  could be allowed and could be used to provoke an

6  interference. And the examiner said no.

7    So we are concerned that Honeywell will get into

8  an argument based upon what the examiner did in his decision

9  on whether to provoke an interference, looking at the '275

10  in connection with different claims of the '626 patent, the

11  patent at issue, when he never looked at -- and then suggest

12  that somehow the examiner granted Claims 1 through 6, which

13  had different numbers in the application, but granted those

14  over the '275 patent. And he did not. The examiner never

15  looked at — this is what you do with the prior art. With

16  the prior art, you say, here is prior art, and I grant

17  these claims over the prior art? That was never done here

18  compared to the '275 patent. And we think any suggestion

19  that it was done would be improper.

20    THE COURT: Who is going to handle this?

21    MR. PUTNAM: Ms. Reznik.

22    THE COURT: Ms. Reznik, you are swimming

23  upstream. Why isn't this potentially misleading and

24  confusing to the jury?

25    MS. REZNIK: I think there are a few reasons.

# EXHIBIT C



1

```
1        IN THE UNITED STATES DISTRICT COURT
2        IN AND FOR THE DISTRICT OF DELAWARE
3
4   HONEYWELL INTERNATIONAL INC.,    :    Civil Action
    and HONEYWELL INTELLECTUAL       :
5   PROPERTIES INC.,                 :
                                     :
6        Plaintiffs,                 :
                                     :
7        v.                          :
                                     :
8   HAMILTON SUNDSTRAND              :
    CORPORATION,                     :
9                                    :
         Defendant.      :    No. 99-309-GMS
10
                - - -
11
              Wilmington, Delaware
12            Monday August 29, 2005
                  9:55 a.m.
13              In Chambers
14                - - -
15  BEFORE:   HONORABLE GREGORY M. SLEET, U.S.D.C.J.
16  APPEARANCES:
17       THOMAS C. GRIMM, ESQ.
         Morris, Nichols, Arsht & Tunnell
18            -and-
         ROBERT KRUPKA, ESQ. (Los Angeles, CA), and
19       JONATHAN F. PUTNAM, ESQ.
         Kirkland & Ellis
20       (New York, New York)
21            Counsel for Plaintiffs
22
23
24
25
```

2

```
1   APPEARANCES CONTINUED:
2        RICHARD D. KIRK, ESQ.
         The Bayard Firm
3            -and-
         MARK L. LEVINE, ESQ.,
4        CHRIS J. LIND, ESQ., and
         BRIAN SWANSON, ESQ.
5        Bartlit Beck Herman Palenchar & Scott LLP
         (Chicago, Illinois)
6            -and-
         DAVID H. HERRINGTON, ESQ.
7        Cleary, Gottlieb, Steen & Hamilton
         (New York, New York)
8
9            Counsel for Defendant
10               - - -
11
12       THE COURT:  Welcome back.
13       Welcome to you, Mr. Krupka, it's been a while.
14       MR. KRUPKA:  Nice to see you again, Your Honor.
15       THE COURT:  We will let local counsel begin with
16  introductions.
17       MR. GRIMM:  Your Honor, it is my pleasure to be
18  here on behalf of Honeywell again.  You know well Bob Krupka
19  and Jonathan Putnam from the firm of Kirkland & Ellis here
20  with me today.
21       THE COURT:  Mr. Kirk.
22       MR. KIRK:  Your Honor, nice to be here again.
23  Dick Kirk from The Bayard Firm.  I will start with counsel
24  from the first case, David Herrington from the Cleary
25  Gottlieb firm.  You know well the team that just finished a
```

3

```
1   case, Mark Levine, Chris Lind and Brian Swanson.
2        THE COURT:  Good to see you.
3        Okay.  Well, thanks for the joint status report.
4   As I would have expected, matters are hotly contested and
5   there is a difference of view as to how things should play
6   out in light of the remand.
7        Maybe, to help inform the discussion generally,
8   I will offer, I do have an inclination toward one party's
9   position, and it happens to be toward HSC.  After having
10  read actually several times the joint status report and
11  conferring with my mighty law clerk over here, Mike Koenig,
12  for everyone's introduction, I am going to keep an open mind
13  somewhat, but I do have a point of view that suggests itself
14  to me in light of what I have read.  I am always prepared to
15  be dissuaded.
16       So, Mr. Putnam.
17       MR. PUTNAM:  Thank you, Your Honor.
18       Just to set the stage, I know Your Honor will
19  have read the Federal Circuit opinion, as we all have to
20  figure out what it instructs us.  The question on remand is
21  going to be whether Honeywell gave up the embodiment at
22  issue, the Sundstrand product that the jury found as a
23  matter of fact to be equivalent to the Honeywell patent
24  claims, whether Honeywell gave up that embodiment during
25  prosecution or not.
```

4

```
1        The Supreme Court at the Federal Circuit
2   identified three potential ways, alternate ways, that
3   Honeywell could meet that burden, make that showing.  If the
4   equivalent was unforeseeable at the time of the prosecution,
5   which happened back here in the '81 to '84 time period, if
6   there was a tangential relation, or if there was some other
7   reason.
8        I think we agree that at least as to the
9   tangential relation prong of the possible test, the case law
10  is clear that the Court should focus on the intrinsic
11  record.  So I think everyone agrees there is no further
12  evidence on that.  It would be the Court presumably guided
13  by the parties' briefing or presentation in some form,
14  reviewing the prosecution record and determining what it
15  says as to that issue.
16       As to unforeseeability, there is some ability to
17  bring in extrinsic evidence.  Let me address head on why we
18  think that should be resolved just on the existing record.
19  That is, as we say in our papers, that the existing record
20  has, both the trial record and the discovery record that led
21  up to the trial in this case, has substantial evidence
22  exactly on what is now the relevant question.  It is a
23  different, in some respects, legal regime, but the matters
24  of fact that the Court as fact-finder will have to determine
25  on remand are the same matters of fact that were at issue
```

45

1  testify about how one drafts patent claims and things.

2        I know there was an issue that arose in the most

3  recent trial on that subject. If we are going to have that

4  come up again, I think now is the time to have it come up.

5        MR. LIND: Two points. We will use our best

6  judgment. We have lived through that issue before. I will

7  make the distinction this is a Bench trial, not a jury

8  trial. One of the reasons at least you don't usually want a

9  patent law expert in front of a jury is because they will

10  give some undue deference to his statement of the law, et

11  cetera, which is not a risk when you are talking about a

12  Bench trial.

13        We haven't talked through that issue. But it

14  certainly is in the cases. It says one of the ways of

15  looking at this is could Honeywell have drafted a claim to

16  cover the alleged equivalent at the time. And I don't know

17  that we need a patent law expert to do that.

18        But at this point I guess I would say we would

19  certainly use our best judgment on that and allude to the

20  distinction that it's not a jury trial, it's a Bench trial.

21  Therefore, I think it's different.

22        THE COURT: I won't prejudge the issue. I will

23  leave it open.

24        I should think that there wouldn't be a

25  tremendous need for in limine practice in this situation.

46

1        MR. LEVINE: I think you are right.

2        THE COURT: January 26, 10:00 o'clock in the

3  morning.

4        MR. PUTNAM: I think that works with the

5  briefing. I think maybe Mr. Lind or Mr. Levine and I can

6  adjust the other dates back a little bit.

