IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF DELAWARE

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., and HONEYWELL INTELLECTUAL PROPERTIES INC., <br><br> Plaintiffs, <br><br> v. <br><br> HAMILTON SUNDSTRAND CORP., <br><br> Defendant. | Civil Action No. 99-309-GMS |

## EXPERT REPORT OF JOHN T. GOOLKASIAN

I, John T. Goolkasian, Esq., submit the following expert report at the request of counsel for Hamilton Sundstrand Corporation ("HSC"). I understand that discovery is ongoing in this case, and I reserve the right to amend or supplement this report or my expected testimony on the basis of new information that I receive.

### I. BACKGROUND

1. I am a patent attorney. Since May 2005, I have practiced as a sole practitioner. Prior to May 2005, I was a partner in the law firm of Oblon, Spivak, McClelland, Maier and Neustadt, P.C., one of the largest intellectual property law firms in the country. My *curriculum vita*, which summarizes my professional background, experience and publications, is attached as Exhibit A. A listing of all matters in which I have testified as an expert witness either by deposition or at trial in the last four years is attached as Exhibit B.

2. I have over twenty-five years of experience working in the United States Patent and Trademark Office ("Patent Office" or "PTO"). I served as an Administrative Patent Judge,

*Goolkasian* EXHIBIT 1
FOR I.D. 1-27-06

previously designated Examiner-in-Chief, on the Board of Patent Appeals and Interferences ("Board") from 1983 to 1994. As a member of the Board I reviewed adverse decisions of Patent Examiners and determined priority of invention in interferences. The decisions of the Board constitute the PTO's final determination of patentability and/or priority of invention.

3.    Prior to being appointed to the Board, I served in the PTO in various capacities including Examiner, Supervisory Primary Examiner, Instructor and Chief Instructor at the Patent Academy (a school established by the PTO to teach patent law), and as a specialist in inequitable conduct cases in the Office of the Assistant Commissioner for Patents. As a result, I am thoroughly familiar with the examining practices, procedures and policies of the PTO.

4.    In addition to Patent Office experience, I have over seventeen years of professional experience outside of the PTO during which time I have prosecuted numerous patent applications at major law firms and written numerous validity and infringement opinions for major national and international corporations.

6.    I have been retained by counsel for HSC as an expert witness on Patent Office practice and procedures and the drafting of patent claims and prosecution of patent applications. I am being compensated at my usual rate of $600 per hour for my independent study and review. I have no financial interest in the outcome of this case.

## II.    <u>DOCUMENTS CONSIDERED</u>

7.    I have considered the following materials in preparing this Report:

   a.    U. S. Patents Nos. 4,380,893 and 4,428,194, their prosecution history files and the references cited therein;

   b.    The expert report of Melvin Garner;

   c.    The decisions of the courts in *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, No. 99-309 GMS, 2001 WL 66348 (D. Del. Jan. 8, 2001); *Honeywell International Inc. v. Hamilton Sundstrand Corp.* 166 F. Supp.

2d 1008 (D. Del. 2001) and *Honeywell International Inc. and Honeywell Intellectual Properties Inc. v. Hamilton Sundstrand Corp.*, 370 F. 3d 1131 (Fed. Cir. 2004);

d.    The post-trial and appellate briefs of the parties in *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, Civil Action No. 99-309-GMS;

e.    The expert reports on infringement of Francis G. Shinskey and Gerard Muller;

f.    Various pleadings and discovery responses submitted by the parties in this remand action; and

g.    Conversation with HSC technical expert David Japikse.

## III.    OPINIONS AND BASES FOR OPINIONS

8.    I have reviewed the expert report of Melvin Garner, whom Honeywell International Inc. and Honeywell Intellectual Properties, Inc. (collectively "Honeywell") have proffered as an expert in patent law and prosecution.

9.    At the outset, I note that it is not the normal function of an expert to advise a district court regarding the law of infringement and/or the doctrine of equivalents, which is much of what Mr. Garner proposes to do. Although I have been permitted to testify in the Delaware District Court before, I have never been permitted to testify regarding the law as it applies to patents. In my opinion, it would be presumptuous for a patent lawyer to advise any court regarding the patent law, including how to interpret or apply the various *Festo* standards to the facts of a given case.

10.    I have reviewed the expert report of Melvin Garner and am of the opinion that much, if not all, of Mr. Garner's report is an exposition of the law of the doctrine of equivalents as he or Honeywell wishes it to be, regardless of how it has been decided by the Court of Appeals of the Federal Circuit and the Supreme Court. In particular, much of Mr. Garner's report is based on his tacit, incorrect and irrelevant suggestion that the Federal Circuit's decision

3

in *Honeywell International Inc. and Honeywell Intellectual Properties Inc. v. Hamilton Sundstrand Corp.*, 370 F. 3d 1131 (Fed. Cir. 2004) was incorrect. *See, e.g.,* Garner Report at ¶ 44. I disagree with Mr. Garner. It was on the basis of the very prosecution history he recites that the Federal Circuit found there was a presumption of prosecution history estoppel.

