# 2001 Trial Transcripts Part 8

Hearing Volume Number 10  
February 16, 2001  
Case 1:99-cv-00309-GMS    Document 421-16    Filed 05/01/2006    Page 2 of 8  
Honeywell International Inc., et al. v. Hamilton Sundstrand

[13] QUESTION: And it is by measuring [14] the position of the inlet guide vanes that the APS [15] 3200 surge control system insures that it does not [16] go into low-flow mode when it actually should be [17] in high-flow mode; correct?
[18] ANSWER: Correct."[19] Thank you, Mr. Putnam. Actually, I [20] should probably keep the Elmo on. What I'm going [21] to do is I'm going to show you a copy of what [22] you're going to have in the jury room as the [23] verdict form, I suspect Mr. Ziegler is going to do [24] the same.

Page 2552

[1] And the first two questions that [2] you're going to be asked are, Has Honeywell shown [3] by a preponderance of the evidence that Hamilton [4] Sundstrand's APS 3200 product literally infringes [5] Claim 4 of the '194 patent?
[6] Now, the one you're getting in the [7] jury room wouldn't have an X there yet. I put [8] that there. Because I think that's the right [9] answer. But that's for you to decide. That's [10] your decision based on the evidence, based on what [11] you think is right, but I thought I would at least [12] put up there my position.
[13] And on the second question, Has [14] Honeywell shown by a preponderance of the evidence [15] that Hamilton Sundstrand APS 3200 product [16] infringes Claim 4 of the '194 patent under the [17] doctrine of equivalents?
[18] And the answer is yes, too. [19] Then we go to Claim 8 of the '893 [20] patent, that's the apparatus patent, that's the [21] one that covers the mechanism for doing this. And [22] again, they admit most of the elements are met.
[23] They admit that the APS 3200 has all [24] the things that they say here Sundstrand admits,

Page 2553

[1] yes, or Sundstrand's expert admits yes.
[2] As you can see there is two in [3] dispute. Five out of seven they agree. The other [4] two they take issue with.
[5] And the first one talks about [6] sensing means for sensing the value of a [7] predetermined, flow-related parameter within said [8] duct means, et cetera, et cetera.
[9] We've already been through that, [10] haven't we, that's DELPQP or Delta P over P and [11] the evidence that I mentioned a little while ago [12] about the sensing and the duct. So I mean, it's [13] the same evidence, same proof.
[14] And you'll remember that was also [15] the testimony that I put up or the admission from [16] Mr. Greubel, the guy who they brought in and said, [17] hey, I did this.
[18] And then this says further that the [19] flow-related parameter being substantially [20] independent of the temperature of the compressed [21] air. So there is temperature in there, let's talk [22] about that because I don't want you to think I [23] skipped over that.
[24] Mr. Muller testified in the last

Page 2554

[1] part of claim D, part D of Claim 8:
[2] "Is said value of said flow-related [3] parameter being substantially independent of the [4] temperature of the compressed air, is that part [5] also met by the appears 3200?
[6] ANSWER: Yes."[7] And for Mr. Ziegler's benefit, [8] that's at 644. I think it's right on there. We [9] put it on there so we don't have to worry about [10] trying to find it.
[11] The next, element E, Sundstrand [12] admits that.
[13] Next element is element F, that's [14] the one that they dispute. Varying set point as a [15] function of the position of inlet guide vanes.
[16] We admit, they don't do it exactly [17] the same way that the patent calls for, but they [18] do it in a way that's not substantially different [19] and we talked about that already. I already put [20] that evidence up with respect to how the [21] flow-related parameter and the surge set point are [22] functions and related to the inlet guide vane [23] position.
[24] Also, in addition, they have the

Page 2555

[1] high flow/low flow and the inlet guide vanes used [2] to switch back and forth to that, you remember all [3] about that.
[4] So those are the two elements that [5] they dispute on Claim 8.
[6] Now, remember we also have claims 10 [7] and 11 in the case, those are the dependent [8] claims. Those are the ones that are dependent on [9] Claim 8. You got to meet all the elements of [10] Claim 8, they admit.
[11] I think you remember Mr. Shinskey [12] admitting this, if they infringe Claim 8 they have [13] the extra element of Claim 10, and the extra [14] element of Claim 11. They don't argue that they [15] don't. They admit if they infringe Claim 8, they [16] also infringe Claim 10 and 11.
[17] Then we go to claim 19, and again, [18] out of all the elements in Claim 19, we have got [19] eight elements there, I think, I think I counted [20] them up right. They admit they have six of them, [21] so the only ones you have to worry about are two.
[22] Element B, well, that looks [23] familiar. A sensing device having a sensing [24] portion adapted to be positioned in the duct to

Page 2556

[1] sense there in a predetermined parameter related [2] to the air flow rate through the duct, said [3] sensing device further having an output portion.
[4] We've already been through that. We [5] had Delta P over P, that's the flow-related [6] parameter, and I showed the evidence with respect [7] to — their witnesses admit that it's measured in [8] the duct.
[9] And Mr. Muller testified to that as [10] well. Then we have, what's the next one, it's [11] element G. They admit C, D, E and F. Let me get [12] down to G, a guide vane position sensor and a [13] function generator coupled in series between the [14] inlet guide vanes and said input portion of said [15] comparator.
[16] We talked about this already. The [17] flow-related parameter DELPQP is a function or [18] related to inlet guide vane position. There is no [19] question they have a guide vane position sensor. [20] We talked about that with everybody, everybody [21] agrees they have a sensor. The question is, what [22] do they do with it?
[23] And they use it in part to develop [24] their DELPQP, or Delta P over P and the surge set

