# 2006 Remand Trial Transcripts Part 1

3

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

HONEYWELL INTERNATIONAL INC.        :    Civil Action
and HONEYWELL INTELLECTUAL          :
PROPERTIES INC.,                    :

    Plaintiffs,                     :

    v.                              :

HAMILTON SUNDSTRAND                  :
CORPORATION,                        :

    Defendant.                      :    No. 03-1153-GMS

- - -

Wilmington, Delaware
Thursday March 23, 2005
9:00 a.m.

- - -

BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J., and a Jury

APPEARANCES:

    THOMAS C. GRIMM, ESQ.
    Morris, Nichols, Arsht & Tunnell
        -and-
    ROBERT KRUPKA, ESQ.,
    JONATHAN F. PUTNAM, ESQ.,
        -and-
    MICHAEL STRAPP, ESQ.
    LEE ANN STEVENSON, ESQ.
    Kirkland & Ellis
    (New York, New York)

        Counsel for Plaintiffs

---

2

APPEARANCES CONTINUED:

    RICHARD D. KIRK, ESQ.
    The Bayard Firm
        -and-
    MARK L. LEVINE, ESQ.,
    CHRIS J. LIND, ESQ., and
    BRIAN SWANSON, ESQ.
    Bartlit Beck Herman Palenchar & Scott LLP
    (Chicago, Illinois)
        -and-
    DAVID HERRINGTON, ESQ.
    Cleary Gottlieb

        Counsel for Defendant

    - - -

        THE COURT:  Good morning.  Please be seated.

    (Counsel respond "Good morning.")

        THE COURT:  We will start out with a round of
reintroductions, beginning with Mr. Krupka and his team.

        MR. KRUPKA:  Good morning, Your Honor.  Nice to
see you again.  Bob Krupka, Jonathan Putnam, Lee Ann
Stevenson, and Tom Grimm for Honeywell.

        Also at counsel table, this is David Schlaifer,
who is our technical assistant.  He will be sitting at
counsel table for convenience, if it is okay with the Court.

        THE COURT:  That is fine, absolutely.  Mr. Kirk,
or whoever.

        MR. LEVINE:  Your Honor, Mark Levine for

---

1    Hamilton Sundstrand.  With me from my firm are Chris, and
2    Brian Swanson, an also here is David Herrington.
3        THE COURT:  We can get back.
4        What did we decide at the pretrial conference
5    with regard to openings?
6        MR. KRUPKA:  Your Honor, we decided that the
7    parties could make openings and indeed I thought it would be
8    helpful to the Court and it would simply count against our
9    time, which we have agreed would be split between the
10   parties.
11       THE COURT:  You have the floor, Mr. Krupka.
12       MR. KRUPKA:  Yes, Your Honor.  If I might
13   briefly bring up a few housekeeping matters that will be
14   very quick.
15       In view of Your Honor's ruling yesterday, we
16   will not be calling Mr. Garner, obviously.  Mr. Goolkasian,
17   obviously, will not be called, either.  I have discussed
18   this with opposing counsel.  We don't have any strong
19   feelings about it.  We would like the record to reflect that
20   as an offer of proof, the subject matter of Mr. Garner's
21   testimony would be as described in his expert report, which
22   was attached to our opposition to Sundstrand's motion in
23   limine, limited to, obviously, the subject matter of the
24   other reasons.
25       THE COURT:  I think it is important, yes.

---

4

1        MR. KRUPKA:  If the Court would like to do
2    something more formal than what I have just done, I am happy
3    to.  But I was reluctant to voluntarily put more paper
4    before the Court unless the Court thought it would be
5    necessary.
6        THE COURT:  Mr. Lind, Mr. Levine?
7        MR. LIND:  I think that is fine.  It is clear
8    they gave up on tangential relation, and just as to the
9    other reasons, the papers and the parties have already been
10   filed.  We agree.
11       THE COURT:  The Court agrees, it is sufficient.
12       MR. KRUPKA:  Thank you, Your Honor.
13       With respect to exhibits and deposition
14   designations, the parties are still feverishly working out
15   final details on that.  We will sort those all out.  We are
16   trying to keep issues that the Court needs to decide to a
17   minimum.
18       The parties are still working on that.  The only
19   other thing, Your Honor, I have advised Sundstrand's counsel
20   we would invoke the sequestration rule with respect to their
21   fact witnesses and there is no objection to that.
22       THE COURT:  So ordered.
23       MR. LIND:  The only issue on the deposition
24   designations is that we will be giving Your Honor DVDs that
25   will fit the video, so you can see the actual testimony.

**9**

1 Federal Circuit did not change the file history, and did not
2 change the language of the claims. There was no rearranging
3 of the language. There was no reinterpretation of what the
4 claims meant. It simply, like all of us, when we do this in
5 court, used a shorthand term to identify what we knew we
6 were talking about as opposed to every time we say
7 something, speak the exact complete, full words of all three
8 claims.
9 Now, the specific text of the claims, that
10 constitute the so-called inlet guide vane limitations, is
11 what is set forth here in red. I recognize it is difficult
12 to do so on the screen, but we are all familiar with the
13 claims and all familiar with the terms of the claims.
14 My point here was simply to demonstrate that the
15 term inlet guide vane limitation does not become the
16 limitation. It is the reference to this language in each of
17 the three independent claims that's at issue, namely, the
18 language that appears in red, all of which was added by the
19 amendment that rewrote the dependent claims in independent
20 form.
21 If we go to the next slide, which is Slide 6,
22 this is how it occurred. The independent Claim 16 was
23 rejected. Dependent Claim 17 was objected to. It was
24 rewritten in independent form and became Claim 8 of the
25 '893 patent.

**10**

1 Similarly, Claim 19 found its origin in
2 independent Claim 32 that was rejected, dependent Claim 35,
3 that was objected to, and it became allowed Claim 19 in
4 independent form.
5 Similarly, with respect to the '194 patent, it
6 actually was two patent preliminaries that were rejected,
7 independent 48 and dependent 49, to which the Patent Office
8 rejected them on prior art grounds. Dependent Claim 51,
9 which depended from 49 and therefore 48, was rewritten in
10 independent form and became Claim 4.
11 And I think Your Honor is aware that there were
12 some minor changes on Rule 112 grounds. And I think both
13 parties have agreed and set forth in their trial briefs that
14 we all agree, those are irrelevant for purposes of this
15 trial.
16 So, the result of this rewriting, Your Honor,
17 was that Claim 8 added four limitations, including the inlet
18 guide vane limitation.
19 Not only the inlet guide vane limitation. So it
20 was the inlet guide vane limitation and three others.
21 Similarly, Claim 19 had four limitations added,
22 only one of which was the inlet guide vane limitation. And
23 Claim 4 had two limitations added, one of which was the
24 inlet guide vane limitation.
25 Now, if we look at Claim 8, and Your Honor has a

**11**

1 better copy to look at in your book, to be sure, Claim 8
2 added from the dependent claim the reference to adjustable
3 inlet guide vanes. But it also added a limitation that
4 talked about how the flow-related parameter would be
5 substantially independent of temperature. That is a
6 separate limitation that is not part of the so-called inlet
7 guide vane limitation.
8 Third, in Element (e), there was added an
9 adjustable control set point. Again, separate from the
10 inlet guide vane limitation.
11 Finally, Your Honor, means for transmitting to
12 the comparator means a reset signal in Item (f).
13 The reason I bring this up, Your Honor, is
14 because we have two things going on here simultaneously.
15 The Court is asked to make a decision with
16 respect to file wrapper history, as to whether the reason
17 for the amendment was merely tangential to the equivalent
18 found by the jury. So we have two issues there. One is the
19 reason for the amendment. And the other is the equivalent
20 and whether it's tangential to the equivalent.
21 Sundstrand would have the Court believe that the
22 only thing -- indeed, their trial brief remarkably says, the
23 only limitation that was added, the only limitation that was
24 added when the independent claims were rewritten -- excuse
25 me, the dependent claims were rewritten into independent

**12**

1 form, it was the inlet guide vane limitation. That is
2 demonstrably not correct.
3 There were limitations added when the dependent
4 claim was rewritten into independent form beyond the inlet
5 guide vane limitations. So what Sundstrand says in their
6 trial brief, that there was only one limitation added and it
7 was only the inlet guide vane limitation, is demonstrably
8 incorrect.
9 This is important for purposes of analyzing the
10 objective record of the file wrapper history with respect to
11 whether or not the equivalent was tangential to the reason
12 the amendment was made during the prosecution of these two
13 patents.
14 Similarly, Your Honor, with respect to Claim 19,
15 there were four different limitations added by the
16 amendment, which rewrote the dependent claim into
17 independent form. Yes, one of them was adding adjustable
18 inlet guide vanes. That is this first one up here. Another
19 one was the sensing of a predetermined parameter in Element
20 (b).
21 A third was to include an outlet in Element (e).
22 And finally, the last and fourth was a guide vane position
23 sensor added in Element (g).
24 So again, there were limitations added by the
25 amendment during the prosecution which the Federal Circuit

37

1  one would ask if this case had been brought ten years
2  earlier would the outcome have been the same. Well,
3  everything was done the same, if it was, it probably would
4  have been. Does that make the outcome foreseeable? I don't
5  think so.
6        The fact that you develop something when you
7  turn your attention to, if you had done it somewhat earlier,
8  and you go through all the steps to come up with a new way
9  of doing it, does that make the new way of doing things
10  foreseeable? No. It simply means that you would have been
11  as creative back then as you were later. I am not sure it
12  really applies to the APS 3200, because as Your Honor will
13  recall from the evidence, the only way Sundstrand got over
14  the hump and figured out how to do it, and came out with a
15  device that was competitive with Honeywell, was by going to
16  Honeywell's partner, Turbomeca, and getting access to
17  Honeywell's data, and then -- data from in part the 331
18  through 350, and then coming up with the solution they did
19  in 1995.
20        I don't believe that that testimony means
21  anything as foreseeable.
22        Next, Your Honor, what they do is they go
23  through -- and this, Your Honor, there Your Honor is well
24  familiar with this in cases where people argue obviousness.
25        They take what they say the equivalent is and

38

1  they go back into history and say, well, gee, this piece is
2  over here, and this other piece is over there, and I find
3  some other pieces down over here. We will just now, now
4  knowing what this combination is, that came up, Sundstrand
5  came up with in 1995, we will go back and see if we can find
6  the different parts someplace and put them together.
7        That is not foreseeability. That is
8  unforeseeability.
9        You can't use hindsight to go back and try to
10  pick all the different pieces and say, well, it would have
11  been obvious to put all this stuff together then. We know,
12  Your Honor, that these patents, these claims, are not
13  obvious. They tried to prove they were obvious and the jury
14  said no, the Court said no, and the Federal Circuit said no.
15        So now what they are trying to do is the same
16  thing and go back using hindsight and say, let me start from
17  the end and work backwards and see if I can figure out the
18  different pieces, and then I will pretend that if I had
19  known about all those pieces then, I would have been able to
20  put them together in the same combination later.
21        It doesn't work. If anything, Your Honor, the
22  fact that they needed to do that shows that, in fact, the
23  combination is unforeseeable.
24        So, where are we with respect to
25  unforeseeability?

