# 2006 Remand Trial Transcripts Part 3

02:40:55 A. No.
02:40:55 Q. Now, you accepted Mr. Muller's definition of who a person of ordinary skill in the art is. Correct?
A. That's correct.
Q. And you are not a person of ordinary skill in the art. Correct?
02:41:16 A. No, that's not true. That's not true. I have ten years of experience working with surge and compressors and gas turbines.
02:41:25 Q. I am sorry, Doctor. You misunderstood the import of my question. Let me state it this way. You are far more expert than someone of ordinary skill in the art. Correct?
02:41:37 A. I like to think I have a little bit more expertise.
02:41:40 Q. Considering all the awards and the training and the higher degrees and the experience and the articles and the books and the other items that are in your CV, wouldn't you agree that you are far more expert in this field than somebody of ordinary skill in the art?
02:41:57 A. I have a bit more skills.
02:42:00 Q. You were here for the opening, weren't you, Doctor?
02:42:34 A. Yes.
02:42:34 Q. The opening statements yesterday?
02:42:36 A. Yes.
02:42:37 MR. KRUPKA: Mr. Schlaifer, is it possible to put up Hamilton Sundstrand Demonstrative Exhibit No. 215?

02:42:45 BY MR. KRUPKA:
02:42:48 Q. Do you remember seeing this during the opening yesterday?
02:42:54 A. It looks familiar. I was sitting at a very oblique view so I couldn't read what was up there.
02:43:00 Q. Can you tell me what portions of the APS 3200 meet the so-called inlet guide vane limitation of Claim 19 that is shown there?
02:43:18 MR. LEVINE: Same objection, Your Honor. Outside the scope of his opinions. We are getting the same thing again.
02:43:24 THE COURT: Mr. Krupka.
02:43:24 MR. KRUPKA: Your Honor, again, it is as to whether or not that was relevant to his determination of whether, to someone of ordinary skill in the art in 1982, whatever it is that was equivalent would be foreseeable. I am just asking him, what is it that was equivalent. That is the very basis of this testimony.
02:43:42 MR. LEVINE: Your Honor, he has said he didn't look at whether or not there was infringement by equivalence.
02:43:48 THE COURT: We will establish it one more time. Go ahead. You believe this bears on his credibility.
02:43:55 MR. KRUPKA: Well, Your Honor, let me rephrase the question and see if we can't make it a little clearer

02:44:01 how it is relevant to this subject matter.
02:44:02 BY MR. KRUPKA:
02:44:03 Q. Doctor, what is it in the APS 3200 that is equivalent to the inlet guide vane limitation that is set forth on HSC Demonstrative Exhibit No. 215 highlighted in yellow there, the bottom, the so-called inlet guide vane limitation?
02:44:29 MR. LEVINE: Same objection. I am also going to note, the way it is phrased now, it calls for a legal issue, about what was the basis for the jury determination, which the Court can look at. Certainly beyond the scope of this expert.
02:44:40 MR. KRUPKA: Your Honor, as I understand it, this witness' only purpose is to testify as to the foreseeability of the equivalent that was found in this case. I am simply asking him what the equivalent is.
02:44:54 MR. LEVINE: Your Honor, he did it based upon looking at assumptions, looking at this technology, was it equivalent. Looking at this technology, was it equivalent. Not trying to parse through what the basis was for the jury's opinion or what the basis was for the Court determining things. That's a -- those are legal issues.
02:45:11 THE COURT: I am not sure that I necessarily agree with that. But I am not sure, also -- well, did you review this?
02:45:17 THE WITNESS: Certainly not for the things he is asking. I can't help there.
02:45:22 THE COURT: Go ahead, Mr. Krupka. I am going to let you go. He didn't review this.

02:45:27 BY MR. KRUPKA:
02:45:27 Q. Certainly you saw Claim 19, didn't you, Doctor?
02:45:31 A. I certainly didn't spend time reading the claims there. That was not important to me. I may have seen it. But I didn't study that. I took technical issues and worked technical issues through. I did not involve myself with the legal interpretations, that is not my field. I don't do that.
02:45:50 Q. So you didn't take into account the claim language when you were rendering your opinions?
02:45:55 A. I did not parse through claim language, no.
02:45:58 Q. Did you go through the 2001 trial record and look at the actual evidence that was presented about the operation of the APS 3200 and its relating to the claims at issue in the case?
02:46:21 A. And its relationship to the claims, we are in the legal world again. No, I am not doing that legal parsing. I have seen little bits when it would pertain to a technical issue, I have seen bits here. Worked with little bits when it pertains to a technical issue. But that's not where my emphasis was. We were looking at functionality. How things work, how they function, whether a person could see that

certain specificity.

Q. It is a name in the computer code that represents a particular parameter measured in particular places in a particular load compressor used in a particular APU?

A. All those are particulars. There is nothing to keep a person from using the same or similar name in any other machine, too.

Q. I am trying to go the other way.

A. Also, the pressures change with time. You move it to different locations. So the specificity changed as they search for good locations.

Q. And as a consequence, what it represents, namely, delta P over P, changes depending on where it is measured. Correct?

A. The value changes. That's why you move the taps.

Q. Is there more than one way to control surge in a load compressor?

A. There are many different ways to control surge in compressors in general. And in load compressors --

Q. Is that correct in terms of load compressors that are used in auxiliary power units for aircraft?

A. Yes, if you just cut the definitions tight enough, you can make something that will follow.

Q. It's not a trick question, Doctor. I am trying to establish, is there only one way to do it or are there lots

of different ways to do it?

A. If we confine our class to the particular type that we are talking about, the type of APUs that are used, there is a lot of similarities. If you take it out to a broader set of other types, then there are other possibilities. There are variations.

Q. Now, in preparing your opinion, you actually broadened it out and included a lot of different types of compressors, didn't you?

A. Different types of compressors, yes.

Q. You didn't confine yourself to compressors that are used in APUs?

A. No. I looked at compressors in general.

Q. The references that you rely upon don't even focus on surge control systems. Correct?

A. Well, for certain questions, I looked for data that would answer questions.

Q. But for other parts of your -- other pieces of your opinion, such as measuring delta P over P or other aspects of your opinion, you just looked at compressors generally, not necessarily focused on surge control systems?

A. That is true.

Q. With respect to, for example, all the testimony you gave today about inlet guide vanes, that wasn't limited to the use of inlet guide lanes veins in a surge control

system. Correct?

A. It is not limited.

Q. And what I mean is, the references that you went to to describe about the inlet guide vanes and what was foreseeable in that, you did not -- you included reference that did not involve the use of measurement at inlet guide vane position in a surge control system?

A. We used Glennon for a lot of -- for some examples. Yes, Glennon. That's a surge control system.

Q. Doctor, could you answer my question now? Isn't it correct that the references that you cited were not limited to the use of inlet guide lane position as part of the surge control system?

A. Broadly, that's true. It's a mixture of references.

Q. Now, would you agree that surge control systems typically move the operating point from near surge condition to a point of higher flow rate located further from the instability limit?

A. That was a general statement. And I would not.

Q. Could you look at Page 7 of your expert report?

A. Yes. Where would you like me to look?

Q. I am finding it, Doctor, in the second paragraph, the middle of that paragraph, where you say, This action during the early decades was typically the use of bleed flow from the compressor.

