# Sliptrack v. Steeler
# 10/12/04

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 2323935 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

# H

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court,N.D. California.

SLIPTRACK SYSTEMS, INC. a California Corporation, Plaintiff,

v.

STEELER METALS, INC., a Washington Corporation, Matt Surowiecki, an individual and Does 1 through 50, inclusive Defendants.

**No. C-04-0462 PVT.**

Oct. 12, 2004.

Joyce E. Crucillo, R. Joseph Trojan, Trojan Law Offices, Beverly Hills, CA, for Plaintiff.

Delbert James Barnard, Barnard, Loop & McCormack, LLP, Seattle, WA, Timothy B. McCormack, Barnard Loop & McCormack, LLP, Renton, WA, Todd A. Noah, Michael E. Dergosits, Dergosits & Noah LLP, San Francisco, CA, for Defendants.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TRUMBULL, Magistrate J.

*1 This action involves a lawsuit by Sliptrack Systems, Inc. ("Sliptrack" or "Plaintiff"), the manufacturer of slotted defection track systems and the owner of U.S. Patent No. 5,127,760 (the " '760 Patent"), against Steeler Metals ("Steeler" or "Defendant"), a company that makes and sells sheet metal framing products, and its President, Matt Surowiecki (collectively, "Defendants"). Sliptrack contends that the sheet metal framing products sold by Steeler infringe upon the '760 patent.

Now before the court is Defendants' Motion for Summary Judgment. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court hereby enters the following memorandum and order.

## BACKGROUND

Sliptrack is the owner of the '760 patent for a Vertically Slotted Header. As described in the "Field of the Invention," the '760 patent relates to a "building construction assembly and, more particularly, to a header for allowing horizontal, non-load bearing headers to vertically fluctuate in relationship to vertical non-load bearing wall studs to which the headers are attached. By allowing the header freedom of vertical movement, the walls that are fixed to the vertical studs are protected from cracking because the freedom of vertical movement of the header prevents translation of mechanical stresses to the walls caused by downward, environment forces on the header." *See* Barnard Decl., Exh. A.

Plaintiff Sliptrack contends that Defendants infringe independent claims one and seven of the '760 patent. Claim construction of the term "having at least one hole formed therein" is the textual determinative issue in this case and is identical in both claims one and seven. The hole referred to in this disputed claim language is formed in the non-load bearing wall studs. Defendant Steeler contends that the hole must be formed prior to inserting the stud into the header during assembly of the device. By contrast, Sliptrack asserts that the patent is for a product only, not a process, and that, accordingly, the claim at issue calls only for a hole to be formed in the stud as ultimately assembled in the device irrespective of whether it is formed before or after inserting the stud into the header.

> FN1. Because the disputed claim language is identical in claims one and seven, the court limits its discussion to claim one.

On July 26, 1990, Todd. A. Brady, the inventor, filed a patent application which eventually issued as the '760 patent. The application as originally filed contained nine claims, including the following claim one:

A building construction assembly that includes a header and a stud wherein the header is capable of vertical movement relative to said stud comprising:

a header having a web and flanges with said flanges connected to said web;

at least one of said flanges having at least one vertical slot therein;

a stud having a width less than the distance between said flanges of said header;

said stud being aligned with said vertical slot; and

an attachment means passing through said slot to unit said header to said stud whereby said slot permits

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01202-GMS     Document 421-25     Filed 05/01/2006     Page 3 of 23
Page 2
Not Reported in F.Supp.2d, 2004 WL 2323935 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

said header to move vertically with respect to said stud while restricting horizontal movement of said header.

**\*2** *See* '760 Patent Application, Barnard Decl., Exh. B. In the first office action, the PTO rejected all nine claims under 35 U.S.C. § 112 as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. *See* Action by PTO, Barnard Decl., Exh. C. Specifically, in his rejection of claim one, the PTO examiner questioned "how is the stud aligned with the vertical slot." *See* Action by PTO, Barnard Decl. Exh. C.

In response, the applicant amended the claims and, in particular, amended claim one to read as follows, with deletions in brackets and additions underlined:
A building construction assembly that includes a header and a stud wherein the header is capable of vertical movement relative to said [stud] *assembly* comprising:
a header having a web and flanges with said flanges connected to said web;
at least one of said flanges having at least one vertical slot therein;
a stud having a width less than the distance between said flanges of said header *and having a top end;*
said stud [being aligned with said vertical slot] *having at least one hole formed therein proximal to said top end;* [and] *said top end fitting between said flanges perpendicular to said header positioned so that said hole is aligned with said vertical slot; and*
an attachment means passing through said slot to [unit] *slideably unite* said header to said stud whereby said slot permits said header to move vertically with respect to said stud while restricting horizontal movement of said header.

*See* Amendment to '760 Patent Application, Barnard Decl., Exh. D. In this amendment, *inter alia,* applicant changed the text of claim one such that the stud no longer was aligned with the vertical slot and, instead, the *hole* was aligned with the slot. Further, in the remarks section of the Amendment, counsel for applicant stated that: the Examiner's question of how the stud is aligned with the vertical slot has been answered by adding hole 22 proximal to top end [ ] of the stud as an element of the claims. The hole serves as a reference point on the stud which is used to align the stud and the slot. This amendment should overcome the Examiner's § 112 rejection based upon indefiniteness with respect to claim 1 and the claims dependent therefrom.

*See* Amendment to Patent Application, Barnard Decl., Exh. D. Ultimately, in 1992, following this amendment, the '760 patent issued with the above-stated language in claim one.

The written description of the '760 patent, which is the same as the description in the patent application prior to amendment, sets forth two methods of assembly for the preferred embodiment-one with a hole formed after the stud is inserted into the header and the other with a pre-drilled hole. First, the "preferred method for assembling the invention" describes placing the end of the stud between the flanges of the header so that the end abuts against the bottom of the web such that the header and the stud are perpendicular to each other and a vertical slot is generally centered on the side of the stud. An appropriate attachment means, such as a self-tapping screw, is positioned in the slot midway between the bottom of the slot and the top of the slot. Once positioned, the self-tapping screw is drilled into the stud. This method of assembly clearly calls for the hole in the stud to be formed *after* the stud is inserted into the header.

**\*3** Second, the description discloses "another method of assembling the invention," which states, in relevant part, that "holes are pre-drilled in the stud. The stud is then inserted between the flanges so that the holes in said stud are aligned with the slots. The attachment means passes through the slots and through the hole in the stud." This method clearly calls for the hole to be formed in the stud *before* it is placed in the header.

Defendant Steeler manufactured and sold slotted metal track. Sliptrack sued Steeler, alleging that Steeler's manufacture and sale of this slotted track contributes to and induces infringement of the '760 patent. Steeler Metals now moves for summary judgment of non-infringement, contending that, because it does not sell or manufacture products with pre-drilled holes nor does it instruct its customers to pre-drill holes in the studs before inserting them into the headers, as required under its construction of claim one, it does not infringe the '760 patent and should prevail as a matter of law.

### STANDARD FOR SUMMARY JUDGMENT

FN2. Plaintiff contends that on the issue of claim construction, summary judgement is inappropriate and that the court instead must

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conduct a detailed, limitation-by-limitation construction of each of the asserted claims pursuant to what commonly is referred to as a *Markman* hearing. Plaintiff is incorrect. As the Federal Circuit has made clear, "*Markman* does not require a district court to follow any particular procedure in conducting claim construction. It merely holds that claim construction is the province of the court, not a jury." *Ballard Medical Products v. Allegiance Healthcare Corp.,* 268 F.3d 1352, 1358 (Fed.Cir.2001). "If the district court considers one issue to be dispositive, the court may cut to the heart of the matter and need not exhaustively discuss all other issues presented by the parties." *Id.*

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment may be granted in favor of defendant on an ultimate issue of fact where the defendant carried his burden of "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.,* 145 F.3d 1303, 1307 (Fed.Cir.1998).