7        THE COURT: Again, as I stated earlier, I am in

8  general accord, obviously, we have revised considerably that

9  view, the Court's view, with HSC's position.

10        On the question of whether the marking, the

11  State Contracting issue should be addressed again, in light

12  of the -- the marking issue should be addressed by me in

13  light of State Contracting, my thinking is HSC has the

14  better position. Mr. Putnam, maybe you can convince me

15  otherwise.

16        MR. PUTNAM: Sure. I think this is a much

17  smaller issue in terms of the Court's and the parties'

18  resources, although it is an important issue in terms of

19  damages and therefore an important issue in terms of the

20  resolution of the case.

21        THE COURT: Damages is something else in terms

22  of evidence.

23        MR. PUTNAM: We said in our submission that it's

24  not our position we want to have another trial. We

25  recognize that it would probably make sense to have the

47

1  rebuttal of the presumption issue get addressed by the

2  Federal Circuit before we had additional damages. So I am

3  not pushing for anything more than the right to submit a

4  brief to the Court in view of new precedent. The State

5  Contracting case, that was not available to the Court at the

6  time --

7        THE COURT: Why don't you address what was

8  available to the Federal Circuit when they had the first

9  Honeywell --

10        MR. PUTNAM: We did submit a 28(j) letter to the

11  Federal Circuit on new precedent. The Federal Circuit did

12  not reach any damages issue by virtue of its --

13        THE COURT: It certainly had the opportunity.

14        MR. PUTNAM: I don't think logically it did,

15  Your Honor. Given that it vacated the liability verdict, I

16  think it would not have made any sense for them to continue

17  to damages.

18        MR. KRUPKA: In fairness, Your Honor, we may be

19  putting Mr. Putnam on the spot for something I suggested.

20  And I should take the blame for it, for the point that Your

21  Honor made earlier, that you certainly wouldn't want to go

22  back to the Federal Circuit and have them say, Judge, you

23  should have allowed them to take some discovery so we are

24  going to have to do this over again.

25        THE COURT: Also address this -- I am not sure

48

1  it is within my mandate or this matter is even before me.

2  But go ahead.

3        MR. KRUPKA: We did look into it, Your Honor. I

4  believe there is precedent that says that the Court does

5  have the discretion, not the obligation, but the discretion,

6  when the case is remanded in the way that it has, to take

7  into account more recent developments, since the Court had

8  the case last, and address this issue. We do believe you

9  have the ability to do so, even though it is not

10  specifically within the remand.

11        What I was contemplating, perhaps it's simply

12  too hypothetical to be concerned about, is we go up -- we

13  know we are going back up to the Federal Circuit. We go

14  back up to the Federal Circuit and they say, okay, we agree

15  with Judge Sleet that this wasn't foreseeable, the

16  presumption is rebutted, and now we are going to get into

17  the merits of the rest of the case. Now we got to deal with

18  the marking issue. But in view of our more recent

19  decisions, we noticed that the District Court didn't have

20  the benefit of that, so we are going to remand to the

21  District Court for that.

22        THE COURT: It could do that.

23        MR. KRUPKA: What I was hoping -- again, I don't

24  want to put this burden on Mr. Putnam because it was sort of

25  my suggestion that maybe we ought to give the Court the

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL INC and HONEYWELL INTELLECTUAL PROPERTIES INC., | ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civil Action No. 99-309 (GMS) |
| HAMILTON SUNDSTRAND CORPORATION, | ) ) | |
| *Defendant* | ) ) ) ) | |

## EXPERT REPORT OF MELVIN GARNER

### I.    INTRODUCTION

1.    Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, I, Melvin Garner, give this Expert Report.  I am prepared to testify at trial on behalf of Plaintiffs as an expert on the operation, rules of practice and procedures of the United States Patent and Trademark Office ("USPTO") and the reasonable practices of patent attorneys prosecuting patent applications before the USPTO

### II.    MATERIALS CONSIDERED

2.    I have considered the following materials in preparing this Report:

a.    The patents-in-suit;

b.    The file histories of the patents-in-suit and the references cited therein;

c.    The pleadings in the case, including *Hamilton Sundstrand's Brief in Support of its Motions for Judgment as a Matter of Law and for a new Trial on Issues Pertaining to Liability, Honeywell's Opposition to Hamilton Sundstrand's Brief in Support of its Motions for Judgment as a Matter of Law and for a new Trial on*

*Issues Pertaining to Liability, Hamilton Sundstrand's Reply Brief in Support of its Motions for Judgment as a Matter of Law and for a new Trial on Issues Pertaining to Liability, Defendant Hamilton Sundstrand Corporation's Renewed Motions for Judgment As a Matter of Law Under Fed. R. Civ. P. 50 or, in the Alternative, for a new Trial Under Fed. R. Civ. P. 59, Honeywell's Memorandum in Support of its Post-Trial Motions Pursuant to Fed. R. Civ. P. 50 for Judgment as a Matter of Law, Hamilton Sundstrand's Brief in Opposition to Honeywell's Rule 50 Motions for Judgment as a Matter of Law, Honeywell's Reply Memorandum in Support of its Post-Trial Motions Pursuant to Fed. R. Civ. P. 50 for Judgment as a Matter of Law,* and *Hamilton Sundstrand's Response to Plaintiffs' First Set of Requests for Admission;*

  d.  The decisions of the courts in *Honeywell Int'l Inc. v. Hamilton Sundstrand Corporation*, 166 F. Supp. 2d 1008 (D. Del. 2001) and *Honeywell International Inc. and Honeywell Intellectual Properties, Inc. v. Hamilton Sundstrand Corporation*, 370 F.3d 1131 (Fed. Cir. 2004);

  e.  The expert reports of Francis G. Shinskey dated November 10, 2000 and December 1, 2000; and

  f.  The expert Reports of Gerard Muller dated October 27, 2000 and November 10, 2000.

## III.  QUALIFICATIONS

  3.  I graduated from Drexel University in 1964 with a B.S. in Electrical Engineering degree. While at Drexel I received the Drexel Technical Journal Award for the best student article published in 1963. I was elected to Eta Kappa Nu, the Electrical Engineering Honor

Society, and was President of the student chapter of the Institute of Electrical and Electronic Engineers. I obtained an M.S. in Electrical Engineering degree from New York University in 1967.

4.    I was employed as an Electrical Engineer by IBM, CBS Laboratories and Sequential Information Systems, respectively, from 1964 to 1970. During this period I rose from the rank of Junior Engineer to Project Engineer.

5.    From 1970 to 1973 I was employed as a Member of Patent Staff at Bell Telephone Laboratories (now Lucent Technologies, Inc.) becoming a Patent Agent registered to practice before the USPTO in 1972. All of my work during that period of time involved patent prosecution.

6.    While working at Bell Telephone Laboratories I attended Brooklyn Law School, graduating in 1973. At Brooklyn Law School I was on Law Review and was a Senior Editor of the Law Review in 1973.

7.    From 1973 through 1981 I was an Associate at the law firm of Brumbaugh, Graves, Donohue & Raymond (now part of Baker & Botts) where I was primarily involved in patent prosecution, but also worked on patent litigation and opinions.