A.    **Summary of Opinions**

11.    If the Court were to allow testimony of experts on the subjects addressed by Melvin Garner, the primary opinions on which I would expect to testify are: it was not unforeseeable to a reasonable patent lawyer in 1982 to draft a claim that covered the alleged equivalent in this case; there was more than a tangential relationship between the reason for amending the claims and the alleged equivalent; and there is no other reason that prosecution history estoppel should not apply.

B.    **The benefits of drafting a patent claim literally encompassing the asserted equivalent was foreseeable in 1982.**

12.    In paragraphs 43 and 44 of his expert report, Mr. Garner states that an attorney practicing before the USPTO in 1982 would not have believed that prosecution estoppel was created by incorporating the limitations of a dependent claim into the independent claim in order to achieve allowance. Mr. Garner's contentions about what an attorney would have thought in 1982 are not relevant. The Federal Circuit already has decided that Honeywell (and by definition all persons involved in prosecuting the patent for Honeywell) did narrow its patent claims when it cancelled the rejected application claims that lacked the IGV Limitation and replaced them with claims that added the IGV Limitation.

13.    The *en banc* Federal Circuit decision in this case and others (including *Festo*) apply to all pending cases, not just those based upon applications filed after the decisions issued. Under Mr. Garner's logic that these decisions do not govern applications filed prior to the

4

Federal Circuit's ruling in *Festo*, the *Festo* decision would not apply to the application at issue in *Festo* itself, which is clearly not the case. Here, the Federal Circuit already has held that *Festo* applies. If Mr. Garner's position were correct, and a patentee could overcome the *Festo* presumption based on its legally erroneous "belief" as to whether estoppel existed, then the Federal Circuit's 2003 *Festo* decision and its later ruling in the *Honeywell* case would be irrelevant and effectively overruled.

14.      If, however, the Court were to allow expert testimony on this issue, I would testify that a reasonable patent attorney, practicing in 1982 or today, would have understood that he or she was narrowing a patent claim by incorporating the limitation of a previously dependent claim into an independent claim and canceling the broader independent claim, as the Federal Circuit in the 2004 *Honeywell* case held. Therefore, a reasonable patent attorney in 1982 would have recognized the benefit of drafting a patent claim that literally covered the alleged equivalent, rather than attempting to rely on the doctrine of equivalents. In fact, it was well understood by reasonable patent attorneys in 1982 that some claims should be drafted broadly, instead of simply relying on the doctrine of equivalents. *See, e.g.,* Manual of Patent Examining Procedure, 4th Ed. (1979) (stating that patentee should draft claims "varying from the broadest to which he or she believes he or she is entitled to the most detailed that he or she is willing to accept.")

15.      The Federal Circuit in *Honeywell Int'l Inc. and Honeywell Intellectual Properties Inc. v. Hamilton Sundstrand Corp.*, 370 F. 3d 1131 (Fed. Cir. 2004), correctly held that Honeywell narrowed its claims when it rewrote its dependent claims into independent form and canceled the original independent claim. (Garner Report ¶ 21) Because Honeywell narrowed its claims, it presumptively surrendered all equivalents to the "inlet guide vane limitations." In

5

explaining the rationale for its decision, the Federal Circuit stated that when a patent applicant rewrites a dependent claim in independent form, the rewriting constitutes a narrowing amendment because "the patentees clearly disclaimed the territory between the original claim -- and the new claim -- as issued." 370 F.3d at 1143. The Federal Circuit further stated that "the surrendered subject matter is defined by the cancellation of independent claims that do not include a particular limitation, and the rewriting into independent form of dependent claims that do include that limitation. Equivalents are presumptively not available with respect to that added limitation." *Id.* at 1144. And applying this rule to the facts of this case, the Federal Circuit held:

> In this case there is a presumptive surrender of all equivalents to the inlet guide vane limitation. The only independent claims asserted in this case, claims 4, 8 and 19, were originally dependent on independent application claims 16, 32, 48 and 49, which did not include the inlet guide vane limitation. Claims 4, 8 and 19 included the inlet guide vane limitation. Claims 4, 8 and 19 were rewritten into independent form, and the original independent claims were cancelled, effectively adding the inlet guide vane limitation to the claimed invention. Honeywell is presumptively estopped from recapturing equivalents to the inlet guide vane limitation.

*Id.*

16.    The prosecution record (or "file wrapper") demonstrates that for each of the three asserted independent claims – claims 8 and 19 of the '893 patent and claim 4 of the '194 patent – Honeywell relied on the IGV Limitation within such claim to distinguish the prior art and gain allowance. Issued claim 8 of the '893 patent was originally application claim 17, which was dependent on application claim 16. A18639-70. After application claim 16 (which lacked the IGV Limitation) was rejected as obvious, Honeywell cancelled it and replaced it with application claim 17 (which added the IGV Limitation). A18662, A18666, A18667-68.