Page 2557

[1] point. So that takes care of that. There is no [2] question, I think, about the input to the [3] comparator. We have got testimony from that and [4] there was a drawing that showed it and Mr. Muller [5] talked all about that.
[6] Then we go to dependent Claim 23, [7] and again dependent Claim 23 is just an extra [8] element to Claim 19, and they admit that if we [9] infringe — or if they infringe Claim 19 they also [10] infringe Claim 23. Remember, to win, all we have [11] to do is win one claim.
[12] You may ask why did we put in all [13] these other ones, that was partly because of the [14] invalidity arguments. We wanted to deal with [15] fairly with the two patents that way, but all we [16] have to win on is one.
[17] So the next question on the jury [18] verdict form, question number three, Has [19] Honeywell shown by a preponderance of the evidence [20] that Hamilton Sundstrand's APS 3200 product [21] infringes any of the following claims of the '893 [22] patent under the doctrine of equivalents?
[23] And again, I've put the X's there to [24] indicate that we think we have.

Page 2558

[1] Again, this is preponderance of the [2] evidence, remember. If the scales tilt a little [3] bit in our favor, then we win.

### Page 2584

[1] fair thing that they did.

[2] And there is no evidence it doesn't [3] infringe. The actual testimony by Mr. Muller [4] would include the design even without that high [5] flow/low flow cutoff.

[6] All right. Last point. Reasonable [7] royalty.

[8] Do you remember I did this with [9] Mr. Staats? And the reason I did it with [10] Mr. Staats was because Ms. Davis didn't have all [11] the information. Mr. Staats had access to some [12] information about sales made by Hamilton [13] Sundstrand between February 3rd, '99 and February [14] 19th, next Monday, 2001, with respect to these are [15] the sales made by Hamilton Sundstrand.

[16] And Mr. Staats had information, [17] Ms. Davis didn't have. So what I did was I took [18] the number he had for these OEM sales, because [19] they hadn't given that to Ms. Davis and I [20] multiplied it by two to come up with the [21] aftermarket sales.

[22] Do you remember Mr. Johanson [23] admitted they make all their money on the [24] aftermarket sales?

### Page 2585

[1] You know what I discovered after I [2] got back to the office, I made a mistake. [3] Ms. Davis testified the number should be 2.2. Her [4] actual testimony was the amount of aftermarket [5] compared to OEM is 2.2, I only used 2, so my [6] mistake. I'll live with it.

[7] 12 percent, that's the royalty [8] figure you heard from us. That's what you come up [9] with, you add interest, prejudgment interest. Do [10] you remember I went through that with Mr. Staats?

[11] So I ask you to write some of these [12] down. The demonstratives don't go back to the [13] jury room, so if you want to remember any of these [14] numbers, I would ask that you write them down. [15] The number for the reasonable royalty is [16] $3,024,409.

[17] And the number for — if you could [18] put the number for the lost profits, $71,007,251, [19] that's item eight. Reasonable royalty is the one [20] I just mentioned over there, and we're asking you [21] to decide what the reasonable royalty is, and [22] that's 12 percent.

[23] If we have to talk about that [24] anymore, I'll raise it in rebuttal to Mr. Ziegler.

### Page 2586

[1] Thank you for your attention.

[2] THE COURT: Ladies and gentlemen, I [3] think we can benefit from a break. Why don't we [4] do that. Let's take a short break.

[5] (A brief recess was taken.)

[6] THE COURT: Okay. The jury is on [7] the way. Mr. Krupka, I counted, you have 14 and [8] change, but we'll round it up to 15 minutes for [9] rebuttal.

[10] MR. KRUPKA: Thank you, Your Honor.

[11] (Jury entering the courtroom at [12] 10:55 a.m.)

[13] THE COURT: Is everyone all right? [14] Okay. All right. We'll proceed now. [15] Mr. Ziegler.

[16] MR. ZIEGLER: Thank you, Your [17] Honor. May it please the Court and ladies and [18] gentlemen of the jury, I think there are two [19] things that Mr. Krupka and I actually agree on.

[20] One is our gratitude to you for [21] sitting through this for the last two weeks and [22] paying what I really think is an incredible level [23] of attention that you have paid, and we really [24] appreciate it.

### Page 2587

[1] The other thing that he mentioned [2] that I agree with is the importance of patents. [3] Patents are important. Hamilton Sundstrand [4] believes that patents are important. It has its [5] own patents and it wants others in the world to [6] respect its patents.

[7] But there is a flip side of the [8] importance of patents. Patents encourage [9] innovation and they're important. But if a patent [10] is misused, it stifles competition, and [11] competition in the marketplace is also important.

[12] And part of what makes our society [13] as productive as it is, is the ability of [14] companies to compete with one another.

[15] And the fact is, the evidence that [16] you've heard shows that competition from APIC with [17] the 3200 turned out to be very important in [18] improving AlliedSignal, Honeywell's product.

[19] Because on the very first day of [20] this trial, we heard from Mr. Loranger, and [21] particularly on cross-examination of Mr. Loranger, [22] that back in the days when AlliedSignal had the [23] only APU available for the A320, Airbus' A320 [24] aircraft, the customer, and the airlines didn't

### Page 2588

[1] like it because it wasn't very good.

[2] And you may recall that I showed him [3] an article from Aviation Week magazine in which [4] there were quotes from both Airbus and airline [5] representatives indicating there was a graphic [6] quote from Airbus saying that their APU, the [7] AlliedSignal APU, the 36-300 was a piece of junk, [8] according to Airbus.

[9] And there is no dispute in this case [10] between the parties that the failure of [11] AlliedSignal, now Honeywell, to satisfy its [12] customers needs with its APU is what led Hamilton [13] Sundstrand to develop a competing product with the [14] encouragement of Airbus to do it.