39

1        Our position, Your Honor, is the evidence shows
2  that the equivalent, which is the blue-purple text, was
3  unforeseeable at the time of the amendments in 1982 and '83
4  because nobody had ever done it before, and it took
5  Sundstrand another ten to 15 years to do it.
6        So, our position, Your Honor, then, closing up,
7  is that there are two reasons why we have rebutted the
8  presumption. The rationale underlying the narrowing
9  amendment bore no more than a tangential relation to the
10  equivalent. And we will talk more about that in our
11  posttrial briefings and the closing. And that the
12  equivalent that is at issue here would have been
13  unforeseeable at the time the of the narrowing amendment.
14        Therefore, we contend, Your Honor, that we have
15  overcome -- if you can flip to the last slide -- that is the
16  question that we were asked. The answer is, Your Honor, we
17  have overcome the presumption and the jury's verdict of
18  willful infringement should be reinstated.
19        THE COURT: Thank you, Mr. Krupka.
20        MR. KRUPKA: Thank you.
21        THE COURT: For planning purposes, we will take
22  lunch about 12:30. We will take breaks in the interim as
23  needed. If counsel need a facilities break at any point you
24  should just let me know. If you need one now.
25        MR. LIND: We are going to set up a board and

40

1  stuff.
2        THE COURT: Let's take a short break then.
3        (Recess taken.)
4        THE COURT: Please be seated, counsel. Mr.
5  Lind.
6        MR. KRUPKA: Your Honor, Mr. Lind has indulged
7  me one correction.
8        Your Honor, you will recall I went through and
9  explained there are other limitations to the claim, not just
10  the guide vane. That is correct. When I was playing with
11  my laser on the depictions of the actual claim language,
12  apparently I picked out some wrong things. I just want to
13  refer Your Honor to Page 8 of our trial brief, which sets
14  forth the four limitations in each of the '893 patent claims
15  that were added and the two that we claim were added to
16  Claim 4 of the '194.
17        So it is on Page 8 of Honeywell's trial brief,
18  not reply trial brief.
19        THE COURT: I was looking at the wrong one.
20        MR. KRUPKA: They are all set forth there. If I
21  misspoke, and I am told I did, fortunately, Mr. Putnam and
22  Ms. Stevenson are here to correct me when I make those
23  exuberant mistakes with the laser, they are set forth there,
24  Your Honor, just so there is no misunderstanding.
25        THE COURT: Okay.

47

1 and the original independent claims were canceled,

2 effectively adding the inlet guide vane limitation to the

3 claimed invention.

4     That is how the Federal Circuit describes the

5 amendments that are at issue in this case. And because of

6 that, Honeywell's rewriting the dependent claims into the

7 independent form, along with canceling the original

8 independent claims, constitutes a narrowing amendment, a

9 narrowing amendment because of adding in the guide vane

10 limitation. And therefore in this case, as the Federal

11 Circuit held, there is the presumptive surrender of all

12 equivalents to the inlet guide vane limitation and Honeywell

13 is presumptively estopped from recapturing those equivalents

14 to the inlet guide vane limitation.

15     These are issues that have been cited and these

16 are issues that Honeywell cannot reargue now.

17     The first thing they did in their opening

18 statements this morning is point to Your Honor's summary

19 judgment opinion from 2001 two years before the Festo case

20 came out, and pointed to things that they called factual

21 findings in a judgment, or opinion denying summary judgment.

22     A couple of things about that.

23     I don't think that that has any bearing on the

24 issues that are now before the Court on remand, for a couple

25 of different reasons.

1 vane limitation and the original broader claim that was

2 rejected as obvious.

3     Now, even if, however, Honeywell interprets the

4 Court's summary judgment opinion from 2001 to suggest that

5 Honeywell didn't give up any equivalents to the inlet guide

6 vane limitation, the Federal Circuit addressed that issue

7 and based on the narrowing amendments that Honeywell made

8 adding the inlet guide lane limitation, the Federal Circuit

9 determined that there is a presumptive surrender of all

10 equivalents to the inlet guide vane limitation and that

11 Honeywell is presumptively estopped from recapturing those

12 equivalents.

13     The starting point as to the Court's 2001

14 summary judgment opinion does not direct the analysis that

15 we are here for today.

16     A couple other things that the Federal Circuit

17 decided that bear on some of Honeywell's arguments. The

18 first is that the Festo presumption of surrender applies

19 retroactively.

20     So just because Honeywell's attorneys, lawyers,

21 the patentee itself, thought something was different back in

22 1982, and this may not be an issue anymore in light of the

23 other reasons ruling, does not mean that Festo estoppel does

24 not apply. It is a retroactive application.

25     Secondly, Honeywell conceded that the inlet

46

1     The first reason is, the Court's statements

2 about Honeywell not giving up the inlet guide vane

3 limitation or not surrendering the inlet guide vane

4 limitation are not findings of fact. Those were legal

5 determinations based on the motion for summary judgment.

6     Second of all, accepting those statements, which

7 we don't agree bear on this, but accepting those statements

8 as they were, what the Court's statements were is that

9 Honeywell did not give up the inlet guide vane limitation.

10 That's what was on Mr. Krupka's slide as a direct quote from

11 the Court's opinion.

12     That is not what is at issue here. What is at

13 issue here is whether Honeywell gave up all equivalents to

14 the inlet guide vane limitation. What is at issue here is

15 whether Honeywell gave up the entire scope, in the words of

16 the Supreme Court, the entire scope between the dependent

17 claim that was allowed once it was rewritten and the

18 original independent claim.

19     What the Federal Circuit held in this case is

20 that Honeywell gave up that entire scope. They didn't give

21 up the actual inlet guide vane limitation. They still have

22 their inlet guide vane limitation.

23     In fact, the reason we are here is because they

24 are limited to their inlet guide vane limitation without its

25 equivalents and without anything between that in the guide

48

1 guide vane limitation is not literally met by the accused

2 APS 3200 and they can't relitigate that issue as they try to

3 do again under the other reasons.

4     Honeywell's equivalence argument, as recognized

5 by the Federal Circuit, was that the 3200 met the inlet

6 guide vane limitation under the doctrine of equivalents

7 because the APS 3200 uses inlet guide vane position to

8 efficiently control surge.

9     That is what the Federal Circuit recognized as

10 the equivalent in the case.

11     As Your Honor recognized in the JMOL opinion,

12 the Honeywell equivalence theory was that the flow-related

13 parameter used by the APS 3200 was a direct function of the

14 inlet guide vane position, and therefore was equivalent.

15     That, too, bears directly on the

16 unforeseeability issue that Mr. Levine is going to address.

17 Each of these determinations that the Federal Circuit made

18 affect Honeywell's arguments in this case and they can't be

19 relitigated.

20     I am going to move on with the slides. I have

21 put the majority of these up on the board and I might refer

22 back to them.

23     The next important point to look at in the big

24 picture here is, there were certain choices that Honeywell

25 made, both during prosecution and during the litigation in

**49**

1  this case that determined the outcome of many of the issues.

2  As Your Honor recognized, and as the case law

3  has recognized, the test is not whether Honeywell thought it

4  made a decision or made a choice not to have drafted a

5  broader claim at the time. But the test is whether

6  Honeywell could have. And Honeywell's choices are important

7  in looking at the overall Festo analysis.

8  The first choice they made was that they chose

9  to accept the narrowing amendment that was offered by the

10  examiner, as is, without any modification, without any

11  argument, without any traversing, which is the patent word

12  for trying to get around it, without any appeals, and,

13  importantly, without drafting any new claims of intermediate

14  scope.

15  You had a claim here that was narrow. You had a

16  claim here that was broad. And they took the narrow claim

17  on the first offer, without trying to get anything in

18  between. We are going to see how the Federal Circuit treats

19  that decision by a patentee.

20  They also chose not to explain any reason for

21  their amendments.

22  They have some post-hac rationales and reasoning

23  now as to what they were really trying to do and why the

24  prior art really didn't affect the amendments that they made

25  and why they made amendments for different reasons. That is

**50**

1  not in the prosecution history. And they chose not to

2  explain any reason for the amendments, other than we are

3  using the IGV limitation to overcome the prior art or the

4  examiner's prior art rejection.

5  The last choice they made was the choice that

6  they made during litigation, and that was the choice to

7  assert a broad characterization of the equivalent in order

8  to get an infringement verdict. And they are stuck with the

9  characterization of what the equivalent or what falls under

10  the equivalence of their IGV limitation that they pursued at

11  trial in order to get the verdict that they did.

12  They can't relitigate those issues. The choices

13  that Honeywell made on each of these points, along with the

14  prosecution history evidence and the Federal Circuit's case

15  law, show that Honeywell can't meet their burden under any

16  of the three Festo prongs.

17  Let's talk about tangential relation

18  specifically now.

19  Honeywell can't show its amendments were

20  tangentially related, as the case law says, to the

1  equivalent.

22  The prosecution history merely shows that the

23  reason for Honeywell's amendment was directly related to the

24  equivalent. The reason for Honeywell's amendments was to

25  use inlet guide vane limitation and the use of inlet guide

**51**

1  vane position to overcome the prior art rejection, which was

2  directly related to the equivalent, which was Sundstrand's

3  use of inlet guide vane position.

4  And it's important to, when you are looking at

5  the equivalent for purposes of tangentially related, the

6  test is not was reason for the amendment exactly the same as

7  the details of the equivalent. On tangentialness,

8  especially, it is, is there a relationship there? Do they

9  both involve the same type of thing? Not the exact detailed

10  subject matter.

11  There is no question here that the reason for

12  Honeywell's amendment, to add that IGV limitation and the

13  specific use of IGV position to overcome the examiner's

14  prior art rejection, was directly related to the alleged

15  equivalent.

16  What Honeywell can't do is rely on its own

17  silence and failure to explain any reason for having added

18  the inlet guide vane limitation, which is what they say now.

19  They just say, well, we took the examiner's deal, without

20  explanation, they didn't say anything about it. They can't

21  rely on that silence. They can't rely on that explanation

22  for any reason in order to overcome the Festo presumption.

23  The third point on tangentiality is that they

24  can't show tangentiality. Mr. Krupka said that we

25  misinterpreted their opening brief and Your Honor has seen

**52**

1  the brief and can interpret it himself. But they seem to

2  make a pretty aggressive argument that, let's go back to the

3  old rule, where you had, in order to get estoppel, you had

4  to have the equivalent exactly in the prior art before the

5  examiner, and you only get around the presumption if you

6  match the prior art that was before the examiner.

7  That's not the rule anymore. The Federal

8  Circuit cases now say you cannot show tangentiality under

9  Festo merely by establishing that the equivalent was not

10  disclosed in that prior art cited by the examiner.

11  Now, why was the reason for the amendment

12  directly related or how was it directly related?

13  What Honeywell did based on the examiner's

14  rejection is they -- and this is not disputed. They

15  effectively, as the Federal Circuit put it, inserted the

16  dependent claim language, the extra limitation, the IGV

17  limitation, into the independent claims that had been

18  rejected in order to get around the prior art rejection by

19  the examiner. And that's what Honeywell relied on in order

20  to gain allowance of the claims.

21  That is what the reason was, the rationale, the

22  purpose, behind Honeywell's amendment, was to use that IGV

23  limitation in order to get around the claims and distinguish

24  the prior art.

25  By doing so, what Honeywell did is voluntarily

**53**

1  surrender the entire scope of equivalence between the IGV
2  limitation that they added and the broader rejected claim.
3  And that reason for the amendment, the addition, the use of
4  the IGV position in order to get around that prior art
5  rejection, is directly related to the equivalent and the
6  purpose — the equivalence argument that they made at trial,
7  which is that's Sundstrand's use of the IGV position in its
8  surge control system. Those two uses of IGV position are
9  obviously related because they argue that they are
10 equivalent.
11       Festo, it is important, had similar facts.
12 Festo to itself.
13       What happened in Festo is the patentee, Festo,
14 added what was called a sealing ring limitation in the case,
15 at least in part, which is an important part of Festo. I
16 don't think we need to rely on it, but it is important Festo
17 noticed the amendment made at least in part to distinguish
18 the prior art or the reason for the amendment. The sealing
19 ring limitation was added at least in part to distinguish
20 prior art that did not have the sealing limitation.
21       And the Court found that that relationship was
22 not merely tangential, because the sealing ring is what was
23 at issue in the equivalence argument that the patentee made
24 on the original case.
25       As in Festo, the reason for the amendment,

**54**

1  adding the IGV limitation to get around the prior art that
2  did not contain it, is directly related and certainly not
3  tangential to the equivalent at issue in this case relating
4  again to the use of IGV position.
5       And Honeywell did not in the prosecution history
6  and still cannot today give any other reason for the
7  amendment that would be tangentially related.
8       What the cases say is that it's Honeywell's
9  burden to affirmatively point to evidence in the prosecution
10 history that shows a lack of relationship or a merely
11 tangential relationship between the reason for the amendment
12 and the equivalent.
13       And on this prosecution history especially,
14 Honeywell cannot show that.
15       What I have done here in the next slide is --
16 these are Exhibit 31, which is the prosecution history to
17 the '893 patent, and Exhibit 33 on the bottom, which is the
18 prosecution history for the '194 patent. This is the sum
19 and substance, these two clips, of everything that Honeywell
20 said in the prosecution about their amendment. All they
21 said was, these claims at issue in this remand have been
22 rewritten in independent form. That is all they said.
23 That's all they explained. That's all they did. They
24 didn't explain any other reason for their amendment.
25       And this is the sum and substance of what they