A. That's correct.

Q. Which then allowed the compressor to pass more mass flow and hence move its operating point from the near surge condition to a point of higher flow rate located farther from the instability --

A. That's correct. That is different from what you just asked me.

Q. Is it your testimony that a surge control system does not typically move the operating point from near surge condition to a point of higher flow rate?

A. My testimony is that during the early decades --

Q. This is a different question now. I am asking you, is it your testimony as you sit here today that surge control systems do not typically move the operating point from near surge condition to a point of higher flow rate?

A. No, that's not fair, because surge is very, very, very broad. If you ask me a broad question, I have to give the professional answer that speaks to the broadest world of possibilities. We are here talking about APUs in a certain time period.

Q. Doctor, in fairness, you didn't limit your references to APUs, did you?

A. I limited my references to a certain period of time.

Q. Doctor, would you answer my question, please. You didn't limit your references to APUs, did you?

A. That's correct.
Q. You didn't limit your references to surge control systems, did you?
MR. LEVINE: Objection.
THE COURT: Overruled.
BY MR. KRUPKA:
Q. Did you?
A. No.
Q. My question, then, is, is it correct that surge control systems typically move the operating point from near surge condition to a point of higher flow rate?
A. Many of them typically do, especially in the early decades.
Q. Did surge control systems in 1982 behave differently?
A. In the broad sense or the specific?
Q. Surge control systems in the sense of the references that you referred to in your expert report, which included things that didn't involve APUs and didn't involve a specific load compressor for an APU?
A. They carried a variety of possibilities. But this was the most frequent method.
Q. Now, the surge control system in the L1011, did it move the operating point from near surge condition to a point of higher flow rate?
A. Did it move -- repeat, please, sir.

Q. Did the surge control system in the L1011 move the operating point from near surge condition to a point of higher flow rate?
A. Yes.
Q. Did the surge control system of the L1011 attempt to maintain minimum compressor bleed flow rates slightly above the compressor's surge flow rate?
A. Repeat, please, once.
Q. Did the surge control system of the L1011 attempt to maintain compressor bleed flow rate slightly above the compressor's surge flow rate?
A. It depends on slightly. A bit above it.
Q. Was there any effort in the L1011 to try to get it as close as possible or to try to stay away from it?
A. Definitely to stay away from it. I wouldn't be the one to testify on how they adjusted all of the little screws and throttles and things they have in there, which would determine how close it went.
Q. Indeed, you would like to stay far away from it, wouldn't you, to avoid surge?
A. Well, no. I just don't want to be in surge. But if I want to go to lower flows I would like to go as low as I can safely.
Q. What is safe?
A. A nominal distance from the surge line.

Q. What is a nominal distance?
A. You would like to avoid vibrations, things that could disturb people and so forth. So as you start going into any precursors of surge you would like to avoid those.
Q. Do you know whether the L1011 surge control system was designed to try to stay slightly above the compressor's surge flow rate?
A. No, I do not.
Q. Did you read the patents in this case?
A. I read various parts and one of them I read earlier early in the process.
Q. In connection with the work that you did and the opinions that you rendered, did you attempt, or did you take into account with respect to your opinions on foreseeability any effort to maintain minimum compressor bleed flow slightly above the compressor's surge flow?
A. Slightly above? No. I don't have a definition of that yet.
Q. But in any event, you didn't take that into account in rendering your opinions. Correct?
A. I did not work on slightly and parse out whether it's one percent or three percent.
Q. Now, is it correct, Doctor, that with respect to compressor maps, they are not uniquely specified unless the inlet temperature and pressure is considered in the map

preparation?
A. That is fundamental.
Q. And isn't it correct that the characteristics of a machine, a compressor, will depend upon the actual flow rate, its inlet pressure, its inlet temperature, and the specific geometry used?
A. Yes.
Q. Isn't it correct, with respect to the surge control system of the L1011, that the position of the inlet guide vanes was not used as an input to the shock switch?
A. To the shock switch.
Q. Correct.
A. Yes, but they still work in a similar fashion.
Q. And what do you mean by similar fashion, that they have the same function, to shut down the effect of the surge control system when you get near shock?
A. They do not shut it down. They just ignore it. It just ignores it.
Q. I will take your terminology. So it's your testimony that that is what's the same. Correct? That it ignores it?
A. When the shock switch and shock override comes in, it ignores and keeps the valve open, allowing full flow to the aircraft, or whatever they have.
Q. In the L1011, the position of the inlet guide vanes is not an input that is part of the surge control system?

03:20:50 A. That is not correct.
03:20:52 Q. Is the inlet guide vane position measured as part of the L1011 surge control system?
A. Not mechanically measured. But fluid dynamically measured.
03:21:22 Q. Mr. Schlaifer, could I have you play the clip from Dr. Japiske's deposition beginning at Line 166, going to -- at Line 3, Page 166, Line 3 to Page 167, Line 1?

MR. LEVINE: Your Honor, I have it right here. Hold it. Could we have a sidebar?

THE COURT: Yes.

(The following took place at sidebar.)

THE COURT: Your objection, Mr. Levine. It is not impeaching?

MR. LEVINE: I will withdraw it.

(End of sidebar conference.)

BY MR. KRUPKA:
Q. Doctor, you gave a deposition in this case. Right?
A. That's correct.
Q. Back in January?
A. That's correct.
Q. And you testified there under oath?
A. Yes this is Page 166, Line 3 to Page 167, Line 1.

"Question: In the L1011 surge control system, is it correct that inlet guide vane position was not

measured as part of the surge control system?

"Answer: I don't believe it's correct. The diagram would make it clear.

"Question: So it's your testimony that inlet guide vane position was measured as part of the surge control system for the L1011?

"Answer: That's not -- that's not anything close to what I was saying a minute ago.

"Question: What's your testimony, sir?

"Answer: Let's have one question that I can work with. There was two questions.

"Question: Don't argue with me, sir. Try to answer my questions. My question is, is the inlet guide vane position measured as part of the L1011 surge control system?

"Answer: The inlet guide vane position, to the best of my knowledge, is not measured as part of the control system."

BY MR. KRUPKA:
Q. Is that your testimony, sir? Is that the testimony you gave?
A. That is part of my testimony.
Q. Now, the L1011 surge control system was pneumatic. Correct?
A. It is pneumatic.

Q. And the APS 3200 surge control system is electronic. Correct?
A. Principally electronic.
Q. Isn't it correct that the difference -- that there is a technological advancement between pneumatic and electr[onic] systems for surge control?
A. I wouldn't characterize it necessarily as technological advancement. It is more convenient and you can use it that way. Many people look at it as advances, yes, that's true.
Q. Isn't it true that electronic surge control systems is technology that was developed after the use of pneumatic surge control systems?
A. Electronic is mostly after the pneumatic, that's correct.
Q. Is it correct, sir, that the delta P over P measurement in and of itself does not lead to the double solution curve but, rather, you encounter the double solution curve in subsonic, supersonic flow systems that experience supersonic flow and use static pressure differential across the diffuser to measure flow?
A. When you measure static pressure across the diffuser, if you have them in the right places, you will get the shock and you will get the double solution curve.
Q. So, therefore, the double solution curve is not in and

of itself a function of the DELP over P?
A. It is not a function of the parameter you chose there, that's right. It is a physical phenomenon that exists in the diffuser.
Q. And whether or not you see the double solution curve will depend on where you measure the static pressure. Correct?
A. You say whether or not?
Q. Where, will depend on where you measure the static pressure?
A. Please repeat the whole question.
Q. Yes, be happy to.