### DISCUSSION-INFRINGEMENT

A determination of infringement requires a two-step analysis. See *Gentry Gallery, Inc. v. Berkline Corp.,* 134 F.3d 1473, 1476 (Fed.Cir.1998). "First the claim must be properly construed to determine its scope and meaning. Second the claim, as properly construed, must be compared to the accused device or process." *Id.* (quoting *Carroll Touch, Inc. v. Eletro Mechanical Sys., Inc.,* 15 F.3d 1573, 1576 (Fed.Cir.1993). "In order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Wolverine World Wide, Inc. v. Nike, Inc.,* 38 F.3d 1192, 1199 (Fed.Cir.1994).

Claim construction is an issue of law. See *Markman v. Westview Instruments, Inc.,* 52 F.ed 967, 970-71

(Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact. See *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353 (Fed.Cir.1998). However, in a patent litigation action, " '[w]here the parties do not dispute any relevant facts regarding the accused product ... but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." ' *Rheox, Inc. v. Entact, Inc.,* 276 F.3d 1319, 1324 (Fed.Cir.2002) (quoting *Gen. Mills, Inc. v. Hunt-Wesson, Inc.,* 103 F.3d 978, 983 (Fed.Cir.1997)) (citations omitted).

### A. *Claim Construction*

**\*4** The dispositive issue of claim construction here is whether claims one and seven of the '760 patent are limited to a stud with a hole drilled prior to inserting the stud into the header or whether the claims encompass products without such a pre-drilled hole.

Defendant Steeler asserts that the claim term "having at least one hole formed therein" in claims one and seven unambiguously requires that a hole be pre-drilled into the stud and, thus, excludes any devices where the hole is made by a self-tapping screw after the stud is inserted into the header. Steeler contends that, even though the preferred embodiment discloses a preferred method of assembly where the hole is formed *after* the stud and header are assembled, the claims should be limited to a device with a pre-drilled hole, because the scope of Sliptrack's right to exclude is governed by the language of the claims, as interpreted by the prosecution history, and not by the written description.

For its argument, in addition to the claim language, Steeler relies heavily on the patent's prosecution history. Specifically, Steeler points to the amendment to the patent application, wherein, to address the examiner's indefiniteness rejection, applicant revised the claim from providing that the stud was aligned with the vertical slot to providing that the *hole* "is aligned with said vertical slot." See Amendment to '760 Patent Application, Barnard Decl., Exh. D. In addition, Steeler points to the applicant's remarks in the amendment where he stated that "the hole serves as a reference point on the stud which is used to align the stud and the slot." See Amendment to '760 Patent Application, Barnard Decl., Exh. D. The thrust of Steeler's argument is that in order for the "hole formed therein" to serve as a reference point when

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2323935 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

aligning the stud with the vertical slot, the hole must be formed in the stud prior to inserting it into the header and, thus, it must therefore be pre-drilled.

In response, Sliptrack contends the claim language makes clear that, as ultimately assembled, the stud must have a "hole formed therein," but does not mandate any particular process for when such a hole shall be formed. Sliptrack does not see any inconsistency with this position and the text requiring that the "hole is aligned with said vertical slot" and argues that in either case, pre or post-drilled, the hole formed in the stud will be aligned with the slots when the device is assembled. Finally, Sliptrack contends that it would be improper to construe the claim to require a pre-drilled hole, because such a construction would read out the preferred method of assembly, which describes a self-tapping screw to form the hole after the stud is inserted into the header. Sliptrack does not address Steeler's argument regarding the remarks made during the prosecution history that the hole will serve as a "reference point" when aligning the stud with the vertical slot.

The court begins claim construction analysis with the words of the claim. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). The claim language defines the bound of claims scope. *Bell Communications Research, Inc. v. Vitalink Communications, Corp.,* 55 F.3d 615, 619-20 (Fed.Cir.1995). The words used in the claims are interpreted in light of the intrinsic evidence of record, including the written description, the drawings and the prosecution history, if in evidence. *Interactive Gifts Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323 (Fed.Cir.2001). The intrinsic evidence may provide context and clarification about the meaning of the claim terms. *York Products, Inc. v. Cent. Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1572 (Fed.Cir.1996). "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics,* 90 F.3d at 1582.

*5 This case presents an interesting question and a somewhat difficult resolution. The court agrees with Plaintiff Sliptrack that the claims and the written description, read alone, do not appear to require a pre-drilled hole. The claims at issue, one and seven, provide that the stud will have at least "one hole formed therein proximal to said top end" and that the header shall be "positioned so that said hole is aligned with said vertical slot." *See* '760 patent, Barnard Decl., Exh. C. A fair reading of this language supports Sliptrack's argument that, as ultimately assembled, the stud will have a hole

aligned with the vertical slot. The court agrees that this text, on its face, does not mandate that the hole be pre-drilled. If the claims and the written description were the only evidence the court was relying upon to interpret the claims, Sliptrack likely would prevail. That is not the case, however. In addition to the claims and the written description, the court must also consider the prosecution history, which, here, is dispositive.

As the Federal Circuit has made clear, "[a]rguments and amendments made during prosecution of a patent application *must* be examined to determine the meaning of the claims." *Rheox,* 276 F.3d at 1325 (citing *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 15765 (Fed.Cir.1995)) (emphasis added). "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Id.; see also Teleflex, Inc. v. Ficosa North America Corp.,* 299 F.3d 1313, 1326 (Fed.Cir.2002).

When initially submitted, all nine claims in the application for the '760 patent were rejected for indefiniteness and, specifically, the examiner questioned "how is the stud aligned with the vertical slot." *See* Action by PTO, Barnard Decl. Exh. C. To overcome this rejection, applicant revised his claims to include specific language that there would be a hole formed and positioned so that the *hole* is aligned with the vertical slot. *See* Amendment to '760 Patent Application, Barnard Decl., Exh. D (emphasis added). Counsel for applicant then explicitly remarked that this change answered the examiner's question "by adding hole 22 proximal to top end 40 of the stud as an *element of the claims.* The hole serves as a *reference point* on the stud which is used to align the stud and the slot." *See* Amendment to '760 Patent Application, Barnard Decl., Exh. D (emphasis added).

From this amendment and the remarks therewith, the court cannot escape the conclusion that the claim was narrowed to require that a hole be pre-drilled in the stud prior to inserting the stud into the header. As originally drafted, claim one provided that the *stud* was aligned with the vertical slot, but then was amended to require that the *hole* be aligned with the vertical slot. In order for the hole to be aligned with the vertical slot and to serve as a "reference point" on the stud when used to align the stud and the slot, the hole, by definition, would have to be formed prior to inserting the stud into the header. Quite simply, the hole cannot serve as a reference point if it does not exist.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case Removed in F.Supp.2d GMS    Document 421-25    Filed 05/01/2006    Page 6 of 23
Not Reported in F.Supp.2d, 2004 WL 2323935 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

*6 While the court is aware that such a construction will read out the preferred method of assembly, which discloses a method where the hole is formed by a self-tapping screw *after* the stud is inserted into the header, this result, while perhaps unusual, is nevertheless permissible. *See Rheox, 276 F.3d at 1327; see also Elekta Instruments S.A. v. O.U.R. Scientific Int'l., Inc.,* 214 F.3d 1302, 1308 (Fed.Cir.2000). Because it is rare that a construction reading out the preferred embodiment will be the correct construction, the Federal Circuit has noted that such a construction requires "highly persuasive evidentiary support." *Id.* Sliptrack asserts that prosecution history is not the type of "highly persuasive evidence" sufficient to support such a construction. Sliptrack is incorrect, however, and the Federal Circuit has stated just the opposite. *Id.* ("[W]here the prosecution history requires a claim construction that excludes some but not all of the preferred embodiments, such a construction is permissible and meets the standard of 'highly persuasive evidentiary support' "). Indeed, it is difficult to imagine evidence more "highly persuasive" than Sliptrack's remarks in its Amendment stating that the hole will be used as a reference point to align the stud with the vertical slot. Sliptrack relinquished its right to exclude products without a pre-drilled hole when it amended its claim and provided this explanation to the PTO to overcome the indefiniteness rejection.

Sliptrack vigorously defended its position at the summary judgment hearing by asking the court to distinguish "product" patents and "process" (or method) patents, arguing that the '760 patent is for a product, not a process and, thus, the order or method of assembly is not at issue, and it is not relevant when the hole in the stud is formed. Instead, Sliptrack asserted, in construing the claim, the court must look at the final product, which, by necessity, must include a "hole formed therein" and that such hole always will be aligned with the slots as long as the product is properly assembled.