8.    In 1982 I joined the law firm of Darby & Darby P.C. as an Associate and became a Principal in 1985. I remain with Darby to this day. My work at Darby has been a mix of patent prosecution, litigation and opinion work.

9.    As part of my work at Darby I have acted as an expert witness in a number of cases. In three of those cases, which were tried in New York, Connecticut and Virginia, I was asked to testify at trial and was accepted by the Court as an expert in patent office procedure and the practice of patent law by those registered to practice before the USPTO, as well as electrical

engineering. Those cases are *Velobind v. Southwest Plastics*, Civ. Action No. 89-0193-C-A (S.D.N.Y. 1989); *Ethicon, Inc. v. United States Surgical*, 937 F. Supp. 1015 (D. Conn. 1996); and *Berry Sterling Corp. v. Pescor Plastics, Inc.*, Civ. Action No. 95-1412A (AVB) (E.D. VA 1995).

10.     I have lectured at the Practising Law Institute ("PLI") since about 1985. This non-profit organization provides educational training to lawyers on a variety of topics. At least once a year, and more often twice a year, I have lectured lawyers at the PLI on patent prosecution topics. In addition, I have lectured at the PLI on patent litigation, patent licensing and patent portfolio management strategies. For about three years I also lectured on patent prosecution at programs put on by the American Intellectual Property Law Association.

11.     During my career I have been lead counsel in about 30 litigations, and have prosecuted or supervised the prosecution of thousands of patent applications.

12.     I received the Drexel University Distinguished Alumni Award in 2005.

13.     I am listed in Who's Who Legal - Patents 2005 and in Euromoney's *Guide to the World's Leading Patent Law Experts*.

14.     I was recognized as one of "America's Top Black lawyers" in the November, 2003 issue of *Black Enterprise Magazine* and as one of the "Intellectual Property Superstars" in the May/June issue of *Diversity & the Bar*.

15.     I was President of the New York Intellectual Property Law Association, 2003-2004, and am currently the President of the American Intellectual Property Law Association.

16.     The accompanying Curriculum Vitae provides additional background material relating to my professional experience. **(Exhibit A)**

## IV.    PUBLICATIONS

17.    A list of my publications within the preceding 10 years is set forth in attached **Exhibit B**.

## V.    COMPENSATION

18.    I am being compensated for my work in connection with this litigation at my normal hourly rate of $625 per hour.  I have no financial interest in the outcome of the case.

## VI.    PRIOR TESTIMONY

19.    In the last 4 years, I have not provided deposition or trial testimony as an expert in any case.

## VII.    BACKGROUND

20.    I have been retained by Honeywell in this action as a consultant, and prospectively as a testifying expert witness, to provide my opinion as to the prosecution before the U.S. Patent & Trademark Office of claims 8 and 19 of U.S. Patent No. 4,380,893 of Stokes et al. (the "'893 patent" attached as **Exhibit C**) and claim 4 of U.S. Patent No. 4,428,194 of Stokes et al. (the "'194 patent" attached as **Exhibit D**).  In particular, I have been retained to provide an opinion as to whether the amendments to those claims during prosecution with respect to operation of the control device as a function of the position of the inlet guide vanes (a) could have been written in a foreseeable way to cover the Sundstrand guide vane Lock-out operation (b) bore no more than a tangential relation to the equivalent used in the Sundstrand system or (c) there was some other reason suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent so that file wrapper estoppel should not apply.

21.     It is my understanding from a review of the District Court and Federal Circuit opinions that in the present litigation at the trial level, Honeywell prevailed on the issue of the validity of the '893 and '194 patents.  Honeywell also prevailed on the issue of infringement of claims 8, 10, 11, 19 and 23 of the '893 patent and claim 4 of the '194 patent under the doctrine of equivalents.  On appeal, the Federal Circuit held since each of the claims had been amended during prosecution, a presumption of surrender of equivalents to the inlet guide vane limitation was created under the doctrine of prosecution history estoppel.  The court remanded the case to the district court to consider whether Honeywell can rebut the presumption of prosecution history estoppel.

A.     DISCLOSURES OF U.S. PATENTS NOS. 4,380,893 & 4,428,194

22.     The disclosures of the '893 and '194 patents are the same, being parent and divisional applications, respectively.  They relate to an apparatus and a method for providing compressor bleed air control in an auxiliary power unit ("APU"), particularly as used in aircraft.

23.     An APU is a small gas driven turbine engine usually located in the tail section of an airplane. The APU generates electricity with a generator 12 (Fig. 1) and has a load compressor 18 that provides compressed air to operate pneumatically-operated aircraft accessory systems, e.g., environmental control system 14.  A valve 52 is used to control the amount of air exiting the compressor and delivered to the aircraft's accessory systems.  The volume of the compressed air required for these accessory systems fluctuates substantially.

24.     Rapid changes in the demand for compressed air can produce "surge," a flow instability that occurs when pressure builds up in the main air duct 48.  In a surge condition, the air attempting to exit air duct 48 is unable to do so, and as a result it reverses direction, surging back into the compressor and potentially damaging the APU.  Prior art systems controlled surge

6

by drawing in more air than was needed and venting the excess through a surge bleed valve 58 to the discharge passage 42 of the APU in order to reduce the pressure in the main air duct 48. Such systems maintained sufficient output airflow to control surge, but were inefficient in that they wasted energy by drawing in more air than might be needed.

25.    The control of the APU according to the patents is designed to be more efficient by avoiding the venting of excess air as a way of controlling surge. It uses an electronic controller 86 to determine when and how far to open the surge bleed valve in order to maintain a level of flow sufficient to avoid surge. The electronic controller establishes a "set point," which represents the minimum flow at which surge can safely be avoided. In operation, ambient air is drawn into the APU through a set of adjustable inlet guide vanes (IGV) 46. The position of the guide vanes is sensed by a sensor 98 and that signal 90 is applied to the electronic controller. In addition, the total pressure Pt is measured to provide a signal 82 and the differential pressure Pt-Ps is determined to provide a signal 84, both of which are measured in the main air duct 48 by a flow sensor 72. (Fig. 3)

26.    In the electronic controller 86 (Fig. 4), a divider 100 computes (Pt-Ps)/Pt to form a signal 102. A signal 96 from a pressure sensor in the load compressor inlet, and an atmospheric pressure signal 116 are combined and multiplied to produce an actual altitude signal 120. A manual reset minimum demand signal 94 is modified by a signal generator 110 to provide a signal 112 and the IGV signal 90 drives a function generator 104 to produce a signal 106. The signals 106, 112, 120 and 102 are received by a comparator 122 and are used to generate the set point or error signal 126, which is passed through a kicker control 138 and combined with a manually selected zero demand signal 92 in OR gate 142 to provide a shut off signal 144. The set point error signal 126 is also passed through a dynamic compensator 124 and

drives an integral controller 130 and a proportional controller 128 which are connected in parallel. The outputs of these controllers are combined in the summer 136 and the summer output drives a torque motor 60 that controls the position of the surge bleed value 58. Thus, a comparison is made between the actual flow conditions (represented by the flow-related parameter) and the desired flow conditions (represented by the set point). If the system determines that airflow out of the main air duct 48 is too low, the surge bleed valve will be opened to draw more air through that duct and vent it to the discharge passage of the APU, thereby preventing the build up of excess pressure leading to surge.