17.    Issued claim 19 originally was application claim 35, which was dependent on application claim 32. When application claim 32 (which lacked the IGV Limitation) was

6

rejected as obvious, Honeywell cancelled it and replaced it with formerly-dependent application claim 35 (which added the IGV Limitation). A18644-45, A18661, A18666, A18677.

18.      Issued claim 4 of the '194 patent was application claim 51, which depended on application claim 49. The PTO Examiner rejected claim 49 (which lacked the IGV Limitation) as obvious in light of the prior art. A18740. Honeywell then cancelled claim 49 and replaced it with claim 51 (which added the IGV Limitation), rewritten as an independent claim. A18743, A18746-47. That rewritten claim issued as claim 4. A18748.

19.      In each case, the PTO rejected as obvious the broader application claim that lacked the IGV Limitation. Honeywell then cancelled and replaced that broader rejected claim with a narrower, formerly-dependent claim that added the IGV Limitation. In my opinion, a reasonable patent attorney at the time would have recognized that this clearly gives rise to prosecution history estoppel (or "file wrapper estoppel"), as the Federal Circuit correctly concluded.

20.      In paragraph 31 of his expert report, Mr. Garner contends that because original claims 14, 15, 30, 31, 33 and 34 were "not limited to the IGV position," the attorney would not have considered the IGV limitation as the sole basis for the patentability of the claims. Similarly, in paragraph 37, Mr. Garner states that "the amendment and allowance of claim 50 was not based on the IGV limitation," and thus the attorney would not have considered the IGV limitation as the sole basis for the patentability of the claims. Mr. Garner is wrong. These other claims have nothing to do with the asserted claims. Each of these other claims includes a limitation not at issue in the asserted claims, concerning a feature that responds, when the measured value of the flow parameter falls far below the set point, by disconnecting or interrupting the integral control signal. These other claims have no relevance to the application

7

of estoppel to the asserted claims. In each of the asserted claims, as the Federal Circuit has held, Honeywell relied on the IGV Limitation to define over the prior art and gain allowance by canceling original independent claims that lacked the IGV Limitation and replacing them with formerly-dependent claims that added the IGV Limitation. If necessary, I expect to testify regarding the prosecution history and how the narrowing amendments arose.

21.     If the Court were to allow testimony about what patent lawyers believed in 1982, I also would testify that I strongly disagree with Mr. Garner's position. During the late 1970's, I was a partner in a law firm headed by ex-PTO Commissioner Schuyler, and I spent the major portion of my time prosecuting patent applications and drafting opinions. I did not believe that narrowing a claim by incorporating the limitations of a dependent claim into the independent claim did not create a file wrapper estoppel. Indeed, I constantly strove to obtain claims without amendments and instructed associates to do so in order to avoid file wrapper estoppel.

22.     Mr. Garner also states that even attorneys practicing after the Supreme Court's *Festo* decision would not have envisioned file wrapper estoppel under the circumstances of this case. (Garner Expert Report ¶44) Mr. Garner points to Judge Newman's *dissent* in *Festo* (in which she was joined by only one other judge on the *en banc* panel) and notes that she was a patent attorney and Director of Patents and Licensing at FMC Corp. (*Id.*) Mr. Garner's argument is neither convincing nor relevant. The Federal Circuit's decision in the 2004 *Honeywell* case was *en banc*, and Judge Newman was the sole dissenter among 12 judges. The entire Federal Circuit was fully aware of her dissenting arguments in *Festo*, and it rejected them. Moreover, at least two of the judges in the *Honeywell* majority – Judges Lourie and Linn, each of whom rejected the position espoused by Judge Newman – were patent attorneys of excellent experience and repute. Judge Linn worked in the USPTO as an examiner and practiced patent

8

law as an attorney in private practice since 1969; Judge Lourie was a corporate patent attorney and in charge of patents for a pharmaceutical corporation. Even accepting Mr. Garner's logic, his argument would support HSC's position, not Honeywell's.

23.    It bears noting that the Federal Circuit decision in this case was an *en banc* decision joined by 11 of the Circuit's 12 judges. Further, in response to the United States Supreme Court's invitation to submit the "views of the United States" in connection with Honeywell's *certiorari* petition, the Solicitor General filed a brief – joined by the United States Patent Office and other interested government agencies – agreeing that the Federal Circuit's holding that Honeywell had narrowed its patent claims and surrendered claim scope, thus raising a presumption of estoppel, was correct and fully in accordance with established law and precedent.

**C.    Garner's opinion about unforeseeability lack a competent basis and are wrong**

24.    Mr. Garner contends in paragraph 46 of his report that "[t]here is no indication in the file histories of the patents-in-suit that the Sundstrand equivalent, including its Lock-out technique, was known in the art" and therefore, Mr. Garner argues, such an equivalent would not have been "foreseeable." (Garner Report ¶ 46) Mr. Garner's argument lacks merit for two basic reasons. First, the test of "foreseeability" under *Festo* – or more precisely, the patentee's attempt to overcome the presumption of surrender by showing that the alleged equivalent was unforeseeable – is not limited to what is present in the "file history" of a patent. It depends on what is known and foreseeable in the entire body of knowledge in the art. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003).