[15] So this is an important case and it [16] raises an important issue. Yes, if the patents [17] are infringed, that's wrong. But it's equally [18] wrong for one competitor, Honeywell, to take a [19] patent that doesn't apply to its competitor's [20] product and sue its competitor, a competitor that [21] came in because Honeywell was not doing a good job [22] to satisfy its customers and say you owe us 70, [23] now it's up to $73 or $74 million dollars.

[24] They have to prove that there is

### Page 2589

[1] patent infringement here, and they haven't done [2] it, they can't do it, because the facts of how the [3] APS 3200 controls surge simply do not meet the [4] elements of the patent claims.

[5] And it is significant that despite [6] Mr. Krupka's great eloquence and ability to [7] articulate, that when it comes to the critical [8] issue of what is in the patent claims, and how the [9] APS 3200 works, it doesn't come out clearly. And [10] that's what this case requires, a clear [11] understanding of how the APS 3200 does it, and a [12] clear understanding of what the patent calls for.

[13] And you did not hear in that [14] summation that was wilted with phrases disparaging [15] Hamilton Sundstrand's case and its powerful facts [16] as excuses as plan B and plan G or whatever.

[17] Of course, a company that is being [18] sued for $70 million is going to provide to you [19] all of the information and all of the bases and to [20] say there is more than one reason why Honeywell [21] loses, that that somehow means none of the reasons [22] are valid really defies common sense.

[23] All Mr. Krupka in terms of validity [24] tried to turn a sow's ear into a silk purse.

### Page 2590

[1] There are numerous articles out there [2] that teach the basic principle of adjusting your [3] set point to control surge by IGV position, numerous.

[4] And his argument is we should have [5] selected one, and the fact that we showed you [6] numerous is somehow a weakness rather than a [7] strength. It turns common sense on its head.

[8] What I would like to do is start [9] with a clear explanation, as clear as I can make [10] it based on the evidence in this case of what the [11] APS 3200 does to control surge and compare it to [12] the only

Hearing Volume Number 10
February 16, 2001
Case 1:99-cv-00309-GMS    Document 421-16    Filed 05/01/2006    Page 4 of 8
Honeywell International Inc., et al.  v.
Hamilton Sundstrand

element of the patent that are really at [13] issue here.

[14] Let me start with the elements of [15] the patents. If we could put on the screen claims [16] eight — let's start with Claim 4. I'll tell you [17] exactly, Stephanie. 51.

[18] And if we could highlight the last [19] portion just above that, but starting two lines [20] above. Now blow that up for us.

[21] This is what this infringement case [22] is all about, ladies and gentlemen. Claim 4 in [23] element C refers to utilizing integral and [24] proportional control signals to operate the bleed

### Page 2591

[1] valve to prevent surge.

[2] And element D says when you're [3] generating their integral and proportional control [4] signals that you're using to prevent surge, to [5] infringe the patent you have to adjust the [6] relationship between the magnitudes or size of [7] those integral and proportional control signals, [8] and the magnitudes of the parameter variations [9] which you now know, we've come an awfully long way [10] in the last two weeks, you now know the parameter [11] variations and the measurement of the air flow or [12] the movement that's going on in the compressor, [13] you have to do an adjustment as a function of the [14] IGV position.

[15] That's the issue. [16] Claim 8 and claim 19 have similar [17] language to this. And maybe we should put up [18] Claim 8. And in Claim 8, it's item F, and please [19] enlarge that.

[20] Again, earlier in Claim 8, there is [21] a reference to proportional and integral control [22] signals to control the surge valve, and F says [23] you're putting into the comparator that generates [24] a signal that varies the set point as a function

### Page 2592

[1] of the position of the inlet guide vanes.

[2] And Claim 19 in element G, it's [3] worded had differently but it's really saying the [4] same thing, I don't think there is any dispute [5] between the parties.

[6] Now, let me show what the APS 3200 [7] does and compare it to that claim language because [8] that's what this case is about. That's what [9] Mr. Shinskey did. It's what Mr. Muller when he [10] was asked questions gave answers regarding.

[11] And I'm going to talk about the [12] differences between Mr. Shinskey's testimony and [13] its quality and the quality of Mr. Muller's [14] testimony in a moment. But before I do that, I [15] just want to walk you through what the APS 3200 [16] actually does in light of that claim language, [17] because as jurors in a patent infringement case, [18] that's what you — the exercise you need to go [19] through to understand it, to determine whether [20] they have proven, met their burden to show that [21] what the 3200 does is described by those [22] elements.

[23] And you recall yesterday in the [24] Judge's instruction, I don't think I need to flash

### Page 2593

[1] it up on the screen — Your Honor, does the jury [2] have their copies of the instructions with them [3] now?

[4] THE COURT: They should.

[5] MR. ZIEGLER: Okay. [6] For infringement, each and every [7] element has to be satisfied either exactly, [8] literally, or in a manner that is just [9] insubstantially different than under the doctrine [10] of equivalents, and every element has to be there [11] before infringement is proven.

[12] Now, if we could put up the chart [13] that is 32. Chart 32. And Stephanie, if you [14] could outline this diagram so it's enlarged.

[15] I'm going to walk over to the Smart [16] Board just because it's closer and I can point to [17] things better.

[18] Ladies and gentlemen, there is no [19] dispute between the parties that this describes [20] the part of the 3200 that generates the [21] proportional and integral signals that control the [22] surge valve. And it's relatively, as things go in [23] the case, straightforward.

[24] You have this circle, which is the

### Page 2594

[1] comparator, and it's comparing two different [2] things. It's comparing the actual values of [3] DELPQP, which you know is the parameter that [4] measures the air that is in the compressor. And [5] it's comparing it to the surge set point, which [6] you know is the desired value.