**55**

1  said about why they were amending the claims. That's why
2  there is no reason expressed here, no tangential reason at
3  all, for these amendments. They can't rely, the case law
4  says you can't rely on the failure to give a reason in orde
5  to overcome the presumption and show that the reason w
6  merely tangential. Such unexplained amendments cannot
7  overcome the presumption.
8       Now, I want to go to a couple of cases, because
9  Mr. Krupka didn't refer to any of the case law, actually,
10 when we looked at this issue. But Festo itself and then
11 Biagro, which are two of the important Federal Circuit
12 decisions on this issue, Festo said, where the prosecution
13 history reveals no reason for the amendment, and where the
14 patentee still identifies no reason, the patentee has not
15 shown that the rationale for the amendment was only
16 tangential to the accused equivalent.
17       Similarly, in Biagro, the Court said, since the
18 prosecution history shows no reason for amending the claim
19 to add an upper limit to the concentration range, which was
20 the claim limitation in Festo, Biagro cannot claim that the
21 rationale for the amendment is merely tangential.
22       That is exactly what Honeywell did here. They
23 didn't give any reason. What they just said is, we are
24 converting the claims from dependent form to independent
25 form. And that's not any reason that's tangential to using

**56**

1  the inlet guide vane limitation in order to get around prior
2  art and gain that acceptance.
3       Now, the argument that they make is that, well,
4  we didn't have to explain ourselves, because there was no
5  inlet guide vane prior art. And therefore, there was
6  nothing specifically for us to go in and explain why our use
7  of inlet guide vanes was different from some other use of
8  inlet guide vanes.
9       What Honeywell says is, since the amendment, the
10 addition of inlet guide vanes, was -- or the particular use
11 of inlet guide vanes was unnecessary to get around that
12 prior art, as Mr. Krupka said, they say the prior art
13 involved only the proportion controllers. They say
14 therefore it was unnecessary. We didn't have to explain
15 ourselves because the amendment itself was unnecessary.
16       That is an argument that has been rejected both
17 by the Federal Circuit and Festo, especially in Biagro,
18 where the patentees made the same point.
19       In Festo too, regarding the magnetizable
20 limitation, there were two limitations at issue. The
21 sealing ring, then the magnetizable characterization of the
22 material, the metal. What Festo said, is that, look, there
23 was no art addressing this magnetizable feature. And
24 therefore, we didn't have to even make this amendment. It
25 was an unnecessary amendment. And therefore, it must be

**57**

1  tangential.

2  The Federal Circuit said, no, the fact that that

3  amendment was unnecessary to get around the prior art does

4  not make it tangential where you didn't give any alternative

5  explanation other than adding it to distinguish from the

6  prior art and get the claims allowed.

7  In Biagro the same point was made on the

8  unnecessary argument. That is exactly what is the case

9  here. Unless you go in and explain yourself, I am making

10  this amendment for some reason different than getting around

11  the prior art and getting these claims allowed, because I

12  don't need to get around the prior art with this amendment

13  because there is nothing about in the guide vane use or

14  nothing about magnetizable in Festo, unless you do that, you

15  can't carry your burden of overcoming the tangential

16  relation, under the tangential relation prong.

17  I want to point out the Biagro case briefly. It

18  is interesting what they said.

19  In Biagro they talk about Festo. They said,

20  viewed from that perspective, the situation is analogous to

21  the amendment in Festo that added the magnetizable

22  limitation. The prosecution history revealed no reason for

23  the amendment, and therefore Festo could not show that the

24  rationale underlying the amendment was only tangential to

25  the accused non-magnetizable equivalent. That is our case.

**58**

1  Similarly, in this case -- Biagro -- since the

2  prosecution shows no reason for adding an upper limit to the

3  concentration, Biagro cannot claim that the rationale was

4  merely tangential.

5  Honeywell makes the same argument that Festo and

6  that Biagro rejected.

7  Another important case, especially because it's,

8  I think, instructive, is the most recent, I guess until

9  yesterday, the most recent District Court case addressing

10  the Festo matter, was the Windbrella case, out of the

11  Southern District of New York, decided last month.

12  Again, the Windbrella case -- it is a very

13  interesting case because the facts are identical to this.

14  What happened in Windbrella was the same thing. There was

15  an independent claim and a dependent claim. The examiner

16  said, if you rewrite -- we are going to reject your

17  independent claim. But if you rewrite your dependent claim

18  in independent form, we will allow it. And the patentee

19  said, deal. And that was it.

20  Just like what happened here, with no

21  explanation of any other reason for doing it. They took the

22  deal. And what the Court says, in Windbrella, is there is

23  no tangential relationship where there was no explanation of

24  this amendment in the record that would make that limitation

25  issue.

**59**

1  That is the case here. There is no explanation

2  in this record that says that IGV that you required in your

3  limitation is irrelevant to us in getting this patent. In

4  fact, the contrary, Honeywell, it is clear from the record,

5  they used the IGV limitation to get the patent.

6  Similarly, in the E-Speed case from this

7  district, the amendment was tangential again, where there

8  was no reason given for canceling of the original

9  application claim and subsequent addition of the new claim.

10  This makes sense, this rule makes sense. The

11  rule makes sense because the burden is on Honeywell, the

12  burden is not on us to try to explain what they did, because

13  we weren't there. The burden is on Honeywell to explain

14  why, or where in the prosecution area it shows that what

15  they did was for a tangential, different reason than what

16  their whole equivalence argument was at trial.

17  And the silence in that prosecution history is

18  not enough. This also makes sense because of the public

19  notice function of the prosecution history itself.

20  These are some discussions from the Windbrella

21  case which actually goes through this in pretty good detail.

22  The rule that I just described makes sense

23  because the purpose of the prosecution history is to provide

24  the public with notice. It goes on, it is the public

25  record. The public notice function of the prosecution

**60**

1  history would not be well-served by the acceptance of

2  unsupported post-hac interpretations used to reduce the

3  impact of narrowing amendments and the doctrine of

4  prosecution history estoppel.

5  And that is what is at issue in this case, where

6  there is no alternative explanation for the reason of those

7  claims, you can't claim tangentiality, because what you

8  would do by that is you would encourage, as Honeywell says

9  here, patentees to keep their mouth shut.

10  Basically, their argument is, the less you say

11  in the prosecution, the better off you are. That completely

12  undermines the public notice function of the prosecution

13  history.

14  There shouldn't be the incentive, and the cases

15  recognize there shouldn't be the incentive to have

16  unexplained amendments or to simply say, we will take the

17  deal in order to avoid the prosecution history estoppel.

18  Because of this public notice function, the

19  burden here is important. And the public notice function,

20  not only the case law puts the burden on Honeywell to

21  overcome the presumption, but the public notice function

22  behind the prosecution history itself puts the burden on

23  Honeywell because they are the ones who were there and had

24  the opportunity to explain what they were doing.

25  Honeywell tries to kind of flip the burden and

65

1    put the dependent claim into the independent claim. What
2    Mr. Krupka showed you, and I am going to walk through it, is
3    not what Honeywell prepared at the time to the Patent
4    Office. It is what the graphics people put together for
5    them for litigation. You are going to see some stark
6    differences.
7         What is clear from looking at this, the actual
8    evidence, and this is kind of, the formality of the way that
9    they merged these claims makes this a little
10   counterintuitive on the red-lining aspect because they merge
11   actually the independent claim into the dependent, but
12   nobody thinks that makes any difference.
13        So what this shows is the red-lining that
14   Honeywell submitted to the Patent Office to show the merger
15   of the dependent claim into the independent claim. So what
16   is underlined was the original independent claim. What is
17   not underlined is what comes in from the dependent claim.
18        What you can see by this, and I will do it kind
19   of in reverse order of Mr. Krupka and we will go right to
20   left, because it's easier to look at — is in Claim 4, it is
21   clear as day from Honeywell's own document that they gave to
22   the Patent Office that the only thing that they added was
23   the inlet guide vane limitation, which is Element (d). And
24   there is no separation between — they put the word
25   adjustable inlet guide vanes in the preamble up at the top,

66

1    which is, you have to do it, it is a patent rule called
2    antecedent basis. You can't talk about the use of inlet
3    guide vane positions at the bottom, unless they are added unless
4    you say this thing has got inlet guide vanes.
5         So that is not a separate limitation. It is
6    part of the inlet guide vane limitation and I think in the
7    first slide, Slide No. 5, he treated it as such. When he
8    came back with this errant laser pointer, he pointed to this
9    as a separate limitation. It's not. It is part of the
10   inlet guide lane limitation. It is the only additional
11   limitation they make or the only limitation they added in
12   their amendment.
13        Claim 19 of the '893, same thing. The only
14   change to the claim by them in the dependent and the
15   independent claim if you look at the red-lining is the inlet
16   guide vane limitation, Limitation (g). And again a
17   reference in the preamble, which is related to it, to the
18   adjustable inlet guide vanes.
19        It is clear from this that, from 4 and 19, there
20   can't be any argument that the only thing added was inlet
21   guide vanes. When you look at inlet 8, we have the same
22   inlet guide lane limitation also. In the preamble, we have
23   the inlet guide vane, which is the structure, you need the
24   function. The Federal Circuit says they are one and the
25   same, inlet guide vane limitation then Element (f), which is

67

1    the use of the inlet guide vane limitation, the only common
2    element between these. And I am not forgetting these other
3    ones.
4         What is clear from this is, the only limitation
5    at all added for 19, the only limitation at all added for
6    Claim 4, and the only common limitation added between any of
7    these or all of these claims, is the inlet guide vane
8    limitation, and from that it is clear that the inlet guide
9    vane limitation, adding the inlet guide vane limitation was
10   the reason for this amendment.
11        Adding the use of inlet guide vanes in the
12   system the way that they did was the reason for this
13   amendment in order to get it allowed and get it out of the
14   office as an issued patent.
15        Now I want to look at what Mr. Krupka put up to
16   show why it was, I hate to use the word misleading, but I
17   will.
18        Let's start with Claim 4. And he backed off on
19   this one a little bit, as opposed to what they did in their
20   brief. But — and this is their exhibit, I don't know what
21   slide that is. This is their Slide 10. There is a lot more
22   red, as you can see, obviously, to make an impression on
23   you, than what they really put to the Patent Office when
24   they typed it out and did the red-lining back at the time
25   when they filed the patent.

68

1         The first thing they did again is try to add a
2    limitation at the top about the structure of the inlet guide
3    vanes in the preamble. That is clearly not a separate
4    limitation.
5         The second thing they did, although he backed a
6    little away in argument, is to add the language from the
7    other dependent claim, this big red block on their Slide 10,
8    as sort of suggesting that it was another limitation. But
9    then he said, no, no, no, no, it's not really another
10   limitation, and that makes sense because what that big red
11   block came from was another claim that was also rejected as
12   obvious, because there was a double dependence there. If
13   you look at the front of the book we gave you, with the
14   patents, it explains exactly what happened. And that is
15   that there was Claim 51, which became Claim 4, was dependent
16   on both original Claim 48 and 49, but those were both
17   rejected as obvious. The examiner said, if you take those
18   two claims and then you redraft the 51, which became 4, in
19   the independent form with all that, then you have an
20   allowable claim.
21        The Federal Circuit actually treats 48 and 49
22   together as one. They even call 49 an independent claim
23   with 48.
24        The point of all that, as Mr. Krupka concedes
25   now, is that all of this big red block had nothing to do

69

1   with getting the claims allowed and was not a reason for the
2   amendment at all. It was just more rejected subject matter,
3   just like the rest of the black.
4           So there is only one claim limitation in 4,
5   Claim 4, that was added, the IGV limitation, no matter how
6   much red writing they put up on the screen.
7           Next I will turn to Claim 19, where Honeywell
8   tries to add three additional limitations that aren't there,
9   in addition to the inlet guide vane limitation. Once again,
10  if you compare the red-line that Honeywell made up for trial
11  to the red-line that they submitted to the Patent Office,
12  when they were making the public record the reason for their
13  amendment, you notice again some stark differences.
14          The first thing is that the subject, the inlet
15  guide vane limitation is there, (g). And they show it as
16  (g). They try to add a limitation again from the preamble
17  of the structure of inlet guide vane. That is part of the
18  inlet guide lane limitation. The Federal Circuit said that.
19  It is not an additional limitation.
20          What do they do next? Next they go down to
21  Element (b), and in Element (b) they tried to add a
22  limitation there. They say, no, look, Element (b), the word
23  changed, that red wording changed, and therefore, that was
24  another limitation, says Honeywell, that they added in this
25  amendment.