Is it correct that whether or not you encounter the double solution curve is dependent upon where you measure the static pressure?
A. There is some dependence. You can't go putting it outside of the diffuser. You put a static pressure at the throat of the diffuser or near the throat. Then you have a variety of possibilities downstream.

But you can't put both on one side of the shock.

MR. KRUPKA: Mr. Levine, maybe you would lik[e to] join me.

MR. LEVINE: Sure.

MR. KRUPKA: May I approach, Your Honor?

THE COURT: Sure.

MR. KRUPKA: I would ask Mr. Levine to share with us what exhibit I am holding.

MR. LEVINE: A portion of Defendant's Exhibit 399.

MR. KRUPKA: Thank you.

BY MR. KRUPKA:

Q. Now, in your direct, Doctor, you identified, after Mr. Levine pointed them out here, these holes within the passage of one of the diffuser veins. Is that an accurate description?

A. Yes.

Q. And these four holes in this one specific passage are the static pressure taps for this. Correct?

A. That's correct.

Q. Which are the two -- there is four holes there. Correct?

A. That's correct.

Q. Only two are used in connection with the surge control system. Correct?

A. The surge control system.

Q. Correct.

A. No.

Q. How many are used for purposes of measuring, or for purposes of inputting to the surge control system?

A. Three or four of them are in the surge control system.

Q. Okay. Can you tell us which of the four are the possibly three that are used? You said three or four are used. If it is three, which three?

A. Let me just think -- for the diagram -- for a second in my mind. All four of them -- go ahead.

Q. Do you have a document that we can refer to? Maybe Mr. Levine can refresh our recollection as to which exhibit number it is.

MR. LEVINE: I believe it's Defendant's Exhibit 105 is the Master Key. There is a diagram in there. It should be in your book.

MR. KRUPKA: I appreciate the help, Mr. Levine. We are just trying to get the facts.

MR. LEVINE: That's all I want to do, too.

I will say it is a long document.

MR. KRUPKA: Do we know the page in the Master Key? It may be in my notes.

BY MR. KRUPKA:

Q. 2-12 was the page that -- the page I marked down was 2-12.

A. That is not the diagram I am looking for. But that still helps. I want the diagram.

MR. LEVINE: If I could speak, Your Honor, 2-12 has some text. The diagram is at SUND 493.

THE WITNESS: 493.

Yes, this is the one that I was referring to that I wanted on the video clip. And of these, all are used in the surge control system.

BY MR. KRUPKA:

Q. And would you agree that all four of those pressure tap holes are contained within the confines of the diffuser?

A. Yes.

Q. And, Doctor, that is different from where the static pressure taps are or measurements are taken -- let me start over.

The locations where the static pressure is measured in the L1011 for purposes of surge control are different than where the pressure, static pressure measurements are taken as inputs to the surge control system of the APS 3200. Correct?

A. They are different. But they won't change the inverted-V curve.

Q. Well, actually, let's talk about that. The inverted-V curve for the APS 3200 is different than the inverted-V curve for the L1011, isn't it?

A. Well, on two machines you are going to get two slightly different curves. The number is going to be slightly different, yes. That will depend on the specific --

Q. And isn't it correct you can manipulate the way you

draw a curve so that it can end up looking however you want it to?

A. To a degree. You are plotting scales.

Q. Now, did you find anywhere an example of static pressure measurements taken within the diffuser and one at the exit of the scroll in a load compressor where the inputs -- where those pressure measurements are used as inputs for a surge control system?

A. I think I got it. If you would repeat it, I would appreciate it.

Q. We are talking about pressure, static pressure measurements as inputs to a surge control system, where one static pressure measurement is from within the diffuser, and the other static pressure measurement is at the exit of the scroll.

A. Yes. Did I find a case that had pressure taps at those two locations and were...

Q. Inputs to a surge control system.

A. No, but I don't see a difference of importance.

Q. Doctor, I don't want to argue with you. I just wanted the answer to the question. Thank you.

MR. KRUPKA: We are getting close to the end, Your Honor. Thank you for your patience.

BY MR. KRUPKA:

Q. Is it correct that an APU flow increases past the peak

Isn't it correct that what this drawing shows is that once you get to supersonic speed, the flow remains constant?

A. The corrected flow based on upstream conditions is constant.

Q. Right. So this is a totally different set of parameters than the one that you ended up with on Hamilton Sundstrand Exhibit 335?

A. No, it is not a totally different set.

Q. I thought this was downstream corrected?

A. That is downstream corrected flow.

Q. And if we go back to the Elmo, in this situation, the pressure at the end of the diffuser or nozzle does not reduce. Correct?

A. Sorry?

Q. The pressure at the -- well, let me put up this one again, so we can get this straight. HSC Demonstrative Exhibit No. 322. The back pressure in Exhibit 332 changes. Correct?

A. Yes, it drops.

Q. It drops. And that is partly why you get these different curves. Correct?

A. It's part of the picture.

Q. Now, what about the conditions that are shown in Defendant's Exhibit 335 -- excuse me, HSC Demonstrative 335, is there back pressure that is accountable for -- is the

change in back pressure accountable for these curves?

A. The back pressure is dropping down.

Q. In other words, is it the same set of circumstances as you were explaining for HSC Demonstrative 322?

A. It is the same set of circumstances.

Q. What you are saying the difference is is that this is, you have changed the conditions on the left-hand drawing to show downstream corrected flow as opposed to -- if we can go back to the uncovered exhibit -- opposed to in the bottom right-hand drawing there, which you say is corrected upstream flow?

A. Both are used, and we have, on the placard over there, we have examples of each. It doesn't matter which one you want to use. There are examples of each of them on that placard where they are going both ways. It is all a matter of convenience for what people want to use, control system, people like to get more of a bell shaped curve, so they choose the downstream. That's their preference in the industry. That's what we found in the plot, so that's what we used.

Q. But you picked the downstream, whereas this shows the upstream, because what you wanted to show was an inverted-V curve. Correct?

A. You get inverted-V curves both ways. It doesn't matter. They are both on the placard over there, the

magnetic board.

Q. Well, then, let me ask you.

MR. LEVINE: For the record, that is Demonstrative Exhibit 17.

BY MR. KRUPKA:

Q. While we are on the subject of double solution curves, other than the L1011 about which you have already discussed, is it correct that you are not aware of any surge control system for an APU that exhibited a double solution curve phenomenon prior to 1982?

A. Prior to 1982, the L1011 is the example that comes to mind.

Q. Yesterday, you testified that you had four patents and one soon to come. Do you remember that?

A. Yes.

Q. And you said -- let me make it easier.

MR. LEVINE: Your Honor, this is improper. If he wants to ask him a question now -- he is not impeaching. He is showing what he said. Just ask him the question.