Sliptrack's argument is persuasive and is supported by the written description, which provides two possible methods of assembly, one using a self-tapping screw after the stud is inserted into the header and one where the hole is pre-drilled. Presumably, the applicant would not have provided two "possible" methods of assembly if the patent itself was for a particular process or method. Despite what may have been intended by the inventor in theory, however, the court must rely on the objective, intrinsic evidence in the record. *See Rheox, 276 F.3d at 1327* ("Reading the written description alone, this argument might be effective, but in light of the prosecution history, which was generated after the written description was drafted, it is apparent that Rheox relinquished any coverage of TSP."). Sliptrack simply cannot escape the prosecution history of the '760 patent, where, though perhaps unintentionally, counsel added an element of method or process by amending the claim in the manner he did and by noting that the hole would serve as a "reference point."

*7 The PTO examiner initially rejected patentee's claims for indefiniteness. To address the examiner's concern, overcome the rejection, and get the application approved, counsel amended the claims as set forth above and filed the relevant remarks therewith. While there may have existed an alternative approach to address the examiner's concerns, this was the way prosecution counsel chose to confront the rejection. The court must construe the claims accordingly and cannot undo, by ignoring the prosecution history, what may have been an unintentional result by counsel. In addition to a patent's definitional function, the Supreme Court and the Federal Circuit have consistently recognized the paramount importance of a patent's public notice function, and "the public has a right to rely on such definitive statements made during prosecution." *Rheox, 276 F.3d at 1325* (quoting *Digital Biometrics, Inc. v. Identix, Inc.,* 149 F.3d 1335, 1347 (Fed.Cir.1998)); *see also Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146, (1997); *Vectra Fitness v. TNWK Corp.,* 162 F.3d 1379, 1384 (Fed.Cir.1998) ("The public is entitled to rely upon the public record of a patent in determining the scope of the patent's claims"). Given the prosecution history, the court only can construe claims one and seven as requiring a pre-drilled hole.

### B. Comparison to the Accused Device

Next, having construed the disputed claim language, the court must compare the relevant claims of the '760 patent to the accused device, which here is the slotted vertical track sold by Defendant Steeler. "In order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Wolverine World Wide, Inc. v. Nike, Inc.,* 38 F.3d 1192, 1199 (Fed.Cir.1994). Therefore, because the court has construed claims one and seven of the '760 patent to require that the "hole formed therein" be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2323935 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

one that is pre-drilled, Steeler will only be liable for literal infringement if the products it manufactures and sells include such pre-drilled holes (direct infringement) or if it instructs its customers to assemble the device with a pre-drilled hole (contributory or induced infringement). Steeler contends that it does neither.

To support this contention, Steeler submitted evidence in the form of a declaration from Matt Surowiecki, a defendant in this action and the President of Steeler Metals. In his declaration, Mr. Surowiecki stated that "Steeler Metals, Inc. sells steel framing products including horizontal framing members, termed 'tracks', and vertical framing members, termed 'studs', but does not assemble them." Surowiecki Decl. at ¶ 2. Mr. Surowiecki further asserted that the studs it sells "do not have pre-drilled holes in their upper end portions for use to align the studs with a selected slot in the upper track, or for any other purpose." Surowiecki Decl. at ¶ 3. Finally, with regard to the use of the slotted tracks and studs by Steelers customers, Surowiecki explained that its customers assemble the slotted tracks and studs using the self-tapping screw method after the stud is inserted into the header, and further stated that neither he nor "Steeler Metals, Inc. have ever instructed a customer to first drill a hole in the upper end portion of the stud and then use that hole to align the stud with a selected slot in the slotted track." Surowiecki Decl. at ¶ ¶ 7 and 8.

*8 Sliptrack, in response, argues that Steeler's proffered evidence on the manufacture and sale of its products and use by its customers is insufficient and raises genuine disputes of fact. Specifically, Sliptrack contends that Mr. Surowiecki's declaration is not based on personal knowledge, does not contain the specific assembly instructions that are provided to Steeler's customers, that Steeler has contradicted itself on the sale of slotted track purchased from Metal Lite, Inc., another company that Sliptrack has accused of infringement, and that Steeler has failed to respond to discovery on the issue.

Sliptrack, however, as it must to defeat summary judgment, has not produced any specific evidence to counter Mr. Surowiecki's statements and create a genuine issue for trial. *See* Fed. R. Civ. Pro. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that

there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate shall be entered against the adverse party"). Moreover, while Sliptrack contends that Steeler's discovery responses are inconsistent, Steeler stated repeatedly in its responses that the company does not manufacture products or instruct its customers to assemble products in such a way as to infringe the '760 patent, statements which both support the declaration of Matt Surowiecki. *See* Min Decl., Exhs. 2 and 3. Given that the court has construed claims one and seven of the patent in the manner advocated by Steeler-to include the pre-drilled hole-the evidence produced by Steeler is consistent with a finding of non-infringement. Sliptrack has provided no specific counter evidence, nor has it provided to the court any discovery it believes will support its position and raise a genuine dispute as to whether Steeler sells or instructs its customers to assemble devices in an infringing manner.

> FN3. Indeed, the court notes that, in his deposition for the lawsuit against Metal Lite, the inventor of the '760 patent confirmed that he was not aware of anyone using his product with studs that have pre-drilled holes. *See* Min Decl., Exh. 6, p. 13.

Accordingly, the court only can conclude, based on the evidence before it, that there is no genuine dispute of material fact with regard to the products Steeler sells or as to the assembly instructions it provides to its customers. Because Steeler does not sell studs with pre-drilled holes nor instruct its customers to assemble the studs in such a way, the court therefore finds no literal infringement as a matter of law.

### C. Doctrine of Equivalents

Finally, having found no literal infringement, the court must consider the doctrine of equivalents. "The scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 533 U.S. 722, 732 (2002). Here, however, given the prosecution history of the '760 patent, Plaintiff is estopped from asserting the doctrine of equivalents.

*9 "Prosecution history estoppel requires that the claims of a patent be interpreted in light of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proceedings in the PTO during the application process. Estopppel is a rule of patent construction that ensures that claims are interpreted by reference to those that have been cancelled or rejected." *Id.* at 733 (internal citations and quotations omitted). In *Festo,* the Supreme Court made clear that,

[w]hen ... the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent.

*Id.* at 733-34. "Estoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope." *Id.* at 736. That is, estoppel arises when an amendment is made for a reason related to patentability. While such a narrowing amendment is not a complete bar to asserting the doctrine of equivalents in every case, *Festo,* 535 U.S. at 737, it will operate as an estoppel unless "the patentee [can] show that at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent." *Id.* at 741. Under *Festo,* therefore, the patentee bears the burden of proving both that the amendment was *not* related to patentability *and* that the amendment does not surrender the particular equivalent in question. *Id.* at 740-41.

Given the prosecution history here and the other evidence in the record, the court cannot conclude that the patentee has rebutted the presumption that estoppel applies and that the equivalent at issue-the hole made in the stud by a self-tapping screw after the stud is placed into the header-has been surrendered. The amendments to the application for the '760 patent and the remarks therewith regarding use of the hole as a reference point were made to address the patent examiner's indefiniteness rejections and, thus, were amendments related to patentability under § 112. Further, Plaintiff cannot contend that the equivalent at issue was unforeseeable or that the amendment did not surrender the particular equivalent at issue. Indeed, as discussed above, the very equivalent in question was disclosed in the specification as a "preferred method of assembly." Plaintiff, therefore, is estopped from asserting the doctrine of equivalents as to a hole formed by a self-tapping screw, or other similar means, after the stud is inserted into the header.