**B.    FILE HISTORY OF THE '893 PATENT**

27.    The application which led to the '893 patent was filed on February 19, 1981 as Serial No. 235,795 with 52 claims.

28.    In the first office action, which issued on September 17, 1982, the examiner confirmed a restriction requirement. In particular, the examiner determined that claims 1-40 were drawn to a compressor control apparatus, which the examiner considered a separate invention from the compressor control process defined by claims 41-52. During a telephone interview the applicant's patent attorney had elected claims 1-40 with traverse. i.e., he retained the right to object to the restriction requirement.

29.    The office action also addressed the merits of claims 1-40. In particular, claims 1-5, 11-15, and 21-40 were rejected under 35 U.S.C. 112 as being indefinite because these claims recite "flow rate" as a sensed control parameter, when the disclosure states that pressure is sensed as an indication of flow rate. Claims 28, 31, 34 and 37 were rejected under section 112 as being vague because of the use of the term "predetermined mode of operation."

30.     Further, claims 1 and 11 were rejected under 35 U.S.C. 102(b) as anticipated by U.S. Patent No. 3,411,702 of Metot et al.  Claims 1-3, 6, 10-13, 32, 37, 39 and 40 were rejected under 35 U.S.C. 103 as obvious and unpatentable over U.K. Patent No. 1,021,797 of Shell Oil in view of U.S. Patent No. 1,052,172 of Rateau or the Metot patent.  Claim 7 was rejected on the same grounds as claims 1-3, 6, 10-13, 32, 37, 39 and 40 and further in view of U.S. Patent No. 3,047,210 of Best.  Claims 16, 19-22, 27-29 and 38 were rejected like claims 1-3, 6, 10-13, 32, 37, 39 and 40 and further in view of U.S. Patent No. 2,994,471 of Lewis et al.

31.     The Examiner indicated, however, that claims 8, 9, 17 and 18 would be allowed if written in independent form, and claims 4, 5, 14, 15, 23-26, 30, 31, and 33-36 would be allowed if amended to overcome the rejections under section 112 and rewritten in independent form. While claims 4, 5, 8, 9, 17, 23-26, 35 and 36 had the IGV limitation, claims 14, 15, 30, 31, 33 and 34 were not limited to the IGV position.  Thus, the attorney would not have considered the IGV limitation as the sole basis for the patentability of the claims.

32.     In an Amendment dated October 25, 1982, which was filed in response to the office action, claims 4, 8, 14, 17, 23, 30, 33 and 34 were rewritten in independent form.  Each of claims 4, 8, 17 and 23 contained exactly the same IGV language they had as dependent claims. Further, claim 10 was made to depend on claim 8, claims 19 and 20 were made to depend on claim 17, claim 27 was made to depend on claim 23, and claims 38-40 were made to depend on claim 35.  In addition, changes were made to some of the claims in order to overcome the rejections under section 112.  The remaining claims were "cancelled without prejudice."  The remarks also indicated that claims 41-52 had been filed in a divisional application.

9

33.     The Examiner then issued a Notice of Allowance, the issue fee was paid, and the application issued as a patent on April 26, 1983 in which application claims 4, 8, 14, 17, 23, 30, 33 and 34 became patent claims 1, 3, 6, 8,12 and 17-19, respectively.

## C.     FILE HISTORY OF THE '194 PATENT

34.     The application which led to the '194 patent was filed on September 27, 1982 as Serial No. 426,674 and as a division of application No. 235,794, i.e., the application which led to the '893 patent.  The original application was filed with the same 52 claims as the application for the '893 patent, but claims 1-40 were cancelled because they were covered by the parent application.

35.     In an office action dated August 18, 1983, the Examiner rejected claims 41-43 and 52 under 35 U.S.C. 103 as being obvious and unpatentable over U.K. Patent No. 1,021,797 of Shell Oil in view of U.S. Patent No. 1,052,172 of Rateau or U.S. Patent No. 3,411,702 of Metot et al.  Claims 44 and 45 were rejected for the same reasons as claims 41-43 and 52, but further in view of U.S. Patent No. 3,047,210 of Best.  Similarly claims 48 and 49 were rejected for the same reasons as claims 41-43 and 52, but further in view of U.S. Patent No. 2,994,471 of Lewis et al.

36.     The Examiner stated that "claims 46, 47, 50 and 51 will be allowed if rewritten in independent form."

37.     The applicant responded with an Amendment dated August 30, 1983 in which claims 46, 50 and 51 were rewritten in independent form and claims 41-45, 48, 49 and 52 were cancelled without prejudice.   Claim 46 (patent claim 1) contained the original unchanged limitation "adjusting said set point in response to variations in the position of the inlet guide vanes."  The original unchanged limitation of clam 50 (patent claim 3) was: "interrupting said

10

integral control signal when the difference between the actual value of said parameter and a desired value thereof exceeds a predetermined level." Thus, the amendment and allowance of claim 50 was not based on an IGV limitation. Claim 51 (patent claim 4) had the original unchanged language: "adjusting the relationship between the magnitudes of said integral and proportional control signals and the magnitudes of said parameter variations as a function of the position of the inlet guide vanes".

38.     A Notice of Allowance issued, the issue fee was paid and the patent issued on January 31, 1984.

## VIII.   BASIS AND REASONS FOR THE OPINION

39.     The language in question in paragraph (f) of claim 8 and paragraph (g) of claim 19 of the '893 patent is as follows:

> (f) means for transmitting to said comparator means a reset signal for **varying said set point as a function of the position of said inlet guide vanes** in accordance with a predetermined reset schedule;

> (g) a **guide vane position sensor and a function generator** coupled in series between the inlet guide vanes and said input portion of said comparator.

The language of paragraph (d) claim 4 of the '194 patent is

> (d) **adjusting the relationship** between the magnitudes of said integral and proportional control signals and the magnitudes of said parameter variations **as a function of the position of the inlet guide vanes.**

40.     As shown in Figure 1 of the patents, the position of the inlet guide vanes 46 is sensed by sensor 98 and that information 90 is input to the electronic control 86 to set the surge bleed value 58. Figure 4 shows the signal 90 being applied to function generator 104 and mixed with other signals in comparator 122 to control the set point signal 126.

41.     It is my understanding that Sundstrand contends that its APS 3200 has a Modulating Control System for avoiding surge in which DELPQP (a parameter based on the

11

static pressure in the diffuser and the exit scroll) is compared to a set point which is adjusted based on the temperature at the inlet to the compressor. The measured value of DELPQP is compared to the desired value -the set point- and an error signal reflecting the difference is generated. The error signal in turn generates proportional and integral control signals that modulate the position of the surge valve, opening it to the extent necessary to exhaust a sufficient amount of air so that the value of DELPQP will be controlled at the set point value. If there is a high flow rate, the measured value of static pressure falls, which would falsely indicate that the surge region is being approached. If DELPQP dropped below the set point, the surge valve would be opened. However, since at high flow rates surge is not a concern, the Control System engages a Lock-out Feature[1], which disconnects the Modulating Control System from controlling the surge bleed valve and locks the valve closed. The determination of high flow depends on sensing if the Static Pressure Parameter is greater than 0.35 and when the guide vanes are at least 20% open. (Sundstrand's Expert Report of Shinskey dated November 10, 2000, pages 8-12).