25.    Second, the test under *Festo* is whether the alleged equivalent would have been foreseeable to a person of ordinary skill in the art. *Id.* ("This criterion presents an objective

9

inquiry, asking whether the alleged equivalent would have been unforeseeable to one of ordinary skill in the art at the time of the amendment.") Mr. Garner is a patent attorney, not one skilled in the art competent to testify about what would be known and foreseeable to one of skill in the relevant art in 1982. Mr. Garner simply is not competent to testify on the foreseeability issue.

26.    If the Court were to allow testimony from patent counsel on this issue, it is my opinion that the concept of "later developed technology" encompasses circumstances where a significant and unforeseeable change in technology occurs. An example is the replacement of tubes with transistors. Application of this concept does not cover alternative, foreseeable techniques for accomplishing the same objective.

27.    I have spoken with HSC's technical expert in this case, Dr. David Japikse, and understand that there were no changes or developments in the technology between 1982 and the mid-1990's that would have prevented Honeywell's patent counsel from drafting a claim that would cover the equivalent to the "IGV Limitation."

28.    Mr. Garner presents a fundamentally inconsistent argument regarding the state of the technology. He first states that "[b]ecause at the time of the amendment the Lock-out was not known to the applicant … as an equivalent to the change in set point, it would not have been foreseeable to a reasonable patent attorney to draft claim language to cover the Lock-out." (Garner Report ¶46) Several pages later, Mr. Garner argues that "the patentee could not reasonably have been expected to describe the equivalent, since one skilled in the art would think that he already had." (*Id.* ¶53) It does not make any sense that the equivalent was both unforeseeable because it was unknown, and at the same time it was so apparent to one of skill in the art that he would have presumed the claim captured it.

29.    I disagree with the scenario set forth in paragraph 47 of Mr. Garner's expert report. When the broad original claims were not patentable over the prior art and narrow claims containing the IGV limitations were considered patentable, any reasonable patent attorney would have studied the art and recognized that the subject matter of the broad claims was anticipated or made obvious by the prior art. Under those circumstances, facing the Patent Examiner's rejection of the broader claims, the prosecuting attorney had three viable options. First, he could object to, or "traverse," the rejection under 35 U.S.C. § 132 and ask the Patent Examiner for re-examination of the rejected claim. If the examiner persisted in the rejection, the attorney could appeal. Second, he could attempt to draft a claim of intermediate scope – that is, a claim that is narrower than the rejected independent claim and therefore might gain allowance, but broader than the existing dependent claim. Third, he could accept the dependent claim in its existing scope, by rewriting it into independent form. Honeywell elected the third alternative, and any reasonable patent attorney at the time would have recognized that in so doing, Honeywell had narrowed the scope of its claim and surrendered equivalents to the narrowing claim element.

30.    I also disagree with the position set forth in footnote 2 of Mr. Garner's report, suggesting that his "foreseeability" argument might also be "some other reason" Honeywell can overcome the presumption.

**D.    The reason for amending the claims was directly related – and not tangential – to the alleged equivalent.**

31.    Under *Festo*, a patentee can attempt to overcome the presumption of surrender by showing that the "rationale underlying the amendment [bore] no more than a tangential relation to the equivalent in question." 535 U.S. at 740-41. Mr. Garner is not competent to offer expert testimony on the "tangential" issue. The *en banc* decision of the Federal Circuit on remand from the Supreme Court emphasized that "whether the patentee has established a merely

11

tangential reason for a narrowing amendment is for the court to determine from the prosecution history record *without the introduction of additional evidence, except, when necessary, testimony from those skilled in the art as to the interpretation of that record.*" 344 F.3d at 1370. Mr. Garner does not purport to be or appear to be skilled in the field of compressor technology, and therefore he would not be competent to offer testimony on the "tangential" issue.

32.     If the Court nevertheless were to permit testimony of patent counsel on the tangential issue, I would testify that based on my review of the patents and prosecution history, it is my opinion that the "rationale underlying the amendment" – or the reason Honeywell amended the claims – was directly related to the alleged equivalent.

33.     In ¶48 of his Report, Garner opines that the amendments to add the IGV Limitation "had no 'more than a tangential relation to the equivalent'" because they were merely conversions of dependent claims into independent claims, and thus "in no way changed the language" of the amended elements. This logic again attempts to revisit and overturn the Federal Circuit's decision in this very case. If Mr. Garner's position were true, the Federal Circuit could not have decided this case as it did. Thus, Mr. Garner's logic fails.