[7] And if there is a difference between [8] the surge set point, the desired value of this [9] parameter, and what the actual measurement is at [10] DELPQP, there is a difference, and the difference [11] is called an error and it sends an error signal [12] that there is that difference to the PI controller [13] which generates a control signal called BCBVTL.

[14] That's the control signal that [15] operates that surge valve and opens it to exhaust [16] if it needs to and prevents surge.

[17] Now, the input is the value of the [18] parameter, the actual value of the parameter, [19] what's going on in the machine, and the set [20] point, the desired value.

[21] And the input to the set point, the [22] only input to the set point is temperature. Not [23] IGV position. Temperature is the only thing that [24] governs what that surge set point is.

### Page 2595

[1] And there are four surge desired [2] values, and they're listed on this chart. And the [3] temperatures are listed on this chart. If it's [4] hotter, if it's at least 88 degrees outside when [5] you're sitting in the airport, and the APU is [6] operating, this machine is told by the computer [7] program inside the control box to make the desired [8] value of the parameter .205.

[9] And if the temperature outside [10] changes and it goes down to 87 degrees, or [11] anywhere between 60 and 87 degrees, then the set [12] point changes and goes up to .215.

[13] And if it's a colder day, or you're [14] in a colder place, and it's less than 59 degrees [15] outside, the set point is changed again to .225.

[16] And as a result, depending on the [17] temperature, the desired value changes. The [18] parameter values are what's the air that's going [19] through the system, that's measured by DELPQP.

[20] The comparator compares the two, the [21] desired value against what's going on. And that's [22] what generates the error signal.

[23] So the size of the error signal [24] varies with the set point varied. And the set

### Page 2596

[1] point varies in accordance with how cold or warm [2] it is outside. That's what changes the desired [3] value, and that's what affects the PI controls of [4] your generator.

[5] As a result, the relationship [6] between the value of the parameter, the DELPQP, [7] and the resulting PI control signals is affected [8] by temperature. The air temperature.

[9] There is no dispute that that is the [10] truth. There is nothing about these PI control [11] signals, nothing, ladies and gentlemen, that is [12] affected by IGV position. But what the patent [13] calls for, whether it's in Claim 4 or Claim 8, or [14] Claim 19, and those are the three, the only three [15] claims you really need to focus on, because the [16] remaining three claims are what are called [17] dependent claims.

[18] And if 8 and 4 and 19 are not [19] infringed, then by definition the other three [20] can't be infringed because they just have [21] additional items to them. But they incorporate [22] what's in the other, three others. So it's [23] necessary that eight be infringed before the [24] dependent claims on eight can be in-

Honeywell International Inc., et al. v.
Hamilton Sundstrand Case 1:99-cv-00309-GMS   Document 421-16   Filed 05/01/2006   Page 5 of 8

Hearing Volume Number 10
February 16, 2001

###### Page 2597

[1] So the key issue is the absence in [2] generating those PI control signals, the things [3] that control the surge valve of any input from IGV [4] position. It's not there in the 3200.

[5] Now, IGV position is relied upon in [6] another aspect of this overall system. And I'm [7] going to turn to that right now. But the patent [8] calls for using IGV position to generate the PI [9] control signals that are used to operate that [10] little exhaust valve.

[11] And perhaps I should step back a [12] moment and just review what has come out in the [13] testimony that inside this little compressor [14] that's whirling around and compressing the air for [15] use in the aircraft, if the demand for that air [16] falls, the air flowing through the compressor has [17] no where to go, and surge can occur.

[18] And therefore, to prevent that from [19] happening, the system automatically will open up [20] this valve. If the aircraft doesn't need the [21] compressed air that's being made and therefore the [22] flow inside the compressor is falling because it's [23] got no where to go, this valve is opened and [24] controlled by these PI signals, so it has

###### Page 2598

[1] someplace to go, so that there is enough air [2] flowing through to prevent surge.

[3] And in the 3200, the PI control [4] signals control the operation of that valve to [5] prevent surge. They rely on the desired value, if [6] the parameter value coming in gets into this [7] range, if it's 89 degrees outside, and the [8] parameter value goes below .205, then you're going [9] to have a difference, and then you're going to [10] have a proportional integral control signal that [11] is going to open that valve a little bit, let some [12] air out.

[13] If there is a bigger difference, if [14] your parameter value is way below .205, you're [15] going to get a bigger error signal, it's going to [16] generate a larger signal in the end, the valve [17] will open more. That's what's going on.

[18] Let me turn to how the 3200 does use [19] IGV position. And if we could have the next [20] chart, Stephanie. Do you know which one it is? [21] Could you enlarge it for me?

[22] This is a separate part of the logic [23] that the APS 3200 uses. And what it signifies, [24] this is the — represents the high-flow test. And

###### Page 2599

[1] you will recall from the testimony that this [2] particular parameter, DELPQP which has particular [3] characteristics, follows a curve where it doesn't [4] correlate perfectly with air flow in the [5] compressor.

[6] As flow increases, it goes up. As [7] flow continues to increase, it appears to go [8] down.

[9] Therefore the logic was developed to [10] say which side of that curve are we on so that the [11] system can know if the set point — if the [12] parameter value that's being reported is below the [13] set point, whether it's truly in a high-flow [14] situation, or a low-flow situation. You only need [15] to open your surge valve if you're really in low [16] flow.

[17] Because this particular parameter [18] has this, as Mr. Muller called it, this funny [19] characteristic that you can get a double solution, [20] that you can theoretically have a reading of a [21] parameter value of .18 when you are, in fact, [22] there is a lot of air going through this there.