70

1           Well, when you look at the prosecution history,
2   it's absolutely not true. And if you look at the board that
3   we have up here, which are JX-31 and JX-33, the prosecution
4   history is the actual red-lining that Honeywell added,
5   submitted to the Patent Office, you won't see that
6   red-lining. In (b), (b) shows that when Honeywell merged
7   their dependent claim into their independent claim, the
8   amendments that we are all here to talk about, there is no
9   change in that Element (b). And here is why. Here is where
10  Honeywell gets their argument from or gets their red-lining
11  from.
12          There was a Section 112 of the Patent Statute
13  rejection to the independent claim. What the Patent Office
14  said is they were using the word flow, the Patent Office
15  said I am not sure exactly what you mean by the word flow in
16  the independent claim. Honeywell called that language, too,
17  quote, I will show it to you, to quote, clarify the wording
18  in the independent claim that was rejected because it was
19  obvious.
20          And then they took that independent claim and
21  they merged it with the dependent claim. That is the
22  amendment that is at issue here and that's what got the
23  claims allowed.
24          So this red up there in Element (b) has nothing
25  to do with the amendment that is even at issue here. You

71

1   can see what Honeywell did. If I go real quickly to the
2   prosecution history, I am going to show you the actual
3   evidence in the case. I am not going to go through the
4   whole rejection.
5           Here is what Honeywell says. In 33 and 35 the
6   phrase a flow -- they underline flow, this is Honeywell
7   amending the independent claim that was found obvious, not
8   the merger of the dependent claim -- they say, we have
9   changed it to this other language and that is what Honeywell
10  put in the read ink, and they said, this modification seems
11  to more clearly indicate -- that's all it was. It was a
12  clarification for that 112 rejection, to indicate the flow
13  parameters actually sensed, not actual flow rate.
14          So that red-lining had nothing to do with the
15  amendment in this case and therefore couldn't possibly be a
16  reason for the amendment of the claims, which is what the
17  tangentiality inquiry is.
18          Let's go back to Claim 19, Honeywell's red line.
19  The next thing they do is they sporadically turn red a
20  couple of other words. Those other single words here and
21  there that they try to make up limitations out of or call
22  added limitations again are nowhere in the red-line that
23  Honeywell actually gave the Patent Office at the time. And
24  there is a reason for that. It's because those were not
25  additional limitations that had anything to do with the

72

1   merger of these two claims, the dependent and the
2   independent.
3           You can actually see from the board that one of
4   those words, which was just the examiner, those are the
5   examiner's initials, changing a typo. That's one of the
6   things right there. It's not a whole other limitation that
7   they added in this merger of the claims.
8           This is misleading. That is not what happened.
9   Those little red words there that they added on C, D, B, E
10  E, F, cannot be the reason behind this amendment, the
11  rationale behind this amendment, as they try to suggest.
12          The only limitation added once again was the
13  inlet guide vane limitation.
14          Now let's look at Claim 8.
15          Claim 8, they didn't take any liberties with the
16  red ink this time. But they took a few liberties with the
17  facts. If you look at Claim 8, again, you have the inlet
18  guide lane limitation added, as we talked about. It's once
19  again the only common element or limitation added to all of
20  these claims, and therefore clearly on that alone the reason
21  behind this amendment.
22          Then you also have two additional changes that
23  actually came from the merger of the dependent claim. So
24  unlike the other red ink that Honeywell had that has no
25  relation to the amendment, the non-underlined wording in

75

1   Element (d) and (e) actually did come from that dependent
2   Claim 16 that was merged into independent Claim 17,
3   actually.  I switched that.
4           But the point is, here is why that was done.
5           Those are also not new limitations.  And they
6   are not limitations that Honeywell added in order to gain
7   allowance.  Now, remember what the tangentiality requirement
8   is, the analysis is not did you add more than one
9   limitation.  If so, you are off the hook on Festo.  The
10  analysis is, let's look at what the reason for the amendment
11  was.  And can Honeywell prove that the reason for the
12  amendment had nothing to do with the use of inlet guide
13  vanes in the surge control system.
14          They can't show that here for the commonality
15  reason.  They certainly can't in 19 and 4, even on 8, these
16  other things that were added, the other two things that were
17  added in the amendment from the dependent claim and the
18  independent claim were already things that were in the prior
19  art and were already things that had been rejected by the
20  examiner as being obvious.  And they can't possibly be the
21  reason for the amendment when they are already existing in
22  the claims that were rejected as obvious, and specifically
23  both of these what Honeywell calls extra limitations in
24  Claim 8 were rejected as in the claim until one thing was
25  added to that claim:  inlet guide vane limitations.

74

1           In other claims in the prosecution history,
2   these other features that Honeywell calls the extra
3   limitations were in claims, they were rejected as obvious,
4   and only allowed once in the inlet guide vane limitation was
5   added.  And from the prosecution history record and the
6   actual documentation Honeywell gave to the Patent Office and
7   not the show they created for trial, you can tell the reason
8   for the amendment was the addition of the use of inlet guide
9   vanes in order to get these claims allowed.
10          And that's exactly related, directly related to
11  the equivalent they argued in this courtroom at trial, which
12  is the inlet guide vane use by Sundstrand.
13          I didn't just make it up.  Obviously, we are
14  going off the record.  But also, the Patent Office, when
15  they submitted their brief, in opposition to Honeywell's
16  request that the Supreme Court grant summary judgment in
17  this very case, the Patent Office explained what was going
18  on here, too.  And what I want to look at now is what the
19  Patent Office said briefly.
20          This is the amicus brief filed by the Patent
21  Office to the Supreme Court in this very case.
22          What they did is walked through what happened
23  here.  According to Patent Office, the same guys who
24  prosecuted these patents and saw the red-linings that I have
25  got up on the board, the Patent Office said, the surrendered

material consists of the difference between the scope of the
2   original patent applications, which included an independent
3   claim with no inlet guide vane limitation, and the scope of
4   the amended patent applications, which expressly
5   incorporated that limitation as a necessary one by canceling
6   the claims without that limitation and retaining the claims
7   that included it.
8           Just as I described for the last ten minutes, in
9   a nutshell, the Patent Office read the claims the exact same
10  way.  That inlet guide vane limitation was the reason for
11  the amendment.  It was a necessary one.
12          The Federal Circuit, in their treatment of the
13  inlet guide vane limitation in its opinion in this very
14  case, treated it the same.  I will not walk all through
15  that.  They talk about the fact that what happened here is
16  they effectively got the claims allowed by adding the inlet
17  guide vane limitation.
18          For that reason alone, there is no multiple
19  limitations argument for Honeywell to rely on to try to
20  wedge itself within a case like Insituform, where there were
21  multiple limitations and the Court said it is clear as day
22  from the prosecution history and all the statements made
23  that the reason for the amendment was this limitation up
24  here and not the limitation that everybody is arguing about
25  in equivalence.  They try to shoehorn their case into that

76

1   parameter or into that kind of scope by pointing to multiple
2   limitations that don't exist.
3           But there is another reason that their argument
4   fails.  The second reason is that even if you were to
5   recognize their red ink as in the other limitations, which it can't
6   do at all for 19 and 4, but let's say they keep arguing it
7   on 8, that the limitations that were added but that had
8   already been rejected in other claims as obvious, they don't
9   explain anywhere, which is their burden, in the prosecution
10  history, and you frankly can't tell and Honeywell says you
11  can't tell from the prosecution history whether it was one
12  of these other two things in Claim 8 that they point to
13  versus the inlet guide vane limitation that was the reason
14  or the rationale underlying the amendment, and you can't
15  prove tangential relationship simply by pointing to several
16  limitations added by the amendment.
17          You need to show in the prosecution history that
18  it was, the reason for the amendment was not the subject
19  matter or not what was at issue in the equivalence, but
20  rather some other claim or some other limitation, some other
21  reason.
22          And they can't show that on this prosecution
23  history.
24          And the law on this is clear that they actually
25  must show where in the prosecution history.  They can't say,

79

1    well, there is no reason and we don't know, which is, again,

2    going back to their trial brief, which is what they say,

3    they say there is nothing there to indicate whether it was

4    the inlet guide vane limitation or something else, that

5    doesn't carry their burden. You don't carry your burden by

6    throwing up your hands and saying we can't tell whether it

7    was one versus the other and that that, because we didn't

8    say anything to the Patent Office, Sundstrand can't show it

9    in the prosecution history.

10           You can't reach the burden like that.

11           I want to talk about two cases on this issue

12   that Honeywell relies on. The first was the Cordis case,

13   which is from the District of Delaware, and it is not

14   inconsistent with this case for a couple of different

15   reasons. The first is that the Court did point to

16   statements within the prosecution history, specific

17   distinctions and explanations that the patentee made between

18   the prior art and what its amendments were that it's actual

19   reason underlying the amendment had nothing to do with the

20   equivalence issue at trial and what the equivalent was --

21   not at trial, but what the argument was.

22           That alone distinguishes that case from this

23   case. It's an explanation case.

24           There wasn't this void of anything by the

25   patentee in the Patent Office to actually explain what they

78

1    were doing.

2            The other thing, and I do this hesitantly in

3    this building, to talk about the case on a timeline. Cordis

4    is before Insituform and Cordis is before the Rhodia Chimie

5    case. Remember, the Rhodia Chimie case is the one that

6    says, you can't say because the equivalent wasn't in the

7    prior art before the examiner it's tangential. You can't

8    make that leap. Part of the rationale used in the Cordis

9    case is that leap. Looking at the prior art, focusing on

10   the prior art and saying, I don't see the equivalent here,

11   and therefore, it must not be directly related, it must be

12   tangential, that was without the guidance of Chimie. And I

13   think, you know, the Cordis case is distinguishable for the

14   whole other reason that they actually explain. But that is

15   another important feature.

16           I think Mr. Krupka said that they relied on some

17   other District Court cases, too. The only case that Cordis

18   relies on at its heart is the Amgen case, which we have

19   discussed and read, and I won't get into the differences

20   between that case.

21           The other thing, the other case that was not

22   around yet in the Cordis case is Insituform. Part of the

23   Cordis rationale and Mr. Krupka's rationale was, he says,

24   well, what Sundstrand proposes, under that, you would never

25   get over the hurdle or the presumption because you are

1    always going to be amending the claim in order to get the

2    amendment that you then argue equivalence from at trial.

3    Therefore, it's the exception that swallows the rule.

4            I know Insituform proves exactly why that is not

5    the case. And I know Insituform is important to walk

6    through because it shows exactly the circumstances that you

7    see overcoming the tangential relationship or what is

8    required to do so.

9            Interestingly, there have been a dozen cases,

10   unless they decided something today, at the Federal Circuit

11   that have addressed the Festo presumption and whether the

12   party could overcome the Festo presumption. The only case

13   out of those 12 that has found the plaintiff can overcome

14   the presumption is Insituform. So it is important to show

15   what it takes. It's a stark contrast to what we have here.

16           What you had in Insituform was specific

17   explanation by the patentee over and over and over again of

18   what the reason was behind its amendment and why it was

19   completely unrelated to the limitation or the equivalence

20   arguments that the plaintiff was making.

21           And, briefly, because I know Your Honor has read

22   the case, it had to do with a resin liner for piping. And

23   there were a couple of different issues. One issue related

24   to these cups used to fill that resin liner and another

25   issue related to when you fill it with resin, how far does

80

1    the pump have to be from the resin source, because if you

2    are way down here trying to pump resin, you need a big pump

3    and that is a pain in the neck.