MR. KRUPKA: I am asking the question, Your Honor.

MR. LEVINE: That shouldn't be on the screen.

THE COURT: Are you attempting to impeach him with this?

MR. KRUPKA: No, Your Honor. I am trying to

remind him of the testimony. I will be happy to do it differently.

BY MR. KRUPKA:

Q. Is it correct, Doctor, that you have four issued and one patent about to issue?

A. That's correct.

Q. And is it your testimony that the last four are involved with stability and surge control?

A. The last four, including the one that's about to be issued is involved with stability and other flow field phenomena and surge problems.

Q. And your most recent patents are actually on surge control mechanisms?

A. They are on -- the one to be issued and the one that came out most recently is on stability mechanisms, controlling stability mechanisms that would be involved with surge and triggering surge.

Q. Is it correct that your most recent patents are actually on surge control mechanisms?

A. On surge control mechanisms, the mechanism that I use refers to the flow process, that is the mechanism and that is true.

Q. Let's do it this way, since they are your patents.

MR. KRUPKA: May I approach, Your Honor?

THE COURT: Yes, you may.

BY MR. KRUPKA:

Q. Doctor, for the record, why don't we just let me hand them to you. Then we will start questions. While I am handing these to your counsel, can you look through these and tell me which ones are the ones that are your most recent patents that are actually on surge control mechanisms.

A. The mechanisms of flow involved in the surge processes are dealt with in various degrees in the last four.

Q. Okay.

A. I should just state for the record, this is the first time I have seen the last patent, the fifth one. My check with our office indicated that that was not going to be issued for another week or two. So you have done something rather interesting in getting this one, our patent lawyers told me it wouldn't be available --

MR. LEVINE: Let me interject. He may not be through the process. This is a publication.

THE WITNESS: I see. It says the word publication. Okay.

MR. KRUPKA: I have no problem with Mr. Levine doing my job for me, Your Honor, by not leaving the witness misled.

BY MR. KRUPKA:

Q. All right. I have placed before you the following

documents, U.S. Patent Nos. 3,902,819, 5,368,440, 5,730,580, 6,699,008B2 and U.S. Patent Application publication U.S. 20050152775A1 for the record?

A. Yes.

Q. Can you, by using the last three digits, tell me which ones you are talking about are the last four? Is it every one -- let me try it this one. Is this last four, each one you are talking about 3,902,819 --

A. That is correct.

Q. Starting with the U.S. patent application publication, which is about to issue, are there any claims to a surge control system?

A. I have not reviewed that, any of these recently to look at the claims to see whether the claim is surge control system. And that is not my point.

Q. Have you ever drafted claims yourself?

A. No.

Q. And isn't it true that the only discussion of surge in this is in the background?

A. The surge, the mechanisms of the flow process that I am dealing are there, and we talk about surge there in various cases. And that's typical of the types of things that students expect me to include in the classes when I lecture on this subject.

So these would fit in very well, students would

hold me accountable if I did not have this in my classes on stability, surge, surge control, stability, manipulation. It fit in quite properly.

Q. Could I ask you to look at 6,699,008 and tell me whether the word surge appears anywhere in the page?

A. What are the last digits?

Q. 008.

A. I can't do that sitting here. It's been checked, and three of these four have the word surge. One of them does not. I think I can help on the one that does not have that. Let me just think for a minute.

Q. I will be happy to represent to you, Doctor, that I did a search on the computer of '008. And I didn't find the word surge. I think that is probably the one. But you say that that is a surge control patent?

A. No. I am saying it is a patent that deals with surge stability and the stability mechanisms that go to -- involved in a surge and controlling of surge.

Understand, controlling the surge is very broad. There are many, many ways you can control surge in design and controlling. By making choices, I can control surge in the surge line in my design work, so I move the surge line from position A to position B. And that's a type of surge control.

I can do it by working with the flow, like we

see in the later two patents, where we take flow off on the shroud line and reject it into a different place and we have built and we have moved the surge line in cases of this type. That is a type of surge control.

Another type of surge control uses the bleed-back that is typical in these cases. Another type of surge control just manipulates the rotational speed of a compressor. So that you can interfere with the surge process.

There are many, many ways. It is a very broad subject. These would definitely be included in the future on my lectures on stability and surge and surge control.

THE COURT: Is stability or instability a synonym or are they synonyms for surge?

THE WITNESS: They are synonyms for the initiation, the triggering of the surge, the triggering of surge.

BY MR. KRUPKA:

Q. Is it correct that as of 1982 or '83, you are not aware of anyone, anywhere in the world, who used inlet guide vane position as an input to a surge control system to lock out the surge control system when it approached surge, when the compressor approached surge?

A. Well, lockout, we have discussed that word, with some variance there, that is basically correct. But we still

have a similar mechanism in the L1011.

Q. The similar mechanism in the L1011 had nothing to do with inlet guide lane positions. Correct? That's what you mean by similar?

A. Which piece, please?

Q. What you referred to as the similar mechanism in the L1011 had nothing to do with the measurement of inlet guide vane positions as an input to that system. Correct?

A. Is the system the surge control system?

Q. The system is the shock switch system. Isn't that what it is?

A. There are two systems.

Q. What does the lockout in the L1011?

A. What does the lockout? It's the shock switch.

Q. Right. And the shock switch --

A. Lockout, just ignore, it's an ignore signal.

Q. And that mechanism that does that does not have as an input anything having to do with inlet guide vane position. Correct?

A. That is correct.

Q. And the first --

A. It is all foreseeable.

Q. The first one you ever saw where the inlet guide vane position was used to do that ignore or lockout function was the APS 3200?

A. Yes.

MR. KRUPKA: I have no further questions.

THE COURT: Why don't we take a short stretch break.

(Recess taken.)

THE COURT: Okay. Please be seated.

Redirect, Mr. Levine.

REDIRECT EXAMINATION

BY MR. LEVINE:

Q. Dr. Japiske, I want to look at five areas, please. First, you were asked about a person of ordinary skill in the art. You testified that you have greater than ordinary skill. Do you recall that?

A. Yes.

Q. Do you teach or lecture to people who are of ordinary skill in the art?

A. Yes, I do.

Q. Do you have colleagues at your company who are persons of ordinary skill in the art?

A. Yes.

Q. Are you familiar with persons of ordinary skill in the art?

A. Very much so.

Q. When you wrote your opinions, when you expressed your opinions earlier about foreseeability, were those expressed

from the standpoint of a person of ordinary skill in the art in 1982?

A. Yes.

Q. Let's go to the second topic.

The second topic is whether we should be limited to looking at just APUs. Do you recall you were asked about that and you said that you looked beyond just APUs in what was in the pre-1982 literature? Right?

A. That's correct.

Q. I want to look at the patent, which is Exhibit 30, which is one of those documents provided to you by Mr. Krupka. And I am not going to -- I am just going to show you a page. Maybe you don't need to get it out. Turn your attention to the ninth column, Lines 17 to 20. Does the '893 patent say that the bleed air control principle -- does the '893 patent, Joint Exhibit 30, say at Column 9, starting at Line 17, that the bleed air control principles of the present invention are applicable to a wide variety of compressor bleed applications and are not limited to the APU load compressor application described above?