This result is also required by two recent cases out of the Federal Circuit in which the court discusses what

it terms the "disclosure-dedication" rule. *See Johnson & Johnston Assoc., Inc. v. R.E. Service Co., Inc.,* 285 F.3d 1046, 1054 (Fed.Cir.2002); *see also PSC Computer Products, Inc., v. Foxconn Int'l, Inc.,* 355 F.3d 1353, 69 U.S.P.Q.2d 1460, 1465 (Fed.Cir.2004). In both *Johnson & Johnston* and *PSC Computer Products,* the court addressed the situation where, as here, the claims were narrower in scope than that set forth in the written description. The court concluded that, in such a scenario, the material disclosed in the description but not included within the scope of the claims was thereby dedicated to the public and could not be claimed under the doctrine of equivalents. *See Johnson & Johnston,* 285 F.3d at 1054 ("[W]hen a patent drafter discloses but declines to claim subject matter, as in this case, this action dedicates the unclaimed subject matter to the public"); *see also, PSC Computer Products,* 355 F.3d 1353, 69 U.S.P.Q.2d at 1464 ("We thus hold that if one of ordinary skill in the art can understand the unclaimed disclosed teaching upon reading the written description, the alternative matter disclosed has been dedicated to the public"). Reciting the fundamental principle that the claims define the limits of patent protection, the *Johnson & Johnston* court noted that "[a]pplication of the doctrine of equivalents to recapture subject matter deliberately left unclaimed would 'conflict with the primacy of the claims in defining the scope of the patentee's exclusive right." ' *Johnson & Johnston,* 285 F.3d at 1054 (quoting *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1424 (Fed.Cir.1997)).

*10 The disclosure-dedication rule must apply here where Sliptrack claimed narrowly but then disclosed as a "preferred method of assembly" use of a self-tapping screw to form the hole in the stud *after* it is inserted into the header. This disclosure is dedicated to the public and cannot be reclaimed under the doctrine of equivalents. In other words, as highlighted by the court in *Johnson & Johnston,* Sliptrack "cannot narrowly claim an invention to avoid prosecution scrutiny by the PTO, and then, after the patent issuance, use the doctrine of equivalents to establish infringement because the specification discloses the equivalents." *Id.*

Hence, under either the principle of prosecution history estoppel or the disclosure-dedication rule, Sliptrack may not claim that a product which uses a self-tapping screw (or other similar attachment means) to form a hole in the stud after it is inserted into the header is a substantial equivalent of that claimed in the '760 patent. The court therefore finds no infringement on this basis.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*CONCLUSION*

For the foregoing reasons, the court hereby GRANTS Defendants' Motion for Summary Judgment of non-infringement of the '760 patent. Given the prosecution history of the patent, the court only can conclude that the proper construction of claims one and seven requires that a hole be pre-drilled into the stud before it is inserted into the header. Under such a construction, there is no literal infringement. Defendants do not manufacture devices with pre-drilled holes, nor do they instruct their customers to assemble the device in such a way-a fact which Plaintiff has raised no material evidence to dispute. Finally, Plaintiff may not claim infringement under the doctrine of equivalents. Accordingly, the court concludes that Defendants are entitled to a judgment of non-infringement as a matter of law.

IT IS SO ORDERED.

N.D.Cal.,2004.
Sliptrack Systems, Inc. v. Steeler Metals, Inc.
Not Reported in F.Supp.2d, 2004 WL 2323935 (N.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 3577568 (Trial Pleading) Complaint for Damages. and Injunctive Relief for Infringement of U.S. Patent No 5, 127, 760 (Feb. 03, 2004)
• 5:04cv00462 (Docket) (Feb. 03, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Honeywell's Amicus Brief 5/19/05

**Westlaw.**

2005 WL 1190441                                                                          Page 1
2005 WL 1190441 (U.S.)

For opinion see 125 S.Ct. 2928, 125 S.Ct. 458

<u>Briefs and Other Related Documents</u>

Supreme Court of the United States.
HONEYWELL INTERNATIONAL INC., et al., petitioners,
v.
HAMILTON SUNDSTRAND CORPORATION.
**No. 04-293.**
May 19, 2005.
On Petition for a Writ of Certiorari to the United States Court of Appeals for the
Federal Circuit

Brief for the United States as Amicus Curiae

James A. Toupin, General Counsel.

John M. Whealan, Solicitor.

Cynthia C. Lynch, <u>Linda Moncys Isacson</u>, William LaMarca, Associate Solicitors,
Patent and Trademark Office, Alexandria, Va. 22313.

<u>Paul D. Clement</u>, Acting Solicitor General, Counsel of Record.

<u>Peter D. Keisler</u>, Assistant Attorney General.

Thomas G. Hungar, Deputy Solicitor General.

Jeffrey P. Minear, Assistant to the Solicitor, General.

<u>Anthony J. Steinmeyer</u>, <u>Mark S. Davies</u>, Attorneys, Department of Justice,
Washington, D.C. 20530-0001, (202) 514-2217.

**\*I QUESTION PRESENTED**

This Court's decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535
U.S. 722 (2002), recognizes that, if a patent applicant has amended his application
to narrow the scope of the claimed subject matter, prosecution history estoppel may
prevent him from invoking the doctrine of equivalents to recapture the subject
matter that he surrendered. See *id.* at 736-737. The question presented in this case
is whether a patent applicant who has withdrawn an independent patent claim and
rewritten a formerly dependent claim as a new independent claim is subject to
prosecution history estoppel.

**\*III TABLE OF CONTENTS**

Statement ... 1

Discussion ... 8

A. The court of appeals correctly applied *Festo* to the facts of this case ... 9

1. *Festo* instructs that prosecution history estoppel arises when a patent
applicant surrenders previously claimed subject matter to secure the patent ... 9

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2. Honeywell's amendment of its patent applications narrowed Honeywell's claims and thereby surrendered subject matter ... 10

B. The court of appeals' decision is consistent with its other post-*Festo* decisions and the United States' understanding of prosecution history estoppel ... 13

1. The Federal Circuit has reached the same result in other post-*Festo* decisions ... 13

2. The Federal Circuit's decision is consistent with the United States' amicus curiae brief in *Festo* ... 15

C. The court of appeals' decision will not upset reasonable expectations of patent holders or otherwise disrupt the patent system ... 17

1. The Federal Circuit's decision does not create a "new" and "unbounded" form of estoppel ... 17

*IV   2. Honeywell will have an opportunity on remand to rebut the presumption of estoppel ... 18

Conclusion ... 20

TABLE OF AUTHORITIES

Cases:

*Bloom Eng'g Co. v. North Am. Mfg. Co.*, 129 F.3d 1247 (Fed. Cir. 1997) ... 14

*Bose Corp. v. JBL, Inc.*, 274 F.3d 1354 (Fed. Cir. 2001), cert. denied, 537 U.S. 880 (2002) ... 14

*Business Objects v. Microstrategy, Inc.*, 393 F.3d 1366 (Fed. Cir. 2005) ... 15

*Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.*, 347 F.3d 1314 (Fed. Cir. 2003), cert. denied, 540 U.S. 1184 (2004) ... 13, 20

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*:

535 U.S. 722 (2002) ... *passim*

344 F.3d 1359 (Fed. Cir. 2003) ... 19, 20

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605 (1950) ... 2

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, No. Civ. A. 99-309 GMS, 2001 WL 66348 (D. Del. Jan. 8, 2001) ... 16

*Insta-Foam Prods., Inc. v. Universal Foam Sys., Inc.*, 906 F.2d 698 (Fed. Cir. 1990) ... 14

*V   *Keith v. Charles E. Hires Co.*, 116 F.2d 46 (2d Cir. 1940) ... 10, 11, 17, 18

*Ranbaxy Pharms., Inc. v. Apotex, Inc.*, 350 F.3d 1235 (Fed. Cir. 2003) ... 13, 14

*Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211 (1940) ... 12

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Smithline Beecham Corp. v. Excel Pharm., Inc.*, 356 F.3d 1357 (Fed. Cir. 2004) ... 20

*Vermeer Mfg. Co. v. Charles Mach. Works, Inc.*, No. 00-1119, 2000 WL 1742531 (Fed. Cir. Nov. 27, 2000) (251 F.3d 168) ... 14

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997) ... 2

*Winans v. Demead*, 56 U.S. (15 How.) 330 (1854) ... 2

Statutes:

35 U.S.C. 112 ... 2

35 U.S.C. 112 para. 4 ... 11

35 U.S.C. 252 ... 14

35 U.S.C. 307 ... 14

Miscellaneous:

5A Donald S. Chisum, *Chisum on Patents* (2003) ... 10, 18

Roger E. Schechter & John R. Thomas, *Intellectual Property: The Law of Copyrights, Patents and Trademarks* (2003) ... 11

*1 This brief is submitted in response to the order of this Court inviting the Acting Solicitor General to express the views of the United States. In the view of the United States, the court of appeals' decision below is correct and does not merit this Court's review.