42.    In effect, the Lock-out Feature has the same effect as moving the set point to infinity, i.e., there is no value for which the surge value will open. I also understand that there was testimony at trial by Sundstrand's expert witness that the DELPQP signal will vary depending on the IGV setting. Honeywell's Opposition Brief, page 5.

### A.    The Need to Literally Claim the Lock-out Was Not Foreseeable

43.    In 1982, by which time I had been registered to practice before the USPTO for 11 years, the concept of prosecution estoppel was well understood by patent attorneys. This was at a time when the Federal Circuit had just been created. At that time the doctrine was referred to

---

[1] As should be clear from this discussion, the Lock-out Feature is just one aspect of the equivalent utilized by Hamilton Sundstrand in its APS 3200.

as "file wrapper estoppel," after the folder in which examiners kept copies of the application and the other documents concerning its prosecution. Reasonable patent attorneys during that period would have presumed that any amendment to the claims to avoid prior art would have resulted in an estoppel giving up equivalents in the range between the original claim scope and the literal language of the amended claim, only to the extent necessary to avoid the prior art in under consideration by the applicant and the examiner. Thus, even when claims were amended, the doctrine of equivalents applied to the amended language, so long at it was not extended to cover the prior art for which the claim was amended to avoid. This was know as "flexible estoppel." *See, Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558; 572, 608 (Fed. Cir. 2000) (FESTO I).

44.    Where, as here, a dependent claim was found to be allowable and the applicant's attorney rewrote it in independent form and cancelled the broader original independent claim, a reasonable patent attorney practicing before the USPTO in 1982 would not have believed that any prosecution estoppel was created. At that time the attorney would have believed that rewriting a dependent claim in independent form was not a change in claim scope. Also, the cancellation of a broad claim would not have been considered a dedication to the public of any equivalent to the unchanged elements of the dependent claim. Even attorneys practicing after the Supreme Court's *Festo* decision would not have envisioned this effect. Note that Circuit Judge Newman's dissent in *Festo* illustrates this point, particularly because Judge Newman in 1982 was a patent attorney and Director of Patents and Licensing at FMC Corporation.

45.    The first Festo decision by the Federal Circuit, which replaced the flexible estoppel with a complete estoppel, was considered by attorneys practicing before the USPTO as a radical departure from the existing state of the law. Therefore, a reasonable patent attorney in

13

1982 could not have conceived of this change.  After the Supreme Court Festo decision, patent attorneys understood that the estoppel was created by changing the claim language in view of the prior art, not by failing to change the allowed wording to words broad enough to entirely cover the equivalent.

46.    There is no indication in the file histories of the patents-in-suit that the Sundstrand equivalent, including its Lock-out technique, was known in the art.  Thus, it represents "later-developed technology that was not known in the relevant art, [and thus] it would not have been foreseeable." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003) (Festo IX).  Because at the time of the amendment the Lock-out was not known to the applicant or the Examiner as an equivalent of the change in set point, it would not have been foreseeable to a reasonable patent attorney to draft claim language to cover the Lock-out.  See also *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002) (Festo II).

47.    Specifically, it is my opinion that a reasonable patent attorney prosecuting the patents-in-suit would not have foreseen the need to redraft the elements of the claims that relate to the inlet guide vanes (IGV), and which had already been found by the examiner to constitute patentable subject matter, in a way to cover literally the Lock-out operation of Sundstrand because that possibility was not before him.  In fact, no reference was cited during the prosecution by the examiner showing the use of IGV signals to control the surge valve.  (*See* Hamilton Sundstrand's Response to Plaintiffs' First Set of Requests for Admission, Response No. 5.)  Further, the claims with this limitation were allowed or found to be allowable in the first office action without any discussion by the examiner as to any feature or arrangement of the parts of those elements that made the claims patentable.  As a result, the attorney prosecuting the case would assume that the IGV element was broadly patentable and subject to a full range of

equivalents. Therefore, not only was it not foreseeable that language literally covering the Lock-out would be necessary, there was nothing in the prosecution to cause either the applicant or the Examiner to further consider these elements.

### B. The Amendment to the Claims Had No More Than a Tangential Relation to the Lock-out Equivalent

48. The amendment of claims 8 and 19 of the '893 patent and claim 4 of the '194 patent to add the limitations from the broad claims on which they depended, in no way changed the language of elements (f), (g) and (d), respectively. So it is clear that the actual change to these claims had no "more than a tangential relation to the equivalent" between the claims and the Sundstrand system.

49. The inlet guide vane limitation played no role in the amendments of the claims at issue. As noted by Shinskey, Sundstrand's technical expert, "each guide-vane position has its surge limit" (page 7 of the November 10th report). However, there was no prior art cited by the examiner which the applicant sought to overcome in which the effect of guide vane position was set forth. In fact, application claim 17, which became patent claim 8, and application claim 35, which became claim 19 of the '893 patent, as well as application claim 51 of the '194 patent, which became patent claim 4, were considered allowable in the first office action. Where an amendment is made to avoid prior art that contains the equivalent in question, it is clearly not tangential to that equivalent. Importantly, the converse is also true, i.e., where the change bore no relation to overcoming prior art that contains the equivalent (or anything like the equivalent), the change is no more than tangential to that equivalent. See *Engineered Products Co. v. Donaldson Company, Inc.*, 313 F. Supp. 2d 951, 973-4 (N.D. Iowa 2004) citing *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1355 (Fed. Cir. 2003).

50.    The purpose of the amendment was to accept allowance of the claims that included the guide vane position language.  A reasonable patent attorney at the time would have believed that this acceptance and amendment would have left the patent holder with coverage of the inlet guide vane limitation and its equivalents.  This is because the "rational underlying the amendment" to include language to vary the set point, to trigger a function generator or to change a relationship, as recited in the claims, was no more than tangential to the Lock-out feature of Sundstrand, a feature that was not before the examiner or the applicant.  See *Instituform Technologies, Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1368 (Fed. Cir. 2004).

51.    "The correct inquiry is whether the rationale underlying the amendment, the 'reason the amendment was submitted' -- not the amendment itself -- is more than peripherally related to the equivalent in question." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 287 F. Supp. 2d 126, 150 (D. Mass. 2003) quoting from *Festo II*.  Here, the prosecution history makes clear that the rational for submitting the amendment had nothing to do with the equivalent Lock-out system.  Thus, it cannot be said that the applicants intentionally disclaimed any equivalent between some other broad language with respect to guide vanes and that which is in the claims. *Cordis Corp. v. Medtronic Ave, Inc.*, 336 F. Supp. 2d 363,  (D. Del. 2004)

### C.    The View That the Claims Already Literally Covered the Effect of IGV On Surge Control Is Another Reason Suggesting the Patentee Could Not Reasonably Have Literally Claimed the Lock-out

52.    The presumption of estoppel may also be overcome if the patentee can show some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in questions.  An example of this is where a person skilled in the art would assume that the language already covered the equivalent. *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 287 F. Supp. 2d 126, 157 (D. Mass. 2003).