34.     Moreover, while the Federal Circuit has stated that where an amendment is made to avoid prior art that contains the equivalent in question, the amendment is clearly *not* tangential to that equivalent, it has never articulated or advocated the converse of that proposition, as Mr. Garner suggests (e.g. ¶49-50). In fact, the Federal Circuit in *Chimie v. PPG Industries Inc.*, 402 F.3d 1371, 1383 (Fed. Cir. 2005) advanced the exact *opposite* conclusion to the one Mr. Garner puts forth. In that case, the Federal Circuit stated:

> Rhodia misunderstands the scope of the inquiry into the relationship between the narrowing amendment and the accused equivalent. As we

> have stated, 'an amendment made to avoid prior art that contains the
> equivalent in question is not tangential,' *Festo*, 344 F.3d at 1369. *It does
> not follow, however, that equivalents not within the prior art must be
> tangential to the amendment.*

402 F.3d at 1383 (emphasis added).

35.    Further, the Federal Circuit has defined "tangential" as "peripheral, or not directly

relevant." *Festo*, 344 F.3d at 1369-70, *citing The American Heritage College* Dictionary 1385

(3d ed. 1997) and *The New Shorter Oxford English Dictionary* 3215-16 (1993). The

amendments to the claims were not "tangential" to the alleged equivalent in the APS 3200. After

the original claims that lacked the IGV Limitation were rejected, Honeywell relied on the IGV

Limitation – which specifies adjusting the set point (the desired value of flow needed to avoid

surge) based on IGV position – to distinguish the prior art and gain allowance. The jury in this

case found that the APS 3200 used IGV position in an equivalent way. Adapting the words of

the Federal Circuit in *Chimie* to the facts here, "[a]s a claimed improvement over the prior art,

the [particular use of IGV position to adjust the set point] was at issue during prosecution." 402

F.3d at 1383. Thus, the alleged equivalent in the APS 3200 – the use of IGV position in a surge

control system – is not tangential to Honeywell's narrowing amendment that relied on the IGV

Limitation to distinguish the prior art.

36.    In paragraph 51 of his expert report, Mr. Garner points out that in his opinion the

"reason the amendment was submitted," had nothing to do with the equivalent "Lock-out"

system. Mr. Garner then opines that "it cannot be said that the applicants intentionally

disclaimed any equivalent between some other broad language with respect to guide vanes and

that which is in the claims." I disagree with Mr. Garner's reasoning. By accepting the guide

vane limitation, and not pursuing either the broad claims or claims of intermediate scope,

Honeywell gave notice that the public was free to pursue alternative techniques that did not fall

within the scope of the IGV Limitation.. Mr. Garner's approach to the doctrine of equivalents would give no weight to the "notice" function of the claims and would effectively overrule the Supreme Court and the Federal Circuit.

37.     Moreover, the reason for the amendment is directly relevant to the equivalent because the very limitation that Honeywell needed to gain allowance of the asserted claims granted – the IGV Limitation – is the limitation for which Honeywell also had to resort to the doctrine of equivalents to show infringement. Thus, there is a direct relationship between the amendment and the equivalent.

**D.     There is no reason suggesting that Honeywell could not reasonably have literally claimed the asserted equivalent.**

38.     In paragraphs 52 through 56 of his expert report, Mr. Garner takes the position that a reasonable attorney would not have been expected to describe HSC's "insubstantial substitute" for Honeywell's inlet guide vane limitation. I disagree with Mr. Garner's position, which is essentially a legal argument, has nothing to do with Patent Office practice and is illogical. Mr. Garner argues that the "the claims already literally covered the effect of IGV on surge control." (¶¶52-56) That is incorrect.

39.     First, although Mr. Garner refers to the "other reason" suggesting Honeywell can overcome the presumption as being "where a person of skill in the art would assume that the [claim] language already covered the equivalent" (¶52), he applies a different test – whether "a reasonable attorney practicing before the PTO" would assume that the claim language already covered the equivalent. (¶54) Thus, there is no support for the test he actually applies. Nor would there be any support for his opining under the test he states in ¶52, because he is not a person of ordinary skill in the relevant art.

40.    Second, I understand that Honeywell's trial counsel in this case did not assert at trial that the APS 3200 APU literally met any claims of the '893 patent. Therefore, it does not make sense that a "reasonable patent attorney" would have believed the "inlet guide vane reset signal would cover" HSC's use of inlet guide vanes. Moreover, at trial, Honeywell argued that the APS 3200 literally infringed claim 4 of the '194 patent, but the jury found that the APS 3200 APU did not literally infringe that claim and on appeal Honeywell abandoned any claim of literal infringement. Hence, the record establishes that the APS 3200 does not literally infringe the asserted claims. Therefore, it is not correct that "one skilled in the art" would have believed that the language of claim 4 literally covered the APS 3200's use of inlet guide vanes.