[23] And you can also get a reading of [24] .18 when you're in low flow, because of that it

###### Page 2600

[1] was understood to be a need to have a test to find [2] out if you had this value .18 whether you were in [3] low flow and needed to let your PI signals control [4] the valve or whether you were in high flow, in [5] which there was no need to have the PI signals [6] control the valve.

[7] So there are two parts of the test. [8] The first one, and it's written on this chart, and [9] again, there is no dispute that this is how it [10] works.

[11] If the value of the parameter goes [12] as high as .35, that's way above all those set [13] points, there is no concern at .35 that you're [14] anywhere near the surge limit. You don't have to [15] be, if there is that much movement in the air [16] going through the compressor, you don't have to be [17] opening your exhaust valve.

[18] So if the parameter value goes above [19] .35, this system cuts out those PI control [20] signals, and substitutes a separate signal that [21] everybody degrees, both experts agree is not a [22] proportional and integral control signal. It's [23] just a fixed voltage. And it keeps the exhaust [24] valve shut because you're in high-flow mode, you

###### Page 2601

[1] don't have to be modulating or moving that exhaust [2] valve.

[3] And a separate test is built in that [4] involves IGV position, and it also involves [5] pressures and it involves temperature and it is a [6] back up test that if it's not greater than .35, [7] this test determines which side of that curve [8] you're on. Is it in high flow or is it in low [9] flow?

[10] And if it determines that it is in [11] high flow, all it does is it maintains this [12] constant signal, this non PI signal that's already [13] started to be generated once you got to the .35 [14] line, it just retains it.

[15] And if it determines that you're in [16] low flow, it then allows that — it then chooses [17] the PI signal to operate the surge control valve.

[18] The PI signals that then operate the [19] surge control valve, ladies and gentlemen, are the [20] same ones that are constantly being generated. [21] Regardless of how this test comes out and this [22] lock out of those signals, the PI signals that are [23] generated are the ones that are dependent on [24] temperature.

###### Page 2602

[1] So the only role of IGV position in [2] this entire system is a back up test to determine [3] whether because of the funny characteristic of [4] this particular way to measure the air movement, [5] the machine is in high or low-flow mode.

[6] But there is nothing — if we could [7] put the language from Claim 4 back up there.

[8] What Claim 4 calls for, and Claim 8 [9] and Claim 19, is in generating the signals that [10] control the position of that valve and using [11] proportional and integral control signals, that [12] the magnitudes of those signals be affected under [13] the control logic by IGV position.

[14] And that simply does not happen in [15] the 3200. It's just not part of its design.

[16] And conversely, this high-flow test, [17] this back up high-flow test that does monitor IGV [18] position is no where in the patent. And that is [19] what this case is about. And you didn't hear a [20] word of this from Mr. Krupka.

[21] Mr. Krupka contented himself with [22] saying incorrectly that Mr. Shinskey admitted in [23] this courtroom that Claim 4D was satisfied by the [24] 3200. That is simply not the case.

###### Page 2603

[1] Initially to support that proposition, [2] Mr. Schlaifer mistakenly put up a [3] snippet from somebody else's testimony entirely, [4] then when Mr. Putnam passed the note and [5] Mr. Shinskey's testimony was put up, you could see [6] that that testimony did not have Mr. Shinskey [7] saying yes, element 4D in the 3200, it adjusts the [8] PI signals in accordance with IGV position.

[9] In fact, during that part of the [10] cross-examination, I have no, ladies and [11] gentlemen, and if you focused on this as I did, [12] but in fact Mr. Putnam at that

point had on the [13] screen, on the big screen element 4D and he had [14] been previously going through the claim, all the [15] elements and asking questions that related to the [16] language in the elements.

[17] And then he put up element 4D. But [18] when he asked the question that I thought was [19] coming about element 4D, he changed the question. [20] He did not track the language of 4D. He [21] substituted questions that you heard just now.

[22] So that there was no statement by [23] Mr. Shinskey that this is satisfied. This is not [24] satisfied and that's exactly what he said.

Page 2604

[1] Now, conversely, Mr. Muller gave [2] testimony about these same issues. And you may [3] recall on cross-examination by Mr. Herrington that [4] he was asked a key question about this Claim 4.

[5] He was asked because the 3200 does [6] not do this, it doesn't adjust the relationship [7] between the magnitudes of the integral and [8] proportional control signals that are used to [9] operate the bleed valve in accordance with IGV [10] position.

[11] Mr. Herrington asked Mr. Muller, [12] doesn't he agree that the control signals at issue [13] here have to be used to operate the bleed valve, [14] just as it says in Claim 4C.

[15] And this was what Mr. Muller [16] responded. I'm going to read it to you. It went [17] like this, this is page, starting at page 757, [18] line eight of the transcript, this is [19] Mr. Herrington of Mr. Muller.

[20] QUESTION: Now, in your opinion is [21] that requirement that to utilize the integral and [22] proportional control signals to operate the surge [23] bleed valve require that the system actually [24] utilizes the proportional and integral signals to

Page 2605

[1] operate the bleed valve?"

[2] A pretty straightforward question. [3] What it says in the claim that those [4] signals have to — are used to operate the surge [5] bleed valve, do you agree that's what it means, [6] Mr. Muller?

[7] This is what he said.

[8] "ANSWER: What it says — what it [9] says is that this is a provision which basically [10] states that the integral and proportional control [11] signals simultaneously generated control to [12] operate — let me just — it's the way the wording [13] is phrased here. Yes, what it refers to, it [14] basically just refers to the generation of these [15] signals and then it says — and basically it says [16] these signals are generated to operate the

valve [17] and, in fact, that's what occurs."