4            What the patentee said and made clear is they

5    said, in this amendment, we are going to distinguish the

6    prior art by, we are going to move this resin source real

7    close so you just need a little pump, and they went over and

8    over and over and over again that that was the

9    reason for the amendment and that's the reason they were

10   getting around the claims -- or getting around the prior

11   art.

12           Then we get to trial, that is not an issue. The

13   only issue is something about the number of cups used in

14   this process. And they are totally unrelated to the reason

15   for the amendment.

16           I want to walk through the claim briefly.

17           Here is the Insituform case. What I am going to

18   do here is try to zoom in on the actual claim that is in the

19   case. This is Claim 1 of Insituform. Now what I want to do

20   is put next to it the claim in our case, the red-lining,

21   Claim 4 again. I will zoom in on that, so you can kind of

22   see them side by side and look at the differences. What

23   the text doesn't tell -- here is the point. That is, what

24   happened in Insituform is that the Court said, or the

25   patentee said, here is why I am amending the claims. Here

93

1  is done, you have to infringe each limitation of the claim.
2  But the equivalent analysis is done on a
3  limitation-by-limitation basis.
4      So what was argued to be the equivalent was the
5  equivalent of that IGV limitation.
6      And that is something you know not only from
7  what is going on here, but I have a handout that I pulled
8  together on the Festo case, in this case handed I will that
9  up to the Court.
10     What this shows, Your Honor, is one of the
11 claims in Festo, there were actually two patents in Festo.
12 Mr. Lind talked about a couple of these limitations at issue
13 before. What was accused of infringing was a rodless
14 cylinder. That is the entire product. But when it came to
15 the analysis of what the equivalent was, the Federal Circuit
16 and the Supreme Court when they looked at that looked at
17 what the limitations were where the change was made. And
18 there were two limitations at issue.
19     One is the one where first sealing rings is
20 highlighted. And originally, you had just sealing rings.
21 Then it became first and second. You see the second down a
22 couple limitations below the other limitation where
23 equivalence was claimed was a cylindrical sleeve made of a
24 magnetizable material.
25     But when the Court looked at what the equivalent

95

1  equivalent. To the jury, Mr. Muller argued that it was the
2  use of IGV position.
3      Actually, what I am going to do is -- I have a
4  handout first of Mr. Muller's testimony. Then I am going
5  turn to what was argued in the briefs based upon that.
6  Again, I will hand the handout to Your Honor.
7      This is what we put together as a summary of Mr.
8  Muller's testimony.
9      Remember, as I mentioned earlier, you have to
10 have this linking evidence. It's not just was IGV position
11 talked about at some point in the trial? That is not
12 enough. You have to have the linking evidence that ties the
13 alleged equivalent to the IGV limitation. This is what we
14 found in the trial transcript, when we looked at what Mr.
15 Muller's evidence was. I am not going to go through all of
16 it. That is why I supplied the summary for this Court, just
17 to give a couple examples.
18     On the first page, Claim 19(G0, Mr. Muller said,
19 The purpose here is to measure a guide vane position in
20 order to help as an input to the surge control system.
21     And there is not that much more detail in the
22 rest of the discussion of Claim 19(g).
23     If you turn to the next page, Claim 8(f), there
24 is a little more detail there on the function on 8(f). What
25 Mr. Muller said is that, going down toward the end of that

94

1  was, the equivalent to the first sealing rings wasn't the
2  entire rodless cylinder or, as Honeywell put it, the accused
3  apparatus and method. It was the single two-way sealing
4  ring, a particular aspect of the product at issue.
5      When it came to the next limitation, a
6  cylindrical sleeve made of magnetizable material, the
7  alleged equivalent was the use of aluminum, a
8  non-magnetizable material. Not the entire cylinder but the
9  use of the aluminum in the sleeve. It is not the entire
10 system.
11     Then the question is, okay, so we are not
12 looking at the system. We are looking at IGVs. What was it
13 that was argued to the jury to be the use of IGVs that was
14 the equivalent? Honeywell now says, this is their kind of
15 other way of looking at the equivalent, well, it was the use
16 of IGVs to address the double solution problem, it was this
17 very specific logic, this very specific control logic. And
18 they point to this diagram right here, one of their slides,
19 and they say, see, there is this control logic here and you
20 have to have this exact logic to be unforeseeable. It is
21 unforeseeable unless you have the exact logic.
22     Well, that's not how they argued it to the jury.
23 To the jury, and that's what this board over here
24 Honeywell -- HSC Exhibit 3 is for. To the jury Honeywell__
25 didn't argue that all of this control logic is what made it

96

1  when it is operating in high-flow and when it is operating
2  in low-flow, that is what the IGV tells you.
3      Well, that is fine, in terms of how it's
4  operating in low-flow and high-flow. But that doesn't go
5  through that entire logic that we saw in the diagram and all
6  the different aspects of it. That is more general. Is it
7  high-flow or is it low-flow, that is the job of the IGV
8  position in our system.
9      Now, after this trial, where the jury obviously
10 found there was equivalence, we attacked the sufficiency of
11 the verdict. When we attacked it, we said, hey, there
12 wasn't enough linking evidence. And here is where Honeywell
13 came back in their JMOL brief and then later in the
14 appellate brief and said, no, there was enough evidence.
15     Here is what they said.
16     They said, the flow-related parameter used,
17 DELPQP, which you will hear a lot about, was a function of
18 the IGV position. They didn't say DELPQP caused a double
19 solution issue which then leads us to have to use the bleed
20 select control valve, et cetera.
21     They didn't get into that kind of detail, either
22 with the jury, when they argued what the equivalent was or
23 the JMOL brief. Based on that, the Court found there was
24 sufficient evidence and said the flow-related parameter was
25 a direct function of the inlet guide vane position. That is

105

1  delta P over P.

2         And the particular delta P over P that is used

3  in the 3200 system is delta P over P based on this

4  measurement of static pressure in the diffuser. That is

5  something that was known.

6         The next slide shows that. Honeywell in its

7  brief says that what we did was later-developed technology.

8  That is obviously the test here. That is what Festo says is

9  the test, are you looking at later-developed technology or

10  old technology. That's what you look at. The Court factors

11  in whether it was unforeseeable.

12         Mr. Clark, Honeywell's corporate representative,

13  wrote in 1983 about a system they were looking at, a surge

14  control system that used static pressures, located in the

15  diffuser, to detect surge.

16         Here is what he said in his deposition.

17         Was there any difference in the technology in

18  '83, the question was asked, compared to what could have

19  been implemented two years before that?

20         Now we are looking at two years before, December

21  '83 versus December '81.

22         Honeywell's corporate representative and binding

23  testimony said, It doesn't require any -- well -- it

24  doesn't -- it doesn't require any new technology.

25         1981 is before the relevant date here, October

106

1  of '82. So no new technology means it's old technology,

2  which is obviously more likely to be foreseeable under the

3  Festo ruling.

4         What does it lead to when you have measuring

5  static pressure in the diffuser? And we know that from text

6  as old as the fifties, what happens if you have supersonic

7  flow in this kind of diffuser. What happens is, this is the

8  text from Shapiro, which actually both sides' experts have

9  relied on, and he explains, when there is subsonic flow, you

10  get the pressure going up the diffuser. But when it's

11  supersonic, because of a shock wave that is formed -- and

12  the experts will go into this more -- actually, you get the

13  reverse, and the pressure goes down. So you have this

14  effect caused by supersonic flow.

15         This is something that isn't unique to the APS

16  3200. We know that by looking at Mr. Muller's declaration

17  to this Court in 2000.

18         On the left, on this slide, we have the APS 3200

19  double solution curve. And the right is the testimony from

20  Mr. Muller in his declaration submitted to this Court in the

21  year 2000.

22         He said, the inverted-V/double solution as a

23  result of this shock wave, that is what he has talked about,

24  any compressor taking a static pressure measurement of

25  supersonic air flow in the diffuser would have a similar

107

1  characteristic.

2         This isn't something limited to the APS 3200.

3  You get this any time you measure supersonic flow in the

4  diffuser. As we are going to see shortly, there was such an

5  APU out in the market in the 1970s that measured static

6  pressure in the diffuser and accounts for supersonic flow

7  and that's the L1011 APU. I will talk about that in a

8  couple minutes.

9         So this supersonic flow is when you place static

10  pressure in the diffuser. It's what causes the double

11  solution curve to exist. This is something not new. This

12  isn't something that we only found out about in the 1990s,

13  when we developed the 3200. This is something people had

14  known for a long time.

15         I am going to play right now a clip from Mr.

16  Clark's deposition, Page 117 and 118:

17         Question: When did you -- well, when did you

18  first know the fluid dynamics principles behind the double

19  solution problem? That's back in college. Right?

20         Answer: I knew shock waves and pressure drops

21  back then.

22         Question: And those are through the fluid

23  dynamic principles that you discussed that are responsible

24  for the double solution problem. Correct?

25         Answer: That's correct.

108

1         Aside from having a great hair-do, Mr. Clark's

2  testimony is important because it is binding on Honeywell.

3  He is their corporate representative. He says, the double

4  solution, knew about the principles behind that since

5  college. He started at Honeywell in 1976.

6         There are many examples of double solution

7  curves in the literature. You will see some of those

8  examples in the next two days.

9         Now I want to talk about the L1011. The L1011

10  housing up here, let's see -- can you see that okay?

11         So here we have -- we don't have the impeller

12  for it. That goes in here, like a donut, it goes where the

13  hole is. This is the diffuser right here. Half of it. The

14  other half is this part right here.

15         Your Honor, if I may approach a little so you

16  can see it.

17         What is important is, this diffuser is where

18  static pressure was measured. And you can see, there are

19  these four holes here in one of the passages. You will hear

20  testimony that these four holes are static pressure taps and

21  that the L1011 relies upon the measurement of these static

22  pressure taps in order to detect the change in pressure or

23  delta P, delta P over P, that you have as the flow goes

24  through the diffuser.

25         I am not going to put this down on the table.

109

1    THE COURT: That is a good thing, Mr. Levine.

2    MR. LEVINE: I learned my lesson.

3    So with the L1011 diffuser, there is a document

4    you are going to see, Exhibit 105, which is called the

5    master key document. It was a document on the L1011 APU

6    provided to the airlines. You may remember, the L1011 is

7    the big plane, like DC10 size. And Hamilton Sundstrand,

8    which is one of the two predecessor companies of Hamilton

9    Sundstrand made the L1011 and they started the

10   manufacture -- the APU L1011, they started the manufacture

11   of it in 1972. They first delivered to Eastern Airlines,

12   another company of the past. The document explains that the

13   load compressor discharge flow increases the differential

14   pressure, differential pressure is the difference between

15   pressure at one place and the diffuser in the other, and

16   what it causes is it drives the surge valve toward closed.

17   In other words, the surge valve was opened and

18   closed depending on what this delta P over P measurement

19   told it. It sounds familiar.

20   We have more. Which is, on the left-hand side

21   of the slide, for the 3200, which shows the delta solution

22   curve. On the right-hand side, we have Figure 9 from that

23   Exhibit 104, and this shows a curve from the L1011, pretty

24   close. Double solution curves weren't new. Mr. Clark knew

25   about the principles behind them since college. And we

110

1    experienced them on the L1011.

2    In fact, they are described, and I drew it -- I

3    had the graphic artist draw it in blue so it would be a

4    little easier to see.

5    It is interesting, because the 3200 and the

6    L1011 documents describe this in similar ways. So the 3200

7    that Honeywell quotes from one of our documents in its

8    brief, the DELPQP, as that changes, it -- you have an

9    inflection point about peaks and then decreases. In other

10   words, the bell shaped curve -- it goes up, peaks and

11   decreases.

12   How do the documents in 1975 describe this

13   phenomenon? They say, the tendency of the signal curve and

14   the delta P curve, the peak and then dropoff, thus

15   potentially giving an ambiguous signal. Ambiguous, you

16   don't know which side you are on, the double solution

17   problem.

18   Now, the there was another APU -- let me address

19   one other point. You have heard a lot from Mr. Krupka about

20   the testimony of Mr. Shinskey and the statements by HSC in

21   its briefs back in 2001, and said, hey, those are binding.