A. That's correct.

Q. Okay. Let's go to the third area. You were shown some deposition testimony of yours, about the IGV position and the use in the L1011. I am going to put that up here. This is Page 166 of your deposition.

Specifically, the first question, you were shown more of it, but I want to focus on the first question and answer, you were shown, in the L1011 surge control system, is it correct that the inlet guide vane position was not measured as part of the surge control system?

You said, I don't believe it's correct. The diagram would make it clear.

Now, later in your testimony, when we were looking for that diagram in DX-105 and we found it, you made some comment like this is the diagram that I was talking about.

Do you recall that?

A. Yes.

Q. Now, is the page that we referenced that I will get to in one minute in DX-105 the diagram that you were referring to at Page 166 of your deposition testimony?

A. I am lost on Page 166.

Q. I have up on the screen --

A. That is the page?

Q. -- Page 166 of your deposition testimony. Let me rephrase the question. Is the diagram that is in DX-105, that we will look at in one second, the diagram that you looked at with Mr. Krupka, is that the diagram that you were referring to on Page 166 of your deposition?

A. You are going to show me that?

MR. LIND: It is right here.

THE COURT: Yes.

MR. LIND: Since all of my witnesses were either stricken by the Court's order or they chose not to call them in the last few days, this is what I got. I am milking it for all it's worth.

THE COURT: The Court will overrule the objection to 109 as an ancient document exception, or based upon the ancient document exception.

MR. LIND: So Exhibits 107, 108, 109 --

THE COURT: Except my clerk wants me to rule that October 1979 is itself hearsay.

MR. PUTNAM: Let me adopt the argument of the clerk.

THE COURT: Go ahead, Mr. Lind.

MR. LIND: Admitted then are all of 104 except the last page, 107, 108, 109, 110 and 111.

THE COURT: Any objection, Mr. Putnam?

MR. PUTNAM: Based on the Court's rulings, no.

THE COURT: Are we still jousting about the last page of 104?

MR. PUTNAM: I believe the Court ruled tentatively.

THE COURT: I did. Do you want to still wait and hear from the other witness?

MR. PUTNAM: Yes, Your Honor.

THE COURT: You preserved your objection. I have overruled it conditionally. Okay.

MR. LEVINE: Your Honor, as our next witness we call Richard --

THE COURT: I am wondering, Mr. Lind, how long do we anticipate this witness will take?

MR. LEVINE: Probably about 20, 30 minutes.

THE COURT: Let's break for lunch, take an hour for lunch.

(Luncheon recess taken.)

THE COURT: Please be seated.

MR. LEVINE: Your Honor, as its next witness, Hamilton Sundstrand calls Richard Brown.

I have a binder for the witness and for the Court and for the other side.

THE COURT: Great.

(... RICHARD BROWN having been duly sworn as a witness, was examined and testified as follows ...)

DIRECT EXAMINATION

BY MR. LEVINE:

Q. Good afternoon. State your name.

A. My name is Richard Brown.

Q. Mr. Brown, where are you currently employed, if anywhere?

A. I am retired.

Q. Where was your last place of employment?

A. Hamilton Standard, Windsor Locks, Connecticut.

Q. What is the relationship between Hamilton Standard and Hamilton Sundstrand?

A. Some years after I departed from Hamilton Sundstrand, United Technologies Corporation acquired Sundstrand. And they combined Hamilton Standard with Sundstrand into a new entity, known as Hamilton Sundstrand.

Q. How long did you work at Hamilton Sundstrand?

A. I worked there for 29 years.

Q. And can you tell me the years that was, from when to when?

A. Yes. From the spring of 1963 to the end of 1991.

Q. What type of work did you do at Hamilton Sundstrand?

A. I was an engineer.

Q. Are you familiar with the L1011 aircraft?

A. Yes.

Q. Did Hamilton Sundstrand make an APU for the L1011?

A. Yes, they did.

Q. Who did you sell the APU to, what manufacturer?

A. We sold it to Lockheed.

Q. Did you have a role in the L1011 APU?

A. Yes, I did.

Q. What was your role?

A. I was part of the thermo-analysis group in the design department. And I was responsible for matching up horsepowers, air flows, pressure losses, trying to match the customers' needs to the plane's capability.

Q. Did your role in the L1011 APU include the load compressor to the APU?

A. I was concerned with the amount of horsepower and flow performance of the load compressor.

Q. When is it that you worked on the L1011 APU, during what time frame?

A. Well, it would be at least from the beginning of 1969, and possibly earlier, through to about 1976.

Q. When did the L1011 go into service, approximately?

A. The L1011 went into service in early 1972.

Q. Is there any part or device in the L1011 APU that is used to avoid surge?

A. Yes. There is a system consisting of a surge control and a surge valve.

Q. And how is the surge valve used to avoid surge?

A. When the flow through the compressor approaches a critical minimum, the control directs the valve to open and discharge this overload through the engine exhaust, so that the total flow through the compressor never falls below a certain value.

Q. How is it that the L1011 APU determined when to open

the surge valve to exhaust?
A. There was a combination of pressure taps, and they sent pressure signals into a pneumatic controller, and when this controller decided that the flow was approaching a minimum, it would start to open the surge valve so that the flow never fell below that minimum.
Q. Where is it that the L1011 measured this these pressures?
A. They measure these pressures in the diffuser of the load diffuser.
Q. If you look -- I am going to put up on the screen, you have a binder with documents, I need you to look at those as well, I am going to put up Exhibit 105, which is a document called the Master Key document.
Are you familiar with this document?
A. Yes. I have seen that document.
Q. What is this document?
A. This document, it's a general introductory volume to explain the functioning of all parts of the APU system to people like airline personnel who would be using it an servicing it. It gives them an overall picture of the whole system and how it functions.
Q. I want to turn to Page 2-12 in this document. I will put it on the screen. In the third paragraph, it says that there are four pressure pick-offs, PS0, PS1, PS2 and PT.

Were those four pressure pickoffs in the L1011 APU?
A. Yes, they were.
Q. Where were those four pressure pickoffs?
A. They were all drilled passages in one of the diffuser passages.
Q. What does a pressure pick-off, like the ones described there, look like?
A. A simple round hole in the surface of the diffuser passage.
Q. I have on the stand over here Defendant's Exhibit 399.
There are a couple parts of it. Can you tell me what Defendant's Exhibit 399 is?
A. Yes. That's a load compressor housing.
MS. STEVENSON: Objection, Your Honor.
THE COURT: Basis?
MS. STEVENSON: Lack of foundation. And in Mr. Brown's deposition he testified that he was not involved in the design of the diffuser on the APU for the L1011.
MR. LEVINE: Then what he said is, he didn't design it. He was familiar with it and knew what it looked like.
THE COURT: Why don't you establish it.
BY MR. LEVINE:
Q. Mr. Brown, are you familiar with the load compressor

on the L1011 that you worked on in the early 1970s?
A. Yes, I am.
Q. Are you familiar with what the diffuser in the load compressor looked like?
A. Yes.
Q. Can you identify what Defendant's Exhibit 399 is?
A. That is a load compressor that's been cut in half.
Q. And what is the -- I am holding up a portion of it that's circular with a hole in the middle. What is this part of?
A. That is one-half of the diffuser array.
Q. And where is the other half of the diffuser array --
A. The other half --
Q. I am sorry. Let me finish the question before you answer because it's important for the record that we have questions and answers that match each other.
So where in Defendant's Exhibit 399 is the other half of the diffuser array?
A. The other half of the diffuser array is what is facing us on that stand.
Q. Is it the portion with these slightly curved type vanes that are going around?
A. Yes.
MR. LEVINE: Your Honor, this is an exhibit where there was an objection to authenticity.