### STATEMENT

Petitioners (collectively Honeywell) sued respondent (Sundstrand) for patent infringement. The district court entered judgment for Honeywell based on a jury finding that Sundstrand infringed Honeywell's patents under the doctrine of equivalents. Pet. App. 2a, 42a, 63a-64a. The court of appeals, sitting en banc, vacated the judgment and remanded. *Id.* at 2a. The court of appeals held that Honeywell's cancellation of an independent claim during the patent application process, coupled with Honeywell's rewriting of a related dependent claim as a new independent claim, gave rise to a presumption of prosecution history estoppel. *Ibid.* The court thus ordered a remand, in accordance with *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002), *2 to determine whether Honeywell can rebut the presumption. Pet. App. 2a-3a.

1. In exchange for the benefits conferred by a patent, and to provide notice concerning the scope of the monopoly obtained by the patentee, the patent laws require inventors to describe their inventions in "full, clear, concise, and exact terms." *Festo, 535 U.S. at 731 (quoting 35 U.S.C. 112)*. Language is inherently imprecise, however, and thus "[t]he language in the patent claims may not capture every nuance of the invention or describe with complete precision the range of its novelty." *Ibid.* Consequently, the courts have long recognized that the "scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described." *Id.* at 732 (citing *Winans v. Denmead*, 56 U.S. (15 How.) 330 (1854)). Accord *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997); *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605 (1950). "The doctrine

2005 WL 1190441 (U.S.)

of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo*, 535 U.S. at 733.

Prosecution history estoppel operates as an important limitation on the doctrine of equivalents. The estoppel principle recognizes that, in order to secure a patent, a patent applicant may elect to limit the scope of his claims and surrender subject matter. The principle accordingly "requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process." *Festo*, 535 U.S. at 733. "Were it otherwise, the inventor might avoid the PTO's gatekeeping role and seek to recapture in an infringement action the very subject matter surrendered as a condition of receiving the patent." *Id.* at 734.

The Court has explained the operation of prosecution history estoppel as follows:
*3 Where the original application once embraced the purported equivalent but the patentee narrowed his claims to obtain the patent or to protect its validity, the patentee cannot assert that he lacked the words to describe the subject matter in question.
*Festo*, 535 U.S. at 734. "In that instance the prosecution history has established that the inventor turned his attention to the subject matter in question, knew the words for both the broader and narrower claim, and affirmatively chose the latter." *Id.* at 734-735. See *id.* at 735 ("Prosecution history may rebut the inference that a thing not described was indescribable.").

2. Honeywell owns patents that address the design and operation of an aircraft auxiliary power unit (APU). Pet. App. 3a. The APU, among other things, provides compressed air to control the environment of the aircraft's cabin. The need for compressed air may vary substantially during flight, which can lead to "surge" conditions when the compressor produces more air than is needed. *Ibid*. Surge conditions can cause reversals of air flow through the compressor and can damage the APU. *Ibid*. An APU is typically designed to counteract surge conditions through a "surge bleed valve" that releases the excess air. *Ibid*. The Honeywell invention at issue in this case is, broadly speaking, a control apparatus and method that provides a means of efficiently opening and closing the surge bleed valve. *Ibid*.

The Honeywell control system establishes a "set point," which represents the minimum outlet air flow at which surge can be safely avoided for a particular level of compressor operation, and compares it to the actual flow conditions, which are determined by a sensor that measures air flow out of the compressor. Pet. App. 3a-4a. The value of the set point is a function of the air compressor's adjustable air inlet guide vanes. *Id.* at 4a. If the control system determines, by comparing *4 the actual flow conditions to the set point, that the air flow out of the main duct is too low, the control system opens the surge bleed valve until the actual flow condition matches the set point. *Ibid*.

3. Each of Honeywell's patent claims at issue here "requires the APU to include inlet guide vanes and requires the operation of the surge bleed valve to be a function of inlet guide vane position." Pet. App. 4a. See *id.* at 4a-6a. Claim 8 of Patent No. 4,380,893 ('893 patent) is representative. [FN1] The claim describes a gas turbine engine APU having a fluctuating air supply demand. The claim lists seven attributes of the power unit, including a "compressor having adjustable inlet guide vanes" and the use of a set point that "var[ies] *** as a function of the position of said inlet guide vanes." *Id.* at 4a-5a (emphasis omitted).

FN1. This case also involves another apparatus claim in the '893 patent, issued as Claim 19, and a method claim, issued as Claim 4 of Patent No. 4,428,194. See Pet. App. 5a-6a. For purposes of the question presented, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

principles governing the three independent claims are the same. See *ibid.*; Pet. 6.

Honeywell's Claim 8 (like the two other relevant claims) came into being as a result of the patent prosecution. Honeywell's initial application included an independent Claim 16, which did not contain the inlet guide valve limitation, and a dependent Claim 17, which included that limitation. The patent examiner rejected Claim 16 as obvious based on prior art and disallowed Claim 17 because it was dependent on the rejected independent claim. See Pet. App. 8a-9a & n.4. The examiner indicated that Claim 17 would be allowable if rewritten in independent form. In response, Honeywell cancelled Claim 16 and rewrote Claim 17 as an independent claim that ultimately issued as Claim 8. See *id.* at 9a-10a.

4. Honeywell filed this suit alleging that Sundstrand's APU device (APS 3200) infringes the Honeywell patents. Like Honeywell's APU, Sundstrand's device controls surges by *5 adjusting the surge bleed valve in response to a comparison between actual air flow conditions and a set point. Pet. App. 6a. But Sundstrand's device employs a more complex flow-related parameter (denominated DELPQP), and it establishes a set point based upon ambient air temperature rather than the position of the compressor's inlet guide vanes. *Id.* at 6a-7a & n.1. The Sundstrand device does take into account the position of the inlet guide vane to determine whether to override the DELPQP control signal under high air-flow conditions, when DELPQP might otherwise incorrectly describe actual flow conditions. *Ibid.*

Honeywell claimed that, even if the Sundstrand device does not literally infringe the Honeywell patents: (a) the Sundstrand device nevertheless uses the inlet guide vane position to control surge; (b) the difference in how Honeywell and Sundstrand use the inlet guide vane position is insubstantial; and (c) the Honeywell patents are therefore infringed under the doctrine of equivalents. Pet. App. 7a-8a. Sundstrand responded that, because Honeywell had amended its patent application in the PTO proceedings to narrow the subject matter that it claimed, the principle of prosecution history estoppel prevented Honeywell from invoking the doctrine of equivalents to expand the reach of its patent claims. *Id.* at 8a-10a.

The district court rejected Sundstrand's request for summary judgment based on prosecution history estoppel. Pet. App. 10a; see *id.* at 109a-111a. The court stated that Honeywell "did not surrender the elements at issue during the prosecution of the patent at issue." *Id.* at 110a. The court accordingly ruled that Honeywell "may attempt to convince the jury that Sundstrand's APU 3200 infringes under the doctrine of equivalents." *Id.* at 111a.

The jury concluded that Sundstrand's device infringed various claims, including Claim 8 and the two comparable *6 independent claims, under the doctrine of equivalents. Pet. App. 11a, 42a. The jury also found that Sundstrand wilfully infringed the patents and awarded $1,578,065 in reasonable royalty compensation and $45 million in price erosion damages. *Ibid.* The district court denied, among other post-trial motions, Sundstrand's motions for judgment as a matter of law and for a new trial on issues respecting the doctrine of equivalents. *Id.* at 11a; see *id.* at 54a-65a.