16

53.     As noted in the Expert Report of Gerard Muller dated October 27, 2000, one of ordinary skill in the art would believe that claim 4 of the '194 patent literally covered the Sundstrand Lock-out device.  Paragraph 40 & 44-45.  The language in clause (d) of claim 4 of the '194 patent calls for "adjusting the relationship between the magnitudes of said integral and proportional control signals and the magnitudes of said [flow-related] parameter variations as a function of the position of the inlet guide vanes."  The Sundstrand Lock-out disables the use of the integral and proportional control signals and thereby changes their relationship with the flow-related parameter based on the inlet guide vane position.  This provides an additional reason suggesting that the patentee could not reasonably have been expected to describe the equivalent, since one skilled in the art would think that he already had.

54.     The language in clause (f) of claim 8 of the '893 patent calls for "a reset signal for varying said set point as a function of the position of said inlet guide vanes."  In my opinion, a reasonable attorney practicing before the USPTO would assume that an inlet guide vane reset signal would cover the Sundstrand Lock-out signal.  Note that the specification of the '893 patent states that this "guide vane-related adjustment is accomplished by a function generator 104 which receives reset signal 90 and responsively generates an output signal 106 related to signal 90 according to a predetermined, generally linearly increasing reset schedule 108 as graphically illustrated in FIG. 4" (Col. 6, lines 43-48).  In Fig. 4 the function generator is shown with a slope of about 60°.  If it were 90° it would result in a lock-out.  Claim 8 does not specify the slope, so it could reasonably be interpreted as being broad enough to cover the Sundstrand Lock-out.

55.     The language in clause (g) of claim 19 of the '893 patent calls for "a guide vane position sensor and a function generator coupled in series between the inlet guide vanes and said input portion of said comparator."  As can be seen in block 104 of Figure 4, the function

17

generator does not produce a change in signal for a range of input guide vane (IGV) angles and then slopes up at a constant value after a break point. Claim 19 does not specify the slope. Thus, like the Lock-out of Sundstrand, it takes effect only after a certain condition is reached and after that point it has an effect, which the claim does not limit to a linear slope. In my opinion, a reasonable attorney practicing before the USPTO would assume that an inlet guide vane reset signal would cover the Sundstrand Lock-out signal, where the slope would be vertical after the break point.

56. Each of elements (f), (g) and (d) provide variations on the use of IGV that were known to the applicant, so the applicant reasonably believed that all uses of IGV in the control of the surge valve were covered. This is an additional other reason the patentee could not reasonably be expected to have described the equivalent.[2]

## IX. CONCLUSION

57. Based on a review of the patents-in-suit, their file histories and the prior art cited therein, it is my opinion that the amendments to claims 8, and 19 of the '893 patent and claim 4 of the '194 patent (a) were made without it being foreseeable that the Lock-out feature was an equivalent, (b) were only tangentially related to the equivalent and (c) would have been viewed by the patent attorney prosecuting the claims as covering all versions of IGV control, thus providing another reason that the effect of the amendment was not foreseeable.

58. I reserve the right to give opinions on facts and other matters arising subsequent to this report, including in rebuttal, either prior to or during any hearing or trial in this action.

---

[2] As described in Section VIII(A) of this Report, the need to redraft the claims to literally cover the Sundstrand equivalent would not have been foreseeable to a reasonable patent attorney in 1982-83. While I have discussed this argument under the "forseeability" prong of the *Festo* test, it might also be characterized under the case law as an "other reason" why the equivalent was not described in the patent-in-suit.

59.    Further, I reserve the right to supplement this report.


Dated: December 15, 2005

Melvin C. Garner

# EXHIBIT E

## Melvin C. Garner
*PRINCIPAL*

Phone: 212.527.7717
Fax: 212.753.7701
mgarner@darbylaw.com

**PRACTICE AREAS**

Electronics & Software Technologies
Medical & Mechanical Technologies
Trademark, Copyright & Unfair Competition
Litigation & Dispute Resolution

**EDUCATION**

Drexel University

B.S., Electrical Engineering, 1964
Eta Kappa Nu Honor Society
Technical Journal Award
Student Chapter, IEEE, President

New York University

M.S., Electrical Engineering, 1968

Brooklyn Law School

J.D., 1973
*Brooklyn Law Review*, 1971-1973
Senior Editor, 1972-1973

**ADMISSIONS**

New York State Bar
District Court for the Southern District of New York
District Court for the Eastern District of New York
Court of Appeals for the Second Circuit
Court of Appeals for the Federal Circuit
United States Supreme Court

**PROFESSIONAL
ASSOCIATIONS**

**American Intellectual Property Law Association**
*President* (2005-present)
*President Elect* (2003-2004)
*Second Vice President* (2002-2003)
*Board of Directors* (1999-present)
*Vice Chairman, Committee on Electronics and Computer Law*
(1998-1999)

**New York Intellectual Property Association**
*Immediate Past President* (2004-2005)
*President* (2003-2004)
*President Elect* (2002-2003)
*First Vice President* (2001-2002)
*Second Vice President* (2000-2001)
*Secretary* (1998-2000)
*Board Member* (1997-1998)
*Chairman, Committee on Trade Secret Law and Practice* (1990-1996)

**American Intellectual Property Law Education Foundation**

**Melvin C. Garner**
(continued)

*Trustee* (2003-present)
*Secretary* (2002-2003)
*Vice President* (2001-2002)

**National Inventors Hall of Fame**
*Board of Directors* (2001-present)

**American Bar Association**
*Member, Committee on Patent, Trademark and Copyright Law*

**The Association of the Bar of the City of New York**
*Member, Committee on Patent Law and Practice* (1989-1992)
*Member, Committee on Trademark Law and Practice* (1986-1988)

EXEMPLARY CASES

*Concept Innovation v. CFM Corp.*
Civ. Action No. 04C 3345 (N. D. Ill 2004)
Patent infringement settled with a recovery by client

*OP Solutions, Inc. v. Intellectual Property Network, Ltd.*
52 U.S.P.Q.2d 1818 (SDNY 1999)
Judgment for client in computer software copyright case.

*Pitney Bowes, Inc. v. Bell & Howell Mail Processing Systems*
Civ. Action No. 99 263 GMS (D. Del. 1999)
Patent Infringement settled with client receiving multi-millions
of dollars.

*Universal Gym Equip., Inc. v. ERWA Exercise Equip. Ltd.*
229 U.S.P.Q. 335 (D Md 1985), 827 F.2d 1542 (Fed. Cir. 1987)
Judgment for client in trade secret case.