## IV.    RESERVATION OF THE RIGHT TO SUPPLEMENT

41.    I reserve the right to supplement, and/or amend the opinions expressed herein that may be necessary in response to positions taken by experts of plaintiffs, including any expert on PTO prosecution. Accordingly, I expect to amplify what is stated above, where necessary, especially in view of information, not presently known to me or new information presented by plaintiff or plaintiff's experts prior to; or at trial, and to supplement this report should additional information be brought to my attention during the course of this proceeding.

42.    I also intend to use certain exhibits, blow-ups or annotated versions of such exhibits, and demonstrative exhibits to aid my testimony at trial.

Dated: January 12, 2006

John Goolkasian

15

## CURRICULUM VITAE

**NAME:**

John T. Goolkasian, Esq.

**TELEPHONE:**

Office:     (301) 460- 2857
Facsimile: (301) 460-3406
Home:      (301) 460-5335

**ADDRESS:**

3810 Glen Eagles Drive
Silver Spring, MD   20906

**PRESENT POSITION:**

Patent Attorney; Consultant – May, 2005 to present.

**EDUCATION:**

Juris Doctorate, Georgetown University
Bachelor of Science, Chemical Engineering, Northeastern University
Graduate Work in Biochemistry, FAES Graduate School at National Institutes of Health

**EXPERIENCE:**

**Law Firm of Oblon, Spivak, McClelland, Maier & Neustadt, P.C. – January 1994 through May, 2005**

*Partner*
Involved in a wide variety of patent matters, including patent validity and infringement opinions, providing advice on the prosecution of patent applications, conducting routine patent prosecution, and serving as a patent law expert in litigation.

**United States Patent and Trademark Office (PTO) – 1977 through 1994**

*Examiner-in-Chief and Administrative Patent Judge, Board of Patent Appeals and Interferences – 1983 through 1994*
Served in a quasi judicial capacity to review adverse decisions of patent examiners and to determine priority of invention in interferences.  Decisions appealable to the United States

Court of Appeals for the Federal Circuit or reviewable by civil action in a United States District Court.

Wrote numerous opinions selected by PTO officials as reflecting the then current state of the law and/or PTO policy. The opinions, as listed below, were published in the *United States Patent Quarterly*.

Selected by PTO officials to be the first Board member sent to a foreign country, South Korea, to participate in the World Intellectual Property Organization's program to assist developing countries in formulating a modern patent law policy.

### *Protest and Inter Partes Examiner, Office of the Assistant Commissioner for Patents 1981 through 1983*
Investigated allegations regarding fraudulent procurement of patents, recommended a final course of action and prepared written decisions.

## Law Firm of Schuyler, Birch, Swindler, McKie & Beckett - 1971 through 1977

### *Attorney/Partner*
Handled a well-rounded assortment of patent and trademark matters. Rendered numerous validity and infringement opinions. Wrote numerous briefs in trademark opposition and cancellation proceedings. Drafted and prosecuted patent applications.

## United States Patent Office – 1964 through 1971, 1977 through 1981

### *Patent Examiner to Supervisory Primary Examiner*
Examined patent applications in the technological arts of polymer chemistry, laminating, coatings and semiconductor processing. Trained and instructed junior examiners in the examination of patent applications.

Taught "basic" and "advanced" courses in the Patent Academy. Chief Instructor for the 1980 session of the Patent Academy.

## E.I. du Pont de Nemours & Co., Inc. & U.S. Rubber Company – 1956 through 1964

### *Technical Service Engineer*
Technical service engineer in polymer and coating technologies.


## PROFESSIONAL AFFILIATIONS:

American Bar Association
American Intellectual Property Law Association
Intellectual Property Section – District of Columbia Bar (Steering Committee – 1984)
Federal Circuit Bar Association

2

Maryland Patent Lawyer's Organization (President – 1998 – 1999)
Patent Lawyers Club of Washington, D.C.

## SPEECHES:

"PTO New Rules of Practice (Duty of Disclosure)", <u>Chartered Institute of British Patent Agents</u>, London, England, 1977

"Current Problems re: PTO Rule 56 -- Some Solutions", <u>Association of Corporate Patent Counsel</u>, 1983

"Preparing an Appeal Before the Board of Appeals", <u>Ohio Patent Law Association</u>, 1985

"Conducting Litigation Sensitive Patent Prosecution", <u>New Jersey Patent Law Association</u> 1994

"Patent Law", <u>Glycotechnology Conference</u>, Washington, D.C., 1994

## PUBLICATIONS:

"PTO New Rules of Practice" (Duty of Disclosure), <u>Journal of the Chartered Institute of British Patent Agents</u>, 1977

"Practice in Appeals before the Board of Patent Appeals and Interferences," Chapter 102 of text, <u>Intellectual Property Counseling and Litigation</u>, Matthew Bender & Co., 1990

## PUBLISHED AUTHORED OPINIONS:

Ex parte Skinner, 1986 Pat. App. LEXIS 4, 2 U.S.P.Q. 2d 1788 (BPAI, 1986)

Ex parte Kifer, 1987 Pat. App. LEXIS 14, 5 U.S.P.Q. 2d 1904 (BPAI, 1987)