[18] And Mr. Herrington persisted to see [19] if he can get a clear response from Mr. Muller so [20] he asked the following question:

[21] "QUESTION: My question is, where it [22] says utilizing said integral and pro- portional [23] control signals to operate said surge bleed valve, [24] does that necessarily require that the integral

Page 2606

[1] and proportional control signals are used to [2] operate the said surge bleed valve?"

[3] And this is what Mr. Muller said the [4] next time.

[5] "ANSWER: What it says is that [6] these valves are generated to operate the valve. [7] It does not say to what extent they're operated, [8] over what range. It just simply states that the [9] flow parameter is used, fed through a proportional [10] and integral controller to generate a signal that [11] is available to the bleed control valve, or to a [12] surge control valve, or in the case to a surge [13] bleed valve as the wording in the patent."

[14] Mr. Herrington tried again.

[15] "QUESTION: Just to be clear, it [16] states utilizing said integral and pro- portional [17] control signals to operate said surge bleed [18] valves?

[19] "ANSWER: Yes, which is exactly [20] what it does.

[21] "QUESTION: Does it require that [22] they be utilized to operate the said bleed valve?

[23] "ANSWER: It says nothing here [24] about when it's used and to what extent it's

Page 2607

[1] used. It basically says that it's available to be [2] used to operate these, the surge bleed valves.

[3] "QUESTION: So a system — could in [4] your view satisfy about this language by not [5] utilizing said integral and pro- portional control [6] signals to operate said surge bleed valve."

[7] Mr. Herrington is saying utilizing [8] to operate the bleed valve. He's asking Muller: [9] Could that be satisfied by not doing that?

[10] "ANSWER: This language does not [11] put constraint to the utilization of the signals [12] widely proportional and in- tegral controllers to [13] operate the said bleed control valve. It actually [14] states that they be available to be used to [15] operate the surge bleed valve.

[16] "That's the extent of what the [17] statement says in my reading. I mean, I can see [18] where there could be dis- agreement on that, but [19] that's the way I read that."

[20] Now, ladies and gentlemen, there is [21] disagreement on that, and it's not simply [22] disagreement from me.

[23] If you would turn to your copy of [24] the Judge's charge, jury instructions from

Page 2608

[1] yesterday to page 18, you will see that among the [2] instructions the Judge gave you on page 18 was he [3] explained what 4C means in this regard.

[4] And he gave this straightforward [5] interpretation that utilizing those PI signals to [6] operate the bleed valve means those PI signals are [7] utilized to operate the bleed valve.

[8] Mr. Muller disagrees with that. It [9] may be his right to disagree with that, but you [10] have no right to disregard the Judge's [11] instruction. You are bound by it.

[12] So Mr. Muller's analysis of [13] in- fringement here, at least on Claim 4, is based [14] on an interpretation of the patent claim that is [15] wrong.

[16] The balance of Mr. Muller's [17] testimony was of a piece with the portion that I [18] read for too long, but it was not [19] straightforward. It was not clear. It did not [20] hang together. It was what it was. It went on at [21] great length, and at the end of the day he [22] certainly, in response to Mr. Putnam's questions, [23] dutifully gave the opinion, yes, these elements [24] are satisfied. Yes, there is infringement here,

Page 2609

[1] but it didn't make any sense.

[2] It wasn't tethered to the claims. [3] You may recall, chances are you [4] don't, it's my job to remind you, that in [5] analyzing claims, it was either 8 or 19 that talks [6] about requiring IGV position to be an input into a [7] comparator. He referred to one of their nice [8] charts as the comparator is here, and then to say [9] that IGV position was an input to the comparator, [10] he had to go to a different chart and say, well, [11] there is another comparator over there that IGV is [12] an input to. But there is no comparator over [13] there, and Mr. Shinskey testified to that [14] clearly.

[15] Mr. Shinskey is a fellow with [16] decades of experience and knowledge about [17] controlling compressors. And as you know, has [18] written books and articles, and has been invited [19] to 50 different nations around the world to give [20] lectures about controlling com- pressors.

[21] He's the real McCoy. He's a genuine [22] expert. He knows what he's talking about.

[23] Mr. Muller is a man who lists [24] himself with a lawyer's service on a

Honeywell International Inc., et al. v. Hamilton Sundstrand
Case 1:99-cv-00309-GMS    Document 421-16    Filed 05/01/2006    Page 7 of 8
Hearing Volume Number 10
February 16, 2001

variety of

Page 2610

[1] different subjects. He's available for hire to [2] come into court and give testimony on a whole [3] bunch of subjects.

[4] He's not written any articles or [5] books that we're aware of, nothing about that was [6] elicited. He has experience with surge control. [7] I don't mean to suggest otherwise, at Exxon, but [8] the comparison between the background and the [9] clarity of their testimony is overwhelming.

[10] And the fact is, the only proof of [11] infringement that Honeywell chose to provide to [12] you was the testimony of Mr. Muller. Hamilton [13] Sundstrand is the defendant here, we're not [14] obligated to put anything on on infringement, we [15] don't have to burden to prove we don't infringe.

[16] Honeywell has the obligation to [17] prove that we do infringe. And the only proof [18] that it offered of that was the testimony, which I [19] frankly suggest to you did not hang together, was [20] not clear, of Mr. Muller.

[21] But we didn't just rest on the fact [22] that Muller is not reliable, we provided you [23] Mr. Shinskey. And Mr. Shinskey is not as [24] garrulous as Mr. Muller. Mr. Muller certainly has

Page 2611

[1] a salesman's charm.

[2] Mr. Shinskey provided direct [3] answers. At the end of the day, if the [4] explanation that I've provided based on the [5] evidence does not convince you that there is no [6] infringement here, you need to weigh those two [7] experts, that's your job.