22   It is interesting that Mr. Krupka called Shinskey Mr.

23   Control. I found that curious, because in the briefs that

24   were submitted to this Court five years ago, what Honeywell

25   said about Mr. Shinskey is that he made a series of outright

111

1    misstatements, he was forced to recant and the defense

2    lacked all credibility.

3    When we are talking about people taking

4    different positions a few years ago, we have to look at v

5    Honeywell was doing.

6    But again, when you look at judicial estoppel,

7    which Mr. Krupka mentioned, he talked about it very

8    generally. But he forgot to mention one of the key factors

9    in judicial estoppel. And we cited in our brief the

10   Tracinda case out of this district, where it lists the

11   factors. And one of the key factors, No. 2, is whether the

12   party has succeeded in persuading the Court. That is

13   obviously pretty important because the arguments that were

14   made by Sundstrand and the testimony by Shinskey was to

15   persuade the jury that there was no equivalent.

16   The jury didn't buy that. The jury found there

17   was an equivalent. That is why what Honeywell said in its

18   statements in its briefs are what are most important here

19   because they won before the jury.

20   Now, Honeywell, Mr. Krupka also referred to a

21   number of statements by Mr. -- or in the Sundstrand briefs,

22   talking about the curve as being odd and unusual and funny.

23   It may be all those things. That of course isn't the test

24   of foreseeability. Foreseeability is looking at whether it

25   was something that was known before. Not -- you can hav

112

1    funny looking things that are known before, or odd looking

2    things that people knew before. And the evidence here is

3    going to show that this funny looking brief -- this funny

4    looking curve was known before, and, in fact, as we saw a

5    couple minutes ago, Mr. Muller said to this Court, any

6    compressor that measures static pressure with supersonic

7    flow gets that characteristic.

8    I want to end by talking about a couple of

9    things. One is the Honeywell 331-350. Honeywell in the

10   late 1980s, this is after the relevant date here, but still

11   important for a reason I will get to, in the late 1980s,

12   they developed their own APU, called the 331-350. And lo

13   and behold, they measured static pressure of the diffuser,

14   what do they get? Double solution curve. And they admit

15   that, their 30(b)(6) witness admits they experienced double

16   solution. He says that the same inverted-V or double

17   solution problem is the 3200.

18   So they get the same problem. What do they do

19   to address it?

20   They use IGV position:

21   Question: The 331-350 APU used inlet guide

22   vane position as an input in determining when you are on the

23   right-hand side of the double solution curve. Correct?

24   Answer: That's correct.

25   So they use IGV position. Then comes one of the

113

1 most important questions and answer series in this case.

2 Mr. Lind asked Mr. Clark, the corporate representative: If

3 you had encountered the same problem in the seventies, what

4 would you have done? Here is what he says:

5        Question: One of the reasons that you used

6 IGV --

7        I played the wrong one!

8        Question: In the late 1970s, had the double

9 solution problem come up, it could have been solved at

10 Honeywell?

11        Answer: If it had come up -- if it had come

12 up, it could have been solved.

13        Question: And it could have been solved by

14 using inlet guide vane position, correct, in the late 1970s?

15        Answer: The same way we did it on the 350.

16        Would have done it the same way in the

17 seventies.

18        What does that tell you? It tells you --

19 Honeywell says, well, that's speculation. Well, this is

20 after hours of asking questions about the different

21 principles, the principles that were in Shapiro. The

22 principles behind the double solution curve that Mr. Clark

23 said he learned in college. To ask the witness who has been

24 working on this issue since 1976 how he would have done it

25 in the seventies isn't speculation. That's something he is

114

1 clearly knowledgeable about and he can testify about.

2        But beyond that, what is the test in Festo?

3        Again, it says you should look at whether it's

4 later developed technology or old technology. And Mr. Clark

5 saying we would have done it the same way in the seventies

6 is probative, it's important, because it tells you, it's old

7 technology. If it was later developed, if it is something

8 that wasn't around, it couldn't have done it then.

9        Maybe for that reason, we are not going to see

10 Mr. Clark live. We are only going to see him on the video.

11        One last point, then I will sit down. That is,

12 you heard a lot about the APS 3200, that took four years,

13 that took a while to develop. And I have a timeline I am

14 going to put up. I will take this one down, actually. This

15 is a timeline of the development of the 3200. We have

16 highlighted certain key memos. These memos are all memos

17 that will be in the record. Most are joint exhibits.

18        In October 1991 -- by the way, there is

19 testimony from Mr. Gruebel that Mr. Krupka put up about he

20 didn't know about the double solution in 1990 when he

21 started. There wasn't even testing done at that point. So

22 they didn't know that there was double solution because they

23 didn't know what kind of velocity that encountered. So at

24 that point, there hadn't been testing done to see this.

25        It is important to remember, Turbomeca was our

115

1 partner. We split responsibility with them. They handled

2 the load compressor and some other parts of the APU. We

3 handled different aspects. We split it up 50-50. We were

4 partners. Turbomeca was working on the load improvement.

5 So it wasn't until a little bit later when they even gave us

6 the data. They gave us the information. That was their

7 responsibility. They have gave us the data. Mr. Shinskey

8 said, what about this double solution issue when he saw the

9 graphs.

10        Then Turbomeca said, very next month, they said

11 we can solve it. We will use IGV setting. For the next few

12 years they had in place something called the B factor test

13 to look at which side of the curve you were on based in part

14 on the IGV position.

15        Later they changed to a different test that was

16 based in part on the IGV position called the pressure ratio

17 test. And that is in the final control logic you will see.

18        There are two key points from this timeline.

19 One is we weren't floundering around for four years saying

20 what do we had about double solution, we can't figure out

21 what to do. Within two months, the very next month after we

22 raised the issue, IGV's setting was identified as the way to

23 solve the problem.

24        The second point is that, while there were two

25 different tests used, each of them incorporated IGV

116

1 position. Why? Because use of IGV position wasn't unusual.

2 It wasn't something that was unexpected, when you are trying

3 to figure out if your flow is high, if your flow is low.

4 That is not something that was old technology.

5        In fact, that's something that people knew

6 because you know from these compressor maps that the IGV

7 position tells you, with these lines, they go high or low.

8 I am going to end by playing something from Mr. Clark that

9 addresses just this issue:

10        Question: One of the reasons that you used IGV

11 position to solve the double solution problem is that IGV

12 position influences where you are on the compressor map.

13 Right?

14        Answer: It changes the compressor map.

15        Question: So yes?

16        Answer: Yes, it changes the compressor map.

17        Thank you very much, Your Honor.

18        THE COURT: Thank you. Counsel, rather than

19 12:30, this seems like a natural point at which to break, we

20 will take our first witness in an hour.

21        (Luncheon recess taken.)

22        MR. PUTNAM: Good afternoon, Your Honor.

23        THE COURT: Mr. Putnam, your first witness.

24        MR. PUTNAM: Honeywell calls as its first

25 witness Mr. Gerard Muller.

117

(... GERARD, MULLER, having been duly sworn as a

witness, was examined and testified as follows ...)

DIRECT EXAMINATION

BY MR. PUTNAM:

Q. Good afternoon, Mr. Muller.

A. Good afternoon, Mr. Putnam.

Q. Can you remind the Court of who you are?

A. I am Gerard Muller.

Q. And what is your education and experience?

A. I have a Bachelor of Science degree from Applied

Technical Institute of New York. I have a Master's degree

from the University of Connecticut.

Q. Do you have any engineering in your training or

background?

A. Yes. I am a -- I have a Bachelor of Science in

mechanical engineering.

Q. So the type of engineer you are is a mechanical

engineer?

A. That is correct.

Q. And have you -- what have you done briefly in your

career?

A. Well, my first -- my first employment was with

Pratt-Whitney Aircraft, where I was there for five years. I

was involved in the design of gas turbine engines of all

types.

118

Afterwards, I joined Exxon Research &

Engineering, where I was part of the technology department,

which provided support in the area -- support to all of the

affiliates worldwide, which encompassed chemical plants,

production plants, research, involving rotating machinery,

specifically compressors and their associated drivers, like

gas turbines, steam turbines, motors and things of that

nature.

Q. And how is it that you have knowledge of compressors

from your background?

A. Well, one of the areas -- there are several bases for

that. As I indicated, I was in the technology department

responsible primarily for large rotating machinery, and as

part of that group there were a range of experts there who

were foremost in their field, had been there before me, who

acted to provide training for individuals there.

Specifically as far as more detailed

information, I gained a great deal of experience as part of

an activity that Exxon was faced with shortly after --

shortly after I arrived there, dealing with a problem

where --

Q. Mr. Muller --

MR. PUTNAM: If I can, Your Honor, I want to

keep us on the narrow. I think the Court has heard the

longer version of your background. I was trying with the

119

Court's indulgence to give a shorter version of your

background.

BY MR. PUTNAM:

Q. So you have experience with compressors in your

background. Is that correct?

A. Yes, I do.

Q. Have you encountered the problem of surge control in

compressors before?

A. Yes, I have.

Q. At what jobs have you encountered the problem of surge

control?

A. At the job started at Exxon Research & Engineering, in

the applications there and with my work I have done

subsequent to that time, when I have had my own company

working in the same field.

Q. And you are currently self-employed as an engineering

expert. Is that right?

A. That is correct.

Q. And --

MR. PUTNAM: Your Honor, I may I approach?

THE COURT: Yes.

MR. PUTNAM: I don't know if the Court wants

copies of exhibits.

BY MR. PUTNAM:

Q. Mr. Muller, let me hand you PTX-1162, and ask if you

120

recognize that as a copy of your resume?

A. Yes, I do. It is.

Q. And does that contain more detail of your background

and experience in this area?

A. Yes, it does.

Q. And is it correct that you were the technical expert

testifying at the February 2001 trial, the original trial in

this case?

A. Yes, I was.

Q. And is it correct that you also served as an expert

witness or have since then served as an expert witness on

mechanical engineering issues in other litigations?

A. That's correct.

Q. Now, were you engaged as an expert witness to study

issues relating to the remand from the Federal Circuit in

this case?

A. Yes, I was.

Q. And have you considered whether the surge control

system of the APS 3200 and its particular use of inlet guide

vane position would have been foreseeable to one of ordinary

skill in the art in 1982 and 1983?

A. Yes, I have considered that.

Q. And have you formed an opinion on that subject?

A. Yes, I have.

Q. What work did you undertake to form an opinion on that

1  subject?

2  A.    In addition to review of the information that has been

3  presented in this case, I did my own independent studies,

4  looking into using -- looking into what information was

5  available worldwide, discussing this very area, looking and

6  trying to identify papers and looking at the conferences,

7  dealing in this issue, that discussed any aspect of this.

8  Q.    Have you also reviewed the references cited by

9  Sundstrand in the course of the litigation?

10  A.    Yes, I have.

11  Q.    I believe you said you also reviewed the existing

12  record in this case from the 2001 trial?

13  A.    All of it.

14  Q.    Have you provided reports summarizing your opinions?

15  A.    Yes, I have.

16  Q.    How many different reports?

17  A.    Three.

18  Q.    Were you also deposed by Sundstrand on the subject

19  matter of your reports in this remand proceeding?

20  A.    Yes, I was.

21  Q.    Before I ask you about opinions that you reached,

22  let's talk about the technology and the accused -- the

23  equivalent, found equivalent with the product at issue here.

24        Let me ask you, did you prepare or assist in

25  preparing some demonstrative exhibits to illustrate your

1  demonstrative?

2  A.    The load compressor is identified in the left side of

3  the graph as a load compressor. It constitutes the flow of

4  gasses, which is what is shown here, from that round area

5  adjoining the load compressor following that U-shaped curve

6  to the inlet guide vane.

7        That is essentially the flow path of the air as

8  it enters and is compressed and comes out the round air,

9  which is the -- referred to as a scroll.

10  Q.    So the air enters at the inlet guide vanes. Is that

11  right?

12  A.    Yes.

13  Q.    And then flows out from, I think you said the round

14  area?

15  A.    Yes. It comes in on the outside, it flows radially

16  inward initially, then it curves around and comes back up

17  again. And actually at the bottom of the curve -- I think

18  we see this a bit later in some of the others -- it goes

19  into an impeller, which is what actually compresses the air,

20  then it comes out the top, where it is collected in what is

21  termed a scroll.