MR. LIND: It's been withdrawn.
MR. LEVINE: Okay.
BY MR. LEVINE:
Q. I am now bringing up, whoever wants to cross-examine, if they want to come up with me, the diffuser section of the L1011. I am holding up half of the diffuser section of the L1011 APU from the early 1970s. Is that right?
A. Yes.
Q. Can you identify where the holes are -- well, let me ask a different question.
Do you see any of the pressure taps that you referenced earlier?
A. Yes, I can.
Q. Can you identify what those pressure taps look like? Maybe for the benefit of me and the Court point out where you are referring?
A. Yes. Right in this passage here, there are four holes, about an eighth of an inch diameter, that would go straight in. Those are the four pressure taps we are referring to.
Q. What type of pressure was measured in these pressu taps?
A. These pressure taps measure static pressure.
Q. Now, there are different names that are given in Defendant's Exhibit 105, Page 2-12, to these pressure taps,

regarding the L1011 APU as part of his business at Hamilton Standard?

A. Yes, he did.

Q. More recently, in the last few months, did you go over to Hamilton Standard, for now Hamilton Sundstrand, in Connecticut, and review a collection of memos from the late 1960s and early 1970s about the L1011 APU?

A. Yes, I did.

Q. Was this exhibit, Defendant's Exhibit 104, in the same files as these other memos?

A. Oh, yes.

Q. Now I want to turn to the last page of this document, which is Figure 9. This is the curve that we have looked at several times so far.

MS. STEVENSON: I object to that statement. Is there a question?

MR. LEVINE: I am about to get into a question. I am just explaining the transition.

BY MR. LEVINE:

Q. There are two different vertical axes that are on the curve. There is one to the left and one on the right. Can you tell which curve -- there is two curves. Can you tell which curve relates to which axis?

A. Yes. The curve that has the arrow at the lower part of the graph points to the left, and those are the values on

that vertical axis that apply to that curve, where up in the top quarter there is an arrow on the other curve pointing to the right and that points to the scale on the right-hand side.

Q. If you look at the curve that points to the left, is that the curve that goes up and then peaks and then comes down?

A. Yes.

Q. And what is it that's on the left axis?

A. Well, that is the delta P over P signal, which is based upon PT minus PS1 over PS1.

Q. Have you seen curves for the L1011 APU in the early 1970s that were similar to this curve in Figure 9 of Defendant's Exhibit 104 that goes up, peaks, and then drops down on the right side?

A. Yes. That is essentially what I have shown on these two graphs here, on the graph with the two red curves.

Q. That is HSC Demonstrative Exhibit No. 18 that the witness referred to.

Now, there are some ranges on the bottom for corrected compressor flow. It goes from the first number there, at least, 155, up to 250. Do you see that?

A. Yes, I do.

Q. Do those -- does that range accurately reflect the corrected flow of the L1011 APU as it operated in the early

1970s?

A. Yes, it does.

Q. I want to show you another document now, which is Plaintiff's Exhibit 106. This is a memo from Mr. Rapp to Mr. Moser, April 23, 1969. Do you see that?

A. Yes.

Q. As of April 23, 1969, was the design of the L1011 APU final?

A. Oh, no.

Q. Had the L1011 APU even -- had it flown in the air at that time?

A. No.

Q. Had you seen the double value function as of this time?

A. Not at that time.

Q. When is it that you first saw the double value function?

A. When they did the tests, as I have plotted on this graph here I expect sometime in the 1971 era.

Q. If we look, I am going to now look at a different document, which is Defendant's Exhibit 109, and there is some supplements at the top that I want to particularly point to, SUND 780.

A. Yes.

Q. There is a reference to incorporating a shock switch

to prevent surge control lockout at high flows. There is a date listed there of July 6, 1972. What does that date relate to?

A. That date relates to the date that the appropriate engineering change, which is 108927, that's when that engineering change was finalized and firmly signed off.

Q. All right. One last topic, and I will be done.

You mentioned this double value function. What was done if anything by Hamilton Standard to address the double value function on the L1011 APU?

A. Hamilton incorporated a device called the shock switch.

Q. What was the shock switch?

A. Well, they made an additional static pressure hole upstream of PS1 and they called it PS0. And the pressures from PS1 and PS0 were fed to opposite sides of a diaphragm. And when the pressure ratio changed from being higher on the PS1 side to being lower on the PS1 side, the diaphragm would move and that would change some electrical contacts.

Q. Did the shock switch that was used in the L1011 APU give any of indication of which side of this red double value function you were operating on?

A. No.

Q. Did it tell you anything about whether you were in supersonic flow, or had seen a shock?

06:12:23 A. The shock switch functioned when the pressures reversed. That means that a shock front had passed through PS0 and PS1.
06:12:31 Q. And if the shock front had passed through, does that mean that there was supersonic flow?
06:12:38 A. Yes. That means supersonic flow.
06:12:40 Q. And if there is supersonic flow, do you know anything about what --
06:12:44 A. Well, you know you are way up on that curve. A long, long way from surge.
06:12:51 Q. Is that a higher flow condition?
06:12:53 A. Yes, a higher flow, yes, which has removed you from surge.
06:13:02 Q. Did the shock switch prevent the APU from operating, or prevent the load compressor from operating in supersonic flow?
06:13:15 A. No. It just prevented the surge valve from opening improperly.
06:13:21 MR. LEVINE: That is all I have. No further questions.
06:13:23 THE COURT: Ms. Stevenson, you may cross-examine.
06:13:27 MS. STEVENSON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. STEVENSON:

06:13:30 Q. Good afternoon, Mr. Brown.
06:14:11 A. Good afternoon.
06:14:12 Q. Do you have a college degree, Mr. Brown?
06:14:16 A. Yes.
06:14:16 Q. Would you tell us where you went to school and what you got -- what you studied?
06:14:23 A. I went to Queens University in Kingston, Ontario, Canada. I graduated in 1952 with a Bachelor of Science degree in engineering physics.
06:14:35 In 1953 to '55 I went to the College of Aeronautics of Cranfield in England and graduated with what they called a diploma.
06:14:44 Q. Is that a graduate degree?
06:14:46 A. Yes.
06:14:46 Q. What field was that in?
06:14:48 A. My specialty was aircraft propulsion.
06:14:50 Q. Did you get any other graduate degrees after that?
06:14:53 A. Not after that.
06:14:53 Q. And did you begin working after that as an engineer?
06:14:57 A. Yes.
Q. How long did you work as an engineer?
06:15:01 A. From the time I finished the graduate degree, I worked as an engineer right through to the time of my retirement at the end of 1991.
06:15:09 Q. How many years does that span?