5. Both parties appealed aspects of the judgment. Pet. App. 11a. After a panel of the court of appeals received briefing and heard argument, the court, *sua sponte*, ordered en banc review. *Id.* at 12a. The en banc court, by a vote of 11 to 1, affirmed in part, vacated in part, and remanded the case for further proceedings. *Id.* at 2a-3a, 13a-26a. The court ruled, as its central holding, that "the rewriting of dependent claims into independent form coupled with the cancellation of the original independent claims creates a presumption of prosecution history estoppel."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1190441 (U.S.)

*Id.* at 2a.

The court of appeals first observed that prosecution history estoppel comes into play when a patent applicant makes a "narrowing amendment" to his patent application. Pet. App. 13a. The court concluded, on the basis of this Court's decisions in *Festo* and *Warner-Jenkinson*, that "a narrowing amendment may occur when either (1) a preexisting claim limitation is narrowed by amendment or (2) a new claim limitation is added by amendment." *Id.* at 14a. See *id.* at 14a-16a.

The court next addressed "whether rewriting a dependent claim into independent form, coupled with the cancellation of the original independent claim, constitutes a narrowing amendment when the dependent claim includes an additional claim limitation not found in the cancelled independent claim or circumscribes a limitation found in the cancelled independent claim." Pet. App. 16a. The court concluded that, when **\*7** a patent applicant amends a patent application in that manner, he creates a presumption that he has surrendered subject matter. *Id.* at 17a.

The court of appeals reasoned that "the proper focus is whether the amendment narrows the overall scope of the claimed subject matter." Pet. App. 17a (citing *Festo, 535 U.S. at 736-737).* It noted that the *Festo* decision stated, in discussing the rewriting of "a dependent claim into an independent one," that "[e]stoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope." *Id.* at 18a (quoting *Festo, 535 U.S. at 736-737).* The court of appeals explained:

Thus, the fact that the scope of the rewritten claim has remained unchanged will not preclude the application of prosecution history estoppel if, by cancelling the original independent claim and rewriting the dependent claims into independent form, the scope of the subject matter claimed in the independent claim has been narrowed to secure the patent.

*Id.* at 19a. The court noted that it had consistently applied that rule in its post-*Festo* decisions, *id.* at 19a-21a, and that its rule "is consistent not only with the language of *Festo*, but also its theory," *id.* at 21a. Under *Festo*, the question is whether an amendment surrenders subject matter, *ibid.*, and in this case "the surrendered subject matter is defined by the cancellation of independent claims that do not include a particular limitation and the rewriting into independent form of dependent claims that do include that limitation," *id.* at 22a.

The court of appeals accordingly ruled that "there is a presumptive surrender of all equivalents to the inlet guide vane limitation." Pet. App. 22a. For example, when Honeywell cancelled original Claim 16 and rewrote the new Claim 8 in independent form, Honeywell "effectively add[ed] the inlet guide vane limitation to the claimed invention" and "is presumptively **\*8** estopped from recapturing equivalents to the inlet guide vane limitation." *Ibid.* The court remanded the case to the district court to determine whether Honeywell "can overcome the presumption." *Id.* at 23a.

Judge Newman dissented. Pet. App. 26a-40a. She reasoned that "the act of restating a dependent claim in independent form" is not a "narrowing amendment" and that no presumption of surrender should attach to the simultaneous cancellation of a broader independent claim. *Id.* at 26a. She predicted that the court's ruling would discourage the use of dependent claims and increase the cost and difficulty of patent examination. *Ibid.*

DISCUSSION

The Federal Circuit, sitting en banc, properly applied this Court's decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722 (2002),* to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1190441 (U.S.)

facts before it. The court of appeals correctly ruled that the patent applicant's recasting of a formerly dependent claim in independent form, coupled with the withdrawal of the original independent claim, amounted to a "narrowing amendment" under *Festo*. The applicant's consequent surrender of subject matter triggered a presumption that the patent prosecution history estops the applicant from using the doctrine of equivalents to extend the scope of the patent beyond its literal terms.

The court of appeals' en banc decision is consistent with its post-*Festo* decisions and with the United States' position in *Festo*. The decision, which rests on longstanding patent principles and preserves an opportunity for the patent applicant to overcome the presumption against claiming equivalents, will not upset the reasonable expectations of patent holders or otherwise disrupt the patent system. Further review by this Court is therefore not warranted.

1. *Festo* Instructs That Prosecution History Estoppel Arises When A Patent Applicant Surrenders Previously Claimed Subject Matter To Secure The Patent

This Court explained in *Festo* that the doctrine of equivalents "is premised on language's inability to capture the essence of innovation." 535 U.S. at 734. Prosecution history estoppel ensures that "the doctrine of equivalents remains tied to its underlying purpose" by precluding its invocation where the prosecution history shows that the applicant previously claimed the equivalent subject matter, but consciously chose to narrow his claims and surrender that subject matter to obtain the patent. *Ibid.*

Simply put, "[e]stoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope." *Festo, 535 U.S. at 736.* Consequently, if the patent applicant amends his patent application in a way that "is truly cosmetic, then it would not narrow the patent's scope or raise an estoppel." *Id.* at 736-737. But if the patent applicant "narrows the patent's scope - even if only for the purpose of better description - estoppel may apply." *Id.* at 737. "By amending the application, the inventor is deemed to concede that the patent does not extend as far as the original claim." *Id.* at 738. The patent applicant who narrows his claims has thus acknowledged "an inability to claim the broader subject matter" and has presumptively limited his patent application to the literal terms of its claims. *Id.* at 737.

*10 2. Honeywell's Amendment Of Its Patent Applications Narrowed Honeywell's Claims And Thereby Surrendered Subject Matter

The critical issue in this case is whether Honeywell's amendment of its patent applications, made in response to a patent examiner's rejection of the original independent claims as obvious in light of prior art, narrowed Honeywell's patent claims and thereby surrendered subject matter that Honeywell had claimed in its original patent applications. Honeywell's amendments had precisely that effect.

Honeywell's amendments essentially consisted of: (a) cancelling independent claims that the patent examiner had rejected as obvious in light of the prior art; and (b) rewriting formerly dependent and narrower claims in independent form. The court of appeals correctly concluded that those amendments narrowed the patent scope and surrendered subject matter.

*Festo* leaves no doubt that, when a patent applicant cancels an independent claim and replaces it with a narrower independent claim, in response to a patentability rejection, the applicant surrenders subject matter. See 535 U.S. at 735 (estoppel applies when "the inventor turned his attention to the subject matter in question, knew the words for both the broader and narrower claim, and affirmatively chose the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

latter"). The court of appeals correctly recognized that the same result would obtain if a patent applicant put forward a broad independent claim and a narrow independent claim in the same patent application, but chose, for reasons of patentability, to cancel the former and rely on the latter. Pet. App. 19a n.8. See generally 5A Donald S. Chisum, *Chisum on Patents* § 18.05[2][a][ii] (2003). [FN2]

> FN2. As the court of appeals noted, the Second Circuit, in a decision authored by Judge Learned Hand, described that precise situation in *Keith v. Charles E. Hires Co.*, 116 F.2d 46 (1940). The Second Circuit ruled that prosecution history estoppel applies when "the applicant files a limited and a broader claim at the same time and then cancels the broader one when it has been rejected." *Id.* at 48. The Second Circuit explained that, by cancelling the broader claim, the "applicant has abandoned it as it stood." *Ibid.* "Certainly it cannot be necessary to this conclusion that he shall amend the cancelled claim, when he has already filed a claim which contains the necessary differentia." *Ibid.*

**\*11** Honeywell's patent prosecution in this case presents a materially indistinguishable situation. Honeywell's original patent applications each contained broad independent claims and a series of related dependent claims. Honeywell could have written each original application as a series of increasingly narrow independent claims, but Honeywell instead followed a common practice of employing dependent claims. Honeywell's choice was merely one of form. See 35 U.S.C. 112 para. 4 ("a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed"). [FN3]

> FN3. "The possibility of dependent claims presents a drafting convenience for patent applicants. They enable drafters to express claims of increasingly diminished scope in a succinct fashion. The result is that claims drafters typically craft a series of claims in each application, forming a 'reverse pyramid' of successively narrower claims." Roger E. Schechter & John R. Thomas, *Intellectual Property: The Law of Copyrights, Patents and Trademarks* 409 (2003).