EXEMPLARY AUTHORSHIP
AND RELATED ACTIVITIES

<u>Author</u>
(2003)

"Mock Argument to the Federal Circuit," *AIPLA Mid-Winter Meeting*

"Advanced Claim Drafting and Amendment Writing Workshop for
Electronics and Computer-Related Subject Matter," *14th Annual Patent
Prosecution Workshop*, Practicing Law Institute (2004)

Chapter 13, "Intellectual Property Protection of E-Commerce," *Intellectual
Property Counseling and Litigation*, (Matthew Bender) (2002)

2

**Melvin C. Garner**
(continued)

"Inevitable Disclosure of Trade Secrets by the Departing Employee," Selected Legal Papers, *American Intellectual Property Law Association* (April 1995)

"Report of the Committee on Trade Secret Law and Practice," *Intellectual Property Law Annual* (1995)

"Discovery and Related Motion Practice," *Anatomy of Patent Litigation*, Practising Law Institute (1994)

"Trade Secret Causes of Action and Defenses," *Intellectual Property Counseling and Litigation*, (Matthew Bender) - Chapter 58 (1988), Chapter 44 (1994)

"Trade Secrets Civil Legislation," *Legal Notes & Viewpoints Quarterly*, Vol. 7, No. 1, Practising Law Institute, pp. 59 *et seq.* (Nov. 1986)

<u>Listing</u>        Euromoney's *Guide to the World's Leading Patent Law Experts*

Who's Who Legal - Patents 2005

<u>Lecturer</u>        Practising Law Institute, "Fundamentals of Patent Prosecution" and "Advanced Claim Drafting and Amendment Workshop" (annually 1992-present)

ADDITIONAL INFORMATION        Melvin C. Garner specializes in the procurement and litigation of patent, trademark, trade secret and copyright matters involving various technologies including video circuits, cellular telephones, office products, medical products, and computer hardware and software. Mr. Garner serves a broad range of clients from *Fortune* 500 and *Forbes* International 500 corporations such as Pitney Bowes, Johnson & Johnson and Sanyo, to small and mid-sized companies.

Over the years, Mr. Garner has handled a wide range of intellectual property litigation matters, representing both plaintiffs and defendants. For example:

He successfully registered a trademark in a shape that was previously the subject of a utility patent. Then he was able to enforce that trademark in a litigation against an infringer.

After a plaintiff had successfully enforced a patent covering video equipment against several defendants, he defeated a preliminary

3

**Melvin C. Garner**
*(continued)*

injunction motion filed against his client on the same patent. The Court found that the plaintiff did not have a likelihood of success in proving infringement. The case settled favorably for Mr. Garner's client.

Working with other attorneys at Darby & Darby as well as lawyers at several other firms, he defended a major cellular phone company in a procedure brought against it for a temporary exclusion order before the International Trade Commission. Although the plaintiff won other aspects of the case, Mr. Garner was successful in defeating the motion with respect to a design patent on the cellular phone.

He represented the holder of patent and trade dress rights in a handheld labeling machine. In a litigation that involved proceedings in several states in the United States and European countries, he was able to force a favorable settlement for his client which required the defendant to change the design of its product, as well as pay past damages and a running royalty for use of the client's rights.

He also defended a major media company against charges of unfair business practices in a dispute over a computer software development contract. The plaintiff was seeking several million dollars in damages, but the case ended with a settlement of a few hundred thousand dollars after the jury trial began.

Representing the plaintiff in a case regarding infringement of copyrights in a computer software program that manages trademark portfolios, Mr. Garner was able to get a decision which upheld the copyrightability of various elements of a graphical user interface and determined that the elements had been infringed.

Mr. Garner also counsels a wide variety of clients, frequently providing infringement opinions for potential plaintiffs, non-infringement opinions for potential defendants and validity opinions for both litigants and inventors. For example, he assisted a client facing bankruptcy after a loss in a patent infringement over an electronic circuit that causes shoes to light while the user is walking. The case previously had been handled by another firm. Mr. Garner was able to find non-infringing technology for the client and have the trial court clear that technology of the injunction that had been issued. He also assisted the client in defeating a second infringement suit brought by the plaintiff with regard to the new technology. The process took nearly four years and now the client is a leader in the field. Mr. Garner also helped another company that was operating under a burdensome patent license to develop and patent its own technology. Eventually, as a result of this strategy, the client was able

4

**Melvin C. Garner**
(continued)

to avoid the patent covered by the license, and the original licensor was forced to be come a licensee of his client and to pay an even larger royalty to his client.

Mr. Garner has also appeared as an expert witness in key trials throughout the United States. He frequently lectures on a variety of technology-related legal issues. His approach is to find out the business goal of the client and their present position. Then he seeks to utilize the client's intellectual property assets, and the capabilities of Darby & Darby in terms of prosecution, litigation and negotiation, to help the client reach their business goal.

# EXHIBIT F

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF DELAWARE

4    Case No. 03-1153-GMS

5    ----------------------------------x

     HONEYWELL INTERNATIONAL, INC. and

6    HONEYWELL INTELLECTUAL PROPERTIES, INC.,

7              Plaintiffs,

8

9       - against -

10

11   HAMILTON SUNDSTRAND CORPORATION,

12             Defendant.

     ----------------------------------x

13             January 26, 2006

               9:01 a.m.

14

15

16      Videotaped Deposition of MELVIN

17   GARNER, taken by Defendant, pursuant to

18   Notice, held at the offices of Kirkland &

19   Ellis, LLP, 153 East 53rd Street, New

20   York, New York, before Todd DeSimone, a

21   Registered Professional Reporter and

22   Notary Public of the State of New York.

23

24

25

6

GARNER

1
2  extent I can, in interpreting the file
3  history of the cases involved in this
4  litigation.
5      Q.    Are you also an expert in
6  patent law?
7          MS. STEVENSON:  Objection.
8  Asked and answered.
9      A.    I'm not here testifying as an
10 expert in patent law.  The judge will
11 determine what the law is.
12     Q.    Am I right that you are also a
13 litigator?
14     A.    Yes, I have litigated.
15     Q.    And you've been lead counsel in
16 approximately 30 litigations?
17     A.    Yes, that's correct.
18     Q.    And in that role you are acting
19 as an advocate on your client's behalf?
20     A.    That's right.
21     Q.    Am I right that you haven't
22 been employed as an electrical engineer in
23 over 30 years?
24     A.    That's probably accurate.
25     Q.    Do you have any -- well, what

7

GARNER

1
2  was your last full-time employment as an
3  engineer?
4      A.    As an engineer it was with a
5  company called Sequential Information
6  Systems.
7      Q.    When did that end?
8      A.    Just before I went to Bell
9  Labs.  So it probably ended in 1971.
10         THE VIDEOGRAPHER:  Excuse me,
11 Counsel, can we go off the record?  I'm
12 experiencing technical difficulties.
13         MR. LIND:  Okay.
14         THE VIDEOGRAPHER:  The time is
15 9:05 a.m.  We are going off the record.
16         (Recess taken.)
17         THE VIDEOGRAPHER:  The time is
18 9:07 a.m.  We are back on the record.
19 BY MR. LIND:
20     Q.    Sir, you don't have any
21 experience working with control systems
22 for compressors on gas turbine engines,
23 correct?
24     A.    That's correct.
25     Q.    Has any of your work experience

8

GARNER

1
2  involved gas turbine engines?
3      A.    No.
4      Q.    How about has any of your work
5  experience involved compressors?
6      A.    By "work experience," do you
7  mean my work experience as an engineer or
8  as a patent attorney?
9      Q.    Let's start with engineering.
10 Has any of your work experience as an
11 engineer involved work with compressors?
12     A.    No.
13     Q.    Has any of your work experience
14 as an engineer involved work with
15 diffusers?
16     A.    Could you repeat the question?
17     Q.    Has any of your work as an
18 engineer in your life involved working
19 with diffusers?
20     A.    No.
21     Q.    Has any of your work involved
22 work with surge control systems?
23     A.    That is as an engineer?
24     Q.    As an engineer.
25     A.    No.