Ex parte Kranz, 1990 Pat. App. LEXIS 29, 19 U.S.P.Q. 2d 1216 (BPAI, 1990)

Ex parte Thim, 1991 Pat. App. LEXIS 36, 22 U.S.P.Q. 2d 1941 (BPAI, 1991)

Ex parte Sudilovsky, 1991 Pat. App. LEXIS 27, 21 U.S.P.Q. 2d 1702 (BPAI, 1991)

Ex parte Aggarwal, 1992 Pat. App. LEXIS 5, 23 U.S.P.Q. 2d 1334 (BPAI, 1992)

Ex parte Ochiai, 24 U.S.P.Q. 2d 1265 (BPAI, 1992)

Ex parte Maizel, 1992 Pat. App. LEXIS 38, 27 U.S.P.Q. 2d 1662 (BPAI, 1992)

Ex parte C, 1992 Pat. App. LEXIS 35, 27 U.S.P.Q. 2d 1492 (BPAI, 1992)

Ex parte Obukowicz, 1992 Pat. App. LEXIS 37. 27 U.S.P.Q. 2d 1063 (BPAI, 1992)

Ex parte Deuel, 1993 Pat. App. LEXIS 5, 27 U.S.P.Q. 2d 1360 (BPAI, 1993)

Ex parte Levengood, 1993 Pat. App. LEXIS 10, 28 U.S.P.Q. 2d 1300 (BPAI, 1993)

Ex parte Anderson, 1993 Pat. App. LEXIS 23, 30 U.S.P.Q. 2d 1866 (BPAI, 1993)

Ex parte Duel, 1993 Pat. App. LEXIS 33 U.S.P.Q. 2d 1445 (BPAI, 1993)

## PUBLISHED OPINIONS:

Ex parte Kimbell, 1985 Pat. App. LEXIS 19, 226 U.S.P.Q. 688 (BPAI, 1985)

Ex parte Breuer, 1986 Pat. App. LEXIS 16, 1 U.S.P.Q. 2d 1906 (BPAI, 1986)

Ex parte McCullough, Jr., 1987 Pat. App. LEXIS 2, 7 U.S.P.Q. 2d 1889 (BPAI, 1987)

Ex parte Karol, 1988 Pat. App. LEXIS 18, 8 U.S.P.Q. 2d 1771 (BPAI, 1988)

Ex parte Fujii, 1989 Pat. App. LEXIS 17, 13 U.S.P.Q. 2d 1073 (BPAI, 1989)

Ex parte Holt, 1991 Pat. App. LEXIS 2, 19 U.S.P.Q. 2d 1211 (BPAI, 1990)

Ex parte Anderson, 1991 Pat. App. LEXIS 12, 21 U.S.P.Q. 2d 1241 (BPAI, 1991)

Ex parte Gelles, 1992 Pat. App. LEXIS 4 (BPAI, 1992)

Ex parte Sorg, 1992 Pat. App. LEXIS 13. 22 U.S.P.Q. 2d 1958 (BPAI, 1992)

Ex parte Thomson, 1992 Pat. App.  LEXIS 16, 24 U.S.P.Q. 2d 1618 (BPAI, 1992)

Ex parte Porter, Jr., 1992 Pat. App. LEXIS 27 (BPAI, 1992)

Ex parte Maziere, 1993 Pat. App. LEXIS 9, 27 U.S.P.Q. 2d 1705 (BPAI, 1993)

Ex parte Decastro, 1993 Pat. App. LEXIS 8, 28 U.S.P.Q. 2d 1391 (BPAI, 1993)

Ex parte Phillips, 1993 Pat. App. LEXIS 11, 28 U.S.P.Q. 2d 1302 (BPAI, 1993)

## PUBLISHED INTERFERENCE CASES

*Fiers v. Sugano et al v. Revel et al.*, 1991 Pat. App. LEXIS 44 (BPAI, 1991)

*Fiddes et al v. Baird et al.*, 1993 Pat. App. LEXIS 21, 30 U.S.P.Q. 2d 1481 (BPAI, 1993)

## Cases in Which John T. Goolkasian Testified
## By Deposition (D) or at Trial (T) Within Preceding Four Years

*BJ Services Co. v. Halliburton Energy Services, Inc.,*
     C.A.: H-00.0948 (S.D. Tex) – July 26, 2001 (D) – March 26, 2002 (T)

*Bayer AG, Bayer Corp. v. Housey Pharmaceuticals, Inc.,*
     (D. DE) (C.A.: 01-148 SLR – June 21, 2002 (D)

*U-Fuel v. Highland Tank & Manufacturing, et al.,*
     (E.D. PA) (C.A.: 02-CV-2723), July 24, 2002  (T)

*KLA-Tencor Corp. v. Tokyo Seimitsu Co. and TSK America, Inc.,*
     (N.D. Calif.) C.A.: CV-01-2489 SBA – August 13, 2002 (D)