[8] I will note that Honeywell didn't [9] bring a single Honeywell engineer to come in here [10] and testify, in addition to Mr. Muller. And we [11] know that they got the 3200. They got two of [12] them. And we know that they tore that 3200 apart [13] every way from Sunday, and they generated a [14] document that is in evidence, Defendant's Exhibit [15] 45. I believe it's over a thousand pages long [16] called The Benchmark where they compare their [17] newer product, the 131-9A, to the APS 3200.

[18] And ladies and gentlemen, if you [19] look at page 207863 of this document, it's at the [20] very end, there is a bunch of congratulatory [21] E-mails about what a good job the Honeywell [22] employees did in tearing apart the APS 3200.

[23] They say it's the most complete [24] effort in Kapu history. And it refers to the fact

Page 2612

[1] that the team has produced technical documents [2] with over 60 contributing authors.

[3] So they had 60 engineers pouring [4] over the APS 3200, and they did not bring a single [5] one of them here to testify and support [6] Mr. Muller's conclusion that what the APS 3200 [7] does is anywhere described in their patent.

[8] There's this burden for you to find [9] infringement here. You must conclude as to [10] between Mr. Muller's testimony and Mr. Shinskey's [11] testimony, if you find Mr. Muller more [12] persuasive.

[13] Mr. Muller who in response to [14] Mr. Herrington's questions acknowledged that his [15] interpretation of Claim 4C of the patent is [16] different than Judge Sleet's interpretation that [17] we are bound by.

[18] Based on that, and based on the way [19] it operates, there is simply no basis to find [20] infringement.

[21] Now, let me talk about the doctrine [22] of equivalents for a moment, but first, like [23] Mr. Krupka, I need a drink. More than water, but [24] water is all I got.

Page 2613

[1] The doctrine of equivalents is [2] important to patents. It makes eminent sense. [3] The doctrine of equivalents says if you change — [4] if you do everything the patent does but you [5] change one little thing in an insubstantial, you [6] can't get away with that.

[7] If you are doing what the patent [8] calls for but in some minor respect you make this [9] insubstantial difference, it's the same as [10] infringement, and that's only fair. If there is a [11] genuine invention out there and it's described [12] accurately, people should be able to invade that [13] by tweaking it a tiny little bit so it's [14] essentially the same thing.

[15] But there is a flip side to the [16] doctrine of equivalents, ladies and gentlemen, [17] which is why the Court in its instruction to you [18] yesterday on the doctrine of equivalents told you [19] you have to pay special vigilance to not let the [20] doctrine of equivalents swallow up the claims.

[21] And the flip side is this, and I [22] actually may agree with a third thing Mr. Krupka [23] said, he said in his opening, patents are like [24] property deeds, you own a house, you own some

Page 2614

[1] land, the deed denotes. It lays out what is your [2] property and what the dividing line is between [3] your property and your neighbor's property.

[4] And patents in the claims lay out [5] what the inventor is claiming is that other people [6] can't do without his permission. But if you [7] interpret the doctrine of equivalents broadly, [8] then the rest of the world doesn't know where the [9] claims start and where they start.

[10] And, therefore, the rest of the [11] world would have a risk if they make a product [12] differently. They would not know whether they are [13] infringing or not if the doctrine of equivalents [14] expands those claims, and it would simply be [15] unfair in the same way that if you parked your [16] car, I think that was Mr. Krupka's analogy, on [17] your neighbor's property and he took the air out [18] of the tires, but he hadn't marked the boundary [19] wasn't clear, and you thought you were on your [20] side of it, would be unfair.

[21] And so the doctrine of equivalents [22] has to be confined so that the rest of the world [23] can know that this is the claim. If I don't do [24] that or something very unsubstantially different

Page 2615

[1] from that, if I do something that moves away from [2] that more than just a small way, I'm Okay. So you [3] can't use the doctrine of equivalents to expand [4] claims.

[5] And that is what Honeywell is trying [6] to do here. Because the 3200 does not use IGV [7] position for the fundamental reason the patents [8] say to use it. They say use IGV position to [9] control the surge valve by effecting your desired [10] values.

[11] It's in Claim 4. It says adjust the [12] PI signals that are used to control the valve in [13] accordance with the IGV position. It's in Claim 8 [14] where the word set point is actually used, use IGV [15] to control your set point, the desired value. And [16] it's in Claim 19 where it says use IGV position to [17] go in a function generator and both experts agree [18] that that is doing the same thing. It's using IGV [19] position to determine how much or how little [20] you're controlling your bleed valve.

[21] And that's not what the 3200 does. [22] And it's not what the 3200 does at any time. [23] Mr. Krupka made a point and he showed you the [24] Judge's instruction that there is still

Page 2616

[1] infringement if you infringe part of the time.

[2] Well, if the PI signals that were in [3] the 3200 in that first chart — could you put that [4] first chart back up, Stephanie and enlarge it [5] again.

[6] What that means is if these PI [7] signals were in fact affected by IGV position, if [8] the set points were varying in accordance with the [9] schedule of IGV positions which is what the patent [10] calls

for, but they were cut out some of the time, [11] then that would constitute part-time infringement, [12] because part of the time the PI signals would in [13] fact be influenced with the IGV position.

[14] And I agree, if the PI signals [15] aren't constantly used, but when they are used [16] they're influenced by varying the set point by IGV [17] position, then that would be part-time [18] infringement.

[19] But these PI signals are never [20] influenced by IGV position. It's simply not an [21] input to them at any time. And so there is no [22] part-time infringement here.