22  Q.    Okay. And after the air leaves the load compressor in

23  the APS 3200, where does it go?

24  A.    It goes one of two places. It goes --

25  Q.    First of all, on the chart, where is the air going?

1  testimony?

2  A.    Yes, I did.

3        MR. PUTNAM: With the Court's permission, these

4  are designed so that they can be slipped into the folders,

5  or the binders.

6  BY MR. PUTNAM:

7  Q.    Are you familiar with the operation of the APS 3200

8  surge control system from your work in this matter?

9  A.    Yes, I am.

10  Q.    Let's put on Demonstrative No. 1.

11        Is this a demonstrative that depicts aspects of

12  the Sundstrand APS 3200?

13  A.    Yes, it is.

14  Q.    Is this a demonstrative that was shown to you that you

15  used as part of your testimony to the jury back in February

16  2001?

17  A.    I believe so.

18  Q.    Okay. Can you tell the Court what are the different

19  pieces, or different components in the APS 3200?

20  A.    As indicated here, starting with the inlet guide

21  vanes, what you see are basically small vanes, narrow strips

22  of metal, which are connected, are interconnected

23  peripherally around the inlet of the load compressor

24  indicated by that blue area.

25  Q.    Where is the load compressor indicated on this

1  A.    Well, it is showing right now, if you follow the blue

2  line, it moves out through a duct, moving vertically upward.

3  And then it comes to an area where there is a bleed control

4  valve, which is essentially what is called a butterfly

5  valve, simple valve, that directs the air in this particular

6  case showing it directed towards the aircraft.

7  Q.    Okay. What is the purpose of the bleed control valve

8  or the surge valve in the APS 3200?

9  A.    The bleed control valve exists in the system when the

10  flow, for reasons having to do with the user of the flow in

11  the aircraft, where for some reason it does not -- it has a

12  greatly diminished demand for that air, the flow reduces.

13  And then the problem that occurs for the compressor itself

14  is that it has a minimum flow by where it can safely provide

15  pressurized air.

16        If it falls below that point, it is no longer

17  able to generate the necessary pressurized air and it will

18  momentarily stop doing so.

19        As it does so, the air that is in that vertical

20  line and in that line going to the left that's going to the

21  aircraft, all that air there that is higher pressure in this

22  instance run back into the load compressor. And then, when

23  that happens, it results in the operation of the compressor

24  being reestablished so it repressurizes the air, still

25  staying at very low flow. And it then pressurizes that

1  line.  Again, the same thing happens.

2       The aircraft is not able to use it.  So you get

3  a repetition of the cycling back and forth.  It is this

4  repetition of cycling back and forth which is what is

5  referred to as surge.

6  Q.   Did you prepare an animation as part of your testimony

7  to the jury in 2001 that illustrated this idea of air

8  flowing from the compressor and surge?

9  A.   Yes, I did.

10  Q.   I don't want to show the whole thing, but let me just

11  show a couple of frames, if I can.

12       First of all, let's stop here.  When it says

13  high air demand, what does that indicate?

14  A.   Well, that indicates that it is providing air that

15  both pressurizes the cabin itself and also provides -- and

16  also provides the air for use in the air conditioning system

17  that is on the aircraft.

18  Q.   Keep the frame frozen there.

19       In the higher air demand slide or frame from

20  your 2001 animation, where is the air leaving the load

21  compressor shown as going?

22  A.   As I indicated in the earlier slide, the air again,

23  it's shown in that blue path.  It goes from what I termed

24  the scroll area adjoining the type of load compressor,

25  moving vertically upward, into the area where the bleed

---

1  by the action of the surge control system to rotate that

2  bleed control valve so as to allow the air to go unimpeded

3  from that blue area where it was collected around the -- not

4  collected, but where it was passing through the bleed

5  control valve and now is directed back towards the exh.

6  shown in those orange arrows.  And it is combined with the

7  gas turbine exhaust, and is expelled outward of the

8  aircraft.

9  Q.   So the larger here, orange arrows, are air being bled

10  off via the bleed control valve to the exhaust.  Is that

11  right?

12  A.   That is correct.

13  Q.   Let's run the rest of this just for a couple seconds,

14  run this animation.

15       What happens if you don't have proper surge

16  control and you have a surge situation?

17  A.   I think you have to move on.

18  Q.   Stop it right there.

19  A.   That is the surge condition that I described earlier,

20  where you could see what they are really showing through

21  this animation is that the flow is in a cyclic manner, a

22  very rapid cyclic manner, is trying to get out of the

23  compressor and go into the cabin, is unable to because there

24  is a higher pressure there than it has.

25       So it runs back into the compressor.  It then

---

1  control valve is.  And that valve is positioned so as to

2  allow the air from the compressor to go into the cabin

3  itself.

4  Q.   On this picture, is any air being shown as being

5  vented off to exhaust as well?

6  A.   There is indication, a small indication of some

7  pressurized air going to the exhaust.

8  Q.   Let's run the animation.

9       (Pause.)

10       If we go to the next frame of the animation.

11       Let's stop it here.  I see at the top, the

12  title, it says Low Air Demand.  Do you see that?

13  A.   Yes.

14  Q.   What does that indicate?

15  A.   The low air demand refers to the condition I described

16  earlier, when the user for the pressurized air in the cabin,

17  primarily, the air conditioning system for whatever reason

18  no longer needs the same quantity of air, so it's reduced to

19  a low level.  That low level is at a point where it can

20  cause this instability that I mentioned earlier because the

21  compressor can't operate at such a low flow.

22       That is monitored by what is termed the surge

23  control system, which then activates the bleed control valve

24  and, whereas formerly the valve was positioned so that the

25  air would go to the cabin, now, the valve repositions itself

---

1  gets repressurized and it keeps cycling back and forth in

2  that process, shown by these arrows going back and forth.

3  Q.   Back it up, if you can, a couple seconds.

4       That is the surge condition that the technology

5  here is designed to prevent?

6  A.   That's right.  And the surge is occurring as pulses.

7  It is not quite the way it is shown there.  It is like a

8  continuous sort of flow.

9       It is pulsing back and forth.  This is where the

10  term surging comes from.

11  Q.   Turn off the animation.  We will go back to slide 1.

12       Now, what you have outlined in orange in this

13  slide from the 2001 trial is the load compressor.  Is that

14  right?

15  A.   That would constitute all the elements of the load

16  compressor.

17  Q.   If we can go to Slide 2, please.

18       Is this another slide that was used at the 2001

19  trial with the jury?

20  A.   Yes, it is.

21  Q.   What does this depict?

22  A.   Well, this shows, this is basically a cross-section in

23  scale, in proportion of the actual parts that are used,

24  which were shown earlier as a cartoon.

25       It shows the various parts, then, obviously,

---

129

1 identifies what those parts are.

2 Q. For the 3200 load compressor. Correct?

3 A. That's correct.

4 Q. Now, does this demonstrative, from the 2001 trial show

5 where the 3200 surge control system measures pressure?

6 A. Yes, it does.

7 Q. And where is that?

8 A. Well, if you -- first of all, it identifies the

9 sensing device, which is very close to where you have

10 whatever that little marker is. I assume -- you highlight

11 that. That refers to as P substatic pressure measurement --

12 I can't --

13 Q. I think it says integrated into scroll housing.

14 A. It's basically indicating that there is a sensing

15 measurement device which is located in the wall of the

16 scroll, which has -- wherein it is sensing through a hole

17 that is in the side of the housing the static pressure right

18 at that position which is located. I will describe that in

19 a moment. It is located within what is termed the actual

20 diffuser, diffuser blade.

21         That is that portion right above that.

22 Q. When you say diffuser, where is that?

23 A. The diffuser, it's the portion that is identified in

24 the block just above what you had right there. That is a

25 diffuser there. And it points to, what you see as a little

130

1 rectangular section, which is right in the area above the

2 rotating impeller, which is where the energy is imparted to

3 the air and does the initial pressurization. And then the

4 expansion of the air is what generates the high pressure,

5 occurs through what is termed this diffuser.

6 Q. So am I right that one of the pressure measurements

7 for the APS 3200 surge control system is in the diffuser?

8 A. That is what this drawing indicates.

9 Q. Where is the other one?

10 A. The other one is located in the discharge of the load

11 compressor itself.

12 Q. That doesn't happen to be shown on this diagram?

13 A. It is not shown, because this is a cross-section.

14 Q. Now, does the APS 3200 -- we are done with that slide

15 for now.

16         Does the APS 3200 make use of a flow-related

17 parameter in its surge control system?

18 A. Yes, it does.

19 Q. What is that flow-related parameter?

20 A. It is termed by the act acronym DELPQP.

21 Q. Do you have a demonstrative to explain to the Court

22 what that parameter is?

23 A. Yes, I do.

24 Q. Put up No. 3, please.

25         Explain to the Court how the APS 3200 surge

131

1 control system measures DELPQP?

2 A. Recall for a moment, as I just indicated, it takes one

3 static pressure measurement within the diffuser as indicated

4 in that earlier slide, which is located in the earlier

5 portion of the diffuser.

6         It then compares it to the -- a static pressure

7 measurement made in the discharge of the compressor.

8         It takes those two values, finds the difference

9 between them, and then defines it by the static pressure

10 measured in the discharge of the compressor.

11 Q. Now, the third bullet you have on this chart is a

12 unique measure of flow. What do you mean by that?

13 A. What is unique about it is that the actual measurement

14 in the diffuser, and comparing it to the discharge of the

15 compressor and in turn dividing that by the discharge

16 measured, or the pressure measured in the discharge

17 compressor, that value itself is something that is something

18 I had never seen before. This is going back to the first

19 trial. And it is something that, from what I can see, is

20 still a unique measurement, referring back to that time.

21 Q. In what sense -- what attributes of it make it unique?

22 A. What makes it unique is basically its response.

23 Q. What do you mean its response?

24 A. Well, the purpose of this parameter is to measure the

25 pressure in the diffuser compared to the pressure and

132

1 discharge and divide it by that discharge pressure. And

2 whatever that calculation is, it then, that is referred to

3 as a parameter which in turn is compared to the flow going

4 through the diffuser itself.

5         That is what the function of this parameter is,

6 is to relate the calculation that I have just described to a

7 particular flow that is going through the diffuser itself.

8 Q. And does the APS 3200 surge control system make use of

9 DELPQP?

10 A. Yes, it does.

11 Q. Were there any design issues presented to Sundstrand

12 by DELPQP in its response?

13 A. Yes, there was a serious design issue that was

14 presented by this method of measuring pressure or forming

15 the value of DELPQP.

16 Q. And what was that?

17 A. Well, the purpose -- the purpose of this measurement

18 was for it to be used within the surge controller. And it

19 really is in essence a simple enough measurement. What you

20 are trying to do is by making this pressure measurement, the

21 idea was that there would be a unique value of DELPQP

22 associated with every increment of increasing flow, such

23 that as the flow increased, you would get a proportional

24 curve, generally an increasing, a curve that would move up

25 from the lower right-hand corner to the upper right-hand

135

1   corner in some fashion, in a continuous fashion, giving a
2   progressive natural response.
3           As, for instance, something on the order of, as
4   the flow would increase by a certain amount, there will be a
5   progressive natural increase in the value of DELPQP. And
6   that was the expectation at the time when this sort of
7   measurement was made, because it is a common expectation for
8   a control purpose.
9           You are looking for something that is
10  proportional and predictable.
11  Q.   And what was found with the APS 3200 DELPQP?
12  A.   Well, when they made this measurement, by placing
13  this, taking this measurement from the diffuser and from the
14  discharge and forming this value DELPQP, and when they ran
15  this test, started increasing the flow, rather than it
16  increasing in a nice proportional way and just moving up as
17  would be conventionally expected, they unexpectedly found
18  that they had a result which was unusable for this purpose.
19  Q.   What do you mean unusable for this purpose?
20  A.   Rather than going up in a nice proportional continuous
21  fashion from the lower right-hand corner up to the upper
22  right-hand corner, as these things are expected to do, in
23  fact, when they were about a half of the flow, which is what
24  they were going to be using this for, rather than it at that
25  point being at some value that was still usable, it had

136

1   would have come back down again. Such that, as far as the
2   controller was concerned, it would be confused. It would
3   get two values. Because when it was at eight-tenths let's
4   say, as an example, at eight-tenths of the maximum flow,
5   would have the same electrical value generated proportional
6   to what DELPQPs that would be the same as, let's say, about
7   two-tenths of flow.
8           So it would be confused. It would have made a
9   measurement and gotten two values for it.
10  Q.   And what does the APS 3200 surge control system do to
11  respond to this confused or unpredictable response?
12  A.   When they were faced with this unexpected response,
13  what they had to do was to find a way of discriminating
14  between the low region and the high region, or the high flow
15  region and the low flow region of the response.
16          To do that, they reverted to the use of the IGV
17  position, because the IGV is — or the opening of the IGV is
18  an indication of how much flow is going through the
19  compressor.
20  Q.   If we can turn to Slide 8, please.
21          Now, you saw this in Mr. Krupka's opening as
22  well.
23          This is a diagram from the APS 3200 surge
24  control system. Is that right?
25  A.   That's correct.