06:15:21 A. Well --
06:15:22 Q. It's a fair number of years?
06:15:24 A. About 35 years or so.
06:15:26 Q. It's fair to say you are fairly knowledgeable about the topic of surge control that we have been talking about today?
06:15:33 A. Yes.
06:15:34 Q. I want to talk briefly about the timing of the L1011 APU program. You said on your, during your direct examination that the surge control system was not -- the design for the L1011 APU system had not been finalized by 1969. Do you remember that testimony?
06:15:59 A. Yes.
06:16:00 Q. But in fact the basic design for the L1011 APU had been finalized by 1969. Isn't that right?
06:16:08 A. No.
06:16:08 Q. Do you recall giving deposition testimony in December of 2005 of this year?
06:16:15 A. Yes.
06:16:16 Q. In fact, you appeared at your deposition as Hamilton Sundstrand's corporate representative on topics concerning the L1011 APU. Isn't that right?
06:16:25 A. Yes.
06:16:28 MS. STEVENSON: Mr. Schlaifer, could we look at Page 8, Lines 6 through 11, of Mr. Brown's deposition?

06:16:30 BY MS. STEVENSON:
06:16:57 Q. Do you see there, you are asked, when was the L1011 APU design finalized?
06:17:02 And you testified the basic design would be in the '69-70 time frame?
06:17:08 A. Yes.
06:17:09 Q. And that's because the Lockheed flew their first test in 1970. Did you give that testimony?
06:17:15 A. Yes.
06:17:16 MR. LEVINE: Your Honor, I wonder if she could read the lines right after that.
06:17:20 THE COURT: I will let her conduct the cross-examination. You can redirect.
06:17:25 BY MS. STEVENSON:
06:17:25 Q. I want to turn now to another document that you looked at with Mr. Levine during your direct testimony. It's DTX-108. You should have that in the binder of documents up there with you on the witness stand. This is -- if we turn to the next page, Mr. Schlaifer -- just remind ourselves that this is an October 28th, 1975 Hamilton Sundstrand memo to which you are the first addressee. Is that correct?
06:18:09 A. Yes.
06:18:11 Q. And the subject line is a transmittal of report on the L1011 APU surge control improvements. Do you see that?
06:18:22 A. Yes.

Q. And we are going to look at the first page of the text of the memo, which has Bates No. SUND 00673. Let's look at the summary section, 2-0. It says, the test program showed that significant improvements in surge system performance and reliability can be obtained with the proposed concepts.

Do you see that?

A. Yes.

Q. Then it goes on to say, the boosted pitot probe proved to be a superior alternative to the present diffuser pipe signal. Do you see that?

A. Yes.

Q. It provides for better system stability and response as well as overall system simplification.

Do you see that?

A. Yes.

Q. And do you agree that stability and response are good things in a surge control system?

A. Yes. But they are not the only consideration.

Q. And do you agree that system simplification is a good thing to have in a surge control system?

A. Yes. Simplification generally would be a good thing.

Q. And if we could just look in the paragraph above, the introduction. We should have looked at this first. It says, if you could blow up the first half, it says, this report documents the L1011 APU testing that was conducted to

investigate concepts that would significantly influence the performance and reliability of the load compressor surge control system.

Do you see that?

A. Yes.

Q. And the next paragraph says, the complete APU system was tested. Right?

A. Uh-huh.

Q. And specifically -- could you give verbal responses to the questions so the court reporter can get it?

A. Yes, I see that, yes.

Q. For number one, it says alternate compressor flow sensing signal source. Is that one of the specific things that was tested by Hamilton Sundstrand?

A. Yes.

Q. A boosted pitot probe versus the present load compressor diffuser pipe signal was investigated. Correct?

A. That's correct.

Q. And as a result of this study, Hamilton Standard concluded that there were certain advantages to using a boosted pitot. Is that correct?

A. Yes.

Q. So am I correct that the L1011 APU went into commercial service in 1973 and in 1975 Hamilton Standard was trying to make significant improvements in its surge control

system?

A. That is correct.

Q. Now, your personal involvement in the L1011 APU program ended in approximately 1976. Correct?

A. Yes.

Q. Did you leave Hamilton Sundstrand at that time or you just left the L1011 program?

A. I left the L1011 program.

Q. So you have no personal knowledge of any changes that might have occurred to the L1011 APU surge control system after 1976. Correct?

A. I have very -- a lot of indirect knowledge, because I didn't move -- I was sitting 50 feet from the people who were continuing to work on it. I had lunch with them.

Q. My question was, did you have any direct knowledge, personal knowledge, of any changes that might have been made to the L1011 APU surge control system after 1976?

A. The best answer I can give you is I have no specific recollection of somebody telling me that this was not incorporated.

Q. And you don't have any personal knowledge of any other changes that might have been made to the L1011 APU surge control system after 1976 because you weren't working on the program. Right?

A. Yes.

Q. Now, was the surge control system of the L1011 APU designed to maintain compressor bleed flow so that the flow stayed a safe distance from the compressor's surge flow rate?

A. Yes.

Q. And was the surge control system of the L1011 APU designed to maintain minimum compressor bleed flow rate only slightly above the compressor's surge flow rate?

A. Yes.

Q. I want to talk briefly about the drawing that you did for Mr. Levine during your direct examination. I think it was marked HSC Demonstrative 18. To be clear, that is a drawing you created today in 2006. Correct?

A. Yes.

Q. And you say that you originally saw drawings like that back in the early 1970s when you were working on the L1011 APU?

A. Yes.

Q. And the only way that you discovered that the flow looked like that on the L1011 APU was through a series of testing. Correct?

A. That's correct.

Q. And you say that the last time that you saw original data that looked like that that you were involved in testing was back in the early 1970s?

A. Yes.
Q. Let's take a look at DTX-104. This is the memo from 1975 from Hamilton Sundstrand. You are not copied on this memo. Correct?
A. That is correct.
Q. If we take a look at the last page, I think Mr. Levine said that this is a curve that's like the one you drew, but you didn't see this curve at the time in 1975. Right? You are not copied on this memo?
A. Well, I looked at a lot of memos at that time. The fact that it was not addressed specifically to me doesn't mean that I wouldn't have looked at it with other people who did. Mr. Emmons -- let's see.
Q. Are you an addressee of this memo?
A. No. But I sat besides Mr. Emmons at the time.
Q. If you go back to Page 1 again of the memo, do you see the -- could you blow up the subject line of this memo?
A. I beg your pardon?
Q. I am talking to our technical assistant, Mr. Schlaifer.