When Honeywell cancelled its broad independent claims, and replaced them with narrower independent claims consisting of formerly dependent claims rewritten in independent form, the effect was the same as if Honeywell had cancelled its broad independent claims and chosen to rely solely on a series of pre-existing, but narrower, independent claims. Honeywell presumptively surrendered the territory between its original but cancelled independent claims and its new but narrower independent claims. Pet. App. 19a.

Honeywell argues that its amendments should not result in estoppel because the scope of its rewritten claims has not changed. Pet. 12-13. Honeywell points out that "[b]y statute, **\*12** the newly independent claims claim exactly the same subject matter as the original dependent claims did, and they have not been narrowed at all." Pet. 13. But this is also true in the case of broad and narrow independent claims when the former are cancelled. Moreover, Honeywell overlooks that it did not merely make the formal or "cosmetic" change of rewriting dependent claims in independent form. See *Festo*, 535 U.S. at 736- 737. Rather, Honeywell simultaneously cancelled its broad independent claims, for reasons of patentability, and replaced them with *narrower* independent claims. Those amendments narrowed the scope of the patents, surrendered subject matter, and presumptively estopped Honeywell from relying on the doctrine of equivalents with respect to the surrendered matter. [FN4]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN4. Honeywell incorrectly assumes that prosecution history estoppel applies only on a claim-by-claim basis so that narrowing or eliminating one claim in a patent application has no effect on interpretation of the remaining claims. As the court of appeals recognized, "the proper focus is whether the amendment narrows the overall scope of the claimed subject matter." Pet. App. 17a. See, *e.g.*, *Festo*, 535 U.S. at 736 ("Estoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope."). See also *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-221 (1940) ("It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected, and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent.").

The court of appeals was accordingly correct in stating that "the fact that the scope of the rewritten claim has remained unchanged will not preclude the application of prosecution history estoppel if, by canceling the original independent claim and rewriting the dependent claims into independent form, the scope of the subject matter claimed in the independent claim has been narrowed to secure the patent." Pet. App. 19a. The court properly applied *Festo* to the facts of this case.

1. The Federal Circuit Has Reached The Same Result In Other Post-*Festo* Decisions

The en banc court of appeals accurately noted that its decision in this case adheres to "the rule we have consistently applied in our post-*Festo* decisions." Pet. App. 19a. The court of appeals pointed to two of its decisions in which a patent applicant had replaced an original independent claim with a formerly dependent claim, rewritten in independent form, and the new independent claim covered less subject matter than the original independent claim. In each case, the court of appeals held that the amendment gave rise to the *Festo* presumption. See *id.* at 19a-21a.

In *Deering Precision Instruments, L.L.C. v. Vector Distribution Systems, Inc.*, 347 F.3d 1314 (Fed. Cir. 2003), cert. denied, 540 U.S. 1184 (2004), the patent applicant claimed, in original independent Claim 1, "a sliding weight movably carried by said beam for movement along said scale." *Id.* at 1317. The applicant additionally claimed, in original dependent Claim 3, a "zero position" limitation. *Id.* at 1318. When the patent examiner rejected Claim 1 as obvious, the applicant withdrew that independent claim and rewrote Claim 3 as an independent claim. The court of appeals held that this amendment gave rise to the *Festo* presumption: "While [the applicant] argues that it merely rewrote an allowable original claim *** in independent form, there is no question that the claim was narrowed by the deletion of a broad original claim in favor of a claim that contained the Zero Position Limitation." *Id.* at 1326.

Similarly, in *Ranbaxy Pharmaceuticals, Inc. v. Apotex, Inc.*, 350 F.3d 1235 (Fed. Cir. 2003), the patent applicant *14 claimed, in its original independent claim, a chemical process involving a highly polar organic solvent. *Id.* at 1237. The applicant further claimed, through several dependent claims, a chemical process involving particular categories of highly polar solvents. *Ibid.* When the patent examiner rejected the original independent claim on patentability grounds, the applicant withdrew the original independent claim and rewrote the dependent claims into a single new independent claim. *Id.* at 1238. The court of appeals ruled that the amendment surrendered subject matter and gave rise to prosecution history estoppel. *Id.* at 1240-1241.

Honeywell cites, as conflicting authority, a series of pre-*Festo* cases. See Pet.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1190441 (U.S.)

13-14. At least some, if not all, of those cases present distinguishable situations. [FN5] But in any event, those cases were decided without the benefit of this Court's *Festo* decision. The court of appeals' pre-*Festo* panel decisions do not provide a basis for questioning the en banc court's correct application of *Festo*.

> FN5. For example, *Vermeer Manufacturing Co. v. Charles Machine Works, Inc.*, No. 00-1119, 2000 WL 1742531, at *2 (Fed. Cir. Nov. 27, 2000) (251 F.3d 168) (unpublished), involved a situation in which the rewriting of the dependent claim involved a purely formal amendment that made no change in the patent scope. Similarly, *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354 (Fed. Cir. 2001), cert. denied, 537 U.S. 880 (2002), appears inapposite because the phrase added to the rewritten claim "d[id] not narrow the scope of the claim," but instead was inherent in the claim as originally filed. *Id.* at 1359. While *Insta-Foam Products., Inc. v. Universal Foam Systems*, Inc., 906 F.2d 698 (Fed. Cir. 1990), did not involve purely formal amendments, the amendments might possibly qualify as "tangential" within the meaning of *Festo*, 535 U.S. at 740, because the allowed claim contained "the same limitation," with respect to the alleged equivalent, "as did the abandoned claim." *Insta-Foam*, 906 F.2d at 703. *Bloom Engineering Co. v. North American Manufacturing Co.*, 129 F.3d 1247 (Fed. Cir. 1997), did not involve prosecution history estoppel, but rather the analogous but distinct protections of 35 U.S.C. 252 and 307. See 129 F.3d at 1249-1251.

**\*15** Taken collectively, the court of appeals' post-*Festo* cases manifest the understanding that the consequences of a patent applicant's rewriting of a dependent claim into independent form depends on whether that amendment in combination with any accompanying amendments, such as the cancellation of other claims, "narrows the patent's scope." *Festo*, 535 U.S. at 736. If the amendments in combination broaden the patent's scope or leave it unchanged, then no subject matter is relinquished. See *Business Objects v. Microstrategy, Inc.*, 393 F.3d 1366, 1374 (Fed. Cir. 2005) (no narrowing limitation where amended language broader than original term). But if the amendments in combination "narro[w] the patent's scope - even if only for the purpose of better description - estoppel may apply." *Festo*, 535 U.S. at 737.

   2. The Federal Circuit's Decision Is Consistent With The United States' Amicus Curiae Brief In *Festo*

   Honeywell incorrectly contends (Pet. 15) that the court of appeals' decision is inconsistent with the United States' view of prosecution history estoppel as set forth in the government's amicus curiae brief in *Festo*. See Brief for the United States in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002) (No. 00-1543) (U.S. *Festo* Br.). The United States' position, then as now, is consistent with the court of appeals' decision.

   Honeywell points specifically to a passage in the United States' *Festo* brief explaining that courts must engage in a "discerning analysis" when applying prosecution history estoppel. U.S. *Festo* Br. 15. The United States observed:
   Patent applicants may amend their patent claims for reasons of patentability - such as to clarify an ambiguous term - that do not result in narrowing the claims and surrendering subject matter. Rather, the amendments may state the same - or broader - patent claims in more precise **\*16** terms. For example, an applicant may amend by rewriting a dependent claim as an independent claim. See *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, No. Civ. A. 99-309 GMS, 2001 WL 66348, at * 6 (D. Del. Jan. 8, 2001) (citing *Festo*). Such amendments do not give rise to prosecution history estoppel, which has as its core functions "preserving the notice function of the claims and preventing patent holders from recapturing under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the doctrine of equivalents subject matter that was surrendered before the Patent
Office." Pet. App. 11a.
  U.S. *Festo* Br. 16-17. Contrary to Honeywell's suggestion, the United States did
not urge that prosecution history estoppel can never arise when an applicant
rewrites a dependent claim in independent form.

  The United States' *Festo* brief simply made the point, consistent with its position
here, that not every patent amendment will "result in narrowing claims and
surrendering subject matter." U.S. *Festo* Br. 16-17. The United States noted that an
applicant who makes a purely formal amendment to the patent application--by, for
example, "rewriting a dependent claim as an independent claim" without more - does
not thereby create a basis for estoppel. *Ibid.* The United States did not urge,
however, that an applicant who rewrites a dependent claim as an independent claim
in combination with other actions that narrow the patent's scope - such as
"canceling the original independent claims" (Pet. App. 17a) - would be immune from
estoppel. [FN6]

          FN6. Honeywell suggests that, because the United States cites the district
          court's decision in this case, the government must have determined that
          Honeywell's amendments were purely formal and did not result in a surrender
          of subject matter. See Pet. Reply Br. 2. In preparing its *Festo* brief, the
          United States did not, of course, conduct a de novo review of the prosecution
          history in this case. Rather, it relied on the district court's statement
          that "the elements at issue were not amended." *Honeywell Int'l Inc. v.*
          *Hamilton Sundstrand Corp.*, No. Civ. A. 99-309 GMS, 2001 WL 66348, at * 6 (D.
          Del. Jan. 8, 2001) (reproduced at Pet. App. 109a).

  *17 In short, the United States recognized in *Festo* that patent amendments do not
always surrender subject matter and that a patent applicant's rewriting of a
dependent claim as an independent claim without more can provide an example of a
non-narrowing amendment. This Court agreed with that point. *Festo*, 535 U.S. at 736-
737. The court of appeals' decision is thus consistent with the United States'
position in *Festo*.

  1. The Federal Circuit's Decision Does Not Create A "New" And "Unbounded" Form Of
Estoppel

  Honeywell contends that the court of appeals' decision produces a "new" and
"unbounded" form of estoppel that will disrupt the expectations of patent owners
and discourage the use of dependent claims. Pet. 18-25. Those contentions are
unpersuasive.

  First, the court of appeals' decision does not create a "new" form of estoppel.
Rather, the court of appeals simply applied *Festo*'s fundamental teaching - that a
patent applicant's surrender of subject matter to obtain a patent presumptively
gives rise to estoppel - to the situation in which a patent applicant overcomes a
patent examiner's objection by cancelling a broad independent claim, while leaving
other narrower claims in place. The case is, at bottom, indistinguishable from
Judge Learned Hand's venerable decision in *Keith v. Charles E. Hires Co.*, 116 F.2d
46 (2d Cir. 1940), which held that estoppel applies when "the applicant files a
limited and a broader claim at the same time and then cancels the broader one when
it has been rejected." *Id.* at 48. See *18 note 2, *supra*; see generally 5A *Chisum on*
*Patents, supra*, § 18.05[2][a][ii].

  Second, the estoppel is not "unbounded." Pet. 20. As *Festo* explains, estoppel is
confined to the subject matter that the applicant surrendered. 535 U.S. at 737. In
this case, "the surrendered subject matter is defined by the cancellation of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

independent claims that do not include a particular limitation and the rewriting into independent form of dependent claims that do include that limitation." Pet. App. 22a. Specifically, the surrendered territory consists of the difference between the scope of the original patent applications, which included an independent claim with no "inlet guide vane" limitation, *ibid.*, and the scope of the amended patent applications, which expressly incorporated that limitation as a necessary one by cancelling the claims without that limitation and retaining the claims that included it. See *ibid*.

Third, because the court of appeals' decision simply rests on the application of *Festo* to dependent claims, and is consistent with longstanding decisions such as *Keith*, it will not impair the reasonable expectations of current patent holders. Furthermore, the court's decision will not encourage patent applicants to forgo use of dependent claims in favor of independent claims. As *Keith* illustrates, the same result would obtain if Honeywell had written its original patent applications as a series of wholly independent claims and then cancelled the broader claims in favor of the narrower ones. See 116 F.2d at 48. Indeed, a contrary rule would create an artificial incentive, in light of *Keith*, for dependent claims.

  2. Honeywell Will Have An Opportunity On Remand To Rebut The Presumption Of Estoppel

This Court's decision in *Festo* rejected the notion that prosecution history estoppel provides a "complete bar" to application of the doctrine of equivalents. 535 U.S. at 737-741. *19 Instead, the Court ruled that the patent applicant's apparent surrender of subject matter creates only a presumptive bar, and the patent owner remains entitled to rebut the presumption. *Id.* at 738-741. The Court placed on the patent owner "the burden of showing that the amendment does not surrender the particular equivalent in question." *Id.* at 740. At the same time, the Court made clear that the patent owner must have a meaningful opportunity to overcome the presumption. The presumption of estoppel is not "just the complete bar by another name." *Id.* at 741.

The Court's *Festo* decision notes that there are "some cases" in which a seemingly narrowing amendment "cannot reasonably be viewed as surrendering a particular equivalent." 535 U.S. at 740. It cites the situations in which: "[t]he equivalent may have been unforeseeable at the time of the application; the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question; or there may be some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Id.* at 740-741. The Court suggested that, in those cases, the patent owner can overcome the presumption that prosecution history estoppel bars a finding of equivalence. *Ibid.*

The Federal Circuit, sitting en banc on remand from this Court's *Festo* decision, has since provided some "general guidance" respecting application of what have become known as the "three rebuttal criteria." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1368 (2003). [FN7] But *20 the court of appeals has also recognized, in cases such as this one, where the district court has not had an opportunity to address the rebuttal criteria, that the district court should address specific application of the rebuttal criteria in the first instance. See Pet. App. 25a. [FN8]

     FN7. The court stated, for example, that the inquiry whether an equivalent was foreseeable is an "objective" one. 344 F.3d at 1369. It noted that, as a general matter, if the alleged equivalent rests on "later-developed technology," it would not have been foreseeable. *Ibid*. The court declined to

       © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

    "anticipate the instances of mere tangentialness that may arise," but noted that "an amendment made to avoid prior art that contains the equivalent in question is not tangential." *Ibid*. The court also acknowledged this Court's observation that there may be "some other reason" weighing against estoppel, but the court suggested that this "category, while vague, must be a narrow one; it is available in order not to totally foreclose a patentee from relying on reasons, other than unforeseeability and tangentialness, to show that it did not surrender the alleged equivalent." *Id*. at 1370.

    FN8. See, *e.g.*, *Deering Precision*, 347 F.3d at 1326 (rebuttal of presumption "better addressed in the first instance by the district court"); *Smithkline Beecham Corp. v. Excel Pharm., Inc.*, 356 F.3d 1357, 1365 (Fed. Cir. 2004) (remanding for inquiry into whether equivalent was foreseeable); see also *Festo, 344 F.3d at 1374* (remanding after providing guidance on application of the rebuttal criteria).

  The developing law respecting application of the rebuttal criteria accordingly remains somewhat unsettled. But this much is clear: Honeywell is entitled to a meaningful opportunity to rebut the presumption against its invocation of the doctrine of equivalents. This Court's decision in *Festo* emphatically rejected the notion that prosecution history estoppel operates as a complete bar to the invocation of the doctrine of equivalents, 535 U.S. at 737, and it specifically recognized that a patent applicant could rebut the presumption by "showing that the amendment did not surrender the particular equivalent in question," *id*. at 740. The court of appeals' order remanding the case to the district court, which places this case in an interlocutory posture, will provide Honeywell with the opportunity that *Festo* envisions.

CONCLUSION
  The petition for a writ of certiorari should be denied.

Honeywell Intern. Inc. v. Hamilton Sundstrand Corp.
2005 WL 1190441

### Briefs and Other Related Documents  (Back to top)

• 2005 WL 1304531 (Appellate Petition, Motion and Filing) Petitioners' Supplemental Brief (May. 31, 2005)

• 2004 WL 2296292 (Appellate Petition, Motion and Filing) Petitioners' Reply Brief (Oct. 13, 2004)

• 2004 WL 2246253 (Appellate Petition, Motion and Filing) Respondent's Brief in Opposition (Oct. 01, 2004)

• 04-293 (Docket) (Sep. 01, 2004)

• 2004 WL 1950434 (Appellate Petition, Motion and Filing) Petition for Certiorari (Aug. 31, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.