9

GARNER

1
2      Q.    Has any of your work as a
3  patent attorney involved working with
4  surge control systems?
5      A.    Except for this case, no.
6      Q.    Has any of your work as a
7  patent attorney involved working on
8  diffusers on compressors?
9      A.    I'm not sure about diffusers on
10 compressors.  Potentially I have worked on
11 that as a patent attorney.
12     Q.    What matter?
13     A.    I have a client who makes
14 refrigeration equipment.  I have either
15 prosecuted or supervised the prosecution
16 of a number of patent applications related
17 to their refrigeration technology, which
18 includes compressors and various parts.
19 Whether or not a diffuser was one of those
20 parts, I'm not clear.  I don't recall.
21     Q.    You don't recall any prior work
22 as a patent attorney working with
23 diffusers, correct?
24     A.    That's correct.
25     Q.    Did you ever take any courses

10

GARNER

2 dealing with compressors or diffusers?
3     A.     I have taken a course dealing
4 with compressors.
5     Q.     When was that?
6     A.     That was in college, in the
7 '60s.
8     Q.     Since the 1960s you haven't
9 taken any classes in compressors, correct?
10     A.     That's correct.
11     Q.     And you haven't ever taken any
12 classes in diffusers, correct?
13     A.     I can't say for sure. In my
14 undergraduate education I took a
15 significant number of mechanical
16 engineering courses and thermodynamics
17 courses. I do specifically remember
18 discussing compressors. I don't
19 specifically remember discussing
20 diffusers.
21     Q.     You don't recall at this time
22 ever having taken any classes dealing with
23 diffusers, correct?
24     A.     That's correct.
25     Q.     And you don't recall at this

11

GARNER

2 time taking any classes dealing with surge
3 control systems, correct?
4     A.     That's correct.
5     Q.     I think this follows, but you
6 certainly haven't taught any classes
7 dealing with compressors or diffusers or
8 surge control systems, right?
9     A.     That's correct.
10     Q.     Have you ever operated a
11 compressor?
12     A.     Well, my refrigerator has a
13 compressor in it.
14     Q.     So you've opened the door to
15 your refrigerator and closed it?
16     A.     Right.
17     Q.     Other than opening and closing
18 the door to your refrigerator, have you
19 ever operated a compressor?
20     A.     I believe there is a compressor
21 with a hand-operated sprayer that I've
22 used like for power washing fences and
23 things like that.
24     Q.     So other than operating some
25 stuff around the house, like a power

12

GARNER

2 washer, your refrigerator, have you ever
3 started up and operated a compressor?
4     A.     Not that I can recall.
5     Q.     Have you ever written any
6 articles or books on compressors or
7 diffusers or surge control systems?
8     A.     No, I have not.
9     Q.     And you are not a technical
10 expert in the field of compressors or
11 diffusers or surge control systems or
12 fluid dynamics, correct?
13     A.     That's correct.
14     Q.     Have you ever seen an APU?
15     A.     Not that I can recall.
16     Q.     And you are not a person of
17 ordinary skill in the relevant art in this
18 case, correct?
19         MS. STEVENSON:  Objection to
20 form. Vague.
21     A.     I'm not -- would you repeat the
22 question.
23     Q.     You are not a person of
24 ordinary skill in the art in this case,
25 correct?

13

GARNER

2         MS. STEVENSON:  Objection,
3 vague.
4     A.     I'm not a person of ordinary
5 skill in the art of compressors and
6 diffusers, surge controls. However, some
7 of the technology involved in here appears
8 to be electrical control circuitry and I
9 am a person with ordinary skill in the art
10 of electrical control circuitry.
11     Q.     What electrical control
12 circuitry do you believe is at issue in
13 the case?
14     A.     I don't know what is at issue
15 in the case. I'm saying the patent itself
16 discloses what appears to be electrical
17 control circuitry.
18     Q.     And what electrical control
19 circuitry are you referring to in the
20 patents in suit?
21     A.     I'm going to refer to it.
22     Q.     What are you referring to, sir?
23     A.     The patent number 4,380,893,
24 Figure 4, seems to show what could be
25 electrical control circuitry. However, it

26

GARNER

1
2  number of years?
3    A.    I'm here to offer my opinion
4  about what I believe reasonable patent
5  attorneys have done and would do under
6  certain circumstances in practicing before
7  the Patent Office.
8    Q.    And that is based on your role
9  as a lawyer practicing before the Patent
10  Office for a number of years, correct?
11    MS. STEVENSON:  Objection,
12  vague.
13    A.    It is based on my experience as
14  a lawyer practicing before the Patent
15  Office, as well as my experience in
16  teaching courses on the subject, also my
17  experience in working with others within
18  my firm and other firms and in bar
19  associations dealing with the same issues.
20    Q.    Do you agree that in your
21  experience in prosecuting patents the file
22  histories or prosecution histories for the
23  two patents in suit are relatively
24  uncomplicated?
25    MS. STEVENSON:  Objection,

27

GARNER

1
2  vague.
3    A.    Yes.
4    Q.    And they are some of the
5  shorter file histories I guess that you
6  might have dealt with over the years,
7  correct?
8    A.    I've had shorter, but they are
9  certainly not extensive file histories.
10    Q.    And there were only a few
11  Office actions, maybe only one in the case
12  of one of the patents; is that right?
13    A.    Yes.
14    Q.    Often patents when they go
15  through prosecution can have, you've heard
16  the term tortuous file histories with lots
17  of Office actions and lots of back and
18  forth between the Patent Office and the
19  examiner, correct?
20    A.    That is certainly possible.
21    Q.    Can you name for me all of the
22  cases for which you've ever prepared an
23  expert report?
24    A.    I probably can't do that, but I
25  can give you -- in the three cases that

28

GARNER

1
2  are listed in paragraph 9 of the report, I
3  know there is one in which there was not
4  an expert report because I actually went
5  to look for them.
6    There have been a few other
7  cases in which I know my deposition was
8  taken at least and which did not go to
9  trial or it went to trial and I didn't
10  testify at trial.  One of them was a
11  Johnson & Johnson case that I recall.  It
12  was in the District Court, Southern
13  District of New York, but in the White
14  Plains Division.
15    Q.    Let me start with this:  Other
16  than the three cases listed in paragraph 9
17  of your expert report and the one Johnson
18  & Johnson case in the Southern District of
19  New York, have you ever been retained as
20  an expert witness before?
21    A.    Yes.
22    Q.    In what other cases?
23    A.    Currently I've been retained --
24  I'm not going to remember the name.  There
25  is a litigation pending by someone named

29

GARNER

1
2  Rackman against Microsoft.  I've been
3  retained to study that case.
4    There is another case which is
5  Future Electronics.  There is an
6  individual who is suing Future Electronics
7  over blue LEDs and I've been retained to
8  give some expert opinion in that.  But in
9  neither of those cases has it gotten to
10  the point of actually doing an expert
11  report or being deposed.  I'm not even
12  sure if the other side -- if my
13  participation in the case has been
14  revealed to the other side in those two
15  cases.
16    Q.    Are there any others besides
17  those?  I'm up to six expert assignments
18  so far.
19    A.    Let me think.
20    Q.    I'm talking ever in your
21  career.
22    A.    I would suspect that there are
23  other ones.  They don't come to mind now.
24  I recall generally sort of getting
25  involved in cases and studying things and