*Dictaphone Corporation v. Nice Systems Inc.,*
     (D. Conn.) (C.A.: 3:00 CV 1143 (CFD) – November 7, 2002 (D)

*Sunny Fresh Foods, Inc. v. Michael Foods, Inc. and North Carolina State University,*
     (D. Minn.) Civil Action No. 00-CV-2117 (DSD/JMM) – December 3, 2002 (D)

*Cordis Corp. v. Guidant Corp. & Advanced Cardiovascular,*
     (Arbitration Panel Convened by Center for Public Resources Institute for Dispute
     Resolution) – December 10, 2002 (D)

*Impax Laboratories, Inc. v. Aventis Pharmaceuticals, Inc.,*
     (D. DE) – May 2, 2003 (D)

*Napro Biotherapeutics Inc. and Abbott Laboratories v. Mylan Laboratories, Inc. Mylan
     Pharmaceuticals Inc. and UDL Laboratories, Inc.,*
     (W.D. Penn.) – May 27, 2003 (D); December 8-10 (T).

*Sunny Fresh Food, Inc. v. Michael Foods, Inc. and North Carolina State University,*
     (D. Minn.) Civil Action No. 00-CV-2117 (DSD/JMM) – July 10 and July 21, 2003 (T)

*Kal Kan Foods, Inc. v. H.J. Heinz, et al.,*
     (D. CA) No. CV-01-10961 JFW (JTLx) – July 16, 2003 (D); December 22, 2004 (D)

*IDEC Pharmaceuticals Corp. v. Corixa Corporation, et al.,*
     (D. CA), No. 01-CV-1637 (RBB) – August 27, 2003 (D)

*Glaxo Group Ltd. and SmithKline Beecham Corp. v. TEVA Pharmaceuticals USA, Inc. and TEVA Pharmaceuticals Industries, Ltd.,*
(D. DE), C.A. No. 02-219 (CMS) – September 10, 2003 (D)

*Agfa Corporation v. Creo Products Inc., et al.,*
(D. Mass.), C.A. No. 00CV 10836 (GAO) – October 15, 2003 (D); December 11-12 and 14-15, 2003 (T)

*Syngenta Seeds, Inc., v. Monsanto Co.; Dekalb Genetics Corp.; Pioneer Hi-Bred International, Inc.; Dow Agrosciences, L.L.C.; and Mycogen Plant Science, Inc., and Agrigenetics, Inc.,*
(D. DE), Civil Action No. 02-1331 (SLR), July 22-23, 2004 (D)

*Pfizer Inc. v. Mylan Laboratories Inc. and Mylan Pharmaceuticals Inc.,*
(W.D. PA) Civil Action No. 02 1628, August 4, 2004 (D)

*Pall Corporation v. Cuno, Inc.,*
(E.D.N.Y.) CV 03 0092 (JS/ETB), September 21, 2004 (D)

*Mycogen Corporation, Mycogen Plant Science, Inc. v. Monsanto Com., Monsanto Technology, LLC,*
(S.D. IN), Case No. 1:04-CV-0573, January 12, 2005 (D)

*Inland Empire Foods, Inc. v. Zateca Foods, LLC,*
(E.D. CA), CV No. EDCV 00-0203 RT AIJx), January 19, 2005 (D)

*Honeywell International, Inc. and Honeywell Intellectual Properties, Inc. v. Hamilton Sundstrand Corp.,* (D. DE), CV No. 03-1153-GMS, February 15, 2005 (D)

*Smithkline Beecham Corp v. Ranbaxy Laboratories and Ranbaxy Pharmaceuticals,Inc.,*
(D. NJ), Case No. 03CV2158 (MLC), March 22, 2005 (D)

*Cephalon, Inc. v. Mylan Pharmaceuticals,Inc., Teva Pharmaceuticals USA. Inc., Barr Laboratories, Inc., and Ranbaxy Laboratories Limited,*
(D. NJ) Case No. 032-CV-1394 (JCL), May 13, 2005 (D)

*UCB S.A. and UCB Pharma, Inc. v. Mylan Laboratories, Inc and Mylan Pharmaceuticals, Inc.,*
(ND.GA), Civil Action No. 1:04-CV-0683, July 6, 2005 (D)

*In re Metoprolol Succinate Patent Litigation,*
(ED Missouri), MDL Docket No. 1620, August 11-12, 2005 (D)

*Albemarle Corporation v. Great Lakes Chemical,*
(MD Louisiana), Civil Action No. 02-505-A-M3 (JVP), September 29, 2005 (D)

*Monsanto v. Aventis,*
    (E.D. MO) (C.A.: 4:00 CV 01915 ERW) – August 9, 2002 (D); November 9, 2005 (T)

*Haberman v. Playtex Products, Inc, Gerber Products Company and Wal-Mart Stores Inc.,*
    (W.D. Wisconsin) (Civil No.05C-0224S)  December 1, 2005 (D)