[23] Nor is the use of temperature, as [24] Mr. Krupka tried to suggest, a mere addition to

Page 2617

[1] everything else that's in the patents.
[2] There were two inputs here, [3] temperature and IGV position, there would be some [4] sense to that argument. Because then he could say [5] hey, you're affecting your surge set point by IGV [6] position. The fact that you're also affecting it [7] by temperature, is an addition, doesn't mean you [8] infringe, that would be right. But that's not the [9] facts.
[10] The doctrine of equivalents, the [11] Judge has charged you, is that it has to be a [12] minor — sorry, he didn't use the word minor, an [13] insubstantial difference. The difference here is [14] fundamental. The PI control that operates that [15] surge involves simply not affected by IGV [16] position.
[17] IGV position is used for this [18] secondary part of a test just to determine if the [19] parameter value is reliable or not. That is very [20] far afield from what these patents are talking [21] about.
[22] That's why in my opening I [23] analogized it. I will reread the analogy, its not [24] perfect, no analogy is perfect. You may recall in

Page 2618

[1] my opening, Mr. Krupka just referred to it again, [2] that I analogized what is going on here to my [3] household and to the fact that in my household, [4] this is true, my wife has control of the [5] temperature set point.
[6] I personally wish I had control of [7] the temperature set point in this room, but I [8] don't. And that is an important function.
[9] I have a function with respect to [10] our heating system. I go down to the cellar once [11] a week and make sure there is enough water, the [12] water level in the boiler is right. They are both [13] roles in controlling the heating in our house.
[14] If somebody had a patent on the [15] notion that only the kids — pardon me, only the [16] men should control the thermostat in the house and [17] they came into my house and they said you've [18] stolen our idea because we think you're doing the [19] same thing, it's functionally the same thing.
[20] Yes, it's true we see your wife is [21] the one who is controlling the thermostat but [22] you're going down in the cellar once a week, have [23] a role in the heating system.
[24] IGV position in the 3200 hundred

Page 2619

[1] does have a role in respect to this high-flow [2] test, but it is not the role that is assigned to [3] IGV position in the patent. And there is no way [4] that the doctrine of equivalents could possible be [5] used to stretch those patent claims so broadly to [6] say that as long as IGV does something in [7] connection with this issue, that's enough.
[8] The Judge instructed you that in [9] determining whether something is an insubstantial [10] difference or not, you can look at its function. [11] You can look at the way it does it. You can look [12] at the result it achieves. And if you apply that [13] test, the function, the way, the result, there is [14] no way you can conclude that that difference is an [15] insubstantial one.
[16] Let me turn quickly to the issue of [17] willfulness. Mr. Krupka, I think, makes two [18] points on willfulness, broadly speaking. One is [19] that Hamilton Sundstrand was aware of these [20] patents for years, and did nothing to investigate [21] whether the 3200 infringed or not, until Honeywell [22] provided notice in February of 1999.
[23] Well, part of that is true. [24] Hamilton Sundstrand was not aware of any

Page 2620

[1] connection between the Honeywell patents and its [2] 3200 product, until February 3rd, 1999 when it [3] received a letter from Honeywell, which is in your [4] jury books, saying we think you infringe these [5] patents and some other patents.
[6] And at that point when it got that [7] information, when it was told that, within days, [8] not months, not years, within days it did what the [9] Judge's charge suggests is appropriate. I didn't [10] think for a company to hire a responsible outside [11] patent counsel to analyze it. And that happened.
[12] Hamilton Sundstrand retain Mr. [13] VanSanten and his firm. They did a very thorough [14] analysis. They reported back. There is no [15] infringement here. And that opinion from [16] Mr. VanSanten is in your jury books. It's an [17] exhibit, as is the testimony that we didn't read [18] yesterday about all the work that he did and his [19] colleagues did in reaching that conclusion.
[20] So the issue here is was Hamilton [21] Sundstrand under some obligation to do something [22] more than it did assuming there was infringement, [23] which, of course, I've just finished, there is no [24] way you can conclude based on the — Mr. Muller's

Page 2621

[1] testimony that there was.
[2] But, I don't know, I won't be in the [3] jury room with you, so I need to discuss all these [4] other issues.
[5] Is there any reason in common sense [6] that Hamilton Sundstrand should have done [7] something prior to 1999 when it got that letter to [8] determine if it infringed these patents?
[9] Well, you heard directly, firsthand [10] from Mr. Greubel, one of the engineers who was [11] involved in developing the surge control logic in [12] the 3200. And he told you several important [13] things. You may recall that I asked him, the [14] folks who had — I listed the names of the [15] Hamilton Sundstrand people who were associated [16] with those patents, the ones that Mr. Krupka says [17] — recited where the patent office said about the [18] Stokes patent, among others.
[19] And Mr. Greubel told you that one — [20] one of them wasn't even in the company anymore at [21] the time they were working on the surge control [22] logic of the 3200. Two of them were still with [23] the company but in a completely separate building [24] a mile away. And three of them he never heard of.

Page 2622

[1] So those folks had no role, the ones [2] who had, according to Mr. Krupka's argument, some [3] information about the Stokes patent didn't have [4] any role in developing this surge control logic.
[5] So that the fact that they [6] encountered the Stokes patent in some unrelated [7] context does not tell the company, gee, there is [8] some connection between the Stokes patent and what [9] we're doing here.
[10] And there was testimony on video [11] from Mr. Crowe who was a lawyer, now with [12] Mr. VanSanten's firm but previously at Hamilton [13] Sundstrand, about the fact that Hamilton [14] Sundstrand gets lots of patents. It makes lots of [15] patent applications. The patent office often [16] cites other patents as prior art in that process.
[17] And on average, there may be [18] hundreds of such patents that the patent lawyers [19] in Illinois encounter in the