134

1   actually risen to some maximum value, and somewhere about
2   halfway through that point, instead of continuing, as the
3   flow increased, it began to come down again. And it came
4   down to the point that when it reached its maximum flow, it
5   was back to almost where it started, forming what is just
6   used for purposes of reference an inverted-V curve.
7   Q.   What did the APS 3200 surge control logic do in
8   response?
9   A.   Well, the way the surge logic works is that the whole
10  purpose of this measurement is for the generation of the
11  DELPQP signal. That DELPQP signal is basically an
12  electrical signal that goes out to the controller. Now, if
13  it had been working as it had been, as they had expected,
14  going up in a continuous fashion, there would have been some
15  electrical value, increasing electrical value associated
16  with a specific flow.
17          So if you measured that particular value in the
18  controller, let's say it went from, for example, from one to
19  two, you could say, fine, we have now increased our flow
20  from A to B.
21          If you then went to half its flow, you would
22  have expected a certain value.
23          But then, when you went beyond half that value,
24  half that area where that peak occurred, and continued to,
25  let's say, eight-tenths of that value, well, that value

136

1   Q.   And did you spend a good amount of time with this
2   diagram in front of the jury, walking the jury through the
3   APS 3200 surge control system?
4   A.   Yes, I did.
5   Q.   At the 2001 trial?
6   A.   That's correct.
7   Q.   All right. Now, I don't want to go through the
8   details of how it works, because we already had a trial on
9   that. Just to remember, up top, what is the input into the
10  high-flow/low-flow test?
11  A.   Basically, at the top, as you see what this logic
12  shows is it gets the signal, DELPQP, and it uses that signal
13  as one of the ways of determining what the position of the
14  surge valve should be.
15  Q.   Then what is the other input, or what is one other
16  input, according to this Sundstrand flow diagram that was
17  part of your testimony to the jury?
18  A.   Well, as I just earlier indicated, since the DELPQP
19  measurement alone was not sufficient to tell you what the
20  flow of the compressor was, in order to be able to decide if
21  you should open or close the surge valve, it now needed thi
22  additional information, which is shown in the bottom, as
23  IGVPOS, which stands for the position of the IGV.
24  Q.   And is that where the 3200 surge control system
25  incorporates the position of the IGV?

137

1   A.   Yes. It is at this point that it uses the position of
2   the IGV in order to discriminate what the value of DELPQP is
3   really telling it.
4   Q.   With that background on the APS 3200 surge control
5   system and how it works from the 2001 trial, let me ask you
6   about the opinions that you have that you had formed. What
7   was your conclusion with regard to whether the APS 3200
8   surge control system would have been foreseeable to one of
9   ordinary skill in the art in 1982 or 1983?
10  A.   In my judgment, there was not a foreseeable thing.
11  Q.   What was your conclusion with regard to whether the
12  particular use of inlet guide vane position made by the APS
13  3200 surge control system would have been foreseeable to one
14  of ordinary skill in the art in 1982 and 1983?
15  A.   It would not have been foreseeable in this
16  application.
17  Q.   Can you please explain to the Court the basis for your
18  opinion that the APS 3200 position control system and its
19  particular use of inlet guide vane position would not have
20  been foreseeable?
21  A.   Well, it wouldn't have been foreseeable for two basic
22  reasons in my mind.  First, there was no real need for it.
23  There was a whole body of flow measurement devices that were
24  already available and well-proven that would have given this
25  nice, continuous, proportional value, which is what is used

138

1   in most of industry for the measurement of flow as a result
2   of some parameter.
3        So there were already many devices available.
4   So someone, to my thinking, someone who was looking for some
5   flow measuring device, which is a pretty straightforward
6   thing, would have no reason to turn to -- to consider a
7   device like this, because you already could buy
8   off-the-shelf flow measuring devices.
9        The second reason was that if you wanted to use
10  flow measuring devices for surge control, there are a number
11  of companies making surge control systems used for
12  several-gallon compressors.  And those companies -- what is
13  used throughout the industry is to measure -- to actually
14  measure the flow conditions associated for flow for use in
15  surge controllers on centrifugal compressors.  The pressure
16  measurements that are made and well-established are made at
17  the inlet and discharge of the compressor.
18       It is the use of comparing those two pressures,
19  which is then used in determining what the flow going
20  through the compressor is, which activates the surge
21  control.
22       So if I were someone in that period, I am
23  looking ahead saying, well, you know, how am I going to
24  measure flow, I have two sources.  First, I have the flow
25  measuring devices I can buy off the shelf.  Secondly, I can

139

1   resort to companies themselves to provide me with a surge
2   control system where they have well-established means using
3   pressure measurements on the inside -- on the inlet and the
4   discharge of the compressor, those two pressures, and using
5   that in order to activate a surge control system.  So I
6   would have had no incentive to look at something of this
7   nature or to consider it.
8   Q.   Are there, in your view, any examples in the art
9   existing through 1983 of a surge control system that uses
10  inlet guide vane position to compensate or correct for a
11  flow measurement parameter that is uncertain or could have
12  two values?
13  A.   In my search, I haven't found any, nor has anyone
14  presented any, that I am aware of.
15  Q.   Now, you have testified earlier that the DELPQP
16  variable was unique.  Is that your opinion?
17  A.   That is my opinion, yes.
18  Q.   Is that related somehow to your opinion that the APS
19  3200 surge control system and its use of inlet guide vane
20  position would not have been foreseeable?
21  A.   Yes, it is.
22  Q.   In what way?
23  A.   Well, it's because of the nature of the measurement,
24  that the particular measurement of DELPQP, in the 3200, uses
25  a unique way of measuring pressure.  It uses a pressure

140

1   measurement within the diffuser and compares it to a
2   pressure measurement in the discharge of the compressor, and
3   then divides it by the discharge pressure.
4        That is something that I have never seen before.
5   And to me, that was part of the reason why it wouldn't be
6   considered.  One, there would be no reason to really
7   consider it.  And it is not something, for a number of
8   reasons, you would want to consider.
9   Q.   Now, were you here in Judge Sleet's courtroom when Mr.
10  Shinskey, Sundstrand's former expert, testified to the jury
11  back in 2001?
12  A.   Yes, I was.
13  Q.   Was there any part of his testimony that you believe
14  is relevant to this issue?
15  A.   Yes.
16  Q.   Slide 9, please.
17       What from Mr. Shinskey's testimony to the jury
18  back in 2001 do you believe is relevant to this issue?
19  A.   Well, it is his very statement here.
20  Q.   That he had never seen the surge variable in the 3200
21  used to control surge before in any work that I had ever
22  done or any publications that I have ever read?
23  A.   Yes.  This was in his trial testimony.  It was in his
24  reports as well.  He was very adamant about it, as I recall.
25  That was a clear position which he took at the time.

1  Q.  And for the record, that is the trial transcript at
2  1335.
3       Now, there has been some suggestion, Mr. Muller,
4  that your position at the trial was somehow different than
5  this. Was your position on DELPQP any different at the
6  trial in 2001 than what you are articulating today?
7  A.  No.
8  Q.  Let's go to the next slide, slide No. 10.
9       Am I right that this is a portion of your
10  testimony from the trial of 2001 at Pages 753 to 754?
11  A.  That's correct.
12  Q.  When you said during your trial testimony in 2001 it
13  measures flow in a special way, which is special to the
14  3200, what did you mean by that testimony?
15  A.  When I referred to it as measuring it a special way,
16  which is special to the 3200, I was referring to the fact
17  that it was taking a measurement in the diffuser, comparing
18  it to the discharge pressure, what we are terming DELPQP, it
19  was the method of that measurement, producing what I
20  indicate above this peak key double solution curve, which is
21  specific to the 3200.
22  Q.  And this was from the testimony that you gave to the
23  jury in 2001?
24  A.  That's correct.
25  Q.  In fact, can we switch to one of the slides Mr. Krupka

142

1  used in opening, which was the Sundstrand Federal Circuit
2  brief.
3       You see here, Sundstrand, in their Federal
4  Circuit brief, said Honeywell's own expert admitted that the
5  high flow logic addresses this unusual behavior of DELPQP in
6  a way that is special to the APS 3200.
7       Was that expert you?
8  A.  That would be me, yes.
9  Q.  And is it your understanding that they were quoting
10  here in their brief some of the same testimony that if we
11  flip back to the 3200 funny looking curve actually coming
12  from this very portion of your trial testimony?
13  A.  It certainly appears so.
14  Q.  I want to be clear. Is it just the fact of having a
15  double solution or inverted-V that you are saying is unique
16  to DELPQP?
17  A.  No.
18  Q.  What is it?
19  A.  What is unique to DELPQP is not simply that it is a
20  double solution curve. What is unique to it is the nature
21  of the response itself.
22  Q.  You say the nature of the response itself, what do you
23  mean?
24  A.  Well, the response itself, as used in this surge
25  controller.

1  Q.  Which is what?
2  A.  Well, the response itself being that as a function of
3  flow, it gives two solutions, and as a result of taking
4  measurements in the diffuser and comparing it to the
5  discharge of the compressor.
6  Q.  All right. Now, is there any connection given the
7  unique DELPQP response in the AP 3200 and its use of inlet
8  guide vane position?
9  A.  Yes.
10  Q.  What is that connection?
11  A.  Well, the connection is that in order to get around
12  this, the problem of having an unusable flow measuring
13  parameter, they had to resort to the use of the IGV in order
14  to allow them to use this DELPQP parameter. Otherwise, it
15  would have been unusable.
16  Q.  Again, did Mr. Shinskey in the testimony that he gave
17  to the jury while you were sitting here address this issue?
18  A.  Yes, he did.
19  Q.  Can we have the next slide, please?
20       And this is from the trial transcript at 1383,
21  saying the high flow/low flow test's only purpose is to
22  protect against this possibility and it's caused based on
23  the unique characteristic of DELPQP measurement as a
24  function of flow.
25       Do you agree with Mr. Shinskey that the purp

144

1  of the high-flow/low-flow test is caused by the unique
2  characteristic of DELPQP?
3  A.  Yes.
4  Q.  Now, there was also reference in Mr. Levine's opening
5  to this, some deposition testimony you have given in this
6  case. You are not saying, are you, that the use of, any use
7  of IGV position in a surge control system was new in the APS
8  3200 or in 1982 or '83, are you?
9  A.  No, I am not saying it was new at all.
10  Q.  What is it about the APS 3200's use of IGV position
11  that you are saying was new or unforeseeable?
12  A.  What was new and unforeseeable in the use of the IGV
13  position was its use for this specific purpose, to address
14  the fact that the generation of DELPQP through the
15  measurement of pressure in the diffuser and the discharge
16  produced a response that was unusable unless the IGV was
17  used in order to resolve -- in order to make it a usable
18  value. And this is a use of IGVs they have never done
19  before.
20  Q.  Are you aware of any surge control system anywhere
21  of 1982 or 1983, that made use of IGV position in that w
22  A.  In the way I just described, no.
23  Q.  We are done with that slide.
24       Let me turn to the topic of L1011, which is one
25  of the items that Sundstrand's counsel talked about, t