You see here it says, Mr. Brown, that the subject matter of this memo is the L1011 APU surge control redesign feasibility study? Do you see that?
A. Yes, I see that.
Q. Now, if we look at the second paragraph for a second,

and blow that up, it says, this report has been written to provide a summary of the control dynamics group redesign effort performed in 1973 on the L1011 APU surge control. Do you see that?
A. Yes.
Q. Now, let's look back again at this curve on Figure 9, and see what is being plotted there. The pressure sensors, if we look on the left side, on the Y axis, we have three -- the ratio there is PG3 minus PG2 over PG2. Do you see that?
A. Yes, I see that.
Q. Now, those are not the same pressure readings, pressure ratio -- pressure readings that we saw in the L1011 earlier when we were looking --
A. Which exhibit is this again?
Q. What exhibit are we looking at on the screen?
A. Yes.
Q. We are looking at Exhibit 104.
A. Okay.
Q. And those are not the same pressure readings that we were looking at in the Master Key document. Correct?
A. They are the same pressures with different labels on them.
Q. Okay. The labels that we saw earlier were P0, P1, P2 and PT. Correct? You showed us those --
A. PS0, PS1, PS2 and PT.

Q. Right. And you testified that those were the names of the pressure readings in the L1011. Right?
A. Yes.
Q. Okay. And these are, we see, PG3, PG2, PG3 and PG Right?
A. Correct.
Q. Okay. And if we flip back in this same document to Page 2775, 275 of DTX-104, you will see that PG2 and PG3 are defined. See, sensed, static sensed static pressure signal and sensed total pressure?
A. Yes. That's correct.
Q. In Table II, if we turn back one page more, this is the new design concept table. Do you see that?
A. Table 2, yes.
Q. So PG2 and PG3 are being defined in the new design concept table. Correct?
A. Yes.
Q. If you can go back one page more. Let's look at 275 again. So what's being compared in Figure 9, according to these definitions of PG2 and PG3, are sensed static pressure and sensed total pressure. Correct?
A. That's what it says, yes.
Q. You told me a minute ago that the surge control system on the L1011 APU was designed to maintain the compressor bleed flow so that flow stayed a safe distance from the

compressor's surge flow rate. Correct?
A. That is correct.
Q. How far above the compressor's surge flow rate was it designed to stay?
A. If you could flip back to Figure 9. The surge for this -- at this particular point, the surge line itself would be where that value is of 155. And the surge control was set to operate around a 174. That would be the margin in flow, from 155 to 174. That's the margin that the control tried to apply.

MS. STEVENSON: I have no further questions. Thank you, Mr. Brown.

THE COURT: Redirect?

MR. LEVINE: Yes.

Your Honor, for redirect, there is some questioning on cross on Exhibit 104. We want to renew our request. I think it was, the objection was overruled without prejudice. We want to renew our request to admit Exhibit 104 given the foundation that was laid about the document.

MR. PUTNAM: In light of the testimony, I am happy to have the document enforcement we will have the testimony on that document.

MR. LEVINE: Okay.

MR. PUTNAM: I withdraw the objection.

06:56:35 A. Yes, there are.

06:56:38 MR. SWANSON: I have no further questions for this witness.

THE COURT: Cross-examine.

06:56:43 MR. PUTNAM: Could you give us one minute, Your Honor?

06:56:45 THE COURT: Sure.

06:56:46 (Pause.)

06:58:16 MR. KRUPKA: Your Honor, we decided that I drew the straw.

06:58:21 CROSS-EXAMINATION

06:58:22 BY MR. KRUPKA:

06:58:22 Q. Mr. Telakowski, my name is Bob Krupka. I represent Honeywell.

06:58:34 The baseline APU for the L1011 had a surge control system. Correct?

06:58:42 A. Yes, it did.

06:58:43 Q. And did the baseline unit, APU, what we are calling the baseline unit, did the same basic surge control system remain in it throughout the period of its manufacture?

06:58:57 A. Yes, it did.

06:58:58 Q. And all the way up through 1985, Hamilton Sundstrand and Lockheed didn't see a need to upgrade or modify that surge control system for the baseline L1011 APU. Correct?

A. I believe that's true, yes.

06:59:16 MR. KRUPKA: No further questions, Your Honor.

06:59:18 THE COURT: Anything else?

06:59:20 MR. LIND: Your Honor, we are prepared to rest.

06:59:23 THE COURT: With this witness?

06:59:25 MR. SWANSON: No further questions, Your Honor. I apologize.

06:59:29 (Witness excused.)

06:59:33 MR. LIND: Your Honor, we don't have any more witnesses. We do have a couple of document issues that I would like to take care of before we close. We have I think about 11 documents left that fall into probably three categories. If you want to give me one last shot, I did it up until midnight last night, but I might take another two minutes.

07:00:11 THE COURT: Go ahead and do that.

07:00:13 (Pause.)

07:00:19 MR. KRUPKA: Your Honor, first of all I want to thank the Court for its indulgence in starting early today so we could hopefully conclude in time for me to get to New York. I really do appreciate it. And I will extend your greetings to Judge Lancaster. And I will express my appreciation to you for allowing me to escort him.

07:00:39 Secondly, is the Court intending to cover anything further.

07:00:43 THE COURT: No, if you need to leave, you can

07:00:45 leave, Mr. Krupka.

07:00:47 MR. KRUPKA: Thank you, Your Honor.

07:00:54 MR. PUTNAM: Your Honor, before Mr. Putnam --

07:00:57 THE COURT: Enjoy the dinner Mr. Krupka.

07:00:58 MR. KRUPKA: Thank you, Your Honor.

07:00:59 MR. PUTNAM: Before Mr. Krupka leaves and we put on our extensive rebuttal case in its absence, May 9 for closing arguments, can the Court indicate how much time it has set aside. I have another matter in Philadelphia that day. I would like to inform the tribunal in that case approximately when I will be able to return.

07:01:20 THE COURT: Let me take a quick look.

07:01:22 MR. PUTNAM: I have informed them I will be here as long as the Court needs. I am not suggesting in any way a time limit. I am hoping to get some guidance how long the Court expects to have for us on May 9th.

07:01:34 THE COURT: Right now your argument is the only matter presently on my docket for May 9. I would seek some guidance from counsel.

07:01:45 MR. KRUPKA: Your Honor, I think, I guess --

07:01:49 MR. LIND: Why don't we talk about that. I guess you are looking at how much to set aside, aren't you? I don't see all day.

07:02:00 THE COURT: I wouldn't imagine that we would need even a half-day. Do you want a half-day, I will give

07:02:09 you that. I wouldn't think you would want to talk to me that long.

07:02:18 MR. KRUPKA: I would be satisfied with an hour each side, Your Honor.

07:02:24 THE COURT: Is that acceptable?

07:02:26 MR. LEVINE: How about an hour-and-a-half per side.

07:02:29 MR. KRUPKA: That will work.

07:02:30 THE COURT: That is fine. That is a half-day.

07:02:34 MR. KRUPKA: Your Honor, if I understand correctly what the stipulation is with respect to what happens now is that we present to the Court simultaneous proposed findings and conclusions.

07:02:45 THE COURT: That's what I think we agreed upon at the pretrial conference.

07:02:48 MR. KRUPKA: If I understand, and recall correctly, just so we are all on the same page, that that doesn't involve further briefing, just proposed findings.

07:02:58 THE COURT: And conclusions, yes.

07:03:00 MR. KRUPKA: Okay. Appreciate that clarification, Your Honor. I will, while they are discussing these important evidentiary objections, I will take my leave. Thank you again, Your Honor.

07:03:10 THE COURT: Good to see you again, Mr. Krupka.

07:03:12 MR. KRUPKA: We will see you on May 9